**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IVY NIXON, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| CVS HEALTH CORPORATION, KAREN S. LYNCH, SHAWN M. GUERTIN, and THOMAS F. COWHEY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Ivy Nixon ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CVS Health Corporation ("CVS" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired CVS securities between

May 3, 2023 and April 30, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      CVS is a healthcare company that operates through three primary segments: Health Care Benefits, Health Services, and Pharmacy & Consumer Wellness.  The Health Care Benefits segment purportedly offers "a broad range of traditional, voluntary and consumer-directed health insurance products and related services, including medical, pharmacy, dental and behavioral health plans, medical management capabilities, Medicare Advantage and Medicare Supplement plans, [prescription drug plans ("PDPs")] and Medicaid health care management services."  The Health Care Benefits segment's revenues consist almost entirely of insurance premiums paid by customers.

3.      The pricing and other terms of the Company's private health insurance plans are typically determined in advance of a plan's policy period, which is typically one year.  CVS determines premiums for these plans based on internal forecasts that consider historical data and the profitability of which are dependent on the Company's ability to accurately model, among other things, medical cost trends and health care utilization patterns.  Generally, a fixed premium rate is determined at the beginning of the policy period.  To the extent that unmodeled-for increases in the costs of health care and other benefits arise during a given policy period, CVS is ultimately responsible for the payment of those costs.  Accordingly, the profitability of the Health Care Benefits segment is particularly sensitive to the accuracy of its cost forecasts.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically,

Defendants made false and/or misleading statements and/or failed to disclose that: (i) the forecasts CVS used to determine plan premiums were ineffective at accounting for medical cost trends and health care utilization patterns; (ii) as a result, CVS was likely to incur significant expenses to cover cost increases that were not accounted for in the Company's forecasts and thus not covered by plan premiums; (iii) accordingly, CVS had overstated the profitability of its Health Care Benefits segment; (iv) contrary to Defendants' assurances, the revenues generated from the Company's other primary segments were insufficient to offset the negative financial impact of the increasing expenditures within the Health Care Benefits segment; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On August 2, 2023, CVS issued a press release announcing the Company's results for the quarter ended June 30, 2023 ("Q2 2023"), which revealed that the Company was revising its diluted earnings-per-share ("EPS") guidance range to $6.53 to $6.75 from $6.90 to $7.12.  In a Quarterly Report filed on Form 10-Q the SEC that same day (the "Q2 2023 10-Q"), CVS stated that operating income, which has a direct impact on EPS, "decreased $1.4 billion, or 30.7%, in the three months ended June 30, 2023 compared to the prior year primarily due to declines in the Health Care Benefits segment[.]"

6.      On this news, CVS's stock price fell $2.04 per share, or 2.73%, to close at $72.32 per share on August 3, 2023.

7.      Then, on November 1, 2023, CVS issued a press release announcing the Company's results for the quarter ended September 30, 2023 ("Q3 2023"), which revealed that the Company was again reducing its diluted EPS guidance range to $6.37 to $6.61 from $6.53 to $6.75.  In a Quarterly Report filed on Form 10-Q with the SEC that same day (the "Q3 2023 10-Q"), CVS stated that while operating income increased "in the nine months ended September 30, 2023

compared to the prior year [. . .] [t]hese increases in operating income were partially offset by declines in the Health Care Benefits segment."

8.    Then, on February 7, 2024, CVS issued a press release announcing the Company's results for the year ended December 31, 2023 which revealed that the Company was revising its diluted EPS guidance range to at least $7.06 from at least $7.26, its adjusted EPS guidance range to at least $8.30 from at least $8.50, and its cash flow from operations guidance to at least $12.0 billion from at least $12.5 billion.  In an Annual Report filed on Form 10-K with the SEC that same day reporting the Company's financial and operational results for the year ended December 31, 2023 (the "2023 10-K"), CVS stated that, while operating income increased in 2023 compared to 2022, "[t]hese increases in operating income were partially offset by declines in the Health Care Benefits segment."  Moreover, in a conference call held with investors and analysts that same day to discuss the Company's 2023 results (the "2023 Earnings Call"), CVS's Chief Financial Officer ("CFO") Defendant Thomas F. Cowhey ("Cowhey") stated, in relevant part, "we now expect adjusted operating income for the Healthcare Benefit segment to be at least $5.4 billion, a decrease of $370 million from our prior estimates."

