# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISIANA SHERIFFS' PENSION AND RELIEF FUND, SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, and CITY OF MIAMI FIRE FIGHTERS' AND POLICE OFFICERS' RETIREMENT TRUST, Individually and on behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CVS HEALTH CORPORATION, KAREN S. LYNCH, SHAWN M. GUERTIN, BRIAN A. KANE, and THOMAS F. COWHEY,<br><br>Defendants. | Case No. 1:24-cv-05303-MMG<br><br>CLASS ACTION<br><br>Honorable Margaret M. Garnett<br><br>DEMAND FOR JURY TRIAL |

## AMENDED CONSOLIDATED COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................... 2

II.  JURISDICTION & VENUE ..................................................................... 7

III. THE PARTIES.......................................................................................... 8

    A.    Lead Plaintiffs.................................................................................... 8

    B.    Defendants ......................................................................................... 9

IV. OVERVIEW OF THE FRAUD.............................................................. 11

    A.    CVS's Health Care Benefits Business Was Its Most Lucrative During The Class Period ................................................................... 11

    B.    The Tension Between CVS's Profit Model And Its Regulatory Obligations ....... 13

    C.    Medicare Advantage Plans Are Required To Cover Medically Necessary Post-Acute Care Claims Consistent With Traditional Medicare ......................... 15

    D.    Throughout The Class Period, Defendants Tout Their Legitimate Business Practices And Compliance With Medicare Regulations..................................... 16

        1.    Defendants Touted CVS's Supposed "Responsible" Use Of AI To Promote Patient Care And Assured Investors That CVS's Health Care Benefits Business Fully Complied With Medicare Rules ............... 16

        2.    Defendants Attribute The Success Of CVS's Health Care Benefits Business To Legitimate Practices And Macroeconomic Trends ............. 18

        3.    Defendants Assured Investors That CVS's Guidance Had Properly Accounted For Utilization Trends And Regulatory Requirements.......... 20

    E.    Prior To The Class Period, CVS Leveraged The Company's "Secret Sauce" To Dramatically Expand Prior Authorization Requirements And Slash Costs For The Company's Most Expensive Claims.................................... 21

        1.    The Role Of Prior Authorization In Post-Acute Care............................... 22

        2.    The Senate Report's Findings .................................................................. 24

    F.    CVS Deployed Cost-Driven Algorithms To Deny Treatment The Company Was Required To Provide By Law....................................................... 28

i

1.   Facing Cost Pressure, CVS Expands The Company's Prior Authorization Denials Through Illicit Algorithms .................................. 29

2.   CVS Programs Its Algorithms With The "Secret Sauce": Denying Claims Based On Cost Savings, Not Medical Necessity ......................... 30

3.   CVS Forces Medical Staff To Rubber-Stamp Its Algorithm's Recommendations ...................................................................... 33

4.   CVS Dramatically Expands Its Use Of Illicit Algorithms To Prioritize Cost Savings ................................................................. 35

5.   CMS's Internal Data Reveals That CVS's Prior Authorization Denials Skyrocketed As It Deployed Illicit Algorithms During The Class Period ........................................................................... 36

6.   CVS's Algorithms Generated Millions Of Dollars In Illicit Profits And Artificially Depressed The Company's MBR, Utilization, And Cost Trends ........................................................................... 38

G.   While CVS Reaps Illicit Cost Savings, Its Patients Suffer As Critical Services Are Denied And Delayed ......................................... 40

H.   Defendants Capitalize On Their Lies To Investors To Raise Over $10 Billion In Debt Offerings And Fund Massive Acquisitions ................. 40

I.   Regulators Target Prior Authorization Abuses And CVS's Business Suffers ................................................................................ 42

J.   Defendants Refuse To Account For Known Utilization Trends And Issue False Guidance ...................................................................... 46

K.   The Truth Is Revealed ........................................................... 50

1.   On May 1, 2024, CVS Substantially Rewrites Its Guidance To Reflect Updated Data And Reports Disastrous Earnings Driven by Winding Down The Illicit Algorithms ..................................... 50

2.   On October 17, 2024, The Senate Report Reveals CVS's Abuse Of Prior Authorization To Save Money ....................................... 53

V.   SUMMARY OF SCIENTER ............................................................. 54

A.   Defendants Deliberately Issued Stale Guidance To Cover Up Known Utilization Trends ................................................................. 54

B.   Thousands Of Internal CVS Documents Reveal That The Company Systematically Expanded Its Prior Authorization Denials ..................... 56

ii

C.      Defendants Were The Target Of Intense Regulatory Scrutiny Concerning CVS's Illegal Prior Authorization Practices ........................................ 58

D.      The Outsized Financial Impact of CVS's Illicit Algorithms Supports Scienter ............................................................................................. 59

E.      CVS Programmed Anna With Illegal Internal Criteria That Prioritized Cost Savings Over Patient Care ................................................... 60

F.      CVS Forced Medical Staff To Rubber-Stamp Anna's Illegal Recommendations ....................................................................... 61

G.      CVS Violated Longstanding Requirements To Cover The Same "Basic Benefits" As Traditional Medicare ................................................ 62

H.      Defendants Frequently Spoke With Specificity And In Response To Direct Analyst Questions About The Topics Of Their False Statements ........ 62

I.      The Sudden Wave Of Departures Of CVS's Executives Supports Scienter ........ 65

J.      Defendants Were Motivated To Conceal The Truth Of Their Illicit Practices To Raise Over $10 Billion In Debt Offerings ............................ 65

K.      Defendants' Statements Concerned Matters Critical To CVS's Success ............. 66

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 66

A.      Defendants Falsely Claimed That CVS's Health Care Benefits Business Fully Complied With Medicare Rules And That The Company Would Only Employee AI "Responsibly" And Consistent With "What's Right For Our Customers" ................................................................ 67

B.      Defendants Misstated The Sources Of Their Success For CVS's Health Care Benefits Segment ........................................................ 72

C.      Defendants Falsely Portrayed That CVS's Financial Guidance For Its Health Care Benefits Segment Accurately Reflected Utilization And Medical Cost Trends ..................................................... 77

VII.   LOSS CAUSATION ................................................................. 83

VIII.  PRESUMPTION OF RELIANCE ............................................... 85

IX.    CLASS ACTION ALLEGATIONS ............................................. 86

X.     CLAIMS FOR RELIEF .......................................................... 87

COUNT I ............................................................................. 87

For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All
Defendants ........................................................................................................ 87

COUNT II ...................................................................................................................... 89

For Violations of Section 20(a) of the Exchange Act Against the Executive
Defendants ........................................................................................................ 89

XI.    PRAYER FOR RELIEF ...................................................................................... 90

XII.    JURY DEMAND ............................................................................................... 90

**GLOSSARY**

| Term | Description |
|------|-------------|
| AI | Artificial intelligence. |
| Class Period | November 2, 2022 through October 17, 2024, inclusive. |
| CMS | Centers for Medicare and Medicaid Services, the federal agency that contracts with private companies to provide Medicare Advantage insurance. |
| CVS or the Company | CVS Health Corporation, the second largest healthcare company in the world. |
| Defendant Cowhey | Thomas F. Cowhey, CVS's Chief Financial Officer since October 2023. |
| Defendant Guertin | Shawn M. Guertin, CVS's Chief Financial Officer from May 2021 until his resignation in October 2023. |
| Defendant Kane | Brian A. Kane, CVS's Executive Vice President and President of Aetna from September 1, 2023 until his sudden termination on August 7, 2024. |
| Defendant Lynch | Karen S. Lynch, CVS's President and Chief Executive Officer from February 1, 2021 until October 18, 2024. On October 18, 2024, one day after the close of the Class Period, Defendant Lynch resigned as CEO and "stepped down from her position in agreement with the [C]ompany's board of directors." |
| Defendants | CVS Health Corporation, Karen S. Lynch, Shawn M. Guertin, Brian A. Kane, and Thomas F. Cowhey. |
| Exchange Act | Securities Exchange Act of 1934. |
| Executive Defendants | Karen S. Lynch, Shawn M. Guertin, Brian A. Kane, and Thomas F. Cowhey. |
| Health Care Benefits | Division of CVS Health Corporation that offered Medicare Advantage plans, as well as commercial insurance and other insurance plans. During the Class Period, the Health Care Benefits segment contributed over 33% of the Company's operating income on average. |
| KFF | Kaiser Family Foundation, an independent health policy, polling, and journalism organization. |
| Lead Plaintiffs | Louisiana Sheriffs' Pension & Relief Fund, Southeastern Pennsylvania Transportation Authority (SEPTA), and City of Miami Fire Fighters' and Police Officers' Retirement Trust. |
| MAO | Medicare Advantage Organization |

| Term | Description |
|---|---|
| MBR | Medical Benefits Ratio (alternatively known as Medical Loss Ratio). |
| Medicare | Medicare is the federal government program that provides healthcare coverage to more than 60 million people who are over 65, under 65 and receiving Social Security Disability Insurance for a certain amount of time, or under 65 and living with End-Stage Renal Disease. |
| Medicare Advantage | Medicare benefits received from a private insurance plan that contracts with the federal government. |
| PAA | Post Acute Analytics, a third-party vendor, under contract with CVS to use its AI algorithm to factor in cost while reviewing CVS's Medicare Advantage prior authorizations. |
| Post-Acute Care | Treatments in nursing facilities, inpatient facilities, and long-term acute care hospitals. |
| Prior Authorization | An insurer's requirement to pre-approve whether items and services are medically necessary for the beneficiary and meet Medicare coverage rules before the patient receives the requested healthcare. |
| PSI | U.S. Senate Permanent Subcommittee on Investigations. |
| SEC | U.S. Securities and Exchange Commission. |
| Senate Report | PSI's October 17, 2024 report entitled "Refusal of Recovery: How Medicare Advantage Insurers Have Denied Patients Access to Post-Acute Care." |
| Traditional Medicare | Medicare benefits received from the federal government based on fee-for-service. |
| Utilization | The rate at which Medicare Advantage members use medical services. |

1.      Lead Plaintiffs Louisiana Sheriffs' Pension & Relief Fund, Southeastern Pennsylvania Transportation Authority (SEPTA), and City of Miami Fire Fighters' and Police Officers' Retirement Trust (collectively, "Lead Plaintiffs") by the undersigned counsel, bring this action for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5, against Defendants CVS Health Corporation ("CVS"), Karen S. Lynch, Shawn M. Guertin, Thomas F. Cowhey, and Brian A. Kane (collectively, "Defendants"). Lead Plaintiffs bring these claims on behalf of a class of investors who purchased or otherwise acquired CVS common stock from November 2, 2022 through October 17, 2024, inclusive (the "Class Period") and were damaged thereby.

2.      Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts are based upon the investigation of Lead Plaintiffs and their counsel, including (a) review and analysis of documents filed publicly by CVS with the U.S. Securities and Exchange Commission; (b) review and analysis of CVS's press releases, presentations and other public statements; (c) review and analysis of transcripts of CVS's investor conference calls; (d) review and analysis of research reports by financial analysts and news reports concerning CVS; (e) information from percipient witnesses, consulting experts, and other knowledgeable persons described below; and (f) other publicly available sources as described below. Lead Plaintiffs' investigation into the factual allegations contained in this Complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that

substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for further investigation or discovery.

## I.    PRELIMINARY STATEMENT

3.    This securities class action arises from CVS's misstatements and omissions regarding the illegal drivers of financial performance in the Company's Medicare Advantage business.

4.    CVS is one of the nation's largest Medicare Advantage providers. As detailed below, to cut costs and boost profits, at the direction of CEO Karen Lynch and other members of senior management, CVS deployed illicit artificial intelligence ("AI") algorithms that implemented the Company's "secret sauce"—mass denials of valid medical claims. Among other things, these computer algorithms allowed CVS to broadly deny prior authorization requests for medically required—albeit expensive—"post-acute" care for the elderly. At the same time, Defendants lied to investors by misleadingly attributing CVS's apparent financial success to benign factors, while concealing that CVS's profitability was driven in substantial part by an unsustainable and risky practice: CVS's abuse of AI algorithms and prior authorization to deny medically necessary care.

5.    Crucially, Medicare Advantage revenues were a key part of the Company's growth plan. Leading up to the Class Period, Defendant Lynch disclosed that "obviously, ***Medicare is our largest growth driver***." By the midpoint of the Class Period, Defendant Guertin announced to analysts that it is "important to keep in mind that Medicare [Advantage] is more than 50% of our premium revenue now."

6.    In its Medicare Advantage business, CVS profited from the difference between service costs and the flat premiums awarded by the government. CVS was reimbursed by the

Centers for Medicare and Medicaid Services ("CMS") using a "capitated" payment model, which provides a fixed amount per patient annually.

7.     At the same time, Medicare Advantage providers were governed by longstanding rules and regulations that required such providers to provide the same care—governed by the same coverage criteria—as Traditional Medicare. This fundamental requirement extended to "post-acute" care, which was provided to elderly Medicare recipients following hospital admissions for therapeutic care such as fall prevention, memory care, and physical therapy. Medicare guaranteed that all recipients were entitled to 100 days a year of medically necessary post-acute care—and CVS was obligated to provide the same.

8.     In direct contravention of this baseline requirement, before the Class Period began, CVS secretly employed AI algorithms that allowed the Company to reject post-acute care requests at a massive scale. This misconduct was detailed in an extensive report by the U.S. Senate's Permanent Subcommittee on Investigations ("PSI") released in October 2024, at the end of the Class Period. That report ("Senate Report"), titled "Refusal of Recovery: How Medicare Advantage Insurers Have Denied Patients Access to Post-Acute Care," provided extensive internal—and previously confidential—documents from CVS that revealed the previously unknown impact of CVS's prior authorization policies, particularly in the "post-acute care" space. The Senate Report was the culmination of a 17-month investigation by PSI regarding prior authorization denials.

9.     In addition, former employees from the third-party company "Post-Acute Analytics" ("PAA")—which the Senate Report revealed was a key player in CVS's algorithm-driven denials—who were interviewed for this case recalled that CVS directed that PAA's

analytics generate "target" length of stay durations of 14 days or less, even where doctors prescribed days or weeks longer stays as medically necessary.

10.     These cost-driven recommendations, in turn, were rubber-stamped by CVS's small clinical staff, who were incentivized through their compensation and quota requirements to approve denials (and not approvals). As Senator Blumenthal later described during a public hearing investigating these algorithms, "***artificial intelligence (AI) and algorithms have become a blanket mechanism for denial***." Nonetheless, Defendant Karen Lynch—CVS's then-CEO—reassured investors that CVS was committed to only using "responsible AI."

11.     As the Senate Report later revealed, CVS realized the profitability to be gained by denying prior authorization requests *en masse*. Thus, CVS rapidly expanded PAA's reach. By October 2022—just before the beginning of the Class Period—CVS internally recognized that its "automation concurrent review" had led to astonishingly large "medical cost savings" through denying prior authorization requests. Specifically, in a confidential October 2022 Automation Update, CVS estimated that its denials of "automation concurrent" claims had generated a stunning $2.5 billion in medical cost savings in 2021 alone. The Senate Report estimated that ***$1.1 billion*** of that amount was attributable to Medicare Advantage.

12.     Internally, with billions of dollars for the taking, CVS and its senior executives (including former CEO Lynch, former Executive VP Brian Kane, and CFOs Shawn Guertin and Thomas Cowhey) embraced these AI-driven denials. Publicly, however, they could not reveal CVS's increasing dependence on a risky and unsustainable business practice.

13.     Thus, during the Class Period, Defendants' public statements carefully concealed the extent to which these indiscriminate prior authorization denials were positively affecting, *inter alia*, the Company's crucial "medical benefits ratio" ("MBR"). This key metric measured the

extent to which CVS had to pay out for medical services, thus cutting into the Company's profit margin on the flat payments it received from the federal government. Even while CVS was cutting **billions** in medical costs through prior authorization denials—hundreds of millions of which (at minimum) were attributable to algorithmic denials—in late 2022 and early 2023, Defendants publicly attributed the Company's strong MBR to the declining impact of COVID-19, without disclosing the material impact of the Company's blanket AI-driven denials.

14.     In April 2023, CMS issued new regulations that threatened to put an end to CVS's illicit widespread denials. Specifically, CMS issued new regulations confirming that CVS and other Medicare Advantage providers **always** had the obligation to provide coverage consistent with Traditional Medicare, and requiring that, among other things, Medicare Advantage providers provide greater transparency for their coverage decisions—including their decisions to deny coverage for post-acute care. CMS also signaled that the agency would take a much more active role in auditing these denials going forward, including the extent to which insurers used algorithms to improperly deny care. These regulations would become effective to coverage in January 2024.

15.     Defendants were keenly attuned to these new Medicare regulations, which directly threatened CVS's practice of abusing AI algorithms to deny medically necessary care. Before these regulations were effective to coverage in 2024, CVS quietly ended its relationship with PAA. Nonetheless, Defendants caused CVS to continue issuing positive financial guidance to the market and publicly claimed that this guidance "conservatively" took into account all known utilization trends (*i.e.*, the rate at which members use services, increasing costs for providers like CVS). These assurances were critical because other large Medicare Advantage providers had begun warning in mid-2023 of increasing utilization in the aftermath of the COVID-19 pandemic.

16.     In reality, as confirmed by a former Lead Director of Project Program Management and a Senior Medical Economics Analyst at Aetna's division in CVS, Defendants' "guidance didn't account for known utilization drivers." Instead, "in 2023, CVS was issuing guidance based on 2020 numbers." As a result, there were "huge shifts in Medicare costs and utilization and care being pushed back" that would impact 2024 but were not included in the Company's guidance. The Company had been able to disguise the true rates of utilization during the Class Period through its blanket algorithm denials—but no longer.

17.     Nonetheless, these former employees confirmed that the "C-Suite and CFO directed" the issuance of CVS's misleading guidance. For example, the former Lead Director of Project Program Management saw firsthand "an executive presentation with graphs" that was "from the CFO's group" and that showed they used numbers that pre-dated the Company's implementation of mass-denial algorithms for their guidance issued in 2023. These former employees confirmed that Defendants were "without a doubt" aware of CVS's false guidance.

