**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IVY NIXON, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:24-cv-05303-MMG |
| | CLASS ACTION |
| Plaintiff, | |
| | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT** |
| v. | |
| CVS HEALTH CORPORATION, KAREN S. LYNCH, SHAWN M. GUERTIN, BRIAN A. KANE, and THOMAS F. COWHEY, | |
| | ORAL ARGUMENT REQUESTED |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .....................................................................................................4

    A.    CVS and the Individual Defendants .......................................................4

    B.    Medicare Advantage plans are permitted to require prior authorizations, and there are many lawful reasons why such requests may be denied. ..................4

    C.    CVS and other Medicare Advantage insurers experience unexpected utilization increases after the pandemic....................................................5

    D.    The Senate PSI does not conclude that CVS violated any Medicare regulations...........................................................................................7

    E.    Plaintiffs claim securities fraud based on CVS's alleged "illegal" use of AI to deny post-acute care requests. ............................................................8

LEGAL STANDARDS .............................................................................................9

ARGUMENT ........................................................................................................10

  I.    PLAINTIFFS FAIL TO ALLEGE A SECTION 10(B) CLAIM...................................10

    A.    Plaintiffs fail to plead any actionable misstatements or omissions.......................10

        1.    Plaintiffs fail to allege any material violation of law that caused any statements to be false or misleading when made. ........................................10

            i.    Plaintiffs fail to allege any Medicare violations. .................................10

            ii.    Plaintiffs fail to allege the materiality of any supposed violations...........................................................................................19

        2.    The challenged statements regarding compliance with Medicare rules and use of AI are not actionable...........................................................21

            i.    The statements were not false or misleading when made...................21

            ii.    The statements are inactionable puffery. .............................................22

            iii.    The statements are inactionable opinions. ...........................................23

        3.    The challenged statements regarding sources of success for the Health Care Benefits segment are not actionable. .......................................24

            i.    The statements were not false or misleading when made...................24

            ii.    The statements are inactionable opinions and puffery.........................25

        4.      The challenged statements regarding guidance for the Health Care Benefits segment are not actionable. ............................................................26

              i.     The statements were not false or misleading when made. ...................26

              ii.    The statements are forward-looking statements protected by the PSLRA safe harbor. ......................................................................29

              iii.   The statements are inactionable opinions. ............................................31

   B.     Plaintiffs fail to plead a strong inference of scienter. ...........................................32

        1.      Plaintiffs fail to allege motive. ....................................................................32

        2.      Plaintiffs fail to allege conscious misbehavior or recklessness. .................33

        3.      The more compelling inference is that there was no fraud. .........................40

        4.      Plaintiffs fail to allege corporate scienter. ..................................................42

   C.     Plaintiffs fail to allege loss causation.....................................................................42

        1.      Plaintiffs fail to allege loss causation regarding CVS's 1Q24 earnings. .....................................................................................................42

        2.      Plaintiffs fail to allege loss causation regarding the PSI Report. ................43

   D.     Plaintiffs fail to allege scheme liability. .................................................................43

II.     PLAINTIFFS FAIL TO ALLEGE A SECTION 20(A) CLAIM ...................................44

CONCLUSION ..................................................................................................................................44

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ark. Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb*,
    28 F.4th 343 (2d Cir. 2022) ................................................................9, 19, 32, 44

*ATSI Commc'ns* v. *Shaar Fund*,
    493 F.3d 87 (2d Cir. 2007)...............................................................................4 n.1, 32

*Bolling* v. *Dendreon Corp.*,
    2014 WL 2533323 (W.D. Wash. 2014)....................................................................39

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v.
    *Nat'l Gen. Holdings*,
    2021 WL 212337 (S.D.N.Y. 2021)..........................................................................35

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS*,
    752 F.3d 173 (2d Cir. 2014) .............................................................................. 35-36

*City of Royal Oak Ret. Sys.* v. *Juniper Networks*,
    2013 WL 2156358 (N.D. Cal. 2013) ........................................................................18

*D.E. & J Ltd. P'ship* v. *Conaway*,
    284 F. Supp. 2d 719 (E.D. Mich. 2003)...................................................................23

*Das* v. *Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018)......................................................................37

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JPMorgan Chase*,
    553 F.3d 187 (2d Cir. 2009)......................................................................................33

*Fila* v. *Pingtan Marine Enter.*,
    195 F. Supp. 3d 489 (S.D.N.Y. 2016)......................................................................43

*Frederick* v. *Mechel*,
    475 F. App'x 353 (2d Cir. 2012) ..............................................................................40

*Gamm* v. *Sanderson Farms*,
    944 F.3d 455 (2d Cir. 2019)......................................................................... *passim*

*Garber* v. *Legg Mason*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008).......................................................................20

*Glaser* v. *The9*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................................39, 40

*Gray* v. *Alpha & Omega Semiconductor*,
  2021 WL 4429499 (S.D.N.Y. 2021)..................................................11, 13, 36, 37

*Gregory* v. *ProNAi Therapeutics*,
  297 F. Supp. 3d 372 (S.D.N.Y. 2018)...........................................................16, 31

*Holbrook* v. *Trivago*,
  2019 WL 948809 (S.D.N.Y. 2019)......................................................................40

*Huang* v. *Higgins*,
  2019 WL 1245136 (N.D. Cal. 2019) ...........................................................19, 43

*In re Axis Cap. Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006)...........................................................11, 29

*In re China Mobile Games & Ent. Grp. Sec. Litig*,
  2016 WL 922711 (S.D.N.Y. 2016) ................................................................21-22

*In re Doral Fin. Corp. Sec. Litig.*,
  563 F. Supp. 2d 461 (S.D.N.Y. 2008)................................................................38

*In re DraftKings Sec. Litig.*,
  650 F. Supp. 3d 120 (S.D.N.Y. 2023)................................................................21

*In re Duke Energy Corp. Sec. Litig.*,
  282 F. Supp. 2d 158 (S.D.N.Y. 2003)................................................................20

*In re Elan Corp. Sec. Litig.*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008)................................................................16

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
  2015 WL 4931357 (S.D.N.Y. 2015),
  *report and recommendation adopted*,
  2015 WL 5255469 (S.D.N.Y. 2015)...................................................................38

*In re FBR Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008)................................................................18

*In re Francesca's Holdings Sec. Litig.*,
  2015 WL 1600464 (S.D.N.Y. 2015)..................................................20, 38, 42, 43

*In re ITT Educ. Servc. Sec. & S'holder Derivatives Litig.*,
  859 F. Supp. 2d 572 (S.D.N.Y. 2012)............................................................23, 25

*In re Lone Pine Res.*,
  2014 WL 1259653 (S.D.N.Y. 2014)...................................................................20

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)........................................................................34

*In re NYSE Specialists Sec. Litig.*,
503 F.3d 89 (2d Cir. 2007)........................................................................................18

*In Re Philip Morris Int'l Sec. Litig.*,
89 F.4th 408 (2d Cir. 2023) ......................................................................................23

*In re Ply Gem Holdings Sec. Litig.*,
135 F. Supp. 3d 145 (S.D.N.Y. 2015).......................................................................19

*In re PXRE Grp. Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009).........................................................33, 35, 36, 37

*In re Renewable Energy Grp. Sec. Litig.*,
2022 WL 14206678 (2d Cir. 2022)...........................................................................29

*In re Salomon Analyst Level 3 Litig.*,
373 F. Supp. 2d 248 (S.D.N.Y. 2005).................................................................28, 34

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016).................................................................24, 25

*In re Telefonaktiebolaget LM Ericsson Sec. Litig.*,
675 F. Supp. 3d 273 (E.D.N.Y. 2023) ................................................................22, 25

*In re Travelzoo Sec. Litig.*,
2013 WL 1287342 (S.D.N.Y. 2013)..................................................................... 34-35

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011)................................................................34, 35

*In re Yukos Oil Co. Secs. Litig.*,
2006 WL 3026024 (S.D.N.Y. 2006).............................................................11, 13, 14

*Jackson* v. *Abernathy*,
960 F.3d 94 (2d Cir. 2020)........................................................................................42

*Jackson* v. *Halyard Health*,
2018 WL 1621539 (S.D.N.Y. 2018)..........................................................................38

*Janbay* v. *Canadian Solar*,
2012 WL 1080306 (S.D.N.Y. 2012)....................................................................42, 44

*Jones* v. *Perez*,
550 F. App'x 24 (2d Cir. 2013) .................................................................................35

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001)................................................................................33

*Kavanagh* v. *Zwilling*,
    578 F. App'x 24 (2d Cir. 2014) ...........................................................................9

*Kemp* v. *Univ. Am. Fin. Corp.*,
    2007 WL 86942 (S.D.N.Y. 2007).........................................................................23

*Lentell* v. *Merrill Lynch*,
    396 F.3d 161 (2d Cir. 2005).................................................................................42

*Lighthouse Fin.* v. *Royal Bank of Scot.*,
    902 F. Supp. 2d 329 (S.D.N.Y. 2012)..................................................................40

*Lipow* v. *Net1 UEPS Techs.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015)..................................................................37

*Martin* v. *Quartermain*,
    732 F. App'x 37 (2d Cir. 2018) ...........................................................................31

*Maso Cap. Invs.* v. *E-House (China) Holdings*,
    2024 WL 2890968 (2d Cir. 2024)....................................................................29, 31

*Menaldi* v. *Och-Ziff Cap. Mgmt.*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016)..................................................................11

*Menora Mivtachim Ins.* v. *Int'l Flavors & Fragrances*,
    2021 WL 1199035 (S.D.N.Y. 2021)..........................................................15, 25, 33

*Mucha* v. *Volkswagen*,
    540 F. Supp. 3d 269 (E.D.N.Y. 2021),
    *aff'd*, 2022 WL 774877 (2d Cir. 2022)........................................................10, 11, 37

*NECA-IBEW Health & Welfare Fund* v. *Pitney Bowes*,
    2013 WL 1188050 (D. Conn. 2013) .....................................................................27

*New Eng. Carpenters Guaranteed Annuity & Pension Funds* v. *DeCarlo*,
    122 F.4th 28 (2d Cir. 2023) .................................................................................25

*Novak* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..................................................................... *passim*

*ODS Cap.* v. *JA Solar Holdings*,
    2020 WL 7028639 (S.D.N.Y. 2020)......................................................................27

*Okla. Firefighters Pension & Ret. Sys.* v. *Xerox*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018)..................................................................26

*Okla. L. Enf't Ret. Sys.* v. *Telefonaktiebolaget LM Ericsson*,
2020 WL 127546 (S.D.N.Y. 2020)................................................................................31

*Omnicare* v. *Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)...............................................................................................23, 24

*Ong* v. *Chipotle Mexican Grill*,
294 F. Supp. 3d 199 (S.D.N.Y. 2018)................................................................... 22-23

*Pehlivanian* v. *China Gerui Advanced Materials*,
153 F. Supp. 3d 628 (S.D.N.Y. 2015)...........................................................................9

*Plumbers & Steamfitters Loc. 773 Pension Fund* v. *CIBC*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010)........................................................................36

*Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank*,
11 F.4th 90 (2d Cir. 2021) ..........................................................................................10

*Police & Fire Ret. Sys. City of Detroit* v. *Argo Grp. Int'l Holdings*,
2024 WL 5089970 (S.D.N.Y. 2024).............................................................................23

*Pollio* v. *MF Global*,
608 F. Supp. 2d 564 (S.D.N.Y. 2009)........................................................................26

*Prime Mover Cap. Partners* v. *Elixir Gaming Techs.*,
548 F. App'x 16 (2d Cir. 2013) ...................................................................................29

*Rein* v. *Dutch Bros*,
2024 WL 3105004 (S.D.N.Y. 2024)...............................................................4 n.1, 31, 32

*Rombach* v. *Chang*,
355 F.3d 164 (2d Cir. 2004).........................................................................................33

*San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris*,
75 F.3d 801 (2d Cir. 1996)...........................................................................................33

*Saraf* v. *Ebix*,
632 F. Supp. 3d 389 (S.D.N.Y. 2022)........................................................................40