9.    On this news, CVS's stock price fell $0.96 per share, or 1.27%, to close at $74.36 per share on February 8, 2024.

10.    Finally, on May 1, 2024, CVS issued a press release reporting its results for the quarter ended March 31, 2024 ("Q1 2024") and revising its full-year 2024 guidance.  Among other items, CVS reported $88.4 billion in revenue, missing expectations of $89 billion.  The Company stated that higher utilization of healthcare services, meaning more insurance dollars spent, weighed on its results in addition to Medicare reimbursement rate cuts that will continue to pressure CVS for the remainder of the year.  Accordingly, CVS issued revised full-year 2024 guidance, including

"[r]evised GAAP diluted EPS guidance to at least $5.64 from at least $7.06"; "[r]evised Adjusted EPS guidance to at least $7.00 from at least $8.30"; and "[r]evised cash flow from operations guidance to at least $10.5 billion from at least $12.0 billion". Further, in a Quarterly Report filed on Form 10-Q with the SEC that same day (the "Q1 2024 10-Q"), CVS stated that operating income decreased $1.2 billion, or 34.1% "in in the three months ended March 31, 2024, primarily due to increased Medicare utilization, the unfavorable impact of the previously disclosed decline in the Company's 2024 Medicare Advantage star ratings and a year-over-year unfavorable impact from development of prior-years' health care cost estimates in the Health Care Benefits segment."

11.    On this news, CVS's stock price fell $11.40 per share, or 16.84%, to close at $56.31 per share on May 1, 2024.

12.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

15.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). CVS's stock trades on the New York Stock Exchange ("NYSE"), located within this Judicial District. In addition, pursuant to the Company's most recent Quarterly Report filed with the SEC, as of April 24, 2024, there were 1,255,372,972 shares

of the Company's common stock outstanding. Accordingly, there are presumably hundreds, if not thousands, of investors in CVS securities located within the U.S., some of whom undoubtedly reside in this Judicial District.

16.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.    Plaintiff, as set forth in the attached Certification, acquired CVS securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18.    Defendant CVS is a Delaware corporation with principal executive offices located at One CVS Drive, Woonsocket, Rhode Island 02895. CVS's common stock trades in an efficient market on the NYSE under the ticker symbol "CVS".

19.    Defendant Karen S. Lynch ("Lynch") has served as CVS's Chief Executive Officer at all relevant times.

20.    Defendant Shawn M. Guertin ("Guertin") served as CVS's CFO from prior to the start of the Class Period until October 2023.

21.    Defendant Cowhey has served as CVS's CFO since October 2023.

22.    Defendants Lynch, Guertin, and Cowhey are sometimes referred to herein as the "Individual Defendants."

23.    The Individual Defendants possessed the power and authority to control the contents of CVS's SEC filings, press releases, and other market communications. The Individual

Defendants were provided with copies of CVS's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with CVS, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

24.     CVS and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.     CVS is a healthcare company that operates through three primary segments: Health Care Benefits, Health Services, and Pharmacy & Consumer Wellness.  The Health Care Benefits segment purportedly offers "a broad range of traditional, voluntary and consumer-directed health insurance products and related services, including medical, pharmacy, dental and behavioral health plans, medical management capabilities, Medicare Advantage and Medicare Supplement plans, [PDPs] and Medicaid health care management services."  The Health Care Benefits segment's revenues consist almost entirely of insurance premiums paid by customers.

### Materially False and Misleading Statements Issued During the Class Period

26.     The Class Period begins on May 3, 2023, when CVS issued a press release announcing the Company's Q1 2023 results.  The press release stated, in relevant part:

- Revised GAAP diluted EPS guidance range to $6.90 to $7.12 from $7.73 to $7.93

- Revised Adjusted EPS guidance range to $8.50 to $8.70 from $8.70 to $8.90

*\*\**

"We delivered another strong quarter while executing on the strategy we outlined in December 2021, leading to the close of the Signify Health acquisition followed quickly by Oak Street Health. These additions are core to our strategy and will help unlock future growth as we push further into value-based care, which prioritizes keeping people healthy."