18.     By early 2024, Defendants' scheme had largely collapsed. In May 2024, CVS issued disastrous financial results for the first quarter of 2024, which reflected the impact of rising utilization and medical cost trends now that the Company could no longer rely on AI-driven algorithms to reject costly claims, as well as the consequence of senior management's prior decision to issue guidance using stale data. The Company disclosed that CVS's MBR had skyrocketed to 90.4%—*an increase of 580 basis points* from the same period during the prior year. The Company also revealed that the adjusted operating income for the Company's insurance segment had "decreased *59.9%* for the three months ended March 31, 2024 compared to the prior year *primarily driven by increased Medicare [Advantage] utilization*[.]" The Company's stock price declined dramatically in response, by $11.40 per share, or approximately 16.8%. Analysts

were shocked, with Deutsche Bank expressly calling out the integrity of CVS's "processes and internal reporting" and questioning Defendants' prior assurances that the Company's "book of MA business was priced and coded appropriately for 2024" and that its utilization assumptions were "conservative."

19.    But investors did not learn the full truth until October 17, 2024, when the Senate's PSI released its bombshell report. The Senate Report—which was the result of a 17-month inquiry that secured over 280,000 pages of internal documents from CVS and its two largest competitors, UnitedHealthcare and Humana—concluded that "CVS knew prior authorization denials generated huge savings, and subjected more and more post-acute care requests to the process." PSI found that, "[b]y 2022, CVS was denying prior authorization of post-acute care facilities more than all other types of service requests combined." Until PSI released the Senate Report, "the magnitude and scope of prior authorization requests and denials for particular types of care ha[d] been undisclosed." The next day, CVS announced that Defendant Karen Lynch had "stepped down from her position in agreement with the company's Board of Directors" effective October 17, 2024. In response to this news, the Company's stock price again declined meaningfully by $3.33 per share, or over 5%.

20.    Lead Plaintiffs and the thousands of CVS investors they seek to represent have borne the cost of Defendants' deception—although CVS's patients who were denied medically necessary care paid the ultimate price. Lead Plaintiffs seek to remedy investors' injuries and recover their losses through this action.

## II.    JURISDICTION & VENUE

21.    Lead Plaintiffs bring this action, on behalf of themselves and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

22.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

24.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). CVS's common stock is and was listed and traded on the New York Stock Exchange during the Class Period, and many of the acts and transactions alleged herein, including the dissemination of materially false and misleading statements, occurred in substantial part in this District.

25.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## III.    THE PARTIES

### A.    Lead Plaintiffs

26.     Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") is a public pension fund that provides pension and other benefits for sheriffs, deputy sheriffs, and tax collectors in the State of Louisiana. Louisiana Sheriffs manages assets for the benefit of these active and retired employees and their beneficiaries. As reflected in its attached PSLRA certification, Louisiana Sheriffs purchased CVS common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

27.     Lead Plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA") is a regional public transportation authority that operates across five counties in and around Philadelphia, Pennsylvania. SEPTA manages assets on behalf of participants in SEPTA's five single-employer, defined benefit pension plans for all, non-regional-rail union employees in Southeastern Pennsylvania. As reflected in its attached PSLRA certification, SEPTA purchased CVS common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

28.     Lead Plaintiff City of Miami Fire Fighters' and Police Officers' Retirement Trust ("Miami FIPO") is a public pension fund that provides retirement benefits for firefighters and police officers of Miami, Florida. As reflected in its attached PSLRA certification, Miami FIPO purchased CVS common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

**B.    Defendants**

29.     Defendant CVS Health Corporation ("CVS") provides a variety of health, pharmacy, and insurance services. CVS's common stock trades on the New York Stock Exchange under the ticker symbol "CVS." Leading up to the Class Period, CVS acquired Aetna, the nation's third-largest health insurance company, and transformed itself into one of the largest Medicare Advantage insurers. During the Class Period, the CVS's Medicare Advantage offerings eventually accounted for more than 50% of the Company's premium revenue.

30.     Defendant Karen S. Lynch ("Lynch") was President and Chief Executive Officer ("CEO") of CVS from February 1, 2021 until October 17, 2024. Defendant Lynch also served as a member of CVS's Board of Directors throughout the Class Period. Defendant Lynch previously

served as the Executive Vice President of CVS. On October 18, 2024, one day after the close of

the Class Period, CVS announced that Defendant Lynch resigned as CEO and "stepped down from

her position in agreement with the [C]ompany's board of directors."

31.    Defendant Shawn M. Guertin ("Guertin") served as CVS's Chief Financial Officer

from May 2021 until his resignation in October 2023. Defendant Guertin previously served as the

Chief Financial Officer and Chief Enterprise Risk Officer at Aetna.

32.    Defendant Thomas F. Cowhey ("Cowhey") is the Chief Financial Officer of CVS

since October 2023. Defendant Cowhey previously served as the Chief Financial Officer of

Aetna's Institution Business portfolio, which included financial responsibility for Aetna's

Medicare offerings.

33.    Defendant Brian A. Kane ("Kane") served as the Executive Vice President and

President of Aetna from September 1, 2023 until his sudden termination on August 7, 2024.

According to Defendant Lynch, Defendant Kane was terminated due to Aetna's poor performance.

34.    Defendants Lynch, Guertin, Cowhey, and Kane are collectively referred to herein

as the "Executive Defendants." The Executive Defendants, because of their high-ranking positions

and direct involvement in the everyday business of CVS, directly participated in the management

of CVS's operations, including its public reporting functions, and had the ability to, and did,

control CVS's conduct and the content of CVS's SEC filings and other public statements, and

were privy to confidential information concerning CVS and its business, operations, and financial

statements, as alleged in this Complaint.

35.    CVS and the Executive Defendants together are sometimes collectively referred to

herein as "Defendants."

IV.    **OVERVIEW OF THE FRAUD**

A.    **CVS's Health Care Benefits Business Was Its Most Lucrative During The Class Period**

36.    CVS offers a broad range of healthcare services, including primary healthcare, health insurance, prescription drug coverage, and pharmacy services. In addition to its retail business and its pharmacy benefit manager sectors, in the years leading up to the Class Period, CVS also acquired a significant position in the insurance services sector. Specifically, in late 2018, CVS acquired Aetna, the nation's third-largest health insurance company. CVS's then-Chief Executive Officer Larry J. Merlo touted the acquisition as "a transformative moment for our company and our industry."

37.    As a result of its acquisition of Aetna, CVS created a new division within the Company: Health Care Benefits. As CVS explained in its February 20, 2019 Earnings Release, the Company's "Health Care Benefits segment is equivalent to the former Aetna Health Care segment." The Company's Health Care Benefits segment offered Medicare Advantage plans, as well as commercial insurance and other insurance plans. During the Class Period, the Health Care Benefits segment contributed over 33% of the Company's operating income on average.

38.    CVS's Medicare Advantage plans were critical assets within the Company's Health Care Benefits segment. Medicare is a federal program designed to insure people aged 65 and older, regardless of their income, medical history, or health status. These individuals could elect to receive their benefits from Traditional Medicare or Medicare Advantage. Traditional Medicare is offered directly through the federal government, while Medicare Advantage members receive their benefits from private companies—such as CVS—that contract with the federal government. As discussed below, Medicare Advantage is designed to cover the same services as Traditional Medicare.

39.    Leading up to the Class Period, these plans were a highly material source of revenue for CVS. On February 28, 2023, Kaiser Family Foundation ("KFF"), a non-profit providing independent information and analysis on healthcare policy, reported that its analysis of health insurers' 2021 financial data shows that "insurers continue to report much higher gross margins per enrollee in the Medicare Advantage market than in other health insurance markets." KFF revealed that the average gross margins per Medicare Advantage enrollee were $1,730 in 2021— more than **double** the average gross margin for enrollees in individual market, group market, or Medicaid plans, as shown in the below chart.



40.    Defendants were well aware of the importance of Medicare Advantage to the Company's financial growth. During a February 9, 2022 earnings call, Defendant Lynch noted that

"obviously, *Medicare is our largest growth driver*[.]" Similarly, on September 12, 2023, Defendant Lynch stated that "Medicare is an important area for us for long-term growth. It is one of the fastest-growing segments in America relative to where the growth opportunities lie." During an August 2, 2023 earnings call, Defendant Guertin instructed analysts that it is "important to keep in mind that Medicare [Advantage] is *more than 50% of our premium revenue now*."

**B.    The Tension Between CVS's Profit Model And Its Regulatory Obligations**

41.    CVS, like all Medicare Advantage organizations, is reimbursed by CMS using a "capitated payment model" where insurance companies or providers receive a fixed amount of money per patient, regardless of the services provided to the patient. These fixed amounts are determined annually through a bidding system in which private insurance companies bid on contracts to manage Medicare beneficiaries in a certain region. The government calculates a risk score for each beneficiary based upon their health status, which determines how much the insurance company receives per Medicare Advantage member. Once these annual fees are determined, the private companies typically cannot seek additional reimbursement from the government for unexpected costs. CVS realized profits through the difference between the costs of providing services and the flat premiums awarded by the government.

42.    This profit model raised the specter that private companies could seek to drive up profits through cutting services to beneficiaries. The Office of Inspector General ("OIG"), which investigates and prevents fraud and waste at Medicare and other government programs, has warned that "[a] central concern about capitated payment models—including the model used in Medicare Advantage—is the potential incentive for insurers to deny access to services and payment in an attempt to increase profits."

43.    However, the bedrock principle of Medicare Advantage—with which CVS purported to comply—was that private companies must provide beneficiaries with all benefits that

are covered under Traditional Medicare. They cannot seek to profit through cutting services or imposing limitations that are not present in Medicare. On April 16, 2019, more than three years before the Class Period, the Centers for Medicare & Medicaid Services (the federal agency that contracts with private companies to provide Medicare Advantage insurance) promulgated 42 C.F.R. §422.101(a), which requires that Medicare Advantage plans must cover "all services that are covered by Part A and Part B of Medicare." Part A of Medicare covers inpatient services, including stays in hospitals and post-acute care facilities, and Part B of Medicare covers outpatient care, medical supplies, and preventative services. For example, under 42 C.F.R. §409.61(b), Medicare covers up to 100 days of posthospital care in a skilled nursing facility, during which Medicare pays for all covered services for the first 20 days.

44.    Under 42 C.F.R. §422.101(a), CVS is permitted to offer additional benefits that are not available in Traditional Medicare, but it cannot deny coverage of the "basic benefits" that are available in Traditional Medicare. For example, CVS may choose to offer supplemental benefits beyond those available in Traditional Medicare, such as dental care, gym memberships, meals, and non-medical transport, but it cannot deny access to the core benefits available under Traditional Medicare and must apply the same "coverage criteria" as Traditional Medicare. While CMS has periodically clarified the scope of this rule, this core requirement remained the same both before and during the Class Period.

45.    Instead, CVS purported to profit by leveraging synergies between its Medicare Advantage business and its other health services. For example, during CVS's June 4, 2019 Corporate Analyst Meeting, Eva Boratto (former CFO) disclosed that "the largest source of synergies" for CVS "will come from business integration as we adopt standardized programs":

> The largest source of synergies will come from business integration as we adopt standardized programs. For example, moving Aetna's formularies to Caremark

enable us to use our scale and our negotiating skills to deliver incremental savings for the enterprise . . . . Synergies will also come from streamlining our corporate functions.

46.     Boratto also explained that "we'll realize meaningful synergies from medical cost savings," such as "engaging with Aetna's members through the use of our retail consumer touchpoints and applying data from across the enterprise to drive desired outcomes, reducing overall treatment costs and providing direction to lower cost sites of care." By cross-pollinating its numerous health services, CVS was able to dramatically compound the extent to which it could profit from Medicare Advantage beneficiaries.

**C.      Medicare Advantage Plans Are Required To Cover Medically Necessary Post-Acute Care Claims Consistent With Traditional Medicare**

47.     As individuals aged 65 and older, Medicare beneficiaries are particularly prone to complications in their recovery from illness or injury that is treated in a hospital (the "acute" phase of treatment). Acute care is meant to provide critical, short-term medical treatment that stabilizes an illness or injury.

48.     Following their discharge from acute care, seniors often require "post-acute" care to safely transition back to a more independent lifestyle. As these individuals age, their recovery from their acute care often requires a broader scope of services, such as assistance in daily activities like bathing, dressing, and meal preparation. Post-acute care facilities can also provide fall prevention, memory care, and physical rehabilitation—critical programs for the elderly.

49.     Pursuant to Title XVIII, Section 1812 of the Social Security Act, Part A of Medicare covers post-acute care, including both "post-hospital extended care services" and "extended care services that are not post-hospital extended care services." Traditional Medicare covers up to 100 days of posthospital care in a skilled nursing facility (and Traditional Medicare pays for all covered services for the first 20 days), which was one of the "basic benefits"

Defendants were required to provide under their Medicare Advantage plans. Thus, companies like CVS could not deny medically necessary claims from Medicare Advantage beneficiaries for post-acute care.

**D.    Throughout The Class Period, Defendants Tout Their Legitimate Business Practices And Compliance With Medicare Regulations**

50.    During the Class Period, Defendants touted the Company's investments in "responsible" AI technology to serve CVS's customers and reassured investors that the Company complied with longstanding regulatory regimes governing Medicare and Medicare Advantage. Defendants also led investors to believe that the success of CVS's Medicare Advantage business was attributable to either macroeconomic sources or CVS's unique offerings to its beneficiaries, such as "outpatient and supplemental benefits such as dental and behavioral health" and "seasonal immunizations." Finally, Defendants also assured investors that the Company's earnings guidance to the market fully accounted for essential existing metrics and trends, such as utilization and medical cost trends. Crediting these statements, securities analysts continued to reaffirm the Company's massive earnings growth projections attributable in significant part to the Medicare Advantage business.

**1.    Defendants Touted CVS's Supposed "Responsible" Use Of AI To Promote Patient Care And Assured Investors That CVS's Health Care Benefits Business Fully Complied With Medicare Rules**

51.    As discussed further below in Section IV.I, legislators and regulators launched extensive investigations and rulemaking specifically targeting the use of AI technology in Medicare Advantage. For example, Senator Blumenthal, then-chair of the Senate's Permanent Subcommittee on Investigations, announced that the Committee was requesting documents from CVS (as well as UnitedHealth and Humana), "asking for internal documents that will show how

decisions are made to grant or deny access to care, ***including how they are using AI***. Our nation's seniors should not have to fight to receive medically necessary care."

52.    Against this backdrop, Defendant Lynch assured investors that to the extent that CVS employed AI and generative AI, CVS would do so "responsib[ly]." Specifically, during an "Investor Day" on December 5, 2023, Defendant Lynch announced that "we believe that AI and generative AI will transform healthcare. We're applying technology, data and analytics to every single aspect of our business. The effects will be positive and profound, and we're already seeing significant value, while continuing to preserve the importance of the human connection in healthcare." She also touted CVS's use of "AI to increase the efficiency of our operations" in Aetna. At the same time, Defendant Lynch directly assured investors that "we are committed to responsible AI. We are ensuring that we're doing what's right for our customers, our colleagues, and our patients."

53.    Indeed, throughout the Class Period, Defendants assured investors that their Medicare Advantage offerings—including any AI technology use—fully complied with all applicable rules and regulations. For example, on December 19, 2023, CVS's ESG Report stated that "[w]e are committed to having an effective Medicare Compliance Program ***based on the Centers for Medicare & Medicaid Services (CMS) guidance and the Federal Sentencing Guidelines*** . . . ***Our Medicare businesses have comprehensive fraud, waste and abuse programs designed to comply with laws and regulations***, including compliance operational oversight, risk assessment, data analysis, investigations, training and processes to manage identified issues through corrective actions."

54.    Analysts were squarely focused on CMS's regulation of CVS's Health Care Benefits segment given that this segment's profitability hinged on the capitated payment model

overseen by CMS. For example, on February 7, 2024, TD Cowen noted that "CMS under this administration has not been afraid to intervene where they perceive an industry issue."

        **2.**      **Defendants Attribute The Success Of CVS's Health Care Benefits Business To Legitimate Practices And Macroeconomic Trends**

55.     During the Class Period, Defendants also routinely assured investors that the profits of CVS's Health Care Benefits segment were driven by legitimate efficiencies instituted by CVS, as well as macroeconomic trends that were affecting all health insurance companies equally. Since CVS's premiums were set on an annual basis through the bidding process, CVS's profits were primarily driven—and investors paid close attention to—certain key metrics measuring the cost of medical services CVS provided: medical benefits ratio ("MBR") and the extent of "utilization" of CVS's insurance services.

56.     MBR is a measurement of the cost of insurance benefits (or claims) divided by the premiums earned.[1] MBR provides investors with a quantification of how much CVS pays out in claims for every dollar in premiums the Company earns—thus, the lower the MBR, the more CVS profited. For example, if a company earned $100 in premiums and had an MBR of 90%, the company paid $90 in claims and retained $10 in premiums; but if the company had an MBR of $85 it would retain $15 in premiums, driving significantly higher profits. As explained in each of CVS's annual reports on Form 10-K filed with the SEC during the Class Period, MBR provides CVS's management and investors with critical information concerning the "underlying business performance" and "operating results" of CVS's Health Care Benefits segment:

> Management uses MBR to assess the underlying business performance and underwriting of its insurance products, understand variances between actual results and expected results and identify trends in period-over-period results. MBR

---

[1] Per PSI, CVS also referred to MBR as Medical Loss Ratio.

provides management and investors with information useful in assessing the operating results of the Company's insured Health Care Benefits products.

57.    From 2022-2023, CVS's MBR ranged from 82.9% to 86.2%. Even a difference of one percentage point could reflect a change of hundreds of millions of dollars for the Company's profits.

58.    CVS's MBR—the Company's measurement of its benefit costs as a percentage of its premium revenue—was closely tied to the rate at which its patients used its services. Throughout the Class Period, CVS reported on the rate at which its patients used its services and coverage as "utilization." As explained in CVS's February 7, 2024 Form 10-K, "The Company uses a variety of techniques designed to help encourage appropriate utilization of medical services ('utilization') and maintain affordability of quality coverage." This same filing also explained the relationship between CVS's utilization and medical cost trends:

> The Company's ***health care cost trend rate is affected by changes in per member utilization of medical services*** as well as changes in the unit cost of such services. ***Many factors influence the health care cost trend rate, including the Company's ability to manage benefit costs through product design, negotiation of favorable provider contracts and medical management programs***, as well as the mix of the Company's business. The health status of the Company's Insured members, aging of the population and other demographic characteristics, advances in medical technology and other factors continue to contribute to rising per member utilization and unit costs.