*Schaffer* v. *Horizon Pharma*,
2018 WL 481883 (S.D.N.Y. 2018)................................................................... *passim*

*Schiro* v. *Cemex*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019)........................................................................35

*Schiro* v. *Cemex*,
438 F. Supp. 3d 194 (S.D.N.Y. 2020)........................................................................11

*S.E.C.* v. *Rio Tinto*,
   41 F.4th 47 (2d Cir. 2022) ...................................................................44

*Shemian* v. *Rsch. In Motion*,
   2013 WL 1285779 (S.D.N.Y. 2013) ......................................................34

*Shields* v. *Citytrust Bancorp*,
   25 F.3d 1124 (2d Cir. 1994) ................................................................35

*Singh* v. *Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019) ..................................................................22

*Staehr* v. *Hartford Fin. Servs.*,
   547 F.3d 406 (2d Cir. 2008) ...........................................................4 n.1

*Tellabs* v. *Makor Issues & Rts.*,
   551 U.S. 308 (2007) ..............................................................32, 40, 41

*Tyler* v. *Liz Claiborne*,
   814 F. Supp. 2d 323 (S.D.N.Y. 2011) ..................................................35

*Woodley* v. *Wood*,
   2022 WL 103563 (S.D.N.Y. 2022) .......................................................39

*Woolgar* v. *Kingstone Cos.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020) ..........................................28, 39-40

*Xerion Partners* v. *Resurgence Asset Mgmt.*,
   474 F. Supp. 2d 505 (S.D.N.Y. 2007) .............................................27-28

**Statutes and Rules**

42 C.F.R. § 409 ...........................................................................5, 12

42 C.F.R. § 410 ...................................................................................5

42 C.F.R. § 412 ..........................................................................12, 28-29

42 C.F.R. § 422 ..........................................................................*passim*

15 U.S.C. § 78u-4 .........................................................................9, 32

15 U.S.C. § 78u-5 ..............................................................................29

42 U.S.C. § 1395w-22(c)(1)(G) ...........................................................5

Fed. R. Civ. P. 9 .........................................................................9, 18

Fed. R. Civ. P. 12(b)(6) .......................................................................9

## PRELIMINARY STATEMENT

CVS Health Corporation ("CVS") is a leading provider of a broad range of healthcare services, including primary care clinics, retail pharmacies, health insurance products, and pharmacy benefit manager services. CVS's Health Care Benefits ("HCB") is the business segment that offers health insurance, including Medicare Advantage plans. As CVS repeatedly disclosed to investors, following the COVID-19 pandemic there was pent-up demand for elective procedures and other medical services that patients had deferred during the pandemic, particularly among seniors in Medicare Advantage. As 2023 progressed, this led to increasing medical service utilization and cost trends, which were reported by CVS and other Medicare Advantage insurers. CVS repeatedly discussed these trends with investors, raised its Medical Benefit Ratio ("MBR") guidance (which measures costs as a portion of health insurance premiums), and reduced its earnings guidance. Ultimately, these utilization and cost trends proved higher than CVS had expected. When CVS announced 1Q24 results on May 1, 2024, it again increased MBR and reduced earnings guidance.

In this action, Plaintiffs have attempted to manufacture a securities fraud case to recover damages based on the stock price drop following that May 2024 announcement. The crux of Plaintiffs' theory is that CVS's results were not fully explained by the industry-wide trends reported by CVS and other Medicare Advantage insurers. Instead, Plaintiffs claim that CVS had been engaged in a secret "illegal" and "illicit" scheme to use artificial intelligence ("AI") to improperly deny prior authorization requests from Medicare Advantage patients, specifically for a service called "post-acute care" that is used following hospitalizations. The increased utilization and costs reported in 2023 and early 2024, Plaintiffs claim, were caused when CVS ceased the "illegal" scheme in light of new Medicare regulations that prohibited the practices (although, according to Plaintiffs, the prior regulations also prohibited the practices). As a result, Plaintiffs

claim that CVS's statements regarding its compliance with Medicare regulations and use of AI, the drivers of performance in the HCB business, and its HCB guidance were false and misleading.

The problem for Plaintiffs is that the Complaint comes ***nowhere close*** to meeting the strict pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). Congress enacted the PSLRA to deter exactly this type of "strike suit[] wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries" "'whenever there is a significant change in an issuer's stock price.'" *Novak* v. *Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). "'[T]o curtail the filing of meritless lawsuits,'" the PSLRA requires that plaintiffs provide particularized pleading and allegations creating a "strong inference" of scienter. *Id.* at 306-07. And where, like here, a securities fraud complaint rests on allegations of undisclosed wrongdoing, the Second Circuit requires that "the facts of those underlying illegal acts must also be ***pleaded with particularity***." *Gamm* v. *Sanderson Farms*, 944 F.3d 455, 458 (2d Cir. 2019) (emphasis added).

The Complaint falls far short of these standards.

(1)    As a threshold matter, Plaintiffs have failed to allege with any particularity that CVS engaged in any "illegal" or "illicit" practices, much less that any such practices were material in scope or financial impact. The primary basis for Plaintiffs' claims is a report issued by the Senate Permanent Subcommittee on Investigations ("PSI") that reviewed prior authorization practices by Medicare Advantage insurers, but that report ***does not*** find that CVS engaged in any violations of Medicare regulations, and nor do Plaintiffs allege any such findings by Medicare regulators. Plaintiffs also ignore that there are many proper reasons under Medicare regulations for why a prior authorization request may be denied (such as when the request fails to meet Medicare coverage criteria), and Plaintiffs fail to allege with particularity that CVS's denials did

not fit within these compliant categories.  Moreover, even if Plaintiffs had alleged any violations, they fail to plead any facts showing **what portion** of CVS's total denials was allegedly improper, or the significance of the alleged improper denials to CVS's financial results, and therefore fail to plead that any supposed violations were material.

(2)    Because Plaintiffs have failed to allege any material "illegal" or "illicit" practices, they have also failed to allege that any of the challenged statements were false or misleading for not disclosing such alleged practices.  With respect to Plaintiffs' other allegations that HCB's guidance was based on "stale" data that did not properly account for recent utilization trends, the anonymous sources on which Plaintiffs rely lack personal knowledge or involvement in setting guidance, and their alleged statements are insufficiently particular to be credited.  The three categories of challenged statements are also inactionable because they comprise opinion statements that Plaintiffs have not alleged were insincerely held or misleading, forward-looking statements protected by the PSLRA safe harbor, and immaterial corporate "puffery."

(3)    Plaintiffs' claims fail for the independent reason that they have failed to raise any "strong inference" of scienter with respect to any Defendants.  Even if Plaintiffs had alleged any "illegal" practices (which they have not), Plaintiffs fail to show that any Individual Defendants received any reports or other information that provided knowledge of the alleged "illegal" denials. And with respect to HCB guidance, not only do Plaintiffs fail to adequately plead that the guidance relied on "stale" data, the claim makes no sense—why would CVS repeatedly disclose that it was experiencing increased utilization and cost trends, yet purposely issue inaccurate guidance that did not account for those trends and which it would inevitably fail to meet?  The far more compelling inference to be drawn from the alleged facts is that CVS's performance is explained by exactly the business factors that it repeatedly disclosed.  And while CVS did its best to forecast utilization and

medical cost trends—while in the midst of the unprecedented circumstances following a global pandemic—it simply underestimated the impact.

(4)    The Complaint should be dismissed for the additional reason that Plaintiffs have failed to plead loss causation because, *inter alia*, neither of the alleged "corrective disclosures" revealed any information about the alleged fraud.

The Complaint should be dismissed in full and with prejudice.

## BACKGROUND[1]

### A.    CVS and the Individual Defendants

CVS provides a broad range of healthcare services, including insurance, retail pharmacy, primary care, and pharmacy benefit manager services.  ECF No. 43 ("Complaint") ¶36.[2]  CVS's Health Care Benefits business offered various types of health insurance, including commercial, Medicaid, and Medicare Advantage.  ¶¶37, 110.  Individual Defendants served as senior executives of CVS, including as CEO and CFO.  ¶¶30-33.

### B.    Medicare Advantage plans are permitted to require prior authorizations, and there are many lawful reasons why such requests may be denied.

Medicare is a federal program that insures people 65 and older, who may participate in Traditional Medicare or Medicare Advantage.  ¶38.  Traditional Medicare is offered by the government, while Medicare Advantage is offered by companies that contract with the Centers for Medicare & Medicaid Services (the federal agency that administers Medicare) ("CMS").  ¶¶38, 43.  Medicare Advantage insurers receive a fixed payment per enrollee that is set through an annual

---

[1] The facts herein are from the Complaint and/or exhibits to the Declaration of Emma S. Stein ("DX_"), which are referenced in the Complaint and/or documents of which the Court may take judicial notice.  *ATSI Commc'ns* v. *Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007) (court may consider "documents incorporated into the complaint by reference" and SEC filings); *Staehr* v. *Hartford Fin. Servs.*, 547 F.3d 406, 424-26 (2d Cir. 2008) ("media reports"); *Rein* v. *Dutch Bros*, 2024 WL 3105004, at *1 n.1 (S.D.N.Y. 2024) (earnings call transcripts).

[2] "¶" refers to Complaint paragraphs.

bidding process. ¶41. Medicare Advantage plans are required to provide the same basic benefits as Traditional Medicare, and may also offer supplemental benefits such as dental and fitness. ¶¶43-44; 42 C.F.R. § 422.101(a). Traditional Medicare does not cover all medical care and services; rather, the covered benefits are limited by coverage criteria and conditions specified by statutes, regulations, and local and national coverage determinations. *See* 42 C.F.R. Parts 409-10.

Medicare Advantage insurers are permitted to require prior authorization for medical services. ¶68; 42 U.S.C. § 1395w-22(c)(1)(G). There are also many compliant reasons under Medicare regulations for why a prior authorization may be denied, including where the service does not meet coverage criteria. ¶68; *see also* Section I.A.1. By properly using prior authorizations, Medicare Advantage insurers can help ensure that safe and medically necessary care is provided, give advance notice to patients regarding whether claims will be covered, and reduce overpayment of medical costs, thus allowing the plan to offer additional benefits and lower costs for members. Medicare regulations also permit the use of AI or algorithms to assist in reviewing requests, and Plaintiffs do not allege otherwise. DX1 (CMS FAQ), 2 ("An algorithm or software tool can be used to assist MA plans in making coverage determinations."). CMS has recognized the role of prior authorization in "help[ing] [Medicare Advantage] plans determine the medical necessity of services and minimize the furnishing of unnecessary services, thereby helping to contain costs and protect beneficiaries." 88 FR 22120, 22185.

### C.    CVS and other Medicare Advantage insurers experience unexpected utilization increases after the pandemic.

During the COVID-19 pandemic, CVS initially reported an "unprecedented decline" in utilization as patients decided to forgo elective procedures and non-COVID-related care. DX2 (2Q20 Tr.), 5-6. As the pandemic progressed, CVS reported higher utilization and medical costs

related to COVID testing and treatment, which increased its MBR.[3]  DX3 (3Q21 Tr.), 7.  CVS repeatedly cautioned that the "impact COVID-19 will have … is uncertain" and "[t]here can be no assurance that future health care and other benefits costs will not exceed our projections."  DX4 (FY21 10-K), 35, 38; DX5 (FY22 10-K), 34, 37; DX6 (FY23 10-K), 41.

In May 2023, the COVID-19 federal public health emergency came to an end.[4]  As FY23 progressed, CVS reported increased utilization from deferred medical services, particularly in Medicare Advantage.  For 2Q23, CVS reported that MBR increased due to "higher-than-expected Medicare Advantage utilization … primarily driven by higher utilization in the outpatient setting, as well as dental and behavioral health," DX7 (2Q23 Tr.), 7, which was "likely due to some of these services that have been postponed by our seniors not feeling comfortable accessing the health care system during the pandemic," such as "outpatient orthopedic procedures, hips and knees," "dental," and "cardiac procedures," *id.* at 11.  CVS reported that its guidance assumed continued utilization pressure during 2023 and an "incremental headwind" in 2024.  *Id.* at 11-12.