27.     That same day, CVS filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2023 (the "Q1 2023 10-Q").  In providing an overview of the Company, the Q1 2023 10-Q stated, in relevant part:

CVS [. . .] is a leading diversified health solutions company reshaping health care to help make healthier happen for more Americans. In an increasingly connected and digital world, CVS Health is meeting people wherever they are and changing health care to meet their needs. The Company has more than 9,000 retail locations, more than 1,100 walk-in medical clinics, a leading pharmacy benefits manager with over 110 million plan members with expanding specialty pharmacy solutions and a dedicated senior pharmacy care business serving more than one million patients per year. The Company also serves an estimated 37 million people through traditional, voluntary and consumer-directed health insurance products and related services, including expanding Medicare Advantage offerings and a leading standalone Medicare Part D [PDP]. The Company is a leader in key segments of health care through its foundational businesses and is creating new sources of value by expanding into next generation care delivery and health services, with a goal of improving satisfaction levels for both providers and consumers. The Company believes its integrated health care model increases access to quality care, delivers better health outcomes and lowers overall health care costs.

28.     Further, in providing an overview of the Company's Health Care Benefits segment, the Q1 2023 10-Q stated, in relevant part:

The Health Care Benefits segment operates as one of the nation's leading diversified health care benefits providers. The Health Care Benefits segment has the information and resources to help members, in consultation with their health care professionals, make more informed decisions about their health care. The Health Care Benefits segment offers a broad range of traditional, voluntary and consumer-directed health insurance products and related services, including medical, pharmacy, dental and behavioral health plans, medical management

capabilities, Medicare Advantage and Medicare Supplement plans, PDPs and Medicaid health care management services. The Health Care Benefits segment's customers include employer groups, individuals, college students, part-time and hourly workers, health plans, health care providers ("providers"), governmental units, government-sponsored plans, labor groups and expatriates. The Company refers to insurance products (where it assumes all or a majority of the risk for medical and dental care costs) as "Insured" and administrative services contract products (where the plan sponsor assumes all or a majority of the risk for medical and dental care costs) as "ASC." In addition, effective January 2022, the Company entered the individual public health insurance exchanges ("Public Exchanges") in eight states through which it sells Insured plans directly to individual consumers. The Company entered Public Exchanges in four additional states effective January 2023.

29.    In its discussion of current trends, the Q1 2023 10-Q stated, in relevant part:

We also face trends and uncertainties specific to our reportable segments, certain of which are summarized below and also discussed in the review of our segment results. For the remainder of the year, the Company believes you should consider the following important information:

- ***The Health Care Benefits segment is expected to continue to benefit from Medicare and Commercial membership growth***, partially offset by declines in Medicaid due to the impact of redeterminations in 2023.[1]

30.    Appended to the Q1 2023 10-Q as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Lynch and Guertin, attesting that "the information contained in the [Q1 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

31.    That same day, CVS hosted an earnings call with investors and analysts to discuss the Company's Q1 2023 results (the "Q1 2023 Earnings Call").  During the scripted portion of the Q1 2023 Earnings Call, Defendant Lynch stated, in relevant part:

We are purposely executing on our strategy as we continue to expand our health platform of capabilities to serve a broader customer and consumer base. We are addressing the total cost of care, improving health, and expanding access to affordable quality care. Today we are announcing changes to our operating model and financial reporting that more accurately reflect how our businesses are

---

[1] All emphases included herein are added unless otherwise indicated.

managed. These changes allow us to be more nimble in our execution and more innovative when expanding our products and services. We are excited about accelerating our momentum by unlocking long-term value across our businesses and the broader healthcare marketplace.

32.     The statements referenced in ¶¶ 26-31 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the forecasts CVS used to determine plan premiums were ineffective at accounting for medical cost trends and health care utilization patterns; (ii) as a result, CVS was likely to incur significant expenses to cover cost increases that were not accounted for in the Company's forecasts and thus not covered by plan premiums; (iii) accordingly, CVS had overstated the profitability of its Health Care Benefits segment; (iv) contrary to Defendants' assurances, the revenues generated from the Company's other primary segments were insufficient to offset the negative financial impact of the increasing expenditures within the Health Care Benefits segment; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

33.     On August 2, 2023, CVS issued a press release announcing the Company's Q2 2023 results.  The press release revealed that the Company was revising its diluted EPS guidance range to $6.53 to $6.75 from $6.90 to $7.12.  In the Q2 2023 10-Q filed that same day, CVS stated, in relevant part:

> *Operating income*
> - ***Operating income decreased $1.4 billion, or 30.7%, in the three months ended June 30, 2023 compared to the prior year primarily due to declines in the Health Care Benefits segment***, including the absence of the $225 million pre-tax gain on the sale of PayFlex recorded in the prior year, and the Pharmacy & Consumer Wellness segment, as well as a restructuring

charge and acquisition-related transaction and integration costs recorded in the current year.