59.    During the Class Period, CVS's MBR results, utilization rates, and medical cost trends were an overriding focus for both the Company and analysts. In every quarterly and annual filing during the Class Period, the first two metrics in CVS's segment analysis for Health Care Benefits were revenue and MBR. Well over 100 analyst reports during the Class Period tracked changes in CVS's MBR, utilization rates, and medical cost trends.

60.    Throughout the Class Period, Defendants pointed to specific macroeconomic factors that drove changes in CVS's MBR and utilization—and by extension, the Company's

profits. For example, during CVS's February 8, 2023 earnings call, Defendant Guertin touted that CVS's medical benefit ratio of 86% had improved 100 basis points year-over-year and its adjusted operating income of $858 million grew 68.2% year-over-year. Defendant Guertin claimed that "*[b]oth of these measures were driven by the net favorable impact of COVID-19 compared to the prior year and strong underlying performance*, partially offset by the unfavorable impact of the flu." Similarly, when an Evercore ISI analyst questioned CVS management on May 3, 2023 about "*what gets to your high end of your MBR guidance*" for the Health Care Benefits segment, CVS's management explained that "[t]he pricing is generally set now, *so it's going to be about the underlying climate experience*."

61.    Analysts credited Defendants' statements regarding the drivers of the Company's key reporting metrics. For example, on November 1, 2023, UBS reported that "3Q appeared to mimic the intra-quarter commentary provided by management, with elevated MLR [medical loss ratio] driving a miss in HCB [Health Care Benefits] AOI [adjusted operating income]." Similarly, on November 2, 2023, Truist Securities agreed that changes in CVS's MBR were apparently "driven by ongoing elevated utilization in MA, primarily driven by outpatient and a number of supplemental benefits, including dental, behavioral and OTC/Flex cards."

### 3.    Defendants Assured Investors That CVS's Guidance Had Properly Accounted For Utilization Trends And Regulatory Requirements

62.    During the Class Period, Defendants assured investors that CVS's financial guidance for its Health Care Benefits accurately represented known MBR, utilization, and regulatory trends. Defendants Guertin and Cowhey emphasized the current, known factors that had informed their guidance, and they routinely assured investors that their then-present guidance had fully incorporated these factors. For example, during CVS's November 1, 2023 Q3 2023 Earnings Call, Defendant Cowhey claimed that "out of an abundance of caution [we] are

maintaining a provision for further utilization pressure in 2024." He also stated that "[w]e further indicated that we had captured a portion of the outpatient trend pressure in our bids in 2024, and that the remaining pressure we did not incorporate was reflected in the 2024 guide." On the same call, Defendant Kane assured that all utilization assumptions are "fully baked in" to CVS's guidance.

63.     Further, given that the viability of CVS's Medicare Advantage offerings hinged on its partnership with the federal government, analysts were particularly focused on the extent to which CVS's guidance reflected its knowledge of current regulatory developments and the present financial impact of increased government scrutiny.

64.     During the Class Period, Defendants assured investors that CVS's guidance had taken into account existing and increasing regulations. For instance, during CVS's February 7, 2024 Earnings Call, Defendant Cowhey assured investors that CMS's implementation of a new rule was "***fully encapsulated inside the guide***."

    **E.**    **Prior To The Class Period, CVS Leveraged The Company's "Secret Sauce" To Dramatically Expand Prior Authorization Requirements And Slash Costs For The Company's Most Expensive Claims**

65.     As investors only later learned in October 2024, when the U.S. Senate Permanent Subcommittee on Investigations ("PSI") released a report titled "Refusal of Recovery: How Medicare Advantage Insurers Have Denied Patients Access to Post-Acute Care" (the "Senate Report"), CVS had profited enormously by subjecting post-acute care to onerous automated "pre-authorization" requirements beginning in 2021. CVS did so with a singular focus on cost, with minimal to no regard to medical necessity.

66.     The Senate Report—which was the result of a 17-month inquiry that included obtaining more than 280,000 pages of internal documents from CVS and its two largest competitors, UnitedHealthcare and Humana—concluded that "CVS knew prior authorization

denials generated huge savings, and subjected more and more post-acute care requests to the process." Until PSI released the Senate Report on October 17, 2024 (the last day of the Class Period), "the magnitude and scope of prior authorization requests and denials for particular types of care ha[d] been undisclosed."

### 1. The Role Of Prior Authorization In Post-Acute Care

67. As discussed above, post-acute care is critical for Medicare Advantage beneficiaries, as these individuals aged 65 and older are particularly prone to comorbidities that complicate their recovery and necessitate treatment in skilled nursing facilities, inpatient rehabilitation facilities, and long-term acute care hospitals, among others. An April 2022 report from the Office of the Inspector General concluded that "[p]ost-acute services provided in facilities for rehabilitation and skilled nursing care are significantly more expensive than home health services, which may lead to increased scrutiny from MAOs [Medicare Advantage Organizations, like CVS] for these types of requests."

68. CVS can require that providers and patients receive preapproval—or "prior authorization"—for certain clinical services before it will provide coverage and payment. However, under CMS rules and regulations, CVS may only deny prior authorization if the Company determines that the request is not covered under the beneficiary's Medicare Advantage plan. Since these denials are issued *before* any coverage or services are rendered, a denial forces the patient to bear the cost themselves and possibly seek to appeal the denial, or forgo treatment altogether.

69. Those beneficiaries that choose to appeal are expected to navigate multiple levels of appeals. The process of the appeals was explained by Christine J. Huberty, an attorney at the Greater Wisconsin Agency on Aging Resources who provides legal assistance to residents experiencing Medicare coverage denials, in her testimony before the Senate's Permanent

Subcommittee on Investigations on May 17, 2023. The skilled nursing facilities give patients a two-day notice through a Notice of Medicare Non-coverage that contains no information regarding the reason for denial. Given the short notice, beneficiaries must immediately appeal to the Quality Improvement Organization ("QIO"), which issues a Determination Letter that provides little information regarding the specific reasons for the denial. Huberty further explained that at the same time, beneficiaries receive a Detailed Explanation of Non-coverage letter from their Medicare Advantage plan—which, despite its name, contains minimal explanation. After the first Determination Letter, Huberty explained that patients can appeal again with the QIO, which generally upholds the denial after a cursory review. Even when QIO overturns the denial, another denial is usually issued a few days later, forcing beneficiaries to continue to appeal again and again. At this stage, beneficiaries may appeal by formally requesting a hearing before an Administrative Law Judge, which burdens the already sick patients with the task of writing a request for a hearing and then providing documents and a list of witnesses—all within five days of receiving the Notice of Hearing.

70.     As a result, beneficiaries rarely appeal their denials. For example, the Senate Report concluded that "***patients sought reconsideration of less than 10 percent of denied requests.***"

71.     Notably, CVS executives had claimed that the Company's acquisition of Aetna would limit—or even eliminate—the hurdles associated with prior authorization requirements. When CVS announced its execution of its merger agreement with Aetna, Mark Bertolini (then-Chairman and CEO of Aetna) assured investors that "this combination right out of the box is going to address a couple of really important issues," including "the opportunity to help [beneficiaries] navigate that system . . . . ***So we can eliminate prior authorizations***."

## 2. The Senate Report's Findings

72. Notwithstanding the critical role of post-acute care in long-term patient health, the Senate Report revealed that CVS disproportionately targeted such care for prior authorization denials. Between 2019 and 2022, the number of post-acute care requests that CVS forced to undergo prior authorization scrutiny increased by 57.5%. However, based on PSI's review of thousands of internal CVS documents, the number of **total** requests subject to prior authorization "almost exactly mirrored the [42%] rate of growth in enrollment." In other words, CVS imposed prior authorization on post-acute care requests at a rate that dramatically outpaced the increases in both its enrollment and its overall volume of prior authorization requests. Simply stated, CVS was requiring far more prior authorizations for costly post-acute care. This significant disparity is illustrated below in Figure 4 from the Senate Report.

| Figure 4: CVS Enrollment and Prior Authorization Requests, 2019/2022 | | | |
|---|---|---|---|
| **Year** | **Overall Requests** | **Post-Acute Care Requests** | **Enrollment** |
| 2019 | 858,879 | 149,717 | 2,231,000 |
| 2022 | 1,218,569 | 235,848 | 3,169,000 |
| Growth | 41.9% | 57.5% | 42.0% |

Sources: Press Release, CVS, CVS Health Reports First Quarter Results (May 1, 2019), cvshealth.com/content/dam/enterprise/cvs-enterprise/pdfs/ingestion/cvs-health-q4-2018-earnings-pr.pdf; Press Release, CVS Health Reports Strong First Quarter Results (May 4, 2022), https://s2.q4cdn.com/447711729/files/doc_financials/2022/q1/Q1-2022-Press-Release.pdf, CVS-PSI-159395, Letter from CVS to PSI, March 29, 2024.

73. While CVS systematically expanded its prior authorization requirements, it simultaneously **decreased** the number of CVS employees responsible for reviewing those requests. Remarkably, CVS's internal documents reveal that, in January 2019, CVS projected precertification requests for its Medicare Advantage beneficiaries to grow by 16% compared to

2018, but it nonetheless downsized the clinical team responsible for reviewing those requests by 9%, from 242 people to 220.

74.     As demonstrated by the Company's internal documents, CVS was keenly aware that its profits were directly correlated with the volume of services it subjected to prior authorization requests. In January 2019, CVS's Clinical Service and Platform Solutions committee developed a presentation about the Company's "Precertification Savings Tool,"[2] which compared monthly savings to the number of prior authorization requests required. Based on an analysis of patient data from November 2017 through October 2018 across all lines of CVS business, including Medicare Advantage, CVS learned that greater prior authorization requirements led to greater savings. An email revealed in the Senate Report identified that CVS was able to mine and analyze years of patient data to calculate savings costs from prior authorization requirements in the Company's "Precertification Savings Tool."

75.     As shown in the chart below, CVS carefully tracked the correlation between "Total Savings" and "Total Requests" on a quarterly basis.

---

[2] The Senate Report notes that "[i]n the healthcare world, 'precertification' and 'prior authorization' are often treated as synonyms, both meaning utilization management decisions about a service made before it is administered."



76.     As shown in the chart above, CVS leveraged its ability to exploit years of confidential patient data in the Company's "Precertification Savings Tool" in order to calculate the extent to which artificially imposing greater prior authorization requirements on patients reaped greater savings for CVS.

77.     Based on CVS's internal utilization management analyses produced to PSI, the Company focused on slashing "medical costs" through denying post-acute admissions. According to an internal CVS presentation in May 2019, CVS saved more than $660 million in inpatient facilities-related medical costs for its Medicare Advantage members in 2018 alone. Based on

internal documents labeled "Concurrent Review"—CVS's term of art for utilization determinations regarding facility admissions and length of stay—the majority of the $660 million in 2018 savings came from "denied admissions."

78.    CVS closely tracked how its "denied admissions" and other rejected prior authorization requests artificially depressed patients' utilization of post-acute care facilities. For example, an internal September 2019 presentation entitled "Utilization Management Overview" presented four "Utilization Management Metrics," one of which was the rate at which CVS's Medicare Advantage beneficiaries were spending time in post-acute care facilities. The chart indicated that CVS's Medicare Advantage beneficiaries spent fewer days per thousand beneficiaries in these facilities in 2018 than they did in 2017. This held true for skilled nursing facilities, inpatient rehabilitation facilities, and long-term acute care hospitals. As a result of CVS's increased use of prior authorization to deny post-acute care claims, the confidential internal CVS presentation projected that patients' usage for each of these facilities would fall even further in 2019.

79.    The Senate Report reveals that expediting approvals to facilitate patient care through technology was not CVS's true goal—and in fact was viewed as an obstacle to CVS's efforts to slash costs and achieve maximum profits. As described in an internal November 2019 Clinical Services and Platform Solutions presentation, CVS developed a model "for all inpatient authorizations that predicts probability of approval." After the "auto-approvals" technology produced a $400,000 modeled loss (rather than savings), CVS abandoned the effort.

80.    By 2022, CVS was denying prior authorization requests for post-acute care facilities ***more than all other types of service requests combined***, which saved the Company (at minimum) hundreds of millions of dollars. CVS knew that its expanded prior authorization denials

of post-acute claims would result in a higher volume of appealed claims, because patients who were unable to afford the necessary post-acute care out-of-pocket—and yet required the prescribed medical care—may seek to overturn the initial denial in the hope that their costs would eventually be covered by CVS. On the other hand, insurance appeals pose a formidable hurdle to patients emerging from a medical crisis, particularly elderly patients who may not have the technical sophistication—or the health—to engage in protracted, complicated appeals. Thus, in March 2020, an internal presentation explicitly stated that CVS's ability to "predict volume of appeals as a result of [utilization management] denials" (*i.e.*, predict how many patients would actually undertake the arduous appeal process) is a "top priority." With this data, CVS would be able to predict the extent to which it could delay payment of these claims through the appeals process—and thus continue to reap hundreds of millions in savings.

### F. CVS Deployed Cost-Driven Algorithms To Deny Treatment The Company Was Required To Provide By Law

81.     While prior authorization requirements ultimately yielded significant profits to CVS, they entailed expensive labor costs up front to conform with CMS's requirements to make determinations based on medical necessity. Thus, in 2021, CVS determined to implement AI technology to expedite its review of prior authorization requests, reduce its up-front labor costs, and realize even greater profit.

82.     However, in practice, CVS's AI algorithms made medical care determinations based on cost, rather than medical necessity, leading to hundreds of millions of dollars in profit from denying claims. By improperly refusing to pay for medically necessary services (including services for which CVS was required to pay under existing regulations), CVS artificially and materially improved CVS's core performance metrics of MBR and utilization, thereby materially inflating the Company's reported and forecast revenue numbers during the Class Period.

1.    **Facing Cost Pressure, CVS Expands The Company's Prior Authorization Denials Through Illicit Algorithms**

83.    In early 2021, CVS faced enormous pressure to cut costs in its Medicare Advantage division. During CVS's February 16, 2021 earnings call, Eva Borratto (Executive VP and then-CFO) disclosed that the Company's MBR for Q4 2020 was 88.3%—"***an increase of 260 basis points compared to the prior year***"—during this "challenging time." Borratto indicated that "COVID-19-related investments, testing and treatment costs" were drivers of this increased MBR. Borratto previewed that "Cost savings initiatives across our segments are expected to ramp over the course of the year."

84.    Desperate to remain competitive, CVS turned to algorithms that could cut medical costs by reducing (or eliminating) the services received by CVS's Medicare Advantage beneficiaries. In a confidential CVS presentation that was only made public years later entitled "UM [Utilization Management] Strategic Innovation Portfolio," CVS's management suggested enlisting the third-party company "Post-Acute Analytics" ("PAA") as a "top five priority." This presentation stated that "Post-Acute Analytics" would deliver "Real time patient monitoring with AI technology and EMR integration optimizing [skilled nursing facility] utilization." Critically, CVS internally recognized that PAA's primary "Value Driver" was "Medical cost savings"— unlike the "Admin cost savings" offered by other "strategic innovation" initiatives. In other words, CVS recognized that implementing PAA's algorithms would contribute to CVS's bottom line by cutting benefits to Medicare Advantage beneficiaries, ***not*** by saving on the administrative costs of processing medical claims.

85.    PAA's ability to slash medical costs using artificial intelligence was immediately appealing to CVS's management. In February 2021, an internal confidential CVS presentation identified PAA as a promising "utilization management modernization" effort. In an internal April

29

21, 2021 email, a CVS Vice President for Utilization Management told her team that she had been asked "to identify $19.5 million in 2022 savings for the Medicare [line of business]." She asked her team to "identify these possible savings opportunities along with Information about what we have to stop doing to meet this target. We need this by the middle of next week." Among her team's proposed solutions was to "Deploy PAA?" Notably, "deploying PAA" would produce the most substantial amount of savings out of all other ideas the Utilization Management team was considering.

86.    According to the Senate Report, CVS enlisted PAA's cost-cutting algorithm in April 2021. Even though CVS hired PAA solely to cut medical benefits (as demonstrated by the Company's internal documents), during a May 4, 2021 earnings call, Defendant Lynch claimed that "We are also using AI and other technologies *to simplify our prior authorization processes*. We are decreasing the workload on providers and shortening the time it takes to get patients on appropriate therapy. This improves the overall patient experience, *while maintaining the clinical rigor, quality improvements and safety programs that are vital to our clients*."

### 2.    CVS Programs Its Algorithms With The "Secret Sauce": Denying Claims Based On Cost Savings, Not Medical Necessity

87.    CVS programmed the Company's algorithms to make care determinations based on cost, rather than to ensure claims were approved or denied based on medical necessity. By using internal criteria that prioritized savings over medical necessity, these algorithms violated longstanding CMS regulations that required CVS to provide the same "basic benefits" that are available in Traditional Medicare and cover "all services that are covered by Part A and Part B of Medicare," including as CMS promulgated in 42 C.F.R. §422.101(a) (2019). The algorithms' recommendations were then rubber-stamped by medical staff that lacked the necessary resources to adequately review the algorithm's recommendations.

88.     Medicare coverage determinations in a skilled nursing facility should turn on the beneficiary's need for skilled care to improve a patient's condition, to maintain a patient's current condition, or to prevent deterioration of the patient's condition. Rather than evaluate prior authorization requests based on medical necessity—as required under longstanding Medicare Advantage rules—CVS programmed the Company's algorithms with internal criteria that prioritized cost savings over patient care.

89.     For example, CVS programed PAA's algorithm with internal criteria to recommend medically insufficient stays to minimize the Company's payments for costly post-acute care facilities. FE-1 worked as a senior PAA account manager to post-acute care facilities assessing clinical needs and use of PAA's algorithm (called "Anna") by those facilities from before the Class Period through summer 2023. FE-1 worked with over 100 facilities across at least 10 states in submitting prior authorization requests to CVS through Anna. FE-1 directly reached out to skilled nursing facilities that provided post-acute care and required them to upload patient data and medical documentation, including ICD-10 codes (which are used to classify diseases, symptoms, and procedures), the age of the patient, medical diagnoses, comorbidities, hospital re-admissions, length of stay, and average acuity ratings for each facility. FE-1 explained that Anna was directly connected with facilities' electronic medical system, and Anna could pull data from these systems.