In 3Q23 and 4Q23, CVS continued to experience higher Medicare Advantage utilization, "primarily attributable to … outpatient and supplemental benefits," DX8 (3Q23 Tr.), 6, and increased its MBR guidance.  *Id.* at 8-11; DX9 (3Q23 Release), 3; DX10 (4Q23 Tr.), 6-8; DX11 (4Q23 Release), 3.  When CVS reported 4Q23 results in February 2024, it lowered 2024 earnings guidance and again increased MBR guidance, "[i]n recognition of the marketplace uncertainty around utilization trends in Medicare Advantage."  DX10 (4Q23 Tr.), 8; *see also* DX11 (4Q23 Release), 1.  CVS also reported that "[m]embership enrollment in Medicare Advantage plans exceeded expectations."  DX6 (FY23 10-K), 79.

---

[3] MBR measures the cost of benefits divided by premiums.  ¶56.
[4] https://www.hhs.gov/coronavirus/covid-19-public-health-emergency/index.html.

During the same period, other Medicare Advantage insurers also reported increased utilization and "had begun warning in mid-2023 of increasing utilization in the aftermath of the COVID-19 pandemic."  ¶15; DX12 (*UnitedHealth expects higher medical costs in Q2 as delayed care makes comeback* (June 2023)); DX13 (*UnitedHealth shares tumble after health care giant reports soaring medical costs in 4Q* (Jan. 2024)); DX14 (*Humana warns that rising care costs will persist through 2024* (Jan. 2024)); DX15 (Humana 2Q23 Tr.), 6 ("[B]eginning in early May, we noted the emergence of higher-than-anticipated non-inpatient utilization trends in our Medicare Advantage business."); DX16 (UnitedHealth 2Q23 Tr.), 6-7, 10-11 ("outpatient care activity among seniors was … above our expectations"; "it looks … like a kind of deferment of care").

As 2024 began, utilization proved even higher than expected.  On May 1, 2024, CVS reported that, although its guidance had assumed increased utilization, "[i]t is now clear that the first quarter 2024 Medicare Advantage trends are notably above this level," DX17 (1Q24 Tr.), 3, 4, 6.  CVS again reduced earnings and increased MBR guidance.  *Id.* at 7; ¶¶150-51.  Following this announcement, CVS's stock declined.  ¶235.  CVS explained that the impact of these trends was exacerbated by increases in CVS's Medicare Advantage membership and attractive supplemental benefits.  DX18 (3Q24 Tr.), 5 ("In this rising trend environment, we offered rich benefits, which exacerbated our utilization pressures and grew membership rapidly."); ¶111.

### D.    The Senate PSI does not conclude that CVS violated any Medicare regulations.

On October 17, 2024, the PSI released a report following an investigation regarding prior authorizations for post-acute care by Medicare Advantage insurers during 2019-2022 ("Report").[5] ¶156; DX19 (Report), 4.  The Report concluded by offering policy recommendations, *e.g.*, that CMS collect additional data.  DX19, 47-52.

---

[5] Post-acute care refers to services provided following hospitalization.  ¶7.

The Report ***did not*** conclude that CVS violated any Medicare regulations.  Plaintiffs do not allege that CVS ever endorsed the accuracy of the Report (it has not and maintains that the Report contains numerous inaccuracies).  Plaintiffs also do not allege that CMS or any regulator ever concluded that CVS violated any Medicare regulations.

The Report asserted that Medicare Advantage insurers denied prior authorizations for post-acute care more often than other services, but it also acknowledged that "[t]here is no statutory or regulatory requirement that Medicare Advantage insurers approve prior authorization requests at the same rates across medical sub-fields, and admission to post-acute care facilities is governed by distinct medical necessity criteria."  DX19, 19.  It further reported that CVS informed the PSI that AI tools may "***only approve*** requests for care, and that any final denials for reasons of medical necessity must come from physician reviewers."  *Id*. at 13 & n.41 (emphasis added).  The Report further concluded that "CVS's prior authorization denial rate for post-acute care remained relatively stable during the period reviewed," *i.e.*, 2019-2022.  DX19, 5.

### E.    Plaintiffs claim securities fraud based on CVS's alleged "illegal" use of AI to deny post-acute care requests.

On March 4, 2025, Plaintiffs filed the Complaint.  Plaintiffs allege that CVS secretly and illegally used AI to improperly deny prior authorization requests for post-acute care.  ¶4.  Plaintiffs claim that CVS began illegally using AI in 2021 when it hired Post-Acute Analytics ("PAA"), which provided an algorithm ("Anna") to review requests.  ¶¶86-90.

Plaintiffs claim that CVS terminated PAA and ceased "illegal" use of AI after CMS issued clarifying regulations in April 2023, applicable for coverage in January 2024.  ¶¶121, 134.  CMS "issued these 'clarifications' to ensure that Medicare Advantage insurers like CVS would provide the same 'basic benefits' as Traditional Medicare 'without unreasonable barriers or interruptions,'" ¶122 (although Plaintiffs acknowledge that Medicare Advantage was already required to cover the

same benefits as Traditional Medicare, ¶185).  Plaintiffs claim that ceasing the "illegal" denials caused utilization and costs to increase.  ¶18.  Plaintiffs also allege that CVS's HCB guidance was based on "stale" data that did not incorporate recent utilization increases or account for ceasing the "illegal" scheme.  ¶221.  Plaintiffs claim that the "truth" was revealed by CVS's 1Q24 earnings in May 2024 and the Report in October 2024.  ¶148.

**LEGAL STANDARDS**

"To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead:  (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation."  *Ark. Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb*, 28 F.4th 343, 351-52 (2d Cir. 2022).  To survive a Rule 12(b)(6) motion, Plaintiffs must allege "sufficient *factual* matter … to 'state a claim to relief that is plausible on its face.'"  *Id*. at 354.  The Court need not "accept as true conclusions unsupported by the facts alleged, legal conclusions, bald assertions, or unwarranted inferences."  *Kavanagh* v. *Zwilling*, 578 F. App'x 24, 24 (2d Cir. 2014).

Complaints alleging securities fraud must also satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA.  Rule 9(b) requires that Plaintiffs "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), including "'the who, what, when, where and how,'" *Pehlivanian* v. *China Gerui Advanced Materials*, 153 F. Supp. 3d 628, 642 (S.D.N.Y. 2015).  The PSLRA requires that Plaintiffs specify each statement "'alleged to have been misleading, the reason or reasons why the statement is misleading,'" and "'if an allegation … is made on information and belief, … state with particularity all facts on which that belief is formed.'"  *Novak*, 216 F.3d at 307 (quoting 15 U.S.C. § 78u-4(b)(1)).  Plaintiffs must also "'state with particularity facts giving rise to a strong inference that the defendant acted with'" scienter. *Id.* at 310 (quoting § 78u-4(b)(2)(A)).

## ARGUMENT

### I.    PLAINTIFFS FAIL TO ALLEGE A SECTION 10(B) CLAIM

Plaintiffs allege that Defendants violated Section 10(b) and Rule 10b-5 by making alleged misstatements regarding:  (i) CVS's compliance with Medicare regulations and use of AI (¶¶200-10); (ii) the sources of the HCB segment's success (¶¶211-20); and (iii) financial guidance for HCB (¶¶221-31).  Plaintiffs fail to state any claim.

#### A.    Plaintiffs fail to plead any actionable misstatements or omissions.

##### 1.    Plaintiffs fail to allege any material violation of law that caused any statements to be false or misleading when made.

Plaintiffs' theory is that each category of challenged statements was false and/or misleading because CVS failed to disclose its alleged "illegal" use of AI to deny prior authorization requests for post-acute care in violation of Medicare regulations.  Plaintiffs' claims fail because they have not alleged any such violations, much less that any purported violations were material.

###### i.    Plaintiffs fail to allege any Medicare violations.

Corporations have no general duty "'to disclose uncharged, unadjudicated wrongdoing.'"  *Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank*, 11 F.4th 90, 98 (2d Cir. 2021).  Accordingly, "'[t]o impose securities law liability on a corporation for failure to disclose underlying unlawful conduct, a plaintiff must plead with particularity the affirmative statements that were made misleading by the defendant's failure to disclose.'"  *Mucha* v. *Volkswagen*, 540 F. Supp. 3d 269, 303 (E.D.N.Y. 2021), *aff'd*, 2022 WL 774877 (2d Cir. 2022).  Critically, "'such statements cannot be misleading if the misconduct did not happen; consequently, a plaintiff must adequately plead that the misconduct did, in fact, occur.'"  *Id.*

The Second Circuit has emphasized that "when a complaint claims that statements were rendered false or misleading through the nondisclosure of illegal activity, the facts of those underlying illegal acts must also be ***pleaded with particularity***."  *Gamm*, 944 F.3d at 458 (emphasis

added).  This requires pleading "'*what* law or standard the defendant violated and *how* the alleged violation occurred'" and "'sufficient ... facts describing the essential elements of that underlying conduct.'"  *Mucha*, 2022 WL 774877, at *2-3; *Schiro* v. *Cemex*, 438 F. Supp. 3d 194, 198 (S.D.N.Y. 2020) ("Plaintiffs must plead the 'who, what, when, where, and how' of the alleged improper transaction.").

Failure to meet these requirements mandates dismissal.  *See, e.g.*, *Gray* v. *Alpha & Omega Semiconductor*, 2021 WL 4429499, at *9 (S.D.N.Y. 2021) (dismissing claims premised on export violations where "[a]part from the bald assertions that [defendant] engaged in illegal conduct, the complaint contains no analysis of the applicable regulations and why [defendant's] indirect sales ... violated them"); *In re Yukos Oil Co. Secs. Litig.*, 2006 WL 3026024, at *14 (S.D.N.Y. 2006) ("the Complaint fails to plead with particularity sufficient facts demonstrating that [defendant's] tax strategy violated [Russian] Tax Code"); *Menaldi* v. *Och-Ziff Cap. Mgmt.*, 164 F. Supp. 3d 568, 578-79, 582 (S.D.N.Y. 2016) (dismissing claims premised on bribery where complaint failed to plead "how, when, and whether" illegal payments were made); *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) ("If the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the nondisclosure of the alleged scheme are fatally flawed.").

Here, Plaintiffs conclusorily assert that CVS applied "illegal" AI algorithms to "deny medically necessary care" in violation of Medicare regulations.  ¶¶3-4.  The only purported misconduct that Plaintiffs even attempt to identify with any specificity concerns alleged improper prior authorization requirements and denials for "post-acute" care.  ¶4.  None of Plaintiffs' allegations come close to sufficiently pleading any violations.

### (i)     Medicare regulations

Plaintiffs acknowledge that Medicare regulations during the Class Period permitted Medicare Advantage insurers to require prior authorizations and to deny requests for care that was not covered by the plan.     ¶68.    Plaintiffs also do not (and could not) allege that regulations prohibited the use of AI or algorithms to assist in reviewing requests.    DX1 (CMS FAQ), 2.    As a result, simply alleging that CVS required prior authorizations, used AI, or denied requests, or that levels of authorizations or denials changed over time, is not sufficient to allege any violations.

Critically, Plaintiffs fail to address or engage with the complexity of Medicare regulations, which contain extensive and detailed coverage criteria and provide for many circumstances in which a Medicare Advantage insurer may properly deny a request for post-acute care.    For example, Traditional Medicare only covers post-acute care in a skilled nursing facility ("SNF") where enrollees meet detailed admission requirements, *see* 42 C.F.R. §§ 409.30(a)-(b) (requiring, *inter alia*, hospitalization for "at least 3 consecutive" days), level of care requirements, *see* § 409.31(b) (requiring, *inter alia*, that the beneficiary must require skilled nursing "on a daily basis" and the services "must be ones that, as a practical matter, can only be provided in a SNF"), *see* § 409.35 (defining criteria for "practical matter"), and have not exceeded coverage limitations, *see* § 409.61(b) (limiting coverage to 100 days), ¶49; *see also* DX20 (CMS Manual), Ch. 8 §30. Similarly, post-acute care in an inpatient rehabilitation facility ("IRF") is "only considered by Medicare to be reasonable and necessary" if the patient meets certain requirements.    DX21 (CMS Manual), Ch. 1 §110; 42 C.F.R. § 412.622(a)(3)-(5) (outlining criteria for when an IRF claim is "reasonable and necessary").    Traditional Medicare also excludes "custodial care," which "serves to assist an individual in the activities of daily living" without providing skilled care.    DX22 (CMS Manual), Ch. 16 §110.