34.    On this news, CVS's stock price fell $2.04 per share, or 2.73%, to close at $72.32 per share on August 3, 2023.  CVS securities nonetheless continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the true scope and severity of the ineffectiveness of the Company's forecasts and the resulting negative financial impact.

35.    For example, the Q2 2023 10-Q contained substantively similar positive descriptions of the Company and its Health Care Benefits segment as discussed, *supra*, in ¶¶ 27-29.  In addition, with respect to current trends, the Q2 2023 10-Q stated, in relevant part:

> The Health Care Benefits segment is expected to experience higher than previously expected medical cost trend in Medicare Advantage for the remainder of 2023, while expected medical cost trends remain consistent with pricing in Commercial and Medicaid. ***The segment is expected to benefit from continued membership growth in Commercial***, primarily related to the individual exchange business.

36.    Appended to the Q2 2023 10-Q as exhibits were signed certifications pursuant to SOX by Defendants Lynch and Guertin, attesting that "the information contained in the [Q2 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

37.    Also on August 2, 2023, CVS hosted an earnings call with investors and analysts to discuss the Company's Q2 2023 results (the "Q2 2023 Earnings Call").  During the scripted portion of the Q2 2023 Earnings Call, Defendant Lynch stated, in relevant part:

> Turning to our performance highlights for the quarter, in our healthcare benefits segment, we grew revenues to $26.7 billion, an increase of nearly 18%, and delivered adjusted operating income of $1.5 billion. Medical membership in the second quarter was 25.6 million, an increase of 1.2 million members versus the prior year, reflecting broad-based growth including individual exchange, Medicare and commercial membership. For our core commercial membership, this quarter marks the eighth consecutive quarter of membership gains. This growth reflects our

differentiated product offerings that address the total cost of care and the whole health of a member through our integrated solutions.

Medical cost trends were well controlled in our commercial and Medicaid books of business. Consistent with the broader industry, elevated medical costs emerged in our Medicare Advantage business which became apparent in the latter part of the quarter. The primary driver of these elevated medical costs was greater than expected utilization in outpatient settings.

\*\*\*

***This quarter, we were able to offset the pressures in our healthcare benefits segment with continued strong execution in our health services segment***. Revenues grew to $46.2 billion, an increase of nearly 8%. Adjusted operating income grew 3.5% to $1.9 billion. These results were driven by our pharmacy services business. ***We consistently demonstrate value to consumers and our clients by successfully managing drug cost trends and bringing innovative clinical solutions to the market***.

38.     Later during the scripted portion of the Q2 2023 Earnings Call, Defendant Guertin stated, in relevant part:

Turning now to our outlook for 2023, we are reaffirming our adjusted earnings per share guidance of $8.50 to $8.70. This guidance reflects our performance through the second quarter as well as a higher than expected Medicare Advantage medical cost trend for the remainder of 2023, ***offset by strength in our pharmacy services business within our health service segment***.

39.     The statements referenced in ¶¶ 35-38 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the forecasts CVS used to determine plan premiums were ineffective at accounting for medical cost trends and health care utilization patterns; (ii) as a result, CVS was likely to incur significant expenses to cover cost increases that were not accounted for in the Company's forecasts and thus not covered by plan premiums; (iii) accordingly, CVS had overstated the profitability of its Health Care Benefits segment; (iv) contrary to Defendants' assurances, the revenues generated from the

Company's other primary segments were insufficient to offset the negative financial impact of the increasing expenditures within the Health Care Benefits segment; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

40.    On November 1, 2023, CVS issued a press release announcing the Company's Q3 2023 results.  The press release revealed that the Company was again reducing its diluted EPS guidance range to $6.37 to $6.61 from $6.53 to $6.75.  In the Q3 2023 10-Q filed that same day, CVS stated, in relevant part:

> *Operating income*
> - Operating income increased $6.1 billion, or 141.4%, in the nine months ended September 30, 2023 compared to the prior year. The increase in operating income was primarily driven by the absence of $5.7 billion in opioid litigation charges recorded in the prior year and increases in the Pharmacy and Consumer Wellness segment, primarily driven by the absence of the $2.5 billion loss on assets held for sale recorded in the prior year related to the write-down of the LTC business which was partially offset by continued pharmacy reimbursement pressure and decreased COVID-19 vaccinations and diagnostic testing compared to the prior year. ***These increases in operating income were partially offset by declines in the Health Care Benefits segment***, including the absence of the $225 million pre-tax gain on the sale of PayFlex recorded in the prior year, as well as the restructuring charges and acquisition-related transaction and integration costs recorded in the current year.