90.     FE-1 explained that Anna's AI analysis was driven by a "target" length of stay of 10 to 14 days or fewer—regardless of the medical needs of the patient, which was often for days or weeks longer. FE-1 confirmed that Anna's recommendation for minimal length of stays was consistent with CVS's cost concerns—"[t]he shorter or lower the stay, the better for Aetna"— because "[t]he lower the days, the more money Aetna [CVS] made."

91.     FE-2 served as Vice President of Product Support at PAA from May 2022 through November 2022. FE-2's "primary responsibility was the company's [PAA's] strategic direction," and FE-2's team coordinated with medical staff "that worked at skilled nursing facilities on behalf of Aetna and assisted them with their software that allowed them to enter the member's information for their health plans and the anticipated length of stay for the members at the skilled nursing facilities." FE-2 similarly confirmed that, notwithstanding the requirement to render a recommendation consistent with Traditional Medicare's standard, "cost" was a "big" factor programmed into Anna—"the question was how long the stay should last." FE-2 explained that the "***secret sauce*** was trying to reduce costs for Aetna," and "the goal was to help Aetna lower their costs and achieve the lowest cost possible to providing services." Per FE-2, "[t]he whole purpose was to reduce cost for a capitated regulated model" because "Aetna had a fixed cost to their program with CMS."

92.     FE-2 also explained that CVS was regularly informed as to Anna's recommendations. Per FE-2, there was a "monthly review between PAA and CVS to look at their metrics" from Anna's recommendations, including "length of stay"—which FE-2 identified as "one of the key metrics."

93.     CVS's internal criteria for Anna violated the Company's obligation to provide care consistent with what would have been provided under Traditional Medicare. Indeed, at the Senate Hearing, Christine Huberty, the attorney at the Greater Wisconsin Agency on Aging Resources discussed above, explained that her agency rarely encountered ***any*** Traditional Medicare denials of stays in skilled nursing facilities.

3.    **CVS Forces Medical Staff To Rubber-Stamp Its Algorithm's Recommendations**

94.    CVS purportedly employed clinical reviewers to review the algorithm's recommendations and ensure that the final determinations were consistent with Medicare's directives. However, during the Class Period, CVS instituted a leadership directive that forced clinical reviewers to churn out as many prior authorization denials as possible, rather than meaningfully evaluate an algorithm's recommendations and make an independent assessment of medical necessity. Therefore, CVS's medical staff, who according to the Senate Report could see the AI recommendations, rubber-stamped the AI-generated recommendations instead of using their own medical judgment to evaluate claims. As David Lipschutz, Associate Director of Center for Medicare Advocacy, a non-profit that has reviewed algorithmic denials for years, commented to STAT News, "[w]hile the firms say [the algorithm] is suggestive, it ends up being a hard-and-fast rule that the plan or the care management firms really try to follow. There's no deviation from it, no accounting for changes in condition, no accounting for situations in which a person could use more care."

95.    CVS implemented a system to steer as many cases as possible toward denials that was monitored and enforced through an internal database. FE-3 was a Utilization Management supervisor for up to 20 utilization management nurses in Aetna's in-patient unit from 2016 through September 2023. In this role, FE-3 directly handled prior authorizations for skilled level nursing and long-term care, including referrals, authorizations, and denials, and FE-3 also oversaw and audited the productivity and quality of utilization management operations. FE-3 emphasized that "leadership wanted them to forward ***at least 50%*** of their cases to medical directors," who were permitted to deny the claims. FE-3 affirmed that the 50% "target" directly came from CVS's leadership. FE-3 explained that CVS had implemented Power BI, a data warehouse that included

"case load numbers, approval and denial metrics," "turnaround work times," "nurse productivity rates," and "whether nurses were handling large case volumes" to enforce this directive. FE-3 explained that the Company leveraged this data to review its denial rates with medical staff—and "[f]or those below that 50% goal, they dove into their work and talked about it."

96.    CVS's implementation of insufficient staffing levels further exacerbated the denial rates. The Company's AI-generated recommendations were supposed to be reviewed by CVS's medical staff (both initially and every 2-3 days thereafter to assess the patient's then-current status). However, FE-1, who worked with post-acute care facilities to implement and use Anna and saw CVS's denial patterns across many such locations, recalled that CVS's staffing shortages made this review impossible. FE-1 explained that "they didn't have enough nurses at Aetna to handle the work" and sufficiently review Anna's recommendations. FE-1 noted that "Aetna needed **double** the work force to handle these cases." FE-3 similarly explained that "they could see through Power BI that nurses were overwhelmed." Per FE-3, the Company "could see nurses' productivity and that the workload outpaced nurse capacity in 2022 to 2023." Specifically, FE-3 described that Power BI tracked nurses' productivity rates: "If the target was to be 100% productive, you knew that a nurse was working hard if they hit 120% to 130%." FE-3 described similar experiences in "the southeast region, which included Georgia, North Carolina, Tennessee, Louisiana, Alabama, Mississippi, the Gulf and Florida." However, despite the crushing workload of these nurses, the Senate Report found that CVS had **reduced** its review staff in 2019 to just 220 individuals to review the thousands of requests received by CVS daily, as described above.

97.    As a result of these denials, the Company's insufficient post-acute stays frequently resulted in appeals. FE-1 recalled "one lady in a nursing home who was approved for the nursing home while she was at the hospital. But before she got into the building, they gave her a notice of

non-coverage, [she] *had one day in and had to be out*." If the patient did not feel that they had received sufficient care, they could appeal the decision—however, as FE-1 explained, "[n]ot everyone has the mental capacity to pursue the appeals," particularly in their weakened state that necessitated post-acute care.

98.     If the patient remained at the facility and lost the appeal, they would have to pay out-of-pocket for the additional days they stayed. FE-1 explained that these appeals were "frequent" and estimated that "1 out of 3 cases were appealed"—which underscores the medically insufficient length of the stays prescribed by Anna. This outsized appeal rate stemming from CVS's illicit algorithm is particularly stark given how few prior authorization cases are typically appealed. For example, as discussed, the Senate Report concluded that "*patients sought reconsideration of less than 10 percent of denied requests.*" The impropriety of the algorithm's recommendations—and failure to adequately evaluate medical necessity—is underscored by its disproportionate appeal rate when compared to CVS's peers.

### 4.     CVS Dramatically Expands Its Use Of Illicit Algorithms To Prioritize Cost Savings

99.     As revealed in the Senate Report, upon its initial success of deploying PAA to reduce costs, CVS rapidly expanded the Company's use of algorithms to generate savings across the entire Medicare Advantage division. For example, in April 2021, CVS first deployed PAA's algorithm in its Medicare Advantage plans in Ohio and Kentucky. However, by July 2021, CVS had already planned to expand the Company's use of the algorithm to the rest of its Medicare Advantage division nationwide.

100.     CVS's use of these denial algorithms—and the resulting cost savings to the Company from cutting medical costs—exploded in the months leading to the Class Period. In early 2022, CVS started building a "Facility level predictive model." As of October 2022, that model

was already evaluating requests at twenty-six facilities that served Medicare Advantage patients. By fall of 2022, CVS had developed the ability to apply its rules engine to both "facilities" and "diagnoses," after determining those areas presented the best opportunity for savings. By the fourth quarter of 2022, CVS had sanctioned the Company's algorithms for use in in sixteen states. Internal CVS projections estimated that, by the end of 2022, prior authorization requests for facility admissions were automated at approximately one-seventh the rate of surgeries and other procedures. That made facility admissions a ripe target for CVS to deploy its algorithms to deny care, cut costs, and thereby boost profits.

101.    CVS sought to reap the greatest savings—at the cost of denying medically necessary services—by strategically deploying Anna in the Company's highest-enrollment states for Medicare Advantage beneficiaries. FE-1 recalled that PAA's algorithms were at use in facilities in "predominantly the Eastern seaboard and expanding to the Midwest," and identified states including Indiana, Illinois, Florida, North Carolina, Georgia, Pennsylvania, Texas, Tennessee, Alabama, Ohio, Kentucky, Missouri, Mississippi and Minnesota. As of the start of the Class Period in November 2022, Pennsylvania, Ohio, and Florida had the highest Medicare Advantage enrollments for CVS in the United States.

### 5.    CMS's Internal Data Reveals That CVS's Prior Authorization Denials Skyrocketed As It Deployed Illicit Algorithms During The Class Period

102.    The rate at which CVS imposed and denied prior authorization requests skyrocketed as the Company deployed its illicit algorithms during the Class Period.

103.    A proprietary consulting expert analysis of certain data, including enrollment statistics from CMS and prior authorization denial rates from KFF, reveals that CVS's number of prior authorization requests per enrollee increased by over 60% from 2021 to 2023—starting from

0.8 prior authorization requests per enrollee in 2021 and peaking at 1.3 prior authorization requests per enrollee in 2023.

104.    Further, proprietary consulting expert analysis of the CMS and KFF data found that CVS had a 50% increase of prior authorization denials per enrollee from 2021 to 2023, spiking from 0.096 in 2021 to 0.143 in 2022 and 2023.

105.    This analysis also found that CVS had a higher probability of denying a prior authorization request than its biggest competitors. As shown in the below chart, CVS alone denied double-digit percentages of prior authorization requests, while large competitors had denial rates as low as 3%.



106.    However, Defendants scrupulously concealed the Company's use of illegal algorithms during the Class Period, while misleadingly attributing the Company's financial performance to other, benign factors.

**6.    CVS's Algorithms Generated Millions Of Dollars In Illicit Profits  And Artificially Depressed The Company's MBR, Utilization, And Cost Trends**

107.    As a result of CVS's illicit algorithms that prioritized cost over medically necessary clinical services, the Company's savings skyrocketed and its core cost metrics—including MBR, utilization, and medical cost trends—were artificially lowered by material amounts.

108.    By denying medically necessary care, CVS's algorithms resulted in substantial savings for the Company. Based on PSI's review of internal CVS documents, in April 2021, CVS initially projected that the Company's cost-focused algorithms would save approximately $4 million per year. However, internal documents revealed that, just seven months later in November 2021, CVS projected that these algorithms would save the Company more than $77 million over the next three years—***at least six times more than its initial estimate***.

109.    Based on these substantial savings, in a March 2022 meeting, CVS decided to deprioritize a plan to reduce the overall volume of prior authorizations (which would have saved on administrative costs), concluding that the negative impact on cost savings was "too large to move forward." CVS continued to prioritize denials of facilities claims.

110.    Then, in October 2022—directly before the beginning of the Class Period—CVS internally recognized that its "automation concurrent review" had led to astonishing "medical cost savings" (*i.e.*, ***not*** administrative savings) through denying prior authorization requests. Specifically, in a confidential October 2022 Automation Update, CVS estimated that automated approvals of 174,000 initial reviews of inpatient admissions would generate, at most, $13.3 million in administrative cost savings. However, in the same update, CVS estimated that its 225,000 denials of these claims had generated an astonishing $2.5 billion in "Medical Cost Savings" in 2021—*i.e.*, savings generated from ***cuts*** to providing medical services, as shown in the below slide entitled "UM [Utilization Management] Automation Concurrent Dashboard."



111.    Based on the "2021 analysis" in the above slide, coupled with its review of additional CVS documents, the PSI concluded that "Medicare Advantage beneficiaries represented the largest share of these denials: if the $2.5 billion were proportionally distributed, ***denials of these Medicare Advantage claims would represent $1.1 billion in savings***." As disclosed in CVS's Form 10-Ks, CVS's Medicare Advantage membership grew from 2,971,000 as of FY 2021 to 3,270,000 as of FY 2022 and 3,460,000 as of FY 2023. Conservatively assuming that the $1.1 billion in savings CVS reaped in 2021 from denials of Medicare Advantage claims linearly grew in parallel with its enrollment—and did not exponentially grow—CVS's denials of Medicare Advantage claims would have reached over ***$1.2 billion*** in 2022 and nearly ***$1.3 billion*** in 2023.

112.    CVS continued to generate massive savings from denying medically necessary care to Medicare Advantage patients during the Class Period. As a result, CVS's MBR, utilization, and medical cost trends were all artificially lowered during the Class Period, falsely overstating the Company's financial performance. Nonetheless, Defendants repeatedly touted these positive

metrics—and CVS's resulting inflated revenues and profits—and expressly attributed the Company's apparent success to other factors, while they misleadingly concealed the material extent to which these core performance metrics were affected by CVS's secret implementation of algorithms to generate cost savings. Predictably, this unsustainable and risky practice ultimately collapsed, as discussed further below.

### G. While CVS Reaps Illicit Cost Savings, Its Patients Suffer As Critical Services Are Denied And Delayed

113.    As a result of CVS's illicit algorithms, the rate at which CVS denied its patients coverage and services skyrocketed past even its largest competitors. On January 24, 2025, after the Class Period, KFF published an analysis based on non-public CMS data that revealed CVS had denied more prior authorization requests than *any other* Medicare Advantage provider in 2022. Specifically, CVS denied in part or in full 13% of all prior authorization requests in 2022. CVS's denial rate exceeded even its largest competitors—for example, UnitedHealthcare had a 9% denial rate and Humana had a 7% denial rate during the same time period. KFF's analysis also revealed that CVS had the second highest rate of successful appeals in 2022—*91% of patients' appeals overturned CVS's initial denial*. CVS's outsized rate of successful appeals reinforces that a substantial portion of its initial denials were non-meritorious.

114.    CVS's use of algorithms to deny and delay care saved the Company a tremendous amount of money by not paying out for medical services—but at a great cost to its patients. Patients denied coverage are forced into a "Sophie's Choice": either pay out-of-pocket and seek to appeal the adverse determination over many months, or forgo treatment altogether.

### H. Defendants Capitalize On Their Lies To Investors To Raise Over $10 Billion In Debt Offerings And Fund Massive Acquisitions

115.    CVS's illicit algorithms artificially improved the Company's core performance metrics—including its MBR, utilization rate, and medical cost trends—and falsely painted a rosy

and misleading picture of the Company's financial health. Defendants capitalized on CVS's artificially inflated performance to raise over $10 billion of long-term debt and fund massive acquisitions that were critical to the Company's sustained growth.

116.    CVS undertook nearly $20 billion in acquisitions in the first half of 2023. As Defendants explained in CVS's May 3, 2023 Form 10-Q, CVS acquired Signify Health (an in-home healthcare provider) for $7.8 billion on March 29, 2023. Just a month later, on May 2, 2023, CVS acquired Oak Street Health (a large primary care company) for $10.6 billion.

117.    Defendants assured investors that these acquisitions were critical to the growth of the Company. As part of the "CEO Commentary" in a May 3, 2023 press release, Defendant Lynch claimed that these acquisitions "will help unlock future growth[.]" Analysts believed Defendants' assurances that these acquisitions were critical to the long-term success of CVS. For example, on May 3, 2023, Truist reported that "these acquisitions carry a whole host of benefits" and "further build upon CVS's highly differentiated suite of assets which we think improves positioning to further accelerate the shift to value-based care and capture a greater portion of healthcare spend."

118.    In addition, Defendants emphasized that these acquisitions would impact core Medicare Advantage metrics. For example, on a February 8, 2023 earnings call, Defendant Guertin stated that "as we think about navigating the future of Medicare Advantage and maybe even a broader opportunity in Medicare value-based care in the fee-for-service population, I think ***both Signify and Oak are exactly the kind of assets that you would like to have at your side as you do that***."

119.    Defendants relied on massive debt offerings to finance these acquisitions. In two offerings in February and June 2023, CVS issued and sold $11 billion of debt to fund the

acquisition of Signify and Oak Street. In each of these offerings, the Company relied on filings that presented artificially deflated MBR and utilization metrics.

120.    Defendants were motivated to inflate CVS's use of illicit algorithms in order to complete these offerings and so that CVS could consummate nearly $20 billion in acquisitions to expand the Company. Investors purchased debt in these offerings under the false belief that CVS's success was attributable to its legitimate business practices and benign macroeconomic trends. In truth, the success of the Company's Health Care Benefits segment was propped up by CVS's implementation of illegal algorithms that prioritized cost over medically necessary services.

## I.    Regulators Target Prior Authorization Abuses And CVS's Business Suffers

121.    Starting in early 2023, the government began to target the widespread violations of existing CMS regulations that CVS had secretly carried out during the Class Period. On April 12, 2023, CMS issued "Clarifications of Coverage Criteria for Basic Benefits and Use of Prior Authorization" as part of its "Contract Year 2024 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicare Cost Plan Program, and Programs of All-Inclusive Care for the Elderly" (42 C.F.R. 417, 422, 423, 455, 460). These clarifying regulations were effective on June 5, 2023 and largely applicable to coverage beginning January 1, 2024.

122.    In response to "numerous inquiries regarding MA organizations' use of prior authorization and its effect on beneficiary access to care," CMS issued these "clarifications" to ensure that Medicare Advantage insurers like CVS would provide the same "basic benefits" as Traditional Medicare "without unreasonable barriers or interruptions." CMS made clear that CVS and other Medicare Advantage insurers "must comply" with the "general coverage and benefit conditions included in Traditional Medicare laws." CMS also explained that "prior authorization policies for coordinated care plans may only be used to confirm the presence of diagnoses or other

medical criteria and/or ensure that an item or service is medically necessary based on standards specified in this rule." Further, CMS emphasized that "*approval granted through prior authorization processes must be valid for as long as medically necessary*."

123.    These clarifying regulations required CVS to make any internal criteria for prior authorization requests it used transparent. For example, the regulations provided that "[w]hen additional, unspecified criteria are needed to interpret or supplement general provisions, the MA organization must demonstrate that the additional criteria provide clinical benefits that are highly likely to outweigh any clinical harms, *including from delayed or decreased access to items or services*." Further, CMS now required Medicare Advantage insurers to post their "internal coverage criteria" and provide a public "summary of evidence that [was] considered during the development of the internal coverage criteria used to make medical necessity determinations."