Accordingly, there are many circumstances in which post-acute care would not be covered by Traditional Medicare and therefore by Medicare Advantage.  This remained true both before and after the April 2023 clarifying regulations, which reaffirmed that prior authorizations are permitted and may be denied if Traditional Medicare criteria are not met.  One of the provisions implementing the April 2023 regulations, 42 C.F.R. § 422.138(b), expressly provides that prior authorization may be used to confirm "medical criteria" and ensure care "is medically necessary" based on the standards in § 422.101(c)(1), which incorporates Traditional Medicare coverage criteria.  § 422.101(c)(1), (b)(2); *see also* DX1 (CMS FAQ), 2-3 (coverage may be denied "based on coverage criteria … or for other expressly permissible bases, such as network limitations or failure to comply with prior authorization requirements.").  Thus, failure to meet (or provide required information to assess) these criteria may result in compliant denials.

Plaintiffs fail to address the many compliant reasons for prior authorization denials, and fail to allege that any CVS denials (or what portion) did not fit within these categories.  Plaintiffs therefore have failed to allege that CVS engaged in any "illegal" conduct with the particularity required by the PSLRA.  *See, e.g.*, *Gray*, 2021 WL 4429499, at *9 (dismissing claims where plaintiffs failed to allege that exports did not fit within regulatory "exemptions" that made them not "necessarily illegal"); *Yukos*, 2006 WL 3026024, at *14 (dismissing claims where defendants' tax strategies "were not clearly illegal"); *Schaffer* v. *Horizon Pharma*, 2018 WL 481883, at *8 (S.D.N.Y. 2018) ("the mere fact that prescriptions were written for off-label purposes … does not necessarily imply" improper marketing).

(ii)     **Report and FEs**

The Report and alleged statements by anonymous former employees ("FEs")[6] do not add any particularized support for Plaintiffs' claims.

The Report ***does not*** conclude that CVS violated Medicare regulations, and Plaintiffs do not allege any finding of violations by CMS or any regulator. DX19. Plaintiffs claim that CVS "deployed illicit [AI] algorithms" to "broadly deny prior authorization requests," ¶4, but the Report states that CVS reported that AI "may ***only approve*** requests" and that final denials "must come from physician reviewers." DX19, 13 & n.41; *id.* at 37 n.161 (noting that CVS's "predictive model" and "rules engine" "auto-***approve***[]" requests) (emphasis added); *Yukos*, 2006 WL 3026024, at *12 ("The Court need not accept as true any allegations that are contradicted by documents deemed to be part of the complaint," including "documents incorporated in it by reference"). And Plaintiffs elsewhere acknowledge that it was medical directors, not an AI algorithm, "who were permitted to deny the claims." ¶95.

Plaintiffs allege that CVS's prior authorization requests for post-acute care grew 57.5% while enrollment grew 42%, and that it required more prior authorizations and had a higher denial rate for post-acute care than for other services. ¶¶72, 80. But because CVS was permitted to require prior authorizations, and Plaintiffs do not (and cannot) allege any requirement to have the same prior authorization or denial rate across all medical services, concluding that any of these requests or denials violated the law (or what portion) is ***entirely speculative***.[7] Moreover, Plaintiffs omit that the PSI concluded that "CVS's prior authorization denial rate for post-acute care

---

[6] Two of the FEs were employed by PAA, not CVS. ¶¶89-92.
[7] Plaintiffs also fail to allege how these statistics were calculated or address the compliant reasons why denial rates could be higher for certain care, *e.g.*, for services like SNF that has detailed coverage criteria and where a hospital may request approval for multiple facilities at once and receive approval for one and "denials" for the others.

*remained relatively stable*" during 2019 to 2022—which contradicts Plaintiffs' theory that CVS in 2021 launched some "illicit" program to generate "mass denials." DX19 (Report), 5, 19 (CVS's denial rate for post-acute care went from 24.6% in 2020 to 25.9% in 2022) (emphasis added).[8]

Plaintiffs' FE allegations are equally unavailing. A complaint may rely on information from confidential witnesses where "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. Courts discredit such allegations where information was "sourced secondhand" and is "'insufficiently particular.'" *Menora Mivtachim Ins.* v. *Int'l Flavors & Fragrances*, 2021 WL 1199035, at *11 (S.D.N.Y. 2021).

***Algorithm "Target."*** Plaintiffs claim FE-1 alleged that an AI algorithm "was driven by a 'target' length of stay of 10 to 14 days or fewer—regardless of the medical needs of the patient." ¶90. But FE-1 never explains how this "target" worked in practice or impacted any final decisions (if at all). Indeed, FE-1 describes this "target" as merely a "recommendation," ¶90, and Plaintiffs elsewhere plead that "clinical reviewers" were employed to "review the algorithm recommendations," ¶94. Plaintiffs do not allege that the "target" dictated the outcome on any request or was not subject to adjustment by human review. That AI merely suggested "targets" does not mean that Medicare regulations were violated. *See* DX19 (Report), 51 ("CMS stated that AI could be used to 'assist' in predicting a patient's length of stay."). And there are no particularized allegations regarding to what portion of requests the alleged "target" was applied or

---

[8] Plaintiffs also reference documents referring to cost savings related to prior authorizations and denials. *E.g.*, ¶¶ 74-78, 84-85, 108, 110-11. But Medicare Advantage providers are permitted to require prior authorizations, and there is nothing impermissible about analyzing cost savings related to proper application of regulatory criteria.

for what time period.  *See, e.g.*, *Gregory* v. *ProNAi Therapeutics*, 297 F. Supp. 3d 372, 409 (S.D.N.Y. 2018) (disregarding allegations that were "unmoored in time")*.*

      FE-2, who was employed by PAA for, at most, the first month of the Class Period, makes only the vague statement that "'cost'" was a "'big'" factor without any particularized allegations that any final decisions ever violated Medicare regulations, and also states that Anna provided only "recommendations," not final determinations.  ¶¶91-92 (FE-2 employed from "May 2022 through November 2022"); *Horizon*, 2018 WL 481883, at *8 (discounting sources who "left [company] early in the Class Period").

      Moreover, ***none*** of the FEs are alleged to be a physician or nurse, and therefore none can offer creditable allegations regarding whether any request was medically necessary.  *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008) ("disregarding" medical conclusions where source "was not a physician").  Indeed, a determination of medical necessity, and whether any request met complex Medicare coverage criteria, would require careful review and assessment of each patient's medical history, status, and diagnoses, and knowledge of the extensive regulatory coverage requirements, which was not any FE's job and which there is no basis to infer they would have undertaken or had the expertise to assess.  Neither FE-1 nor FE-2 are alleged to have any knowledge or involvement in the clinical review of the alleged AI "recommendations" or final decisions on requests.  Since Plaintiffs offer no other basis for the assertion that CVS improperly denied any requests for "medically necessary care," this repeated, conclusory allegation must be disregarded.  *See, e.g.*, *Gamm*, 944 F.3d at 465 ("stock phrases" like "'worked in concert'" insufficient to plead antitrust violations).

      ***Staffing.***  Plaintiffs acknowledge that CVS employed clinicians "to review the algorithm's recommendations," but conclusorily allege that CVS "forced clinical reviewers to churn out as

many prior authorization denials as possible" and that medical staff "rubber-stamped" AI recommendations.  ¶94.  The only support for this allegation is FE-3's alleged statement that "'leadership wanted them to forward **at least 50%** of their cases to medical directors,' who were permitted to deny the claims."  ¶95.  But this only alleges that claims **were forwarded** to medical directors, not that any claims were illegally denied.  Plaintiffs allege nothing about the process applied by the medical directors in reviewing claims, or that medical directors illegally denied any claims.  As for alleged insufficient staffing, Plaintiffs do not allege that any regulation required any specific staffing levels, or that alleged insufficient staffing caused denials that were not permitted by Medicare regulations.  There is also no logical basis to infer that less staffing would even result in more rather than fewer denials.

    *Appeal Rates.*  Plaintiffs allege that CVS denied "in part or in full 13% of all prior authorization requests in 2022" and had a successful appeal rate of 91%.  ¶113; DX23 (KFF Report), 19.  But these statistics concern denials and appeals of **all** requests for **all** medical services, and therefore do not provide any particularized allegations concerning post-acute care or AI.[9]  And the fact that an initial denial was overturned on appeal does not indicate any violation.  Medicare regulations provide for appeals, 42 C.F.R. § 422, Subpart M, and additional information may be provided with an appeal than with the initial request, or different clinical reviewers may reasonably reach different judgments on application of complex criteria.  FE-1's allegations about appeal frequency are also unmoored in time.  ¶98.

    *Consulting "Expert."*  Plaintiffs cite an alleged "proprietary consulting expert analysis," which they claim shows an increase in prior authorization denials.  ¶¶103-05.  But Plaintiffs do

---

[9] Plaintiffs' source shows that CVS had one of the **lowest** rates for requiring prior authorizations, which logically explains a higher denial rate, and other Medicare Advantage insurers also had high successful appeal rates.  DX23 (KFF Report), 8, 19.

not explain the qualifications of this anonymous "expert" or the methodology applied, and thus these allegations lack sufficient reliability, and "'opinions couched as factual allegations'" are not credited on a motion to dismiss. *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007); *City of Royal Oak Ret. Sys.* v. *Juniper Networks*, 2013 WL 2156358, at *7 (N.D. Cal. 2013) ("'[expert] opinions cannot substitute for facts under the PSLRA'"). There is also no indication that the referenced data related to post-acute care or AI, and the consultant's opinion conflicts with the PSI's finding that CVS's denial rate "remained relatively stable." DX19 (Report), 5.

***Regulatory Changes***. Finally, Plaintiffs assert that "CVS quickly acted to wind down these programs before the new CMS regulations were applicable," including by "quietly terminat[ing] PAA" and "phas[ing] out its illicit algorithms." ¶134. But Plaintiffs provide no particularized facts showing that PAA's termination was related to new regulations, and the allegations that CVS wound down "illicit" programs are ***entirely conclusory***. Plaintiffs artfully reference FE-5's quotations to suggest that CVS reduced "'automation'" leading to increased utilization, but FE-5 merely makes the vague statements that "'the more they rolled up automation, it set off bells'" and it "'had an impact on utilization.'" ¶143. It is impossible to conclude what FE-5 is referring to, or to what time period, much less infer that CVS engaged in and stopped "illegal" conduct. FE-4 simply states that by 2023 "'there was a lot more utilization'" (which CVS disclosed). ¶¶142, 224. "Securities plaintiffs cannot meet the heightened pleading standards imposed by Rule 9 and the PSLRA with such conclusory claims." *In re FBR Sec. Litig.*, 544 F. Supp. 2d 346, 354-55 (S.D.N.Y. 2008). There is also no basis to conclude that CVS was not already substantially in compliance with the April 2023 regulations with respect to post-acute care, since they confirmed existing requirements to cover the same benefits as Traditional Medicare. And since any prior

authorization denials had to be made by clinical staff, there is also no logical basis to infer that allegedly reducing automation would have any impact on utilization.[10]

There is likewise no support for Plaintiffs' assertion that the revised regulation would require "public disclosure of the Company's illicit criteria," as Plaintiffs fail to allege any "illicit criteria."  ¶133.  The regulation required publication of "internal coverage criteria" that was used when Medicare rules did not specify the criteria.  42 C.F.R. § 422.101(b)(6).  Plaintiffs do not allege that CVS used any such internal criteria to fill gaps in Medicare regulations.  As discussed, the alleged 14-day "target" was alleged to be merely a "recommendation" subject to clinical review, and thus was not "coverage criteria" that would need to be disclosed.  ¶90.