CVS securities nonetheless continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the true scope and severity of the ineffectiveness of the Company's forecasts and the resulting negative financial impact.

41.    For example, the Q3 2023 10-Q contained substantively similar positive descriptions of the Company and its Health Care Benefits segment as discussed, *supra*, in ¶¶ 27-29 and appended to the Q2 2023 10-Q as exhibits were signed certifications pursuant to SOX by

Defendants Lynch and Cowhey, attesting that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

42.    That same day, CVS hosted an earnings call with investors and analysts to discuss the Company's Q3 2023 results (the "Q3 2023 Earnings Call").  During the scripted portion of the Q3 2023 Earnings Call, Defendant Lynch stated, in relevant part:

> And once again, we generated outstanding operating cash flows, bringing our year-to-date total to $16.1 billion. We are reconfirming our guidance range for 2023 adjusted EPS of $8.50 to $8.70, ***this reflects execution against our strategy with strong performance in our Pharmacy & Consumer Wellness segment and continued momentum in our Health Services segment, offsetting incremental Medicare Advantage medical cost pressures in our Health Care Benefits segment***.
>
> Medicare Advantage is a key strategic growth area for our business. While it's still early in the 2024 annual enrollment period, we are confident that our competitive offering and attractive benefit design will meet consumer expectations. Aetna continues to be a leader in zero-dollar premium product and approximately 84% of Medicare eligibles will have access to Aetna plans in this category in 2024.
>
> \*\*\*
>
> Let's turn to our performance in the quarter. In our Health Care Benefits segment, we grew revenues to more than $26 billion, an increase of nearly 17% and delivered adjusted operating income of $1.5 billion. Medical membership in the third quarter grew to 25.7 million, an increase of 1.4 million members versus the prior year, reflecting growth across multiple product lines, including individual exchange, Medicare and commercial.
>
> We continue to experience elevated utilization trends in our Medicare Advantage business, primarily in outpatient and supplemental benefits such as dental, behavioral health, OTC and flex card. Given the elevated cost trends that have emerged this year, we are executing on plans to unlock additional revenue, clinical and network opportunities to help alleviate these pressures.

43.    Also during the scripted portion of the Q3 2023 Earnings Call, Defendant Cowhey stated, in relevant part:

> Our Medical Benefit ratio of 85.7% increased 230 basis points from the prior year quarter, primarily reflecting lower prior period development as well as higher Medicare Advantage utilization inside the quarter. Utilization pressure was

primarily attributable to the categories [Defendant Lynch] highlighted earlier, including outpatient and supplemental benefits such as dental, behavioral health, OTC and flex cards.

Further, we also experienced individual exchange growth in the special enrollment period that exceeded our expectations. These members, particularly when added late in the year, will drive a higher MBR. As a result, our higher individual exchange growth is also contributing to our updated MBR guidance for the full year. We continue to closely watch utilization trends in our other lines of business.

But at this stage, we have not observed any other trends that we would consider inconsistent with our total expectations. Days claims payable at the end of the quarter was 50.3, up 3.4 days sequentially and reserve growth exceeded premium growth sequentially. Overall, we remain confident in the adequacy of our reserves.

44.    The statements referenced in ¶¶ 41-43 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the forecasts CVS used to determine plan premiums were ineffective at accounting for medical cost trends and health care utilization patterns; (ii) as a result, CVS was likely to incur significant expenses to cover cost increases that were not accounted for in the Company's forecasts and thus not covered by plan premiums; (iii) accordingly, CVS had overstated the profitability of its Health Care Benefits segment; (iv) contrary to Defendants' assurances, the revenues generated from the Company's other primary segments were insufficient to offset the negative financial impact of the increasing expenditures within the Health Care Benefits segment; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

45.    On February 7, 2024, CVS issued a press release announcing the Company's 2023 results.  The press release revealed that the Company was revising its diluted EPS guidance range to at least $7.06 from at least $7.26, its adjusted EPS guidance range to at least $8.30 from at least