124.    CMS also highlighted that Medicare Advantage insurers could not use algorithms to circumvent existing regulations. Specifically, "MA organizations must ensure that they are making medical necessity determinations based on the circumstances of the specific individual, as outlined at §422.101(c), *as opposed to using an algorithm or software that doesn't account for an individual's circumstances*." CMS explained that §422.101(c) requires that "MA organizations must make medical necessity determinations based on, among other things, the enrollee's medical history (for example, diagnoses, conditions, functional status), physician recommendations, and clinical notes."

125.    The regulatory scrutiny continued to swell following CMS's clarifying regulations. On May 17, 2023, PSI launched its investigation into "the barriers facing seniors enrolled in Medicare Advantage in accessing care." PSI's investigation specifically targeted CVS and its two largest competitors, UnitedHealthcare and Humana. During the course of PSI's investigation, CVS

and these companies ultimately produced more than 280,000 pages of internal documents concerning their internal prior authorization practices.

126.    On May 17, 2023, PSI held a hearing on "Examining Health Care Denials And Delays In Medicare Advantage" ("Senate Hearing"). The Senate Hearing focused on Medicare Advantage insurers' abuse of prior authorization requirements to deny medically necessary care. At the outset of his opening statement, Senator Blumenthal highlighted the longstanding rule that while "Medicare Advantage insurers are required to provide beneficiaries with the same minimum level of coverage as traditional Medicare . . . [w]e have seen evidence indicating that in many instances, they are failing to do so." Senator Blumenthal emphasized that, "[p]erhaps most troubling of all, there is growing evidence that insurance companies are relying on algorithms, rather than doctors or other clinicians, to make decisions to deny patient care." Senator Blumenthal explained that, while "[i]nsurers may refer to these algorithms as tools used for guidance," the "denials they generate are too systematic to ignore"—and so "part of what needs to happen is to make them more transparent so that patients and providers know, along with the public, how they are being used."

127.    Senator Blumenthal also announced PSI's bipartisan investigation into the nation's largest health insurers. Specifically, Senator Blumenthal announced, "I want to put these companies on notice. If you deny lifesaving coverage to seniors, we are watching. We will expose you. We will demand better. We will pass legislation if necessary, but *action will be forthcoming*."

128.    Later in the hearing, Megan H. Tinker, Chief of Staff for the Office of Inspector General, testified that "Medicare Advantage plans' internal criteria are supposed to be no more restrictive than original Medicare," but that the "capitated payment system in Medicare Advantage creates a potential incentive for insurers to deny access to services for enrollees."

129.     However, barely more than a week later, CVS's May 25, 2023 Form 8-K assured investors that "The Company has invested significant resources to comply with Medicare standards, and its Medicare compliance efforts will continue to require significant resources." This statement falsely assured investors that CVS was dedicated to its legal compliance and had nothing to fear from PSI's announcement of an investigation into the Medicare Advantage industry.

130.     Behind the scenes, however, the Company was privately singled out by regulators. As revealed in the Senate Report, on September 14, 2023, CVS's senior leadership was summoned to a non-public briefing before the PSI concerning the Company's use of algorithms for prior authorization.

131.     Later in 2023, CMS warned CVS and other Medicare Advantage organizations that it intended to audit insurers to ensure compliance with these clarifying regulations. On October 24, 2023, CMS issued a memorandum entitled "2024 Oversight Activities" to all Medicare Advantage organizations. CMS announced that "[s]tarting in January 2024, the Medicare Parts C and D Oversight and Enforcement Group will begin conducting both routine and focused audits of organizations to assess compliance with the UM [utilization management] requirements finalized in CMS-4201-F." In advance of these audits, CMS announced that it would "conduct[] strategic conversations with MAOs to ensure your understanding and implementation of these coverage criteria and UM requirements." Per CMS, these were intended for MAOs to "confirm your compliance before CMS begins auditing the requirements in 2024."

132.     This surge of government scrutiny was an overriding focus for Defendants. For example, CVS's Q3 2023 "Medicare Compliance FDR Newsletter" assured that "CVS Health® is *actively reviewing all the changes in this final rule*." In this newsletter, CVS acknowledged that,

for certain aspects of these rules, "CVS Health will ***need*** to comply for 2024 plan year materials, beginning September 30, 2023."

133.    In part due to "actively reviewing all the changes in this final rule," Defendants knew that CVS's illicit algorithms posed an immense risk for the Company, particularly given that PSI had already put CVS "on notice" that its prior authorization practices were under scrutiny and that CMS would conduct audits starting in 2024 to assess the Company's compliance with Medicare Advantage rules. Further, not only did CVS's algorithms violate longstanding CMS rules, but under the recent clarifying regulations Defendants would now be forced to publicly publish the Company's internal criteria for the algorithms that prioritized cost savings over care determinations. Defendants knew that any audit or public disclosure of the Company's illicit criteria would risk both reputational harm and regulatory penalties that could jeopardize CVS's reimbursements under the capitated payment—a substantial threat to the Company's profitability.

134.    Thus, CVS quickly acted to wind down these programs before the new CMS regulations were applicable for coverage starting in January 1, 2024 and before CMS subjected CVS to an audit of the Company's internal criteria practices. Before the rule took effect, CVS quietly terminated PAA. As CVS rushed to phase out its illicit algorithms, the Company was no longer able to deny claims for medically necessary care it deemed too costly. As the Company was forced to pay out on additional claims, CVS's MBR increased to a Class Period high of ***90.4%--*** nearly a 7% increase from when CVS first implemented PAA's algorithm in the years leading up to the Class Period.

**J.    Defendants Refuse To Account For Known Utilization Trends And Issue False Guidance**

135.    Once CVS was no longer able to rely on illegal algorithms to manipulate the Company's profitability by artificially deflating utilization and cost trends, the story of the its

Medicare Advantage business's profitability began to collapse. Nonetheless, Defendants continued to issue inflated guidance and falsely attributed the Company's performance to benign macroeconomic trends. In reality, Defendants' purported guidance was based on stale data and assumed CVS's continued use of illicit algorithms to boost financial performance. Both assumptions were contrary to the facts known to Defendants at the time.

136.    Detailed accounts from former CVS employees with firsthand knowledge have revealed that, during the Class Period, Defendants refused to incorporate known utilization trends into their guidance to investors, and instead relied on stale, out-of-date data that painted a falsely rosy picture of the Company's financial health. To make matters worse, Defendants lied to investors about the basis for this inflated guidance, claiming that "everything is fully baked in" and "nothing that we've seen" in current data "gives us pause."

137.    From April 2021 through February 2024, FE-4 served as a Senior Medical Economics Analyst at Aetna's division in CVS. As part of this role, FE-4 "assessed potential savings programs that CVS could implement in order to control rising utilization or increasing costs," and he possessed direct insight into utilization and medical claims for CVS's Medicare Advantage business.

138.    From October 2021 through October 2023, FE-5 served as the Lead Director of Project Program Management at Aetna's division in CVS. As part of this role, FE-5 "oversaw business readiness, change and product management for the utilization management space." FE-5 and his team of six direct reports "coordinated all training" and "testing plans" for CVS's utilization management practices. FE-5 reported to CVS's Chief Medical Officer, who reported to the Executive Director, Clinical Services at CVS, who in turn was "heavily involved" in forecasting and "connected to the C-suite."

139. FE-5 explained that, during the Class Period, CVS's "guidance didn't account for known utilization drivers." Specifically, FE-5 explained that CVS's numbers for 2020 were a lot less than in previous years, and it was known that utilization would be a certain percentage higher in 2021 and subsequent years. Nonetheless, per FE-5, "in 2023, CVS was issuing guidance based on 2020 numbers." FE-5 further reported that the utilization figures CVS used did not reflect the "state of the world and what was going on at that time, which would increase utilization."

140. Corroborating FE-5, FE-4 stated that CVS's guidance "relied on stale utilization data and stale medical cost trends." FE-4 explained that, instead of using current data, CVS "used data from 2 to 3 years earlier"—which resulted in "huge shifts in Medicare costs and utilization and care being pushed back."

141. CVS's use of stale data was a crucial flaw because 2020—during the depths of the COVID-19 pandemic—was a period of unusually low utilization, when millions of Americans were locked down or otherwise deferred medical procedures. Data from 2020 in no way reflected the reality of 2023. In 2020, for example, CVS's Health Care Benefits segment had an MBR of just 80.9%, meaning CVS retained over $19 of every $100 in premiums as profit.

142. As vaccination spread after the FDA authorized the Pfizer and Moderna COVID-19 vaccines in December 2020 and the United States recovered from the pandemic, utilization increased. By 2023, per FE-4, "there was a lot more utilization"—specifically, CVS observed "utilization spiking through the roof," and "this was on the radar for a while."

143. Compounding CVS's use of stale data, CVS's AI-driven claims denials had artificially depressed utilization because they prevented Medicare Advantage members from accessing care. As CVS was forced to terminate this practice, utilization further increased. FE-5 confirmed that "the more they rolled up automation, it set off bells" and it "had an impact on

utilization." In other words, as certain automation programs were wound down, CVS's utilization metrics skyrocketed. But, per FE-4, "the rising costs and increased utilization were not reflected in [CVS's] current forecast" in 2023. FE-5 even escalated the automation issues to the Chief Medical Officer, who escalated to the Executive Director of Clinical Services, who escalated to the Vice President of Commercial Care Management, who escalated the issue even further.

144.    Nonetheless, Defendants did not stop using stale data for CVS's guidance until 2024. FE-4 explained that "it was not until 2024 when they started using the correct models that weren't outdated" and "in 2024, CVS started shifting from pre-pandemic data and started incorporating current data into their models." FE-4 similarly confirmed that "the big driver behind things that were out of whack" was CVS's failure to consider more recent data in the modeling— *i.e.*, CVS's refusal to incorporate data from 2021-2022 into its guidance until 2024.

145.    CVS's senior management was well aware that stale data from 2020 did not reflect the current reality by 2023. FE-4 explained that "it was no secret that the modelling at CVS was problematic"—and, in fact, "the Company leadership was aware of these issues." FE-4 attended leadership town halls with the Company's leadership, including Aetna's Vice President of Medical Economics, specifically "to discuss rising medical costs, utilization, and economic trends" on a quarterly basis during the Class Period. FE-4 further explained that CVS's outdated and misleading forecasts were "without a doubt" discussed with CVS's CEO and CFO based on his experience with CVS executives.

146.    Similarly, FE-5 stated that "the forecasting was overseen by the CFO"—and, moreover, "the C-Suite and CFO directed" CVS's guidance. Remarkably, FE-5 saw firsthand "an executive presentation with graphs" provided by the Executive Director of Clinical Services that was "from the CFO's group" and "showed they used 2020 numbers for their 2023 guidance."

147.    FE-4 attempted to escalate these utilization issues, including to CVS's executives. FE-4 raised these modeling issues to the Senior Manager of Medical Economics, who then escalated these issues to the Director of Medical Economics. Unfortunately, these executives refused to heed FE-4's concerns.

### K.    The Truth Is Revealed

148.    The truth about Defendants' misrepresentations and omissions was revealed to investors on May 1, 2024 and October 17, 2024. These disclosures revealed, in piecemeal fashion, CVS's risky and unsustainable use of AI-driven algorithms that rejected costly claims, as well as the financial impact of Defendants issuing guidance based on artificially depressed utilization and stale data. Both corrective disclosures caused the price of CVS's stock to decline significantly on high trading volume—and, collectively, they wiped out at least $14 billion in shareholder value. Investors suffered enormous damages as the truth was incrementally revealed.

### 1.    On May 1, 2024, CVS Substantially Rewrites Its Guidance To Reflect Updated Data And Reports Disastrous Earnings Driven by Winding Down The Illicit Algorithms

149.    On May 1, 2024, CVS issued a Form 8-K that reported the Company's financial results for Q1 2024, including disturbing financial results in CVS's Health Care Benefits segment. These results—which were dramatically below the market's expectations—stemmed in large part from the fact that Defendants had been forced to wind down the illicit algorithm programs that CVS had previously used to artificially boost the Company's financial performance. For example, the press release disclosed that the MBR for the Company's Health Care Benefits segment had peaked at 90.4% for Q1 2024—a Class Period high and *an increase of 580 basis points* from the same period during the prior year. Nonetheless, CVS did not fully disclose the principal reason for this stark decline in financial performance. Instead, CVS stated that the adjusted operating income for the Health Care Benefits segment had "decreased *59.9%* for the three months ended March 31,

2024 compared to the prior year **primarily driven by increased Medicare utilization**, the unfavorable impact of the previously disclosed decline in the Company's 2024 Medicare Advantage star ratings, as well as an unfavorable year-over-year impact of prior-year development."

150.    CVS also disclosed that the poor performance of its Health Care Benefits segment had dramatically affected the entire Company's financial health. The press release announced that CVS was forced to substantially revise down its guidance for 2024, including cutting its diluted EPS guidance from $7.06 to $5.64 and reducing its cash flow from operations guidance **by $1.5 billion** from $12 billion to $10.5 billion. The Company disclosed that its earnings shortfall was "**primarily due to a decline in the Health Care Benefits segment's operating results**, **reflecting utilization pressure in the Company's Medicare business**."

151.    During an earnings call that same day, Defendant Cowhey revealed that the "Health Care Benefits medical costs primarily attributable to Medicare Advantage came in approximately **$900 million above our expectations**" in Q1 2024. Notably, Cowhey conceded that $400 million of this amount "is driven by elevated utilization trends that our guidance now assumes will persist for the remainder of 2024"; in other words, CVS's original guidance omitted at least $1.6 billion in costs from higher utilization in 2024. Defendant Cowhey also disclosed massive cuts to CVS's guidance for the Health Care Benefits segment, including that "we now expect adjusted operating income of at least $3.6 billion, down from our previous guidance of at least $5.4 billion. We now expect our 2024 medical benefit ratio to be approximately 89.8%, an increase of 210 basis points from our previous guidance." However, Defendants again concealed that their cessation of illegal algorithms had materially contributed to this poor performance.

152.    Analysts were shocked at the magnitude of CVS's revisions, particularly after Defendants had repeatedly assured investors as to the integrity of their guidance as recently as February 2024. For instance, in a May 2, 2024 report, Deutsche Bank stated that "CVS reported Q1 results and annual guidance that were ***among the most disappointing we have ever seen come from a company of the size and breadth of CVS*** . . . CVS had reiterated guidance as recently as late February, which again makes the magnitude of the negative surprise a bit disorienting." The report also questioned the integrity of CVS's "processes and internal reporting" and Defendants' prior assurances that the Company's "book of MA business was priced and coded appropriately for 2024" and that its utilization assumptions were "conservative":

> CVS had been telling investors their book of MA business was priced and coded appropriately for 2024, and that investor concerns around utilization were unfounded. If anything, CVS had indicated its utilization assumptions in its MA book were ***conservative***. However, investors and analysts were cautioning the company on utilization as far back as December of 2023, and ***the company sticking to its messaging on utilization being under control now forces analysts to question CVS'[s] processes and internal reporting***.

153.    Similarly, HSBC Global Research downgraded CVS's rating based on its "gloomy 2024 outlook" and described CVS's press release as a "big miss" that was "much lower than HSBCe and consensus." HSBC acknowledged that "[w]e are surprised as to how quickly the outlook deteriorated."

154.    These disclosures caused the price of CVS's stock to decline by $11.40 per share, or approximately 16.8%, from a closing price of $67.71 on April 30, 2024 to a closing price of $56.31 per share on May 1, 2024, on high trading volume. In sum, these disclosures erased over $14 billion in shareholder value.

155.    On August 7, 2024, Defendant Kane was suddenly terminated as part of CVS's leadership restructuring. In a press release that day, CVS disclosed that it ousted Defendant Kane—less than a year after he was hired as Aetna's president—"based on the current performance

and outlook for the Health Care Benefits segment," which prompted "leadership changes effective immediately."

<blockquote>

**2.      On October 17, 2024, The Senate Report Reveals CVS's Abuse Of Prior Authorization To Save Money**

</blockquote>

156.    On October 17, 2024, PSI published the Senate Report and revealed CVS's willingness to abuse prior authorization requirements to cut costs. The Senate Report disclosed CVS's weaponization of prior authorization, willful disregard of longstanding Medicare Advantage rules, and deliberate efforts to use algorithms to deny Medicare Advantage claims in order to generate savings. The Senate Report made clear that "[t]he magnitude and scope of prior authorization requests and denials for particular types of care has been undisclosed before now."

157.    Media and market participants were outraged upon learning of CVS's willingness to abuse prior authorization requirements, including through the use of algorithms to deny medically necessary care. For instance, on October 18, 2024, the American Health Care Association and National Center for Assisted Living ("AHCA/NCA") President and CEO Clif Porter stated that "[i]nsurers and artificial intelligence should not determine if or how long a senior needs to recover in a skilled nursing facility—that's a decision that should be made by the patient and their care team. We will continue to advocate that these plans be held accountable for unfair practices."

158.    An October 18, 2024 joint statement by the AHCA/NCAL, American Medical Rehabilitation Providers Association, National Association of Long-Term Hospitals, the National Alliance for Care at Home, and LeadingAge similarly condemned CVS and its competitors identified in the Senate Report: "this report reveals what far too many patients and providers already know: MA plans have dramatically scaled up care denials in recent years and are placing serious barriers to patients receiving the medically necessary care they need." The joint statement

noted that "[the Senate Report] also raises serious concerns about plans' use of artificial intelligence, algorithms, and other predictive technologies to curtail prior authorizations and potentially override the decision-making authority of reviewing clinicians employed by plans."

159.    On October 18, 2024, the day after the Senate Report was published, CVS announced that Defendant Karen Lynch had "stepped down from her position in agreement with the company's Board of Directors" effective October 17, 2024.

160.    PSI's release of the Senate Report caused the price of CVS's stock to decline by $3.33 per share, or over 5%, from a closing price of $63.67 on October 17, 2024 to a closing price of $60.34 on October 18, 2024, on high trading volume.

## V.    SUMMARY OF SCIENTER

161.    The facts detailed above and summarized below, when viewed holistically and together with all the other allegations in this Complaint, establish a strong inference that each of the Defendants knew or were severely reckless in not knowing that each of the misrepresentations and omissions alleged herein would be, and were, misleading to investors at the time they were made.