### ii.  Plaintiffs fail to allege the materiality of any supposed violations.

To state a claim, Plaintiffs must allege that Defendants made "a misstatement or omission of material fact."  *Bristol-Myers*, 28 F.4th at 351.  Even if Plaintiffs had alleged any regulatory violations (which they have not), their claims would still fail because they fail to allege that any violations were material.

Plaintiffs reference statistics regarding prior authorizations and denials, but the numbers Plaintiffs cite include ***all*** requests and ***all*** denials, either for post-acute care or all services, yet Plaintiffs provide no basis to infer that ***all*** denials were improper (or, assuming any were improper, what portion).  ¶¶72, 80, 102-05, 113.  "Assessing the materiality of the [conduct] based on these allegations is like trying to guess the number of jellybeans in a jar after being told only that the jar is 'big.'"  *In re Ply Gem Holdings Sec. Litig.*, 135 F. Supp. 3d 145, 151 (S.D.N.Y. 2015); *Huang v. Higgins*, 2019 WL 1245136, at *9 (N.D. Cal. 2019) (failure to allege materiality where plaintiffs

---

[10] Plaintiffs' reference to a newsletter stating that CVS "will need to comply for 2024 plan year materials," ¶132, was referencing regulations for "translated materials" in other languages. DX24, 2.

failed to allege "what portion of [drug's] sales" was from illicit marketing); *Garber* v. *Legg Mason*, 537 F. Supp. 2d 597, 613, 615 (S.D.N.Y. 2008) (plaintiffs failed "to describe … the magnitude of the increase" or "how much the actual costs exceeded … budget"); *In re Francesca's Holdings Sec. Litig.*, 2015 WL 1600464, at *14 (S.D.N.Y. 2015) ("speculation is insufficient to allow an inference of materiality"). There is likewise no reasonable inference that just because prior authorizations or denials increased, that the entire increase (or any specific portion) comprised "illegal" denials. And while Plaintiffs claim that by 4Q22, CVS had "approved [CVS's] algorithms for use in sixteen states," this fails to allege whether or what algorithms were actually applied or scope of application. ¶173.

Plaintiffs also allege that "illicit" AI practices led to "massive" savings, ¶¶107-12, but fail to particularly allege any financial impact. Plaintiffs claim that documents cited by the PSI show that, in November 2021, CVS projected that "algorithms" would save "more than $77 million over the next three years," ¶108, but Plaintiffs do not plead what portion (or any) of these alleged savings resulted from illegal conduct, as opposed to permissible denials, or what portion of "projected" savings was achieved (if any). Moreover, the entire $77 million was only 0.0073% of CVS's revenues, 0.023% of HCB's revenues, and 0.45% of CVS's net income over 2022-24, and thus immaterial.[11] *In re Lone Pine Res.*, 2014 WL 1259653, at *4 (S.D.N.Y. 2014) ("an impact of less than 5% … is presumptively immaterial"); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003) (0.3% of revenues "immaterial").

Plaintiffs also allege that CVS generated "$2.5 billion in medical cost savings in 2021 from 225,000 denials" for inpatient admissions, "which the PSI estimated to be a $1.1 billion impact to

---

[11] DX25 (FY24 10-K), 72, 79 (CVS and HCB had, respectively, $322.5 billion and $91.4 billion revenues in FY22, $357.8 and $105.6 in FY23, and $372.8 and $130.7 in FY24; CVS had $4.3 billion net income in FY22, $8.3 in FY23, and $4.6 in FY24).

Medicare Advantage." ¶¶110-11, 215.  But even assuming 2021 savings translate into 2022-23, these numbers refer to savings from ***all denials***.  Plaintiffs fail to plead what portion of the $1.1 billion (if any) was attributable to alleged violations related to post-acute care, versus other medical services or permissible denials, and thus have not plead materiality.  Plaintiffs' other pre-Class Period allegations have the same flaws.  ¶¶77-78.

### 2. The challenged statements regarding compliance with Medicare rules and use of AI are not actionable.

Plaintiffs challenge statements regarding legal compliance and use of AI, such as that CVS "'has internal control policies'" and was "'committed to responsible AI.'"  ¶¶200-10; App. A.[12] These claims fail because Plaintiffs have not particularly alleged that any statements were false or misleading, and the statements are inactionable puffery and opinions.

### i. The statements were not false or misleading when made.

With respect to many statements, Plaintiffs do not allege that the statements were affirmatively false.  For example, Plaintiffs challenge statements that CVS has "internal control policies" and "invested significant resources" on compliance.  ¶¶201-02.  But Plaintiffs do not allege that CVS did not have such policies or invest such resources.

Instead, Plaintiffs' theory is that the statements were false and/or misleading due to CVS's failure to disclose its alleged "illegal" conduct.  ¶¶204, 206, 208, 210.  As discussed above, Plaintiffs have failed to allege any material violations of Medicare regulations, and therefore have failed to allege that any of the statements were false or misleading on the basis of such conduct. *See, e.g.*, *In re DraftKings Sec. Litig.*, 650 F. Supp. 3d 120, 170 (S.D.N.Y. 2023) (failure to plead actionable omission where complaint "alleges only conclusorily—not with particularity—the fact of illegal black-market dealings"); *In re China Mobile Games & Ent. Grp. Sec. Litig*, 2016

---

[12] Appendix A is an index listing the statements and the applicable sections of this brief.

WL 922711, at *4 (S.D.N.Y. 2016) ("Plaintiffs' inability to allege that any bribery occurred … is fatal to their required showing of contemporaneous falsity.").[13]

**ii.     The statements are inactionable puffery.**

"'[G]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them.'"  *Singh* v. *Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019).  Here, the challenged "compliance- and policy-related statements are unactionable both because of their generality and because Defendants never promised perfect compliance."  *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 292 (E.D.N.Y. 2023).

Several of the statements expressly warn of potential compliance failures.  *E.g.*, ¶¶202-03 ("CMS may … institute … sanctions and/or civil monetary penalties against the Company ***if it fails to comply with CMS regulations***"); ¶201 (similar).  Other portions of the 10-Ks also disclosed the complexity of the regulatory environment and potential of non-compliance.  *See, e.g.*, DX6 (FY23 10-K), 51 ("The laws and regulations governing … Medicare Advantage … are complex, are subject to interpretation and can expose us to penalties for non-compliance."); DX5 (FY22 10-K), 17 ("The application of these complex legal and regulatory requirements … creates areas of uncertainty."); *id.* at 46-47.

The statement in ¶209 regarding "'commit[ment]'" to "'an effective Medicare Compliance Program'" is far too generalized to be material.[14]  *See, e.g.*, *Singh*, 918 F.3d at 60, 63 (statements regarding "commitment to regulatory compliance" were puffery); *Ong* v. *Chipotle Mexican Grill*,

---

[13] Plaintiffs' falsity allegations with respect to these statements also cite portions of 42 C.F.R. § 422.101(c), ¶¶204, 206, 208, 210, which were not applicable until January 2024 and thus could not have been violated prior to that time.  88 Fed. Reg. 22120.

[14] We have not identified any publicly available ESG Report containing this alleged statement.

294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (statements that company was "'committed to serving safe, high quality food'" and has programs "'designed to ensure'" compliance were puffery).

The challenged statements regarding technology and AI—*e.g.*, CVS was "'committed to responsible AI'" and "'we're doing what's right for our customers,'" ¶¶205-07—are likewise inactionable. *See, e.g.*, *In re ITT Educ. Servc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 580 (S.D.N.Y. 2012) ("focus continues to be on maximizing students' success" was puffery); *Police & Fire Ret. Sys. City of Detroit* v. *Argo Grp. Int'l Holdings*, 2024 WL 5089970, at *11 (S.D.N.Y. 2024) (statement that business is "efficient" was puffery); *Kemp* v. *Univ. Am. Fin. Corp.*, 2007 WL 86942, at *14 (S.D.N.Y. 2007) (statements "touting quality customer service" are puffery).

### iii.    The statements are inactionable opinions.

Unlike statements of fact, "whose objective, 'fact[ual]' truth or falsity c[an] be ascertained 'with certainty,'" statements that express "'inherently subjective'" assessments are opinions. *In Re Philip Morris Int'l Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023); *see also, e.g.*, *Omnicare* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) (statements that "'we believe we are obeying the law'" were "pure statements of opinion"); *D.E. & J Ltd. P'ship* v. *Conaway*, 284 F. Supp. 2d 719, 736 (E.D. Mich. 2003) ("'we maintain comprehensive systems of internal controls'" was an opinion); *Horizon*, 2018 WL 481883, at *10 ("'we do the right thing for the patient, the right thing for the physician'" were opinions).

An opinion is only actionable if:  "(1) if 'the speaker did not hold the belief [the speaker] professed,' (2) if the opinion 'embedded statements of fact,' or (3) if the opinion omits facts that 'ma[d]e [the] statement of opinion ... misleading to an ordinary investor.'"  *Argo*, 2024 WL 5089970, at *6 (quoting *Omnicare*, 575 U.S. at 185-88).  To plead falsity by omission, a

plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion …

whose omission makes the opinion … misleading." *Omnicare*, 575 U.S. at 194.

Because Plaintiffs have not alleged any "illicit" conduct or awareness of any wrongdoing,

they fail to allege that Defendants did not sincerely hold their opinions. *See* Sections I.A.1., I.B.

Plaintiffs likewise fail to allege that any of these opinions contain an embedded false statement or

omit necessary facts.

### 3.     The challenged statements regarding sources of success for the Health Care Benefits segment are not actionable.

Plaintiffs challenge statements regarding the "sources of [] success" for the HCB segment,

claiming that "Defendants misleadingly attributed changes in CVS's MBR, utilization, and cost

trends to a variety of benign macroeconomic causes" and factors such as "strong underlying

performance." ¶¶211-20; App. A.  None of these statements are actionable.

### i.     The statements were not false or misleading when made.

Plaintiffs claim that the challenged statements were misleading because they "conceal[ed]

that changes were also attributable to the Company's illicit practices," which allegedly generated

$1.1 billion in savings.  ¶¶211, 213, 215, 220.

Plaintiffs have failed to allege any statements were false or misleading because they have

failed to particularly allege any "illicit," "illegal," or "risky and unsustainable" practices, *see id.*,

or that any supposed misconduct had a material financial impact.  *See* Section I.A.1.; *see also, e.g.*,

*Gamm*, 944 F.3d at 460, 466-67 (disclosures regarding "increase in cash flows" not misleading

where plaintiffs failed to plead "underlying illegal acts … with particularity").  Plaintiffs also do

not challenge the accuracy of the financial metrics in the statements, and a claim "'cannot be

premised upon a company's disclosure of accurate historical data.'"  *In re Sanofi Sec. Litig.*, 155

F. Supp. 3d 386, 404 (S.D.N.Y. 2016).

Moreover, the supposed misconduct is not "'sufficiently connected'" to any challenged statements to render them misleading. *ITT*, 859 F. Supp. 2d at 579. For example, in *ITT*, statements regarding "revenue and enrollment" were not misleading for failure to disclose "predatory recruitment practices" because the statements had no "direct connection" with the alleged wrongdoing and "d[id] not suggest that the undisclosed improper activity ... was not occurring." 859 F. Supp. 2d at 579; *see also, e.g.*, *Sanofi*, 155 F. Supp. 3d at 394, 404 (statements that diabetes group was "growth platform" not actionable for omitting kickback scheme because they did not "plausibly attribute the growing sales" to pharmacies in the scheme); *Telefonaktiebolaget*, 675 F. Supp. 3d at 288-90 (statements regarding "sources of growth" that referred to "general trends and strengths" "lack[ed] the specificity necessary for actionability"); *Menora*, 2021 WL 1199035, at *17-18 ("statements about [company's] financial performance were too generalized to require it to disclose bribes affecting only a portion of its operations").