$8.50, and its cash flow from operations guidance to at least $12.0 billion from at least $12.5 billion. In the 2023 10-K filed with the SEC that same day, CVS stated, in relevant part:

> *Operating income*
> - Operating income increased $5.8 billion, or 72.8%, in 2023 compared to 2022. The increase in operating income was primarily driven by the absence of $5.8 billion of opioid litigation charges recorded in 2022 and increases in the Pharmacy & Consumer Wellness segment, primarily driven by the absence of a $2.5 billion loss on assets held for sale recorded in 2022 related to the write-down of the Company's Omnicare® long-term care business ("LTC business") which was partially offset by continued pharmacy reimbursement pressure and decreased COVID-19 vaccinations and diagnostic testing compared to 2022, as well as an increase in the Health Services segment. ***These increases in operating income were partially offset by declines in the Health Care Benefits segment***, including the absence of the $250 million pre-tax gain on the sale of bswift and the $225 million pre-tax gain on the sale of PayFlex recorded in 2022, as well as the restructuring charges and acquisition-related transaction and integration costs recorded in 2023.

46.    Moreover, in the Q4 2023 Earnings Call held that same day, Defendant Cowhey stated, in relevant part, that "we now expect adjusted operating income for the Healthcare Benefit segment to be at least $5.4 billion, ***a decrease of $370 million from our prior estimates***."

47.    On this news, CVS's stock price fell $0.96 per share, or 1.27%, to close at $74.36 per share on February 8, 2024. CVS securities nonetheless continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the true scope and severity of the ineffectiveness of the Company's forecasts and the resulting negative financial impact.

48.    For example, the 2023 10-K contained substantively similar positive descriptions of the Company and its Health Care Benefits segment as discussed, *supra*, in ¶¶ 27-29 and appended to the 2023 10-K as exhibits were signed certifications pursuant to SOX by Defendants Lynch and Cowhey, attesting that "the information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

49.     In addition, that same day, during the scripted portion of the Q4 2023 Earnings Call, Defendant Lynch stated, in relevant part:

> While the Medicare Advantage market has been challenged recently, our view of the long-term opportunity offered by this business remains unchanged. As we discussed in December, we are committed to achieving our targeted 4% to 5% margin in Medicare Advantage over time and we will begin that journey in 2025. At CVS Health, we have both the scale to transform how healthcare is delivered, and the ability to personalize care and coverage for each individual we serve. By bringing together the powerful capabilities of our brands, including Aetna, CVS Pharmacy, CVS Health Buyer and Caremark, we can deliver significant value to the customers and communities we serve and unlock tremendous potential for our shareholders.

> \*\*\*

> I'll now turn to the highlights from each of our businesses in the quarter. In our healthcare benefits segment, we continue to navigate through elevated utilization trends in our Medicare Advantage business. In the quarter, we grew revenues to nearly $27 billion, an increase of over 16%, and delivered adjusted operating income of $676 million, medical membership ended the year at 25.7 million an increase of 1.3 million members versus the prior year reflecting growth across multiple product lines, including individual exchange, Medicare and commercial. Medicare Advantage is integral to the CVS Health Strategy, after a very successful 2024 annual enrollment period, we expect to add at least 800,000 new members in 2024.

50.     The statements referenced in ¶¶ 48-49 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the forecasts CVS used to determine plan premiums were ineffective at accounting for medical cost trends and health care utilization patterns; (ii) as a result, CVS was likely to incur significant expenses to cover cost increases that were not accounted for in the Company's forecasts and thus not covered by plan premiums; (iii) accordingly, CVS had overstated the profitability of its Health Care Benefits segment; (iv) contrary to Defendants' assurances, the revenues generated from the Company's

other primary segments were insufficient to offset the negative financial impact of the increasing expenditures within the Health Care Benefits segment; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

51.     In addition, throughout the Class Period, CVS's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose the damage that would result from its ineffectiveness in accounting for medical cost trends and health care utilization patterns when determining plan premiums violated Item 303 because this issue represented a known trend and uncertainty that was likely to have a material unfavorable impact on the Company's business and financial results.