### A.    Defendants Deliberately Issued Stale Guidance To Cover Up Known Utilization Trends

162.    Per multiple former employees with firsthand knowledge, including direct review of "an executive presentation" from "the CFO's group," it was "no secret" that Defendants knowingly used out-of-date data for CVS's guidance, which disguised the Company's true utilization trends.

163.    Defendants used stale data to generate CVS's financial guidance, which allowed CVS to push back "huge shifts" in utilization rates and medical cost trends. FE-5 explained that, during the Class Period, CVS's "guidance didn't account for known utilization drivers." Per FE-

5, "in 2023, CVS was issuing guidance based on 2020 numbers." FE-4 similarly affirmed that CVS's guidance "relied on stale utilization data and stale medical cost trends." FE-4 explained that, instead of using current data, CVS "used data from 2 to 3 years earlier"—which resulted in "huge shifts in Medicare costs and utilization and care being pushed back."

164.    In truth, the Company's utilization rates had skyrocketed as CVS was forced to roll back its illegal algorithms. Per FE-4, CVS observed "utilization spiking through the roof," and "this was on the radar for a while." FE-5 confirmed that "the more they rolled up automation, it set off bells" and "had an impact on utilization." But, per FE-4, "the rising costs and increased utilization were not reflected in current forecast" in 2023.

165.    Defendants knowingly and deliberately used stale data to conceal the Company's rising utilization. For instance, FE-5 stated that "the forecasting was overseen by the CFO"—and, moreover, "the C-Suite and CFO directed" CVS's guidance. Remarkably, FE-5 saw firsthand "an executive presentation with graphs" that was "from the CFO's group" and "*showed they used 2020 numbers for their 2023 guidance*." Similarly, per FE-4, CVS's outdated and misleading forecasts were "without a doubt" discussed with CVS's CEO and CFO. FE-4 attended leadership town halls with the Company's leadership and Aetna's Vice President of Medical Economics specifically "to discuss rising medical costs, utilization, and economic trends" on a quarterly basis during the Class Period.

166.    Defendants refused to stop using stale data for CVS's guidance until 2024. FE-4 explained that "it was not until 2024 when they started using the correct models that weren't outdated" and "in 2024, CVS started shifting from pre-pandemic data and started incorporating current data into their models." FE-4 similarly confirmed that "the big driver behind things that were out of whack" was CVS's failure to consider more recent data in the modeling.

167.    In May 2024, CVS executives met with analysts at Goldman Sachs to discuss the challenges in the Company's Medicare Advantage business. In a report prepared for investors summarizing that discussion, the analysts noted that CVS has "made meaningful changes to Aetna's Medicare leadership team" and that its management explained that the Company was "enhancing its bid process including more rigorous reviews and stress-testing of assumptions, *compared to a less defined process and oversight in recent years*." That "less defined process and oversight"—coupled with Defendants' admitted failure to incorporate CVS's known, actual 2023 cost trend into CVS's 2024 guidance—underscores Defendants' scienter.

**B.    Thousands Of Internal CVS Documents Reveal That The Company Systematically Expanded Its Prior Authorization Denials**

168.    PSI issued the Senate Report based on its review of more than 280,000 internal, confidential documents from CVS and its two largest competitors. The Internal documents described in the Senate Report reveal that CVS systematically expanded its secret pursuit of prior authorization denials to maximize the profitability of its Medicare Advantage business, including as described below and in Section IV.E.

169.    Leading up to the Class Period, CVS knew that the profitability of its Medicare Advantage business was directly correlated to its prior authorization requirements. A January 2019 presentation revealed that CVS had employed a secret "Precertification Savings Tool" to meticulously track the correlation between "Total Savings" and "Total Requests" on a quarterly basis. This "Precertification Savings Tool" leveraged the Company's "secret sauce": CVS's ability to mine and analyze years of patient data to calculate cost savings from prior authorization requirements. This data revealed that the Company's savings in its Medicare Advantage business and other segments dramatically increased as the number of prior authorizations increased.

170.    During this time, CVS's internal utilization management analyses revealed that slashing "medical costs" through denying post-acute admissions decreased utilization rates and saved CVS hundreds of millions of dollars. For example, a May 2019 presentation revealed that CVS had saved more than $660 million in inpatient facilities-related medical costs for its Medicare Advantage members in 2018 alone, which primarily came from "denied admissions." Further, a September 2019 presentation entitled "Utilization Management Overview" presented four "Utilization Management Metrics," which tracked utilization rates for CVS's Medicare Advantage beneficiaries and revealed declining utilization rates in post-acute care facilities.

171.    As revealed in the Senate Report, CVS weaponized these learnings to maximize savings from denying prior authorization requests for post-acute care. Between 2019 and 2022, the number of post-acute care requests that CVS forced to undergo prior authorization scrutiny increased by 57.5%--a rate that dramatically outpaced CVS's increases in enrollment and overall volume of prior authorization requests. By 2022, CVS was denying prior authorization requests for post-acute care facilities more than all other types of service requests combined.

172.    Facing cost pressure in early 2021, CVS sought to expand its program of prior authorization through algorithms that could reduce (and even eliminate) benefits for Medicare Advantage beneficiaries with lesser administrative burden. For example, an internal presentation "UM [Utilization Management] Strategic Innovation Portfolio," recognized that PAA's primary "Value Driver" was "Medical cost savings"—unlike the "Admin cost savings" offered by other "strategic innovation" initiatives.

173.    CVS hired PAA in April 2021 and, based on its initial success, CVS implemented a concerted policy to rapidly expand CVS's use of algorithms to deny costly Medicare Advantage prior authorization claims. A September 2022 "Automation Update" explicitly directed that "Post-

acute care is addressable for automation." As of October 2022, the Company's "facility level predictive model" was already evaluating requests at twenty-six facilities that served Medicare Advantage patients. By the fourth quarter of 2022, CVS had approved the Company's algorithms for use in in sixteen states.

174.    CVS's directive to expand these algorithms reaped massive savings for CVS. Based on PSI's review of internal CVS documents, as of April 2021, CVS initially projected that CVS's cost-focused algorithms would save the Company approximately $4 million per year. By October 2022—shortly before the beginning of the Class Period—CVS internally recognized that its "automation concurrent review" had led to astonishing "medical cost savings" (i.e., not administrative savings): CVS estimated that its 225,000 denials of these claims had generated $2.5 billion in medical cost savings. PSI concluded that "Medicare Advantage beneficiaries represented the largest share of these denials: if the $2.5 billion were proportionally distributed, ***denials of these Medicare Advantage claims would represent $1.1 billion in savings***."

175.    These internal documents, presentations, and meetings, among others described above in Section IV.E-F, raise a strong inference that Defendants knew, or recklessly disregarded, the true facts that they publicly misstated and concealed, including that CVS's financial performance was inflated by the Company's systematic denials of prior authorization claims using illicit algorithms.

## C.    Defendants Were The Target Of Intense Regulatory Scrutiny Concerning CVS's Illegal Prior Authorization Practices

176.    As described above, PSI rigorously investigated CVS's illegal prior authorization practices over the course of a 17-month investigation. During its investigation, PSI compelled CVS and its two largest competitors to produce more than 280,000 pages of internal documents concerning CVS's internal prior authorization practices, including its use of algorithms to evaluate

and deny prior authorization claims. The Senate Report also revealed that CVS responded to numerous written inquiries from PSI throughout the Class Period. Further, the Senate Report disclosed that, on September 14, 2023, CVS's senior leadership was summoned to a non-public briefing before the PSI specifically concerning the Company's use of algorithms for prior authorization. Around this time, CVS terminated its contract with PAA. Defendants' direct knowledge of CVS's illegal algorithms to deny coverage based on cost is demonstrated by CVS's protracted regulatory scrutiny, CVS's firing of PAA, and CVS's numerous submissions to PSI concerning these very issues.

### D.    The Outsized Financial Impact of CVS's Illicit Algorithms Supports Scienter

177.    The massive cost savings generated by CVS's illicit algorithms during the Class Period—and the speed at which the Company was able to reap such savings—is probative of Defendants' scienter. Based on internal CVS documents described in the Senate Report, in April 2021, CVS projected that PAA—just one of the Company's algorithms—would generate savings of roughly $4 million per year. Just seven months later, in November 2021, CVS projected that these algorithms would save the Company more than $77 million over the next three years—*at least six times more than its initial estimate*. In October 2022, shortly before the Class Period, CVS's "Automation Update" estimated that the Company's 225,000 denials in 2021 had generated $2.5 billion in medical cost savings—*i.e.*, savings from *denying requested medical services that would have otherwise been provided*. PSI concluded that "Medicare Advantage beneficiaries represented the largest share of these denials: if the $2.5 billion were proportionally distributed, *denials of these Medicare Advantage claims would represent $1.1 billion in savings*."

178.    These astonishing savings—reaped from denying medically necessary care to Medicare Advantage patients—continued to increase dramatically during the Class Period, materially distorting CVS's reported MBR, utilization, and medical cost trends and materially

boosting the Company's financial performance. The magnitude and speed of these illicit savings, as well as their material impact on the Company's critical performance metrics, are strong indicia of Defendants' scienter.

**E.    CVS Programmed Anna With Illegal Internal Criteria That Prioritized Cost Savings Over Patient Care**

179.    Percipient witnesses attested that CVS deliberately programmed algorithms to illegally prioritize cost savings over patient care. These witnesses established that CVS programed PAA's algorithm with internal criteria to recommend medically insufficient stays in order to minimize the Company's payments for costly post-acute care facilities and undermine CMS's capitated payment model. Under Defendants' leadership, CVS employed these illicit algorithms in over 100 facilities.

180.    For example, FE-1 explained that CVS programmed Anna to recommend a "target" stay of 10 to 14 days or fewer, regardless of the medical needs of the patient. Per FE-1, CVS instituted this "target" because "[t]he lower the days, the more money Aetna [CVS] made." FE-2 similarly confirmed that Anna's "secret sauce was trying to reduce costs for Aetna," and that "[t]he whole purpose was to reduce cost for a capitated regulated model" because "Aetna had a fixed cost to their program with CMS."

181.    Defendants knew or had access to information regarding Anna's recommendations on an at least monthly basis. Per FE-2, there was a "monthly review between PAA and CVS to look at their metrics" from Anna's recommendations. During these monthly reviews, CVS and PAA evaluated the "length of stay" recommendations—which FE-2 identified as "one of the key metrics."

### F. CVS Forced Medical Staff To Rubber-Stamp Anna's Illegal Recommendations

182. CVS instituted a leadership directive that forced clinical reviewers to churn out as many prior authorization denials as possible, rather than meaningfully evaluate the algorithm's recommendations and make an independent assessment of medical necessity as required under law. CVS enforced this company policy through actively monitoring denial rates, chastising medical staff who failed to meet the Company's "target" denial rate, and cutting staffing to pressure medical staff to issue denials instead of closely evaluating cases on their merits.

183. For example, FE-3 emphasized that "leadership wanted them to forward *at least 50%* of their cases to medical directors," who were empowered to deny the claims. FE-3 affirmed that the 50% "target" directly came from CVS's leadership. CVS deployed an internal database, Power BI, to enforce their directive. Power BI reported "case load numbers, approval and denial metrics," "turnaround work times," "nurse productivity rates," and "whether nurses were handling large case volumes." Per FE-3, CVS leveraged this data to review its denial rates with medical staff—and "[f]or those below that 50% goal, they dove into their work" and evaluated why they were not meeting their denial "goal."

184. Under Defendants' leadership, CVS cut staffing levels to further pressure medical staff to issue denials. FE-1 noted that "Aetna needed *double* the work force to handle these cases." FE-3 similarly explained that "they could see through Power BI that nurses were overwhelmed." Specifically, per FE-3, the Company "could see nurses' productivity and that the workload outpaced nurse capacity in 2022 to 2023." However, despite the crushing workload of these nurses, internal CVS documents referenced in the Senate Report revealed that CVS had *reduced* its review staff in 2019 to just 220 individuals to review the thousands of requests received by CVS daily, as described above.

**G.    CVS Violated Longstanding Requirements To Cover The Same "Basic Benefits" As Traditional Medicare**

185.    CVS's violations of the longstanding rules and regulations governing Medicare Advantage coverage is probative of scienter. Since at least 2019, the bedrock principle that Medicare Advantage insurers must cover the same "basic benefits" as Traditional Medicare has been unchanged. For instance, on April 16, 2019, more than three years before the Class Period, CMS promulgated 42 C.F.R. §422.101(a), which requires that Medicare Advantage plans must cover "all services that are covered by Part A and Part B of Medicare."

186.    These "basic benefits" extend to post-acute care. For example, under Title XVIII, Section 1812 of the Social Security Act, Part A of Medicare covers "post-hospital extended care services" and "extended care services that are not post-hospital extended care services." In addition, Traditional Medicare covers up to 100 days of posthospital care in a skilled nursing facility (and Traditional Medicare pays for all covered services for the first 20 days). CVS's refusal to cover these "basic benefits" to the Company's Medicare Advantage patients—in spite of their longstanding regulatory obligation to do so—raises a strong inference that Defendants knew or recklessly disregarded the true facts that made their public statements false and misleading.

**H.    Defendants Frequently Spoke With Specificity And In Response To Direct Analyst Questions About The Topics Of Their False Statements**

187.    As discussed above, throughout the Class Period, analysts carefully monitored and consistently reported on CVS's MBR and utilization, which are core metrics in its Health Care Benefits segment. Specifically, since CVS's premiums for Medicare Advantage were set on an annual basis through the bidding process, CVS's profits were primarily driven by the extent to which the Company could extract premiums and the rate at which its patients were utilizing medical coverage. Therefore, analysts repeatedly inquired about the nature, extent, and timing of the drivers of these metrics. As a result, many of Defendants' alleged false statements were made

in response to specific repeated questions from analysts about the core metrics, their drivers, and their impact on CVS. Given the specificity and repetition of these questions, the fact that Defendants were highly placed executive officers, and Defendants' omission of the true drivers of the Company's key performance metrics and their impact on CVS's financial performance, these statements contribute to a strong inference of scienter.

188.    Throughout the Class Period, Defendants consistently told investors that CVS's MBR was driven by macroeconomic trends such as the COVID-19 pandemic. However, Defendants did not disclose that the Company's systematic use of illicit algorithms was driving massive profits through prior authorization denials. In addition, Defendants assured investors that all utilization assumptions were "fully baked in" to their guidance, concealing that CVS used stale data from three years earlier and wrongly assuming that CVS could continue to use the illicit algorithms that had boosted its financial performance.

189.    For example, on February 8, 2023, Defendant Guertin informed analysts on CVS's Q4 2022 Earnings Call that CVS's medical benefit ratio of 86% improved 100 basis points year-over-year and its adjusted operating income of $858 million grew 68.2% year-over-year. Defendant Guertin misleadingly claimed that "*[b]oth of these measures were driven by the net favorable impact of COVID-19 compared to the prior year and strong underlying performance*, partially offset by the unfavorable impact of the flu." It was misleading for Defendants to attribute changes in CVS's MBR, utilization rate, and medical cost trends to macroeconomic trends outside of CVS's control while omitting CVS's practice of abusing secret algorithms that artificially improved these core performance metrics by denying claims for medically necessary care.

190.    Similarly, on CVS's November 1, 2023 Q3 2023 Earnings Call, Defendant Kane assured investors that CVS's guidance fully accounted for the Company's known utilization,

MBR, and cost trends. Specifically, he represented that "***everything is fully baked in, including the utilization breakage that Tom discussed, the guide, I believe, fully reflects what's in our pricing, as well as utilization break***." It was misleading for Defendant Kane to assure investors that CVS's financial guidance had incorporated all known utilization and medical cost trends because Defendant Kane knew or recklessly disregarded that this analysis was premised on stale utilization data and that the Company's past performance had been artificially inflated by its algorithms that denied claims for medically necessary care.

191.    Defendants were, at the very least, reckless in not informing themselves about the drivers of the Company's core metrics and whether all utilization assumptions were accounted for in CVS's guidance, given that they regularly fielded questions about the true drivers of CVS's MBR. For example, when an Evercore ISI analyst questioned CVS management on May 3, 2023 about "***what gets to your high end of your MBR guidance***" for the Health Care Benefits segment, CVS's management explained that "[t]he pricing is generally set now, ***so it's going to be about the underlying climate experience***." This statement was misleading given that management did not disclose the Company's use of algorithms to deny prior authorization claims, which directly impacted CVS's MBR guidance.

192.    Throughout the Class Period, Defendants repeatedly faced these and other specific questions about the drivers of the Health Care Benefits's core metrics and their impact on CVS's guidance. In response, Defendants, high-placed executives of CVS, offered detailed responses, representing themselves as knowledgeable about the drivers of the segment's metrics and having fully captured increased utilization in CVS's financial guidance.

193.    Either Defendants were as well-informed about the state of the business as they claimed and therefore knew about CVS's use of stale data and illicit algorithm practices, or they

made these statements without informing themselves on subjects that they knew were critical to CVS's business and the focus of analyst concern, meaning that they were at least severely reckless in making the alleged misstatements.

**I.      The Sudden Wave Of Departures Of CVS's Executives Supports Scienter**

194.    Defendants' scienter is also evidenced by the sudden resignations and terminations of several top executives, including Defendant Lynch (former CEO) and Defendant Kane (former President of Aetna). Each of these departures occurred in the wake of mounting government scrutiny that eventually forced CVS to wind down its illegal algorithms and led to a substantial hit to the Company's financial performance.

**J.      Defendants Were Motivated To Conceal The Truth Of Their Illicit Practices To Raise Over $10 Billion In Debt Offerings**

195.    Underscoring Defendants' motive, CVS completed nearly $20 billion in acquisitions in the first half of 2023. On March 29, 2023, CVS acquired Signify Health for $7.8 billion. About a month later, on May 2, 2023, CVS acquired Oak Street Health for $10.6 billion. Defendants believed that both companies were critical to the growth of the company and impacted its Medicare Advantage business. For example, in a May 3, 2023 earnings presentation, Defendant Lynch highlighted that "these additions are core to our strategy and will help unlock future growth[.]"