Similarly here, generalized statements regarding factors impacting HCB performance are not sufficiently connected to the alleged wrongdoing in one subsection of HCB's business, *i.e.*, prior requests for post-acute care in Medicare Advantage, and do not suggest the alleged activity was not occurring.

### ii.    The statements are inactionable opinions and puffery.

The challenged statements are opinions because they "turn[] on the exercise of subjective judgment" to identify factors driving results. *New Eng. Carpenters Guaranteed Annuity & Pension Funds* v. *DeCarlo*, 122 F.4th 28, 41 (2d Cir. 2023); *Horizon*, 2018 WL 481883, at *10 ("explanations for [company's] success" were opinions).

Plaintiffs have failed to allege that there was any undisclosed "illegal" or "illicit" conduct or that any Defendants were aware of any such alleged misconduct, *see* Section I.A.1, I.B., and

therefore have failed to allege that these opinions were not sincerely held, omitted any necessary information, or contained any embedded false statements.

The statements, including references to "strong underlying performance," ¶¶212, 214, 216, 218, and "favorable" "trends," "development," or "impact," ¶¶212, 214, 216-19, are also too generalized to be material.  *See, e.g.*, *Pollio* v. *MF Global*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) ("'our volumes and revenues have remained strong'" and "'the franchise is performing well'" were puffery); *Okla. Firefighters Pension & Ret. Sys.* v. *Xerox*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018) (statements that "convey 'no meaningful, objective data'" are puffery).

### 4. The challenged statements regarding guidance for the Health Care Benefits segment are not actionable.

Plaintiffs allege that statements regarding guidance for the HCB segment were false and misleading, *see* ¶¶221-31, App. A, because Defendants concealed that the guidance "(1) did not account for either the Company's use of illicit algorithms that had artificially inflated CVS's financial performance, as well as CVS's phasing out of those algorithms in late 2023 and early 2024; and (2) was based on faulty and stale data on utilization and medical cost trends."  ¶221. None of these statements are actionable.

#### i. The statements were not false or misleading when made.

Because Plaintiffs fail to particularly allege any use of "illicit" algorithms that "artificially inflated" performance, or that any such practices were "phas[ed] out," *see* Section I.A.1., they fail to allege that any statements regarding guidance were false or misleading for allegedly failing to account for or disclose these practices.  *See* ¶¶ 224, 227, 229.

Plaintiffs also fail to allege that the statements were false or misleading because guidance was based on "faulty and stale data."  *See* ¶¶ 221, 223, 226, 230.  Plaintiffs base their claims on alleged statements by FE-4 and FE-5.  ¶¶137-38.  But Plaintiffs do not allege that either FE was in

a position to know how any of CVS's guidance was developed. Neither FE is alleged to have had any personal role in developing guidance, which FE-5 claims was directed by "'the C-Suite and CFO.'" ¶146. FE-4 and FE-5 appear to be mid- to lower-level employees who did not report to anyone involved in creating guidance. FE-5 is merely alleged to have "reported to CVS's Chief Medical Officer, who reported to the Executive Director, Clinical Services at CVS, who in turn was 'heavily involved' in forecasting and 'connected to the C-suite.'" ¶138. FE-4's reporting chain is not described. *See, e.g.*, *ODS Cap.* v. *JA Solar Holdings*, 2020 WL 7028639, at *9 (S.D.N.Y. 2020) (discrediting allegations because "CWs' employment descriptions … do not suggest that these CWs were in a position to be relayed" or "have access" to relevant information); *NECA-IBEW Health & Welfare Fund* v. *Pitney Bowes*, 2013 WL 1188050, at *35 (D. Conn. 2013) ("there is no allegation that any witness … played any direct or meaningful role in the company-wide financial forecasting").

The FE allegations are also insufficiently particular. FE-5 allegedly states that 2023 guidance "'didn't account for known utilization drivers'" and was "'based on 2020 numbers,'" ¶139, and FE-4 states that CVS "'relied on stale utilization data and stale medical cost trends'" by "'us[ing] data from 2 to 3 years earlier,'" ¶140. But neither FE explains exactly how or why such data was used, what specific data was used, or whether any later-period data was also considered.

FE-5 allegedly claims that he "saw firsthand" a presentation "'from the CFO's group'" that "'showed they used 2020 numbers for their 2023 guidance,'" ¶146, but Plaintiffs do not allege anything about the purpose, creation, or use of this presentation, including whether it was a draft or final version, when it was prepared, what 2020 numbers were referenced, or whether any other data or factors were incorporated. *See, e.g.*, *Xerion Partners* v. *Resurgence Asset Mgmt.*, 474 F. Supp. 2d 505, 517 (S.D.N.Y. 2007) ("[P]laintiff 'needs to specify the internal reports, who

prepared them and when, how firm the numbers were or which company officers reviewed them.'"); *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) (requiring "particularized allegations about who created these 'other models,' when … for what purpose, using what methodology" and "whether [defendant] … w[as] aware of their existence").

It is not even clear what "'guidance'" the FEs are allegedly referring to, and whether it was the same as the information communicated in the challenged statements.  Moreover, neither FE is alleged to have forecasting expertise, and their personal opinions regarding whether data was "'stale,'" or whether guidance did not properly account for any factors, cannot be credited.  *See, e.g.*, *Woolgar* v. *Kingstone Cos.*, 477 F. Supp. 3d 193, 219 (S.D.N.Y. 2020) ("none of the CWs are alleged to have specific experience with … claims reserving practices").

Plaintiffs' theory also makes no sense.  It is implausible that Defendants would purposely use "stale" or "faulty" data to create flawed guidance, when such guidance would quickly be shown to be incorrect as CVS inevitably failed to meet expectations.  Defendants also repeatedly disclosed that utilization had increased and raised MBR forecasts.  *See* pp. 6-7.  It is implausible that Defendants would have repeatedly discussed recent increases in utilization and cost trends, yet provided guidance that ignored those increases.

Finally, Plaintiffs claim that a statement that "CMS's implementation of a new rule was '*fully encapsulated inside the guide*'" was misleading because "the Company was flagrantly violating other CMS regulations."  ¶231.  Plaintiffs fail to allege any such violations.  *See* Section I.A.1.  They also omit that this statement related to changes in the "two-midnight" rule, which addressed coverage for hospital stays and which Plaintiffs do not allege was violated.  DX10 (4Q23 Tr.), 14 ("Now we did make a provision in both our bids … for the changes that would happen in January from the two-midnight rule. That's fully encapsulated inside the guide…."); 42 C.F.R.

§ 412.3(d)(1).  Accordingly, this statement did not have a sufficiently "direct nexus" with the allegedly omitted information.  *Axis*, 456 F. Supp. 2d at 589.

> ### ii.    The statements are forward-looking statements protected by the PSLRA safe harbor.

Under the PSLRA, a forward-looking statement is inactionable when the statement is (i) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements;" *or* (ii) "the plaintiff fails to prove that the forward-looking statement" was made "with actual knowledge" of falsity.  15 U.S.C. § 78u-5(c)(1)(A)-(B).  Under the "bespeaks caution" doctrine, a forward-looking statement accompanied by "'adequate cautionary language'" is also inactionable.  *Maso Cap. Invs.* v. *E-House (China) Holdings*, 2024 WL 2890968, at *3 (2d Cir. 2024).

Forward-looking statements include "statement[s] of future economic performance," "statement[s] containing [] projection[s] of revenues, income [and] earnings," and "assumptions underlying or relating" to such statements.  15 U.S.C. § 78u-5(i)(1)(A)-(D); *see also, e.g.*, *Prime Mover Cap. Partners* v. *Elixir Gaming Techs.*, 548 F. App'x 16, 18 (2d Cir. 2013) ("an expectation or projection" is "plainly forward looking").  The challenged statements regarding HCB guidance, and utilization and cost assumptions underlying the guidance, were forward-looking.  *See, e.g.*, *In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *4 (2d Cir. 2022) (earnings forecast protected).

These forward-looking statements were identified as such and accompanied by meaningful cautionary language.  CVS's SEC filings identified as forward-looking "[a]ll statements addressing the future operating performance of CVS Health or any segment … and/or future events or developments," including concerning the "impact of COVID-19," "Health Care Benefits segment business," "medical cost trends," "medical benefit ratios," and communications related

to "guidance."[15]  In addition, at the beginning of each earnings call, CVS cautioned that it would be making forward-looking statements that "are subject to significant risks and uncertainties that could cause actual results to differ materially from currently projected results," and "strongly encourage[d]" investors to "review the reports we file with the SEC regarding these risks and uncertainties."[16]  CVS's SEC filings cautioned that forward-looking statements "rely on a number of estimates, assumptions and projections … and are subject to a number of significant risks and uncertainties … that could cause actual results to differ materially."[17]  CVS's earnings releases contained similar cautions.[18]

Many of the identified risk factors spoke directly to CVS's forecasts for utilization and cost trends.  Risk factors included:  "[w]e may not be able to accurately forecast health care and other benefit costs," DX4 (FY21 10-K), 35; DX5 (FY22 10-K), 34; DX6 (FY23 10-K), 39; "[t]here can be no assurance that future health care and other benefits costs will not exceed our projections," DX4 (FY21 10-K), 38; DX5 (FY22 10-K), 37; DX6 (FY23 10-K), 41; "[t]he reserves we hold for expected claims… may be insufficient," DX4 (FY21 10-K), 35; DX5 (FY22 10-K), 35; DX6 (FY23 10-K), 39; and "[t]he impact COVID-19 will have on our businesses," DX4 (FY21 10-K), 35; DX5 (FY22 10-K), 34.  CVS's 10-Ks identified "potential changes in public policy, laws and regulations" as a risk factor, and warned that "[w]e face unique regulatory and other challenges in our … Medicare and Medicaid businesses."  DX4 (FY21 10-K), 35-36, 46-51; DX5 (FY22 10-K), 35, 45-50; DX6 (FY23 10-K), 39, 50-55.

---

[15] *E.g.*, DX5 (FY22 10-K), 1; DX26 (1Q23 10-Q), 66; DX27 (2Q23 10-Q), 77; DX28 (3Q23 10-Q), 78; DX6 (FY23 10-K), 1.
[16] *E.g.*, DX8 (3Q23 Tr.), 3; DX10 (4Q23 Tr.), 3.
[17] *E.g.*, DX5 (FY22 10-K), 1; DX26 (1Q23 10-Q), 67; DX27 (2Q23 10-Q), 77; DX28 (3Q23 10-Q), 79; DX6 (FY23 10-K), 1.
[18] *E.g.*, DX29 (1Q23 Release), 6; DX30 (2Q23 Release), 6; DX9 (3Q23 Release), 6; DX11 (4Q23 Release), 6.

Taken together, these warnings "'convey substantive information about factors that realistically could cause results to differ materially from those projected.'" *Horizon*, 2018 WL 481883, at *3; *Okla. L. Enf't Ret. Sys.* v. *Telefonaktiebolaget LM Ericsson*, 2020 WL 127546, at *8 (S.D.N.Y. 2020) (warnings of "cost pressures" and variations in gross margin were "meaningful cautionary language").

Additionally, the safe harbor applies for the independent reason that Plaintiffs do not allege particularized facts showing that any Defendant had "actual knowledge" that any challenged statements were false or misleading. *See* Section I.B.; *Rein*, 2024 WL 3105004, at *9 ("The scienter requirement for forward-looking statements—actual knowledge—is 'stricter than for statements of current fact.'").

### iii. The statements are inactionable opinions.

The challenged statements are also inactionable opinions. Many include language identifying them as such. *E.g.*, ¶225 ("the guide, ***I believe***, fully reflects …"); ¶228 ("***we are prudently assuming*** …") (emphases added). *See, e.g.*, *ProNAi*, 297 F. Supp. 3d at 406 (phrases like "'I believe'" are "indicative of opinion").