**The Truth Fully Emerges**

52.     On May 1, 2024, CVS issued a press release announcing the Company's Q1 2024 results and revising its full-year 2024 guidance. The press release stated, in relevant part:

> **2024 full-year guidance**
> - Revised GAAP diluted EPS guidance to at least $5.64 from at least $7.06
> - Revised Adjusted EPS guidance to at least $7.00 from at least $8.30
> - Revised cash flow from operations guidance to at least $10.5 billion from at least $12.0 billion
>
> ***
>
> First quarter GAAP diluted EPS of $0.88 decreased from $1.65 in the prior year and Adjusted EPS of $1.31 decreased from $2.20 in the prior year, primarily due to a decline in the Health Care Benefits segment's operating results, reflecting utilization pressure in the Company's Medicare business.

Recognizing the potential for continued elevated medical cost trends in the remainder of 2024, the Company revised its full-year 2024 GAAP diluted EPS, Adjusted EPS and cash flow from operations guidance to reflect the assumption that the majority of this pressure will persist throughout 2024.

53.     Further, in the Q1 2024 10-Q filed with the SEC that same day, CVS stated, in

relevant part:

*Operating income*
- Operating income decreased $1.2 billion, or 34.1%, in the three months ended March 31, 2024, ***primarily due to increased Medicare utilization, the unfavorable impact of the previously disclosed decline in the Company's 2024 Medicare Advantage star ratings and a year-over-year unfavorable impact from development of prior-years' health care cost estimates in the Health Care Benefits segment***, as well as continued pharmacy client price improvements, lower contributions from 340B and the previously announced loss of a large client in the Health Services segment. These decreases were partially offset by an increase in operating income in the Pharmacy & Consumer Wellness segment, including the absence of a $349 million loss on assets held for sale related to the write-down of the Company's Omnicare® long-term care business ("LTC business") recorded in the prior year.

54.     On this news, CVS's stock price fell $11.40 per share, or 16.84%, to close at $56.31

per share on May 1, 2024.

55.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of the Company's securities, Plaintiff and other Class members have suffered

significant losses and damages.

## SCIENTER ALLEGATIONS

56.     During the Class Period, Defendants had both the motive and opportunity to

commit fraud.  They also had actual knowledge of the misleading nature of the statements they

made, or acted in reckless disregard of the true information known to them at the time.  In so doing,

Defendants participated in a scheme to defraud and committed acts, practices, and participated in

a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CVS securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CVS securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CVS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

59.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

60.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

61.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CVS;

- whether the Individual Defendants caused CVS to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of CVS securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

62.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

63.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- CVS securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold CVS securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

64.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

65.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

66.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

68.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CVS securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire CVS securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

69.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for CVS securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CVS's finances and business prospects.

70.     By virtue of their positions at CVS, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

71.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of CVS, the Individual Defendants had knowledge of the details of CVS's internal affairs.

72.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CVS. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CVS's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CVS securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning CVS's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired CVS securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

73.    During the Class Period, CVS securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading

statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of CVS securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of CVS securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of CVS securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

74.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

76.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77.     During the Class Period, the Individual Defendants participated in the operation and management of CVS, and conducted and participated, directly and indirectly, in the conduct

of CVS's business affairs. Because of their senior positions, they knew the adverse non-public information about CVS's misstatement of income and expenses and false financial statements.

78.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CVS's financial condition and results of operations, and to correct promptly any public statements issued by CVS which had become materially false or misleading.

79.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which CVS disseminated in the marketplace during the Class Period concerning CVS's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CVS to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of CVS within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CVS securities.

80.    Each of the Individual Defendants, therefore, acted as a controlling person of CVS. By reason of their senior management positions and/or being directors of CVS, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CVS to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of CVS and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

81.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CVS.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 12, 2024                              Respectfully submitted,

                                                  POMERANTZ LLP

                                                  */s/ Jeremy A. Lieberman*
                                                  Jeremy A. Lieberman
                                                  J. Alexander Hood II
                                                  Thomas H. Przybylowski
                                                  600 Third Avenue, 20th Floor
                                                  New York, New York 10016
                                                  Telephone: (212) 661-1100
                                                  Facsimile: (917) 463-1044
                                                  jalieberman@pomlaw.com
                                                  ahood@pomlaw.com
                                                  tbrzybylowski@pomlaw.com

                                                  THE SCHALL FIRM
                                                  Brian Schall
                                                  (*pro hac vice* application forthcoming)
                                                  2049 Century Park East, Ste. 2460
                                                  Los Angeles, CA 90067
                                                  Telephone: 310-301-3335
                                                  brian@schallfirm.com

27

*Attorneys for Plaintiff*