196.    Defendants relied on massive debt offerings to finance these acquisitions. Specifically, through offerings in February and June 2023, CVS issued and sold $11 billion of debt to fund these acquisitions. The success of these offerings were predicated on the Company's success—a façade that would be stripped away if Defendants had revealed the Company's risky, unsustainable practice of abusing AI algorithms and prior authorization to deny medically

necessary care. Therefore, Defendants were motivated to conceal their fraudulent scheme to keep generating profits to fund their nearly $20 billion acquisitions.

### K.    Defendants' Statements Concerned Matters Critical To CVS's Success

197.    Further supporting an inference of scienter, Defendants' misstatements concerned a uniquely profitable segment of CVS. During a February 9, 2022 earnings call, Defendant Lynch disclosed that "obviously, ***Medicare is our largest growth driver***. . . That is a growth engine for the company, so we would be focused on that[.]" Further, during an August 2, 2023 earnings call, Defendant Guertin instructed analysts that it is "important to keep in mind that Medicare [Advantage] is more than 50% of our premium revenue now."

198.    In addition, CVS's compliance with federal and state laws and regulations was highly significant from both a legal and financial standpoint. As discussed above, the profitability of CVS's Medicare Advantage business was entirely dependent on its ability to obtain reimbursements from CMS. Thus, CVS's ability to comply with CMS regulations was critical to the success of the Company's Medicare Advantage business. The importance of CVS's Medicare Advantage business supports the inference that Defendants knew the truth about the facts Defendants misrepresented to investors, including the extent to which the Company's illegal algorithms materially impacted the profitability of CVS's Medicare Advantage business.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

199.    Throughout the Class Period, Defendants made a number of statements regarding legal compliance, financial drivers, and financial guidance that were either outright false by misrepresenting CVS's actual business practices and policies, or were misleading "half-truths" that omitted material information necessary to make the statements not misleading. Both are equally actionable under the federal securities laws.

A. **Defendants Falsely Claimed That CVS's Health Care Benefits Business Fully Complied With Medicare Rules And That The Company Would Only Employee AI "Responsibly" And Consistent With "What's Right For Our Customers"**

200.    Throughout the Class Period, Defendants falsely assured investors that their Medicare Advantage business fully complied with all applicable rules and regulations. As explained above, under Defendants' leadership, CVS violated CMS regulations by abusing algorithms and prior authorization to improperly delay and deny claims for medically necessary care.

201.    On February 8, 2023, CVS filed its Form 10-K for year 2023, which was signed by Defendants Guertin and Lynch, and on February 7, 2024, CVS filed its Form 10-K for year 2024, which was signed by Defendants Cowhey and Lynch. In both Forms 10-K, Defendants Lynch, Guertin, and Cowhey made materially false and misleading statements regarding CVS's compliance with applicable laws and regulations. Under the heading "Government Regulation," the Forms 10-K contained the following materially false and misleading statement:

> ***The Company has internal control policies and procedures and conducts training and compliance programs for its employees to help prevent, detect and correct prohibited practices.*** However, if the Company's employees or agents fail to comply with applicable laws governing its international or other operations, it may face investigations, prosecutions and other legal proceedings and actions which could result in civil penalties, administrative remedies and criminal sanctions. Any failure or alleged failure to comply with applicable laws and regulations summarized below, or any adverse applications or interpretations of, or changes in, the laws and regulations affecting the Company and/or its businesses, could have a material adverse effect on the Company's operating results, financial condition, cash flows and/or stock price.

202.    In the Forms 10-K under the heading "Laws and Regulations Related to Multiple Segments of the Company's Business," Defendants Lynch, Guertin, and Cowhey made the following misleading statement under the heading of "Medicare Regulation":

> ***The Company has invested significant resources to comply with Medicare standards***, and its Medicare compliance efforts will continue to require significant

resources. CMS may seek premium and other refunds, prohibit the Company from continuing to market and/or enroll members in or refuse to passively enroll members in one or more of the Company's Medicare or [dual eligible] plans, exclude us from participating in one or more Medicare, dual eligible or dual eligible special needs plan programs and/or institute other sanctions and/or civil monetary penalties against the Company *if it fails to comply with CMS regulations or its Medicare contractual requirements.*

203.     The above statements in ¶¶201-202 were also repeated in CVS's Form 8-K dated

May 25, 2023, which was signed by Defendant Guertin.

204.     The statements in ¶¶201-203 were materially false and misleading and omitted facts

necessary to make them not materially misleading. While the Form 10-Ks stated that CVS had

"internal control policies and procedures" to ensure compliance with CMS regulations, Defendants

omitted the material fact that CVS had intentionally instituted and oversaw improper denial

policies that were in direct contravention of CMS's regulations. Specifically, §422.101(c) requires

that "MA organizations must make medical necessity determinations based on, among other

things, the enrollee's medical history (for example, diagnoses, conditions, functional status),

physician recommendations, and clinical notes." Instead of making coverage determinations based

on medical necessity, CVS implemented illegal algorithms that issued a coverage "target" of 14

days or fewer based on cost, as confirmed by FE-1. FE-2 confirmed that the algorithm's "secret

sauce was trying to reduce costs for Aetna," and per FE-1, "[t]he shorter or lower the stay, the

better for Aetna." These coverage "targets" were rubber-stamped by overburdened clinical staff

who lacked the resources necessary to sufficiently review these claims. For instance, FE-1 noted

that "Aetna needed *double* the work force" to meaningfully evaluate the algorithm's

recommendations. Because CVS used illicit algorithms that violated CMS regulations,

Defendants' statements regarding their "internal control policies" and their investment of

"significant resources to comply with Medicare Standards" were materially misleading.

205.    On December 5, 2023, Defendant Lynch made a series of false and misleading statements about CVS's use of AI for operational "efficiency" and their "commitment to responsible AI" during CVS's Investor Day 2023 call. First, Defendant Lynch said that "we're applying technology, data and analytics to every single aspect of our business. The *effects will be positive and profound*, and we're already seeing significant value, *while continuing to preserve the importance of the human connection in healthcare.*" She further stated that "[i]n Aetna, *we're using AI to increase the efficiency of our operations*" and that "at the same time, *we are committed to responsible AI. We are ensuring that we're doing what's right for our customers, our colleagues, and our patients.*"

206.    These statements in ¶205 were materially false and misleading, and omitted facts necessary to make them not materially misleading. Under Defendants' leadership, CVS was using AI for the purpose of cutting costs by denying medically necessary care, instead of "increas[ing] the efficiency of [their] operations." Additionally, the Company's use of AI to deny care in violation of CMS regulations at the expense of patient needs was not a "commitment to responsible AI," nor was the Company "ensuring that [they're] doing right for [their] patients." CVS's improper denial policies were in direct contravention with CMS's regulations. Specifically, §422.101(c) requires that "MA organizations must make medical necessity determinations based on, among other things, the enrollee's medical history (for example, diagnoses, conditions, functional status), physician recommendations, and clinical notes." Instead of making coverage determinations based on medical necessity, CVS implemented illegal algorithms that issued a coverage "target" of 14 days or fewer based on cost, as confirmed by FE-1. FE-2 confirmed that the algorithm's "secret sauce was trying to reduce costs for Aetna" and, per FE-1, "[t]he shorter or lower the stay, the better for Aetna." These coverage "targets" were rubber-stamped by

overburdened clinical staff who lacked the resources necessary to sufficiently review these claims. This practice directly harmed patients because they were denied medically necessary care in direct violation of CMS regulations. Therefore, contrary to Defendant Lynch's statement, the effects of the Company's use of technology would not be "positive and profound."

207.     The December 5, 2023 Investor Day Presentation also included similar misleading statements. Specifically, the presentation represented that CVS was realizing significant value with "responsible AI" while "preserving the human connection in health care" through "increase[d] efficiency of operations," "personalize[d] member experience and engagement," "automate[d] workflows and improved safety," and "improve[d] patient and provider experience." The presentation slide is below:



208.     The statements above in ¶207 were materially false and misleading, and omitted facts necessary to make them not materially misleading. While the presentation claims that CVS is using "responsible AI" to "improve patient and provider experience," in reality, CVS was

focused on using AI to cut costs at the expense of patients' medical needs in direct violation of CMS regulations. Specifically, §422.101(c) requires that "MA organizations must make medical necessity determinations based on, among other things, the enrollee's medical history (for example, diagnoses, conditions, functional status), physician recommendations, and clinical notes." Instead of making coverage determinations based on medical necessity, CVS implemented illegal algorithms that issued a coverage "target" of 14 days or fewer based on cost, as confirmed by FE-1. FE-2 confirmed that the algorithm's "secret sauce was trying to reduce costs for Aetna" and, per FE-1, "[t]he shorter or lower the stay, the better for Aetna." These coverage "targets" were rubber-stamped by overburdened clinical staff who lacked the resources necessary to sufficiently review these claims. This practice directly harmed patients because they were denied care to medically necessary care in direct violation of CMS regulations. Therefore, the statement is misleading because the Company's use of these illicit algorithms in violation of CMS regulations was not "responsible" and it did not "improve patient and provider experience."

209.    Similarly, on December 19, 2023 CVS's ESG Report stated that "[w]e are committed to having an effective Medicare Compliance Program ***based on the Centers for Medicare & Medicaid Services (CMS) guidance and the Federal Sentencing Guidelines*** […] ***[o]ur Medicare businesses have comprehensive fraud, waste and abuse programs designed to comply with laws and regulations***, including compliance operational oversight, risk assessment, data analysis, investigations, training and processes to manage identified issues through corrective actions."

210.    The statement above in ¶209 was materially false and misleading, and omitted facts necessary to make them not materially misleading. It was misleading for Defendants to tout CVS's "Medicare Compliance Program based on [CMS's] guidance" and that their Medicare businesses

have "programs designed to comply with laws and regulation" when, in truth, Defendants willfully violated CMS regulations. Specifically, §422.101(c) requires that "MA organizations must make medical necessity determinations based on, among other things, the enrollee's medical history (for example, diagnoses, conditions, functional status), physician recommendations, and clinical notes." Instead of making coverage determinations based on medical necessity, CVS implemented illegal algorithms that issued a coverage "target" of 14 days or fewer based on cost, as confirmed by FE-1. FE-2 confirmed that the algorithm's "secret sauce was trying to reduce costs for Aetna" and, per FE-1, "[t]he shorter or lower the stay, the better for Aetna." These coverage "targets" were rubber-stamped by overburdened clinical staff who lacked the resources necessary to sufficiently review these claims. This practice directly harmed patients because they were denied care to medically necessary care in direct violation of CMS regulations. Therefore, it was misleading for Defendants to tout their "commitment to having a Medicare Compliance Program" based on CMS guidance to "comply with laws and regulations" while omitting the material fact that the Company was willfully violating §422.101(c).

### B. Defendants Misstated The Sources Of Their Success For CVS's Health Care Benefits Segment

211.    During the Class Period, Defendants misleadingly attributed changes in CVS's MBR, utilization, and cost trends to a variety of benign macroeconomic causes while concealing that changes were also attributable to the Company's illicit practices. In particular, for the first year of the Class Period, Defendants repeatedly attributed positive changes in CVS's MBR and other results to the decreasing impact of COVID-19 on utilization trends—scrupulously avoiding any mention of the impact of the Company's reliance on AI algorithms that were the source of massive profits through prior authorization denials. Because Defendants listed specific factors that

led to the changes in the core metrics, they were obligated to tell the whole truth with respect to the cause of the changes.

212.    On November 2, 2022, during CVS's Q3 2022 Earnings Call, Defendant Lynch stated that CVS's "medical benefit ratio of 83.5% improved by 230 basis points versus the prior year *driven by a lower impact from COVID and medical cost trends that remained favorable.*" The same day, on November 2, 2022, CVS filed its Form 10-Q for the quarterly period ended September 20, 2022, which was signed by Defendants Lynch and Guertin. The Form 10-Q similarly discussed how CVS's MBR was driven by underlying performance and macroeconomic causes, such as COVID-19:

> The MBR decreased to 83.5% in the three months ended September 30, 2022 compared to 85.8% in the prior year *reflective of the net favorable impact of COVID-19 compared to the prior year and strong underlying performance*, including higher favorable development of prior-periods' health care cost estimates in the three months ended September 30, 2022 compared to the prior year.

> The MBR decreased to 83.3% in the nine months ended September 30, 2022 compared to 84.4% in the prior year reflective of strong underlying performance and the net favorable impact of COVID-19 compared to the prior year.

213.    The statements in ¶212 were materially false and misleading, and omitted facts necessary to make them not materially misleading. It was misleading for Defendants to attribute "favorable" changes in CVS's MBR to the "favorable impact of COVID-19" and "strong underlying performance" while omitting CVS's risky and unsustainable practice of using secret algorithms and prior authorization denials to artificially deflate MBR through widespread denials of costly prior authorization claims, regardless of actual medical health trends. CVS's MBR reflects its massive cost savings from the Company's use of the illicit algorithms to deny coverage to beneficiaries, which artificially depressed utilization. By the time of these statements, CVS had implemented illegal algorithms that issued a coverage "target" of 14 days or fewer based on cost, rather than medical necessity, as confirmed by FE-1. FE-2 confirmed that the algorithm's "*secret*

*sauce was trying to reduce costs for Aetna*" and, per FE-1, "[t]he shorter or lower the stay, the better for Aetna." These coverage "targets" were rubber-stamped by overburdened clinical staff who lacked the necessary resources to sufficiently review these claims. Indeed, FE-1 noted that "Aetna needed *double* the work force" to meaningfully evaluate the algorithm's recommendations. However, Defendants concealed this practice and its impact on MBR. Therefore, the statements were materially misleading because Defendants omitted how the favorable changes to MBR were in large part due to the Company's risky and unsustainable practice.

214.    The November 2, 2022 Form 10-Q similarly stated that the Company's operating income was driven by COVID-19 and underlying performance, but failed to mention CVS's use of algorithms and prior authorization denials as another material driver of income:

> Adjusted operating income increased $624 million, or 13.9%, in the nine months ended September 30, 2022 compared to the prior year primarily *driven by strong underlying performance, the net favorable impact of COVID-19* compared to the prior year and membership growth.

> Adjusted operating income increased $438 million, or 39.6%, in the three months ended September 30, 2022 compared to the prior year primarily *driven by the net favorable impact of COVID-19 compared to the prior year and strong underlying performance, including higher favorable development of prior-periods' health care cost estimates* in the three months ended September 30, 2022 compared to the prior year. These increases were partially offset by incremental investments to support growth in the business and net realized capital losses.

215.    The statements in ¶214 were materially false and misleading, and omitted facts necessary to make them not materially misleading. It was misleading for Defendants to attribute the increase in operating income to the "favorable impact of COVID-19" and "strong underlying performance" while omitting CVS's risky and unsustainable practice of using secret algorithms and blanket prior authorizations to artificially generate massive income. By the time of these statements, CVS had implemented illegal algorithms that issued a coverage "target" based on cost, rather than medical necessity, as confirmed by FE-1. FE-2 confirmed that the algorithm's "secret

sauce was trying to reduce costs for Aetna" and, per FE-1, "[t]he shorter or lower the stay, the better for Aetna." These coverage "targets" were rubber-stamped by overburdened clinical staff who lacked the necessary resources to sufficiently review these claims. Indeed, FE-1 noted that "Aetna needed *double* the work force" to meaningfully evaluate the algorithm's recommendations. However, Defendants concealed this practice and its impact on operating income. Additionally, by the time of these statements, CVS internally knew (as confirmed by the confidential October 2022 presentation discussed above) that its denials of these prior authorization claims had generated an astonishing $2.5 billion in medical cost savings in 2021 from 225,000 denials—*i.e.*, savings generated from *cuts* to providing medical services—which the PSI estimated to be a $1.1 billion impact to Medicare Advantage. Indeed, the $1.1 billion savings from these claim denials exceeded the entire increases in operating income referenced above. Therefore, the statements were materially misleading because Defendants omitted how the favorable changes to operating income were in large part due to the Company's risky and unsustainable practices.

216.    On February 8, 2023, CVS filed its Form 10-K for the year ended December 31, 2022, which was signed by Defendants Lynch and Guertin. The Form 10-K touted CVS's increased operating income in the Health Care Benefits segment, while concealing the material impact of CVS's use of AI-driven algorithms to deny claims:

> Adjusted operating income increased $972 million, or 19.4%, in 2022 compared to 2021. The increase in adjusted operating income was ***primarily driven by the net favorable impact of COVID-19 compared to the prior year, strong underlying performance and membership growth***.

217.    CVS's 2022 Form 10-K also discussed how CVS's MBR was driven by macroeconomic causes, such as COVID-19, stating:

> The MBR decreased from 85.0% to 84.0% in 2022 compared to the prior year primarily driven by the net favorable impact of COVID-19 compared to the prior year, partially offset by the unfavorable impact of the flu compared to the prior year.

218.    Similarly, on February 8, 2023, Defendant Guertin, on CVS's Q4 2022 Earnings Call informed investors that CVS's medical benefit ratio of 86% improved 100 basis points year-over-year and its adjusted operating income of $858 million grew 68.2% year-over-year. Defendant Guertin misleadingly claimed that "*[b]oth of these measures were driven by the net favorable impact of COVID-19 compared to the prior year and strong underlying performance*, partially offset by the unfavorable impact of the flu."

219.    On the same day, on February 8, 2023, Defendants Lynch and Guertin were named on CVS's Q4 2022 Earnings Conference Call Presentation, which stated that the MBR decreased from 87.0% to 86.0% in the three months ended December 31, 2022 compared to the prior year. Defendants misleadingly claimed that the decrease was driven by the "*net favorable impact of COVID-19 compared to the prior year*, partially offset by the unfavorable impact of the flu compared to the prior year."