Regardless, the statements reflect management's assessments and forecasts of utilization trends and future performance, which are opinions. *See, e.g.*, *E-House*, 2024 WL 2890968, at *3 (where "the challenged statement is a projection … it is considered an opinion"); *Martin* v. *Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) ("'[P]rojections about the future' are quintessential opinion statements.").

Plaintiffs fail to allege that Defendants did not sincerely hold their opinions that the guidance reflected utilization and cost trends. S*ee* Section I.B.  Plaintiffs also fail to allege any material omissions, because they have failed to particularly allege any material "illicit" conduct

Case 1:24-cv-05303-MMG    Document 54    Filed 05/09/25    Page 41 of 55

or the cessation of such conduct, or use of "stale" data, and have not identified any embedded false statements.  *See* Section I.A.1., I.A.4.i.

### B.    Plaintiffs fail to plead a strong inference of scienter.

Plaintiffs' claims fail for the independent reason that they have failed to adequately allege scienter.  For each statement, the PSLRA requires that Plaintiffs plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  To meet this standard, Plaintiffs must allege particularized facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI*, 493 F.3d at 99.  "If no motive or opportunity (other than a generalized business motive) is shown, the circumstantial evidence of conscious misbehavior 'must be correspondingly greater' and show 'highly unreasonable' behavior or that which evinces 'an extreme departure from the standards of ordinary care.'"  *Bristol-Myers*, 28 F.4th at 355.  For forward-looking statements, the bar is higher: "knowing falsity."  *Rein*, 2024 WL 3105004, at *9.

 For an inference of scienter to be "strong," it "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs* v. *Makor Issues & Rts.*, 551 U.S. 308, 314 (2007).  Accordingly, the Court must "take into account plausible opposing inferences" to determine whether the inference of fraudulent intent is "at least as compelling as any opposing inference."  *Id.* at 323-24.

### 1.    Plaintiffs fail to allege motive.

To plead motive, Plaintiffs must allege that Defendants "benefitted in some concrete and personal way from the purported fraud."  *Novak*, 216 F.3d at 307-08.  Generalized motives "possessed by virtually all corporate insiders," such as "the desire to … sustain 'the appearance of corporate profitability,'" are insufficient.  *Id.* at 307.

-32-

"[T]he 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JPMorgan Chase*, 553 F.3d 187, 198 (2d Cir. 2009). Here, Plaintiffs do not allege any sales of CVS stock by any of the Individual Defendants. Lacking such sales, Plaintiffs attempt to plead motive by alleging that Defendants desired to conceal the alleged "illicit" conduct to propagate the "façade" of "the Company's success" to help CVS raise debt financing to fund acquisitions. ¶¶195-96. But allegations of a generalized corporate motive to raise capital or complete acquisitions are insufficient. *See, e.g.*, *San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris*, 75 F.3d 801, 813-14 (2d Cir. 1996) (alleged motive to preserve "illusion of continued profitability" to help "maximize the marketability of the $700 million of debt securities" was insufficient); *In re PXRE Grp. Sec. Litig.*, 600 F. Supp. 2d 510, 533 (S.D.N.Y. 2009) (alleged motive of "raising capital" is "too generalized"; otherwise "virtually any company that attempted to raise capital … would face specious securities fraud allegations"); *Rombach* v. *Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (alleged motive to "'complete a previously arranged corporate acquisition'" insufficient where "plaintiffs nowhere allege that defendants engaged in these transactions to secure personal gain"); *Menora*, 2021 WL 1199035, at *24 (alleged motive to complete merger to expand business insufficient). Because Plaintiffs fail to plead any "concrete and personal" benefit to any Individual Defendants, they fail to allege motive.

### 2. Plaintiffs fail to allege conscious misbehavior or recklessness.

Having failed to allege motive, Plaintiffs must plead "'correspondingly greater'" allegations of conscious misbehavior or recklessness. *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. "Where plaintiffs contend

defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* at 309. Plaintiffs' allegations do not suffice. *See* ¶¶ 161-98.

*"Stale" Guidance.* Plaintiffs fail to plead scienter with respect to allegedly "stale" guidance. *See* ¶¶162-67. In the first instance, Plaintiffs fail to allege with particularity that any guidance was "stale." *See* Section I.A.4.i. Plaintiffs also fail to allege that the two FEs on which their allegations are based had any interaction with any Individual Defendants, and thus the FEs have no personal knowledge concerning their mental state. *See, e.g.*, *Shemian* v. *Rsch. In Motion*, 2013 WL 1285779, at *15 (S.D.N.Y. 2013) ("'absence of [direct] communication undermines the inference'" of scienter). Even if the FEs believed that guidance was based on "'stale'" data, there is no allegation that they ever communicated those views to any Individual Defendants, or that any Individual Defendant shared their views. *See, e.g.*, *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 581-82 (S.D.N.Y. 2014) ("Though the CWs offer their thoughts and opinions … they do not establish what specific contradictory information [defendants] had" or that the CWs' opinions "were brought to the[ir] attention"); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) ("[T]here is no allegation that any CW met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact."); *Salomon*, 373 F. Supp. 2d at 252 ("[T]he fact that other individuals within [company] may have had [different] views … does not provide any basis for an inference that [defendant] did not believe his own professed opinions.").

As for the allegation that FE-5 saw a presentation "'from the CFO's group,'" ¶165, Plaintiffs do not allege that this presentation was ever received by any Individual Defendants, when, why, or by whom it was prepared, how it showed that guidance was improperly based on stale information, or if it was a final version. *See, e.g.*, *In re Travelzoo Sec. Litig.*, 2013

WL 1287342, at *9 (S.D.N.Y. 2013) (no scienter where plaintiffs "fail to identify whether any of the Individual Defendants accessed" alleged information); *Wachovia*, 753 F. Supp. 2d at 352 ("allegations about an unspecified time period cannot supply specific contradictory facts").

Plaintiffs' allegations that it was "'no secret'" that guidance used stale data, or that forecasts were "'overseen by the CFO'" or "'without a doubt'" discussed with the CEO and CFO, ¶¶162, 165, are far too non-specific, as is FE-4's allegation about "leadership town halls," without any allegations that any Individual Defendants attended, when they took place, or what exactly was discussed, ¶165. *See, e.g.*, *Schiro* v. *Cemex*, 396 F. Supp. 3d 283, 305-06 (S.D.N.Y. 2019) (allegations that "everyone at [company] knew" were insufficient); *Jones* v. *Perez*, 550 F. App'x 24, 28 (2d Cir. 2013) (allegations regarding company's "'internal[]'" view insufficient where witnesses did not "assert direct knowledge that this view was held by defendants"); *Tyler* v. *Liz Claiborne*, 814 F. Supp. 2d 323, 340-41 (S.D.N.Y. 2011) (no scienter where complaint "does not even plead what was said at [a] meeting" that was "'contradictory to the statements'"); *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen. Holdings*, 2021 WL 212337, at *9 (S.D.N.Y. 2021) ("[C]rucially, Plaintiffs have not alleged that any of the individual Defendants attended these meetings.").

Moreover, it would make no sense to provide knowingly inaccurate guidance (based on "stale" data or omitting an alleged impact from ceasing illegal activity) that CVS would inevitably and shortly fail to meet. *See, e.g.*, *Shields* v. *Citytrust Bancorp*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning."); *PXRE*, 600 F. Supp. 2d at 533 (no scienter considering "seeming futility of Defendants' alleged scheme"). And the fact that Defendants repeatedly disclosed increased utilization and costs and raised MBR guidance further undermines any inference of an intention to mislead. *See, e.g.*, *City*

*of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS*, 752 F.3d 173, 186 (2d Cir. 2014) ("specific disclosures … about [] accumulation of mortgage-related securities undercut the inference that defendants … intended to conceal … that accumulation"); *PXRE*, 600 F. Supp. 2d at 533-34 (scienter "belied by" disclosures of "updated initial loss estimates as more information became available").

Finally, Plaintiffs' reference to alleged comments about "a less defined process and oversight in recent years" relates to CVS's "bid process," ¶167, not the creation of guidance, and does not allege any particularized facts showing knowledge of "stale" guidance.

***Internal Documents.***  Plaintiffs claim that internal CVS documents described in the Report show that CVS knew that prior authorizations and reduced utilization could result in cost savings, that prior authorization requests increased, that CVS hired PAA and used "algorithms" to assist in prior authorization review, and that denials of claims allegedly resulted in $1.1 billion in savings. ¶¶168-75.  As discussed, none of these documents show that CVS engaged in any "illegal" or "illicit" conduct, or that any alleged violations had any material financial impact.  *See* Section I.A.1.

In any event, Plaintiffs do not allege that any Individual Defendant ever received any of these documents.  *See, e.g.*, *Plumbers & Steamfitters Loc. 773 Pension Fund* v. *CIBC*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) ("Plaintiffs should, but do not, provide specific instances in which Defendants received [contrary] information.").  And because prior authorizations, use of AI to assist in review, denials of claims that do not meet various criteria, and cost savings from appropriate utilization management are ***all permissible***, even if any Individual Defendants were aware of the documents, this does not show awareness of any "illegal" conduct.  *See, e.g.*, *Gray*, 2021 WL 4429499, at *11 ("Plaintiff has not identified any 'reports or statements' available to

Defendants that would have shown that its exports were unlawful."); *Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 814 (S.D.N.Y. 2018) (allegations that defendants approved alleged bribery payment insufficient without allegations that defendants "knew, or were reckless in not knowing, that the payment was unlawful"); *Mucha*, 540 F. Supp. 3d at 302 (no scienter absent allegations that defendants knew "the cooperation [with competitors] was unlawful").

     ***Regulatory Scrutiny.***  Plaintiffs' allegations that the PSI investigated practices by CVS and other insurers, and that CVS terminated PAA in 2023, fail to support any inference that any Individual Defendants knew of "illegal" conduct. *See* ¶176.  "[G]overnment investigations cannot bolster allegations of scienter that do not exist," *Lipow* v. *Net1 UEPS Techs.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015), and the "existence of [an] investigation does not establish that Defendants knew they were doing something illegal and consciously or recklessly misled investors about it," *Gray*, 2021 WL 4429499, at *12.  Even more so here, since the Report was not released until the end of the Class Period, Plaintiffs do not allege that CVS ever conceded any wrongdoing (and it denies any), and the PSI did not conclude that CVS engaged in illegal conduct.  Plaintiffs also do not allege that any Individual Defendants were aware of PAA's termination, and provide no particularized allegations that PAA engaged in illegal conduct.

     ***Financial Impact.***  Plaintiffs argue that scienter is supported by the alleged "massive cost savings generated by CVS's illicit algorithms." *See* ¶¶177-78.  As noted, Plaintiffs fail to allege any "massive" savings or other material financial impact from any alleged illicit practices.  *See* Section I.A.1.  Moreover, "it is well established that 'the size of the fraud alone does not create an inference of scienter.'"  *PXRE*, 600 F. Supp. 2d at 545.

     ***"Illegal" Criteria.***  Plaintiffs allege that CVS "deliberately programmed algorithms to illegally prioritize cost savings over patient care," based on FE-1's alleged statements that CVS

"programmed Anna to recommend a 'target' stay of 10 to 14 days." ¶¶179-80. As discussed, these allegations fail to show any illegal conduct. *See* pp. 15-16.

Moreover, Plaintiffs fail to plead any particularized allegations that any Individual Defendants were aware of this alleged "target." FE-2 allegedly referenced a "'monthly review'" between CVS and PAA, but does not allege that FE-2 or any Individual Defendants ever attended, or what specifically was discussed or when. ¶181; *see, e.g.*, *Jackson* v. *Halyard Health*, 2018 WL 1621539, at *9 (S.D.N.Y. 2018) (allegations insufficient where "[p]laintiff does not allege that either [source] themselves attended meetings with any of the Individual Defendants"); *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (allegations "so vague as to be meaningless" where CW did not allege when meetings occurred or "how extensively or in what manner" information was discussed); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *19 (S.D.N.Y. 2015), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. 2015) (allegations insufficient absent "details about the timing of the meetings in relation to defendants' statements, or how discussions at those meetings were contradictory.").