220.    The statements above in ¶¶216-219 were materially false and misleading and omitted facts necessary to make them not materially misleading. It was misleading for Defendants to attribute "favorable" changes in CVS's MBR and operating income to the "favorable impact of COVID-19," "strong underlying performance," and "membership growth" while omitting CVS's risky and unsustainable practice of using secret algorithms and blanket prior authorization denials to artificially deflate MBR through widespread denials of costly prior authorization claims, regardless of actual medical health trends. In truth, CVS's MBR reflected its massive cost savings from the Company's use of the illicit algorithms to deny coverage to beneficiaries. By the time of these statements, CVS had implemented illegal algorithms that issued a coverage "target" of 14 days or fewer based on cost, rather than medical necessity, as confirmed by FE-1. FE-2 confirmed that the algorithm's "*secret sauce was trying to reduce costs for Aetna*" and, per FE-1, "[t]he

shorter or lower the stay, the better for Aetna." These coverage "targets" were rubber-stamped by overburdened clinical staff who lacked the necessary resources to sufficiently review these claims. Indeed, FE-1 noted that "Aetna needed **double** the work force" to meaningfully evaluate the algorithm's recommendations. However, Defendants concealed this practice and its impact on the Company's MBR and operating income. Additionally, by the time of these statements, CVS internally knew (as confirmed by the confidential October 2022 presentation) that its denials of these prior authorization claims had generated an astonishing $2.5 billion in medical cost savings in 2021 from 225,000 denials—*i.e.*, savings generated from **cuts** to providing medical services— which the PSI estimated to be a $1.1 billion impact to Medicare Advantage. Indeed, the $1.1 billion savings from these claim denials exceeded the entire increase in operating income referenced above. Therefore, the statements were misleading because Defendants omitted how the favorable changes to MBR and operating income were in large part due to the Company's risky and unsustainable practice.

### C. Defendants Falsely Portrayed That CVS's Financial Guidance For Its Health Care Benefits Segment Accurately Reflected Utilization And Medical Cost Trends

221.    Starting in late 2023, Defendants began to assure investors that they were "cautious" in their utilization assumptions for their financial guidance to the market and that their guidance took into account all known utilization trends, which were "fully baked in." However, Defendants concealed that CVS's guidance: (1) did not account for either the Company's use of illicit algorithms that had artificially inflated CVS's financial performance, as well as CVS's phasing out of those algorithms in late 2023 and early 2024; and (2) was based on faulty and stale data on utilization and medical cost trends.

222.    For example, on CVS's November 1, 2023 Q3 2023 Earnings Call, Defendant Cowhey claimed that CVS's guidance for 2024 properly captured known utilization trends. First,

Defendant Cowhey claimed that "***out of an abundance of caution [we] are maintaining a provision for further utilization pressure in 2024.***" Second, he stated that "[w]e further indicated that ***we had captured a portion of the outpatient trend pressure in our bids in 2024, and that the remaining pressure we did not incorporate was reflected in the 2024 guide.*** We also put a placeholder in for additional utilization in our 2024 preliminary guidance range."

223.    The statements above in ¶¶222 by Defendant Cowhey were materially false and misleading, and omitted facts necessary to make them not materially misleading. Far from reflecting "an abundance of caution," "maintaining a provision for further utilization pressure in 2024," or capturing "outpatient trend pressure," CVS's guidance was based on data that Defendants knew was stale, a fact that was concealed from investors. As FE-5 explained, during the Class Period, CVS's "guidance didn't account for known utilization drivers." At the time of this statement, "CVS was issuing guidance based on 2020 numbers." Likewise, FE-4 stated that CVS's guidance "relied on stale utilization data and stale medical cost trends." FE-4 also explained that CVS "used data from 2 to 3 years earlier"—which resulted in "huge shifts in Medicare costs and utilization and care being pushed back."

224.    The statements above in ¶¶222 were also false and misleading because Defendant Cowhey omitted that the guidance did not account for the impact of using illicit algorithms to artificially depress utilization by improperly denying prior authorizations and the impact of phasing them out. Defendants knew that the Company's past performance had been artificially inflated by CVS's risky and unsustainable practice of using secret algorithms that issued widespread denials of costly prior authorization claims. As this conduct wound down, per FE-4, "there was a lot more utilization"—specifically, CVS observed "utilization spiking through the roof"—and "this was on the radar for a while." FE-5 confirmed that "the more they rolled up

automation, it set off bells" and "had an impact on utilization." In other words, as certain automation programs were wound down, CVS's utilization metrics skyrocketed. But, per FE-4, "the rising costs and increased utilization were not reflected in current forecast" in 2023. During the Class Period, Defendants knew the impact of these illicit algorithms on the Company's utilization and medical cost trends, but refused to accurately reflect this impact in the Company's guidance. Therefore, Defendant Cowhey's statements were false and misleading.

225.    On CVS's November 1, 2023 earnings call, Defendant Kane also assured investors that CVS's guidance fully accounted for the Company's known utilization, MBR, and cost trends. Specifically, he represented that:

> With respect to utilization, just to echo what Tom said, obviously we've been through the bids in detail, really to understand all the detailed utilization assumptions. And I would just say after all—***everything is fully baked in, including the utilization breakage that Tom discussed, the guide, I believe, fully reflects what's in our pricing, as well as utilization break***. So I feel good about where we are for the 2024 guide that Tom laid out.

226.    The statement in ¶225 by Defendant Kane was materially false and misleading, and omitted facts necessary to make it not materially misleading. Defendant Kane represented that "everything is fully baked in" and "fully reflect[ed]" in CVS's guidance, including the "utilization breakage." In reality, CVS's guidance was based on data that Defendants knew was stale, a fact that was concealed from investors. As FE-5 explained, during the Class Period, CVS's "guidance didn't account for known utilization drivers." At the time of this statement, "CVS was issuing guidance based on 2020 numbers." Likewise, FE-4 stated that CVS's guidance "relied on stale utilization data and stale medical cost trends." FE-4 also explained that CVS "used data from 2 to 3 years earlier"—which resulted in "huge shifts in Medicare costs and utilization and care being pushed back."

227.    The statement above in ¶225 was also false and misleading because Defendant Kane omitted that the guidance did not account for the impact of using illicit algorithms to artificially depress utilization by improperly denying prior authorizations and the impact of phasing them out. Defendants knew that the Company's past performance had been artificially inflated by CVS's risky and unsustainable practice of using secret algorithms that issued widespread denials of costly prior authorization claims. As this conduct wound down, per FE-4, "there was a lot more utilization"—specifically, CVS observed "utilization spiking through the roof"—and "this was on the radar for a while." FE-5 confirmed that "the more they rolled up automation, it set off bells" and "had an impact on utilization." In other words, as certain automation programs were wound down, CVS's utilization metrics skyrocketed. But, per FE-4, "the rising costs and increased utilization were not reflected in current forecast" in 2023. During the Class Period, Defendants knew the impact of these illicit algorithms on the Company's utilization and medical cost trends, but refused to accurately reflect this impact in the Company's guidance. Therefore, Defendant Kane's statements were false and misleading, and omitted facts necessary to make them not materially misleading.

228.    On CVS's Q4 2023 Earnings Call on February 7, 2024, Defendant Kane made similar false claims that CVS's guidance fully accounted for recent utilization, MBR, and cost trends. Specifically, he stated that "[a]gain, we feel good, as Tom said, that *we've fully reflected the 2023 baseline in our 2024 numbers. We put a normalized, very reasonable trend on top of that baseline, and today, we put additional dollars on top of that through the increase in the MBR.* So all in all, we feel good about how we're positioned for 2024." On the same call, Defendant Kane stated that "*[t]here's nothing that we've seen in our January data that gives us pause relative to the guidance that we've given today,*" and assured investors that "*we are*

***prudently assuming that the elevated medical cost trends we observed in the fourth quarter will carry forward into 2024***."

229.    The statements above in ¶228 were materially false and misleading, and omitted facts necessary to make them not materially misleading. It was misleading for Defendant Kane to assure investors that CVS's financial guidance had incorporated all known health and regulatory trends. Contrary to Defendant Kane's statements that they "fully reflected" the 2023 numbers, the guide did not include the impact of the Company's use of the algorithms, nor the Company's phasing out of the algorithms. Defendants knew that the Company's past performance had been artificially inflated by CVS's risky and unsustainable practice of using secret algorithms that issued widespread denials of costly prior authorization claims. As this conduct wound down, per FE-4, "there was a lot more utilization"—specifically, CVS observed "utilization spiking through the roof"—and "this was on the radar for a while." FE-5 confirmed that "the more they rolled up automation, it set off bells" and "had an impact on utilization." In other words, as certain automation programs were wound down, CVS's utilization metrics skyrocketed. But, per FE-4, "the rising costs and increased utilization were not reflected in current forecast" in 2023. During the Class Period, Defendants knew the impact of these illicit algorithms on the Company's utilization and medical cost trends but refused to accurately reflect this impact in the Company's guidance. Therefore, Defendant Kane's statements in ¶228 were false and misleading, and omitted facts necessary to make them not materially misleading.

230.    In addition, the statements in ¶228 were materially false and misleading because Defendants were using stale data in their guidance, directly contrary to Defendant Kane's statements that they "fully reflected the 2023 baseline in our 2024 numbers" and "we are prudently assuming that the elevated medical cost trends we observed in the fourth quarter will carry forward

into 2024." In reality, as FE-5 explained, during the Class Period, CVS's "guidance didn't account for known utilization drivers." At the time of this statement, "CVS was issuing guidance based on 2020 numbers." Likewise, FE-4 stated that CVS's guidance "relied on stale utilization data and stale medical cost trends." FE-4 also explained that CVS "used data from 2 to 3 years earlier"—which resulted in "huge shifts in Medicare costs and utilization and care being pushed back." Therefore, Defendant Kane's statements were false and misleading, and omitted facts necessary to make them not materially misleading.

231.    On the same February 7, 2024 earnings call, Defendant Cowhey also assured investors that CMS's implementation of a new rule was "*fully encapsulated inside the guide*." Defendant Cowhey's statement was misleading because he touted CVS's "encapsulat[ion]" of CMS's regulatory development in their guide while the Company was flagrantly violating other CMS regulations. Specifically, §422.101(c) requires that "MA organizations must make medical necessity determinations based on, among other things, the enrollee's medical history (for example, diagnoses, conditions, functional status), physician recommendations, and clinical notes." Instead of making coverage determinations based on medical necessity, CVS implemented illegal algorithms that issued a coverage "target" of 14 days or lower based on cost, as confirmed by FE-1. FE-2 confirmed that the algorithm's "secret sauce was trying to reduce costs for Aetna" and, per FE-1, "[t]he shorter or lower the stay, the better for Aetna." These coverage "targets" were rubber-stamped by overburdened clinical staff who lacked the resources necessary to sufficiently review these claims. For instance, FE-1 noted that "Aetna needed *double* the work force" to meaningfully evaluate the algorithm's recommendations. Defendants knew the impact of these illicit algorithms on the Company's utilization and medical cost trends, but refused to accurately reflect this impact in the Company's guidance. Therefore, it

was misleading for Defendant Cowhey to represent that the guidance "fully encapsulated" a new CMS rule while omitting that their guidance did not account for the impact from CVS's deliberate violations of CMS regulations.

## VII.    LOSS CAUSATION

232.    During the Class Period, as detailed in this Complaint, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. Defendants' scheme artificially inflated or maintained the price of CVS stock and operated as a fraud and deceit on the Class. As a result of Defendants' materially false and misleading statements, omissions of material facts, and fraudulent course of conduct, CVS's common stock traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for CVS common stock and public information relating to CVS, Lead Plaintiffs and other Class members purchased or otherwise acquired CVS common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein.

233.    Later, when the relevant truth regarding Defendants' prior misrepresentations and omissions of material fact were disclosed to the market on May 1, 2024 and October 17, 2024, the price of CVS's stock fell. As a result of their purchases of CVS's common stock during the Class Period, Lead Plaintiffs and other members of the Class suffered harm. Until the final disclosure on October 17, 2024, each of CVS's disclosures described below only partially revealed the relevant truth. As such, the full amount of inflation was not removed until after the final disclosure on the last day of the Class Period.

234.    Specifically, Defendants' materially false and misleading statements misrepresented the reasons for changes in CVS's key healthcare cost metrics and drivers of CVS's profitability, including MBR and utilization, concealing that the Company was dependent on a risky and unsustainable practice of using AI-driven algorithms to deny medically necessary care.

Defendants also misrepresented the Company's compliance with regulations and the basis for CVS's guidance, which in reality reflected artificially depressed utilization and stale data. When the relevant truth regarding Defendants' prior misrepresentations and omissions of material fact were disclosed to investors, the share price of CVS's common stock fell significantly. As a result of these disclosures, the price of CVS common shares declined approximately 38%, from a closing price of $96.80 on November 2, 2022 to a closing price of $60.34 per share on October 18, 2024.

235.    The disclosures that partially corrected the market price of CVS's common stock and reduced the artificial inflation caused by Defendants' materially false and misleading statements and omission are detailed below:

| Date* | Disclosure Summary | Closing Stock Price | Common Stock Price Change |
|---|---|---|---|
| May 1, 2024<br><br>(May 1, 2024) | Before the market opened, CVS announced its Q1 2024 results and disclosed a surprising earnings shortfall "primarily due to a decline in the Health Care Benefits segment's operating results, reflecting utilization pressure in the Company's Medicare business." | $56.31 | -16.84% |
| October 17, 2024<br><br>(October 18, 2024) | PSI published the Senate Report and revealed CVS's weaponization of prior authorization, willful disregard of longstanding Medicare Advantage rules, and their established infrastructure to use algorithms to deny Medicare Advantage claims in order to generate savings. | $60.34 | -5.23% |
| *Date of stock price drop is in parentheses.* | | | |

236.    It was entirely foreseeable to Defendants that their materially misleading statements regarding the key drivers of CVS's profitability would artificially inflate the price of CVS's common stock. It was foreseeable to Defendants that the revelation of the relevant truth would cause the price of the Company's securities to fall as the artificial inflation caused by Defendants'

misstatements and omissions were removed. Thus, the economic losses (*i.e.*, damages suffered by Lead Plaintiffs and other members of the Class) were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements, which artificially inflated or maintained the price of the Company's common stock, and the subsequent significant decline in the value of the Company's common stock when the relevant truth was revealed.

## VIII.   PRESUMPTION OF RELIANCE

237.   At all relevant times, the market for CVS common stock was an efficient market for the following reasons, among others:

a.   CVS common stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange ("NYSE"), a highly efficient and automated market;

b.   As a regulated issuer, CVS filed periodic public reports with the SEC and NYSE;

c.   CVS regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.   CVS was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

238.   As a result of the foregoing, the market for CVS common stock promptly digested current information regarding CVS from all publicly available sources and reflected such information in the price of CVS common stock. Under these circumstances, all purchasers of CVS common stock during the Class Period suffered similar injury through their purchases of CVS common stock at artificially inflated prices and the presumption of reliance applies.

239.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves a failure to disclose material adverse information regarding CVS's business and operations, information that was required to be disclosed, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of, *inter alia*, CVS's MBR and utilization metrics, that requirement is satisfied here.

## IX.    CLASS ACTION ALLEGATIONS

240.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of CVS common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of CVS and their families and affiliates.

241.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of January 31, 2024, CVS had over 1.2 billion shares of common stock outstanding, owned by thousands of investors.

242.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

      a.      Whether Defendants violated the Exchange Act;

      b.      Whether Defendants omitted and/or misrepresented material facts;

      c.      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      d.      Whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

      e.      Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

      f.      Whether Defendants' conduct impacted the price of CVS common stock;

      g.      Whether Defendants' conduct caused the members of the Class to sustain damages; and

      h.      The extent of damages sustained by Class members and the appropriate measure of damages.

243.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

244.    Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

245.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## X.     CLAIMS FOR RELIEF

<u>COUNT I</u>

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

246.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

247.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase CVS common stock at artificially inflated prices.

248.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of CVS common stock in an effort to maintain artificially high market prices for CVS common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

249.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

250.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

251.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them.

Defendants engaged in this misconduct to conceal CVS's true condition from the investing public and to support the artificially inflated prices of CVS common stock.

252.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CVS common stock. Lead Plaintiffs and the Class would not have purchased CVS common stock at the prices they paid, or at all, had they been aware that the market prices for CVS common stock had been artificially inflated by Defendants' fraudulent course of conduct.

253.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of CVS common stock during the Class Period.

254.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Executive Defendants

255.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

256.    The Executive Defendants acted as controlling persons of CVS within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, intimate knowledge of the Company's actual performance, and/or their power to control public statements about CVS, the Executive Defendants had the power and ability to control the actions of CVS and its employees, and the content of CVS's SEC filings and other public

statements. By reason of this conduct, the Executive Defendants are liable under Section 20(a) of the Exchange Act.

## XI.    PRAYER FOR RELIEF

257.    WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XII.   JURY DEMAND

258.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiffs demand a trial by jury in this action of all issues so triable.

Dated: March 4, 2025
New York, New York

**BERNSTEIN LITOWITZ BERGER**
**  & GROSSMANN LLP**

*/s/ Salvatore J. Graziano*
Salvatore J. Graziano
Katie M. Sinderson
Jonathan G. D'Errico
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
katiem@blbglaw.com
jonathan.derrico@blbglaw.com

**BLEICHMAR FONTI & AULD LLP**

Joseph Fonti
Erin H. Woods
George Bauer

300 Park Avenue, Suite 1301
New York, New York 10022
Telephone: (212) 789-1341
Facsimile: (212) 205-3960
jfonti@bfalaw.com
ewoods@bfalaw.com
gbauer@bfalaw.com

-and-

Evan A. Kubota
75 Virginia Road
White Plains, New York 10603
Telephone: (914) 265-2991
Facsimile: (212) 205-3960
ekubota@bfalaw.com

*Lead Counsel for the Class and for Lead*
*Plaintiffs Louisiana Sheriffs' Pension &*
*Relief Fund, Southeastern Pennsylvania*
*Transportation Authority (SEPTA), and City*
*of Miami Fire Fighters' and Police Officers'*
*Retirement Trust*

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**
Robert D. Klausner
Stuart A. Kaufman
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Louisiana Sheriffs'
Pension & Relief Fund and City of Miami
Firefighters' & Police Officers' Retirement
Trust*

**KEHOE LAW FIRM, P.C.**
John A. Kehoe
2001 Market Street
Suite 2500
Philadelphia, Pennsylvania 19103
Telephone: (215) 992-6676
jkehoe@kehoelawfirm.com

*Additional Counsel for Southeastern
Pennsylvania Transportation Authority*