Moreover, FE-2 was only employed by PAA for, at most, the first month of the Class Period, and therefore has no personal knowledge that these alleged reviews took place or what was discussed during the Class Period. ¶91. *See, e.g.*, *Francesca's*, 2015 WL 1600464, at *14-15 (discounting source that left "near the very beginning of the Class Period").

***"Rubber-Stamp[ing]."*** Plaintiffs also cite an alleged "leadership directive that forced clinical reviewers to churn out as many prior authorization denials as possible" (not supported by any particularized facts), an alleged requirement to forward 50% of cases to medical directors that "came from CVS's leadership," and alleged staffing cuts "[u]nder Defendants' leadership." ¶¶182-84. But references to unidentified "leadership" are insufficient to plead scienter with

-38-

respect to any Individual Defendants, and there are no allegations that any FEs discussed these practices with any Individual Defendants, or that they were otherwise aware of them. *See, e.g.*, *Glaser* v. *The9*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011) (CW must have "communicated with the individual defendants" or been "privy to the individual defendants' knowledge."). And because Plaintiffs do not allege any regulations that were violated by the alleged staffing practices, or alleged requirement to forward cases, even if the Individual Defendants were aware of these practices, there is no basis to infer that they were aware of any "illegal" conduct. *See* pp. 16-17.

**Medicare Violations.**  Plaintiffs allege that "CVS's violations of the longstanding rules and regulations governing Medicare Advantage coverage is probative of scienter." ¶¶185-86. But Plaintiffs have failed to allege any violations, *see* Section I.A.1., and offer no allegations showing that any Individual Defendants were aware of any supposed violations.

**Speaking on Certain Topics.**  That Individual Defendants responded to analysts' questions and spoke on topics of the alleged false statements does not show that Individual Defendants were aware of any information showing that the statements were false or misleading. *See, e.g.*, *Bolling* v. *Dendreon Corp.*, 2014 WL 2533323, at *14 (W.D. Wash. 2014) ("[I]t does not demonstrate scienter to point out that analysts asked questions…."). And Plaintiffs cannot show scienter with allegations that Individual Defendants were "highly placed executive officers," ¶187, since "'[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight.'" *Woodley* v. *Wood*, 2022 WL 103563, at *7 (S.D.N.Y. 2022).

**Executive Departures.**  The "[t]erminations or resignations of corporate executives are insufficient alone to establish an inference of scienter," since "'there are any number of reasons that an executive might resign, most of which are not related to fraud.'" *Woolgar*, 477 F. Supp.

3d at 240; *Glaser*, 772 F. Supp. 2d at 598 ("resignations, without some indicia of highly unusual or suspicious circumstances, are insufficient"). Plaintiffs offer no particularized allegations linking the departures to any alleged fraud versus other business reasons. *See* ¶149 (alleging "stark decline in financial performance"); ¶155 (CVS disclosed that Kane's departure was "'based on the current performance and outlook'"); *Lighthouse Fin.* v. *Royal Bank of Scot.*, 902 F. Supp. 2d 329, 343 (S.D.N.Y. 2012) (resignations do not support scienter where they "are at least as consistent" with departures for business reasons).

**Matters "Critical" to Success.** Plaintiffs' arguments based on the alleged importance of HCB and Medicare compliance attempt to invoke the narrowly-applied "core operations" doctrine. Assuming the doctrine survived the PSLRA (which the Second Circuit has not determined, *see Frederick* v. *Mechel*, 475 F. App'x 353, 356 (2d Cir. 2012)), it "'typically applies only where the operation in question constitutes nearly all of a company's business,'" and is "not 'independently sufficient'" to plead scienter. *Saraf* v. *Ebix*, 632 F. Supp. 3d 389, 398 (S.D.N.Y. 2022). Plaintiffs do not allege that Medicare Advantage or post-acute care (where the alleged "illegal" conduct occurred) constituted "nearly all" of CVS's business. Plaintiffs allege that the entire HCB segment, which also included commercial insurance and Medicaid, ¶¶37, 110, "contributed over 33% of the Company's operating income on average," ¶37, and that, within HCB, Medicare Advantage "'is more than 50% of our premium revenue,'" ¶197; and Plaintiffs do not offer any allegations regarding the contribution of post-acute care, all of which is insufficient to invoke the doctrine. *See, e.g.*, *Holbrook* v. *Trivago*, 2019 WL 948809, at *22 n.25 (S.D.N.Y. 2019) (rejecting doctrine where business "was only responsible for less than 45% of Trivago's revenues").

### 3.    The more compelling inference is that there was no fraud.

A court evaluating scienter "must consider, not only inferences urged by the plaintiff … but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314.

"It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind." *Id.* Rather, the inference of fraudulent intent "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

Here, the far more compelling (and only) inference is that there was no securities fraud. Plaintiffs have failed to allege any particularized facts showing that there was any violation of Medicare regulations, much less that any violations were material in scope or financial impact. *See* Section I.A.1. There is no "cogent" or "compelling" inference to be drawn from the facts alleged that any Defendants knew of any illegal scheme or ever sought to mislead investors.

To the contrary, the only cogent inference is that CVS's performance during the Class Period was explained by exactly the business factors that CVS disclosed: Following the pandemic, there was pent-up demand for deferred medical services that caused utilization and cost trends to increase. *See* ¶15; pp. 5-7. CVS repeatedly discussed the increased utilization trend with investors and disclosed that it had incorporated higher utilization into its 2024 bid and guidance, and repeatedly increased its MBR guidance. *See id.* But ultimately the utilization and cost levels in 1Q24 were higher than CVS had expected, which CVS also promptly disclosed when it reported results and reduced earnings guidance on May 1, 2024. *See* p. 7.

Plaintiffs have attempted to concoct an alternative explanation for these events, based on a secret and "illegal" scheme to violate Medicare rules, and issuance of purposefully inaccurate guidance, but the only cogent explanation is the much simpler one: CVS was impacted by the industry-wide economic trends that it disclosed. And, given that CVS must submit annual bids in ***June*** for rates that will apply the ***next year***, it is particularly challenging to forecast circumstances six months and more in the future. DX6 (FY23 10-K), 41. Although CVS attempted to predict and provide guidance regarding utilization and medical cost trends, while in the midst of the

volatile and unprecedented circumstances following the COVID-19 pandemic, CVS simply underestimated the impact.  That is not securities fraud.

### 4.    Plaintiffs fail to allege corporate scienter.

Because Plaintiffs have failed to allege that "'someone whose intent could be imputed to the corporation acted with the requisite scienter,'" they fail to plead scienter by CVS.  *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).

### C.    Plaintiffs fail to allege loss causation.

To plead loss causation, Plaintiffs must allege that (1) "a corrective disclosure informed the market of the fraud, and the market reacted negatively," or (2) "the risk concealed from investors materialized and caused a foreseeable loss."  *Francesca's*, 2015 WL 1600464, at *18. Plaintiffs fail to allege loss causation regarding either 1Q24 earnings in May 2024 or the Report in October 2024.

### 1.    Plaintiffs fail to allege loss causation regarding CVS's 1Q24 earnings.

Plaintiffs fail to allege loss causation under a "corrective disclosure" theory because they do not allege that CVS's 1Q24 earnings disclosed any concealed information concerning the alleged "illegal" practices or use of "stale" data.  *See, e.g.*, *Lentell* v. *Merrill Lynch*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (corrective disclosure must "reveal to the market the falsity of the prior [statements]"); *Janbay* v. *Canadian Solar*, 2012 WL 1080306, at *15 (S.D.N.Y. 2012) (no corrective disclosure where "the partial disclosures identified by Plaintiffs do not reveal the sham sales").

Even if the Complaint is construed as alleging a materialization-of-risk theory (which is not clearly articulated), Plaintiffs' allegations are insufficient.  The alleged "risk" that "materialized" would be the risk that CVS could not continue its alleged "illicit" practices.  But Plaintiffs have failed to adequately allege that CVS ever adopted "illicit" practices, that CVS ever

ceased those "illicit" practices, or any material financial impact.  *See* Section I.A.1.  Because Plaintiffs fail to sufficiently plead that "weakening financial results constituted a materialization of the undisclosed risk," they have not pled loss causation.  *Francesca's*, 2015 WL 1600464, at *19; *see also Huang*, 2019 WL 1245136, at *17 (plaintiffs failed to sufficiently allege that physicians "began to scale back their 'off-label' use" of company's drug).

### 2.    Plaintiffs fail to allege loss causation regarding the PSI Report.

The Report was not a "corrective disclosure" because it did not conclude that CVS violated any Medicare regulations.  Moreover, the Report was released before market open on October 17, and the alleged stock decline happened on October 18.  ¶235; DX31 (news article describing Report published October 17 at 5:02 a.m.).  Plaintiffs allege that CVS stock traded in "an efficient market," ¶237, and therefore any impact from the Report should have been reflected when it was released.

Moreover, on the morning of October 18, CVS issued a press release announcing that CEO Lynch was departing, negatively revising MBR guidance, and noting that "investors should no longer rely on the Company's previous guidance."  DX32, 6; ¶19.  There is no plausible inference that the October 18 stock price decline was caused by the Report, which related to only a segment of the Medicare Advantage business (*i.e.*, post-acute care) and did not find any wrongdoing by CVS, versus these other disclosures.  *See, e.g.*, *Fila* v. *Pingtan Marine Enter.*, 195 F. Supp. 3d 489, 499 (S.D.N.Y. 2016) ("Plaintiffs have not alleged any facts to support an inference that Defendants' alleged fraud caused the drop in stock prices" rather than "other problems" that were disclosed).

### D.    Plaintiffs fail to allege scheme liability.

Plaintiffs cursorily reference scheme liability under Count I, but do not explain how their allegations support any such claim.  ¶248.  Any scheme liability claim fails for the same reasons

as Plaintiffs' misstatement claims, and because Plaintiffs fail to allege any basis for liability other than the alleged misstatements. *S.E.C.* v. *Rio Tinto*, 41 F.4th 47, 54 (2d Cir. 2022) ("misstatements and omissions alone are not enough for scheme liability").

## II.    PLAINTIFFS FAIL TO ALLEGE A SECTION 20(A) CLAIM

Because Plaintiffs fail to plead a Section 10(b) violation, their Section 20(a) claims fail. *Bristol-Myers*, 28 F.4th at 356-57.  Additionally, for the same reasons that Plaintiffs fail to allege scienter, they fail to allege the necessary "'culpable participation.'"  *See, e.g.*, *Janbay*, 2012 WL 1080306, at *17.

## CONCLUSION

The Court should dismiss the Complaint in full with prejudice and without leave to amend.


Dated:  May 9, 2025                                Respectfully submitted,

                                                   **WACHTELL, LIPTON, ROSEN & KATZ**

                                                   */s/ William Savitt*
                                                   William Savitt
                                                   Lauren M. Kofke
                                                   Emma S. Stein
                                                   51 West 52nd Street
                                                   New York, New York  10019
                                                   Tel.:  (212) 403-1000
                                                   Fax:  (212) 403-2000
                                                   wdsavitt@wlrk.com
                                                   lmkofke@wlrk.com
                                                   esstein@wlrk.com

                                                   *Counsel for Defendants CVS Health*
                                                   *Corporation, Karen S. Lynch, Shawn M.*
                                                   *Guertin, Brian A. Kane, and Thomas F. Cowhey*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule II(B)(2) of District Judge Margaret M. Garnett's Individual Rules & Practices and Local Civil Rule 7.1(c) of the United States District Court for the Southern District of New York, relying on the word count of the word-processing program used to prepare the foregoing Memorandum of Law, dated May 9, 2025, I hereby certify that the Memorandum of Law contains 13,486 words (excluding the caption, table of contents, table of authorities, signature blocks, and certifications), and thus does not exceed the Court's Order (ECF No. 51) granting Defendants' request for extensions of the word-count limitations (ECF No. 49).

<i>/s/ William Savitt</i><br>William Savitt

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will give notice of such filing to all counsel of record.

/s/ *William Savitt*
William Savitt
