**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LOUISIANA SHERIFFS' PENSION AND RELIEF FUND, SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, and CITY OF MIAMI FIRE FIGHTERS' AND POLICE OFFICERS' RETIREMENT TRUST, Individually and on behalf of All Others Similarly Situated,<br><br>                                Plaintiffs,<br><br>v.<br><br>CVS HEALTH CORPORATION, KAREN S. LYNCH, SHAWN M. GUERTIN, BRIAN A. KANE, and THOMAS F. COWHEY,<br><br>                                Defendants. | Case No. 1:24-cv-05303-MMG<br><br>CLASS ACTION<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ...................................................................1

II.     STATEMENT OF FACTS .........................................................................3

     A.      CVS's Business and Regulatory Background...........................................3

     B.      CVS Denies Treatments to Reclaim COVID Successes...........................4

     C.      Regulators and Congress Scrutinize CVS's Compliance with Medicare ...............5

     D.      Defendants Use Stale Pandemic-Era Data as Basis of Public Statements...............6

     E.      Defendants' False and Misleading Statements .......................................6

     F.      The Truth Begins to Emerge...............................................................7

III.    LEGAL STANDARD................................................................................7

IV.     PLAINTIFFS ALLEGE ACTIONABLE MISSTATEMENTS .........................8

     A.      Defendants' Misstatements About CVS's Prior Authorization Practices Are False and Misleading ...............................................................8

          1.      Defendants' Misstatements About CVS's Sources of Revenue .................8

          2.      Defendants' Misstatements About CVS's Compliance with Medicare Regulations ...............................................................11

     B.      Defendants' Misstatements About CVS's Financial Guidance Are False and Misleading...............................................................12

     C.      Defendants' Other Challenges to the Misstatements Fail.......................15

          1.      Defendants' Counterfactual Narrative Is Improper ...................15

          2.      Plaintiffs Allege Concealed, Exploitive Conduct .....................16

          3.      Defendants' Misstatements Were Material to Investors............23

          4.      None of the Misstatements Are Inactionable Opinions .............28

          5.      None of the Misstatements Qualify for the PSLRA Safe Harbor.............31

V.      PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER..............32

A.    Defendants Knew or Were Reckless in Not Knowing That CVS Denied Prior Authorization Claims to Cut Costs ................................................................33

B.    Defendants Knew or Were Reckless in Not Knowing That Guidance Was Based on Stale Data ....................................................................................38

C.    Defendants' Motive Supports Scienter ...................................................................39

D.    Plaintiffs Allege CVS's Scienter ...........................................................................40

E.    Defendants' Nonfraudulent Inference Is Less Compelling Than Plaintiffs' Scienter Theory ......................................................................................40

VI.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION ........................................41

VII.   PLAINTIFFS' CONTROL PERSON CLAIMS................................................................43

VIII.  PLAINTIFFS' SCHEME LIABILITY CLAIMS .............................................................43

IX.    CONCLUSION.................................................................................................................44

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020) ...................................................................... 30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................... 7, 22

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)..................................................................................... 23

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
  450 F. Supp. 3d 379 (S.D.N.Y. 2020) ........................................................ 20

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*,
  2013 WL 1100819 (W.D. La. Mar. 15, 2013) ............................................ 12

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012) ........................................................ 19

*City of Royal Oak Ret. Sys. v. Juniper Networks*,
  2013 WL 2156358 (N.D. Cal. May 17, 2013) ............................................ 22

*Cornwell v. Credit Suisse Grp.*,
  689 F. Supp. 2d 629 (S.D.N.Y. 2010) ........................................................ 34

*D.E. & J Ltd. P'ship v. Conaway*,
  284 F. Supp. 2d 719 (E.D. Mich. 2003)...................................................... 30

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)..................................................................................... 41

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) .................................................................. 13, 20

*Fila v. Pingtan Marine Enter. Ltd.*,
  195 F. Supp. 3d 489 (S.D.N.Y. 2016) ........................................................ 43

*Gamm v. Sanderson Farms, Inc.*,
  944 F.3d 455 (2d Cir. 2019) ........................................................................ 16

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000) .................................................................. 23, 24

*Garber v. Legg Mason*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008) ............................................................ 25

*Glaser v. The9*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) ...................................................... 36, 38

*Gray v. Alpha & Omega Semiconductor Ltd.*,
   2021 WL 4429499 (S.D.N.Y. Sept. 27, 2021)............................................ 16, 18, 35

*Gregory v. ProNAi Therapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)................................ 31

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
   422 F. Supp. 3d 821 (S.D.N.Y. 2019) .......................................................... 37

*IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v.*
   *Royal Bank of Scot. Grp., PLC*,
   783 F.3d 383 (2d Cir. 2015) ...................................................................... 23

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010) ...................................................... 22, 33

*In re Avon Sec. Litig.*,
   2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)................................................ 14, 37

*In re Axis Cap. Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006) ............................................................ 17

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017) ............................................................ 28

*In re Barrick Gold Sec. Litig.*,
   2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) .................................................... 43

*In re BHP Billiton Ltd. Sec. Litig.*,
   276 F. Supp. 3d 65 (S.D.N.Y. 2017) ............................................................ 26

*In re BioScrip, Inc. Sec. Litig.*,
   95 F. Supp. 3d 711 (S.D.N.Y. 2015) ...................................................... 12, 30, 31, 35

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008) ............................................................ 35

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
   2018 WL 2382600 (S.D.N.Y. May 24, 2018) ................................................ 14, 36

*In re China Mobile Games & Ent. Grp. Ltd. Sec. Litig.*,
   2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ...................................................... 17

*In re CitiGroup Inc. Bond Litig.*,
    723 F. Supp. 2d 568 (S.D.N.Y. 2010) ................................. 16

*In re Countrywide Fin. Corp. Deriv. Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................. 36

*In re DraftKings, Inc. Sec. Litig.*,
    650 F. Supp. 3d 120 (S.D.N.Y. 2023) ................................. 17

*In re Duke Energy Corp. Sec. Litig.*,
    282 F. Supp. 2d 158 (S.D.N.Y. 2003) ................................. 24

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008) ................................. 21

*In re Francesca's Holdings Corp. Sec. Litig.*,
    2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ...................... 20, 25, 43

*In re Gilead Sci. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ................................. 42

*In re Hain Celestial Grp. Inc. Sec. Litig.*,
    2022 WL 18859055 (E.D.N.Y. Nov. 4, 2022),
    *report and rec. adopted*, 2023 WL 6360345 (E.D.N.Y. Sept. 29, 2023) ................ 25

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
    20 F.4th 131 (2d Cir. 2021) ................................. 16

*In re IMAX Sec. Litig.*,
    587 F. Supp. 2d 471 (S.D.N.Y. 2008) ................................. 36

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017) ................................. 25

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
    859 F. Supp. 2d 572 (S.D.N.Y. 2012) ................................. 10, 28

*In re London Silver Fixing, Ltd. Antitrust Litig.*,
    213 F. Supp. 3d 530 (S.D.N.Y. 2016) ................................. 22

*In re Lone Pine Res., Inc.*,
    2014 WL 1259653 (S.D.N.Y. Mar. 27, 2014) ...................... 24

*In re Massey Energy Co. Sec. Litig.*,
    883 F. Supp. 2d 597 (S.D.W. Va. 2012) ................................. 36

*In re Mylan N.V. Sec. Litig.*,
    2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ...................... 39

*In re NYSE Specialists Sec. Litig.*,
   503 F.3d 89 (2d Cir. 2007) .................................................................. 22

*In re Omega Healthcare Invs., Inc. Sec. Litig.*,
   563 F. Supp. 3d 259 (S.D.N.Y. 2021) ........................................ 41, 42, 43

*In re OSG Sec. Litig.*,
   12 F. Supp. 3d 622 (S.D.N.Y. 2014) ...................................................... 38

*In re Pareteum Sec. Litig.*,
   2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ......................................... 37

*In re Perrigo Co. PLC Sec. Litig.*,
   435 F. Supp. 3d 571 (S.D.N.Y. 2020) .............................................. 15, 22

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015) ..................................................... 26

*In re Ply Gem Holdings Sec. Litig.*,
   135 F. Supp. 3d 145 (S.D.N.Y. 2015) ..................................................... 25

*In re PXRE Grp. Ltd. Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009) ..................................................... 40

*In re Renewable Energy Grp. Sec. Litig.*,
   2022 WL 14206678 (2d Cir. Oct. 25, 2022) ........................................... 32

*In re Salix Pharms., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ......................................... 32

*In re Salomon Analyst Level 3 Litig.*,
   373 F. Supp. 3d 248 (S.D.N.Y. 2005) ..................................................... 15

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016) ..................................................... 10

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) .................................................................... 36

*In re Telefonaktiebolaget LM Ericsson Sec. Litig.*,
   675 F. Supp. 3d 273 (E.D.N.Y. 2023) .............................................. 10, 28

*In re Teva Sec. Litig.*,
   671 F. Supp. 3d 147 (D. Conn. 2023) ..................................................... 40

*In re The Estée Lauder Co., Inc. Sec. Litig.*,
   2025 WL 965686 (S.D.N.Y. Mar. 31, 2025) ................................... *passim*

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) ................................................. 11

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    195 F. Supp. 3d 528 (S.D.N.Y. 2016) ............................................. 9, 10

*In re Yukos Oil Co. Secs. Litig.*,
    2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ...................................... 17

*Inchen Huang v. Higgins*,
    2019 WL 1245136 (N.D. Cal. Mar. 18, 2019) ................................. 25, 43

*Janbay v. Canadian Solar*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ...................................... 42

*John v. Whole Foods Mkt. Grp., Inc.*,
    858 F.3d 732 (2d Cir. 2017) ............................................................. 19

*Karimi v. Deutsche Bank Aktiengesellschaft*,
    607 F. Supp. 3d 381 (S.D.N.Y. 2022) ........................................... 26, 34

*Kemp v. Univ. Am. Fin. Corp.*,
    2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) ......................................... 28

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ....................................... 26, 29, 30

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ............................................................. 42

*Lighthouse Fin. v. Royal Bank of Scot.*,
    902 F. Supp. 2d 329 (S.D.N.Y. 2012) ............................................... 38

*Lipow v. Net1 UEPS Techs. Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015) ............................................... 35

*Lozada v. TaskUs, Inc.*,
    710 F. Supp. 3d 283 (S.D.N.Y. 2024) ............................................... 14

*Martin v. Quartermain*,
    732 F. App'x 37 (2d Cir. 2018) ....................................................... 31

*Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*,
    2024 WL 2890968 (2d Cir. June 10, 2024) ....................................... 31

*Menaldi v. Och-Ziff Cap. Mgmt.*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016) ............................................... 17

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
  2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ........................................................ 11

*Meyer v. JinkoSolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ................................................................... 8, 12

*Mucha v. Winterkorn*,
  2022 WL 774877 (2d Cir. Mar. 15, 2022) ........................................................ 17

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes*,
  2013 WL 1188050 (D. Conn. Mar. 23, 2013) .................................................... 15

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
  122 F.4th 28 (2d Cir. 2023) ..................................................................... 29

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ................................................................. 19, 33

*ODS Cap. LLC v. JA Solar Holdings Co. Ltd.*,
  2020 WL 7028639 (S.D.N.Y. Nov. 30, 2020) .................................................... 15

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
  300 F. Supp. 3d 551 (S.D.N.Y. 2018) ........................................................... 26

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019) ............................................................ 38

*Oklahoma Firefighters Pension & Ret. Sys. v. Musk*,
  2025 WL 951231 (S.D.N.Y. Mar. 28, 2025) ..................................................... 44

*Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*,
  575 U.S. 175 (2015) ......................................................................... 29, 30

*Ong v. Chipotle Mexican Grill*,
  294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) ..................................................... 28

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015) ........................................................... 35

*Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings*,
  2024 WL 5089970 (S.D.N.Y. Dec. 12, 2024) .................................................... 28

*Pollio v. MF Global*,
  608 F. Supp. 2d 564 (S.D.N.Y. 2009) ........................................................... 26

*Prime Mover Cap. Partners v. Elixir Gaming Techs. Inc.*,
  548 F. App'x 16 (2d Cir. 2013) ................................................................. 32

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ............................................................................ 27

*Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*,
    2024 WL 4354809 (S.D.N.Y. Sept. 30, 2024) ...................................................... 8

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007) ............................................................................ 15

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) .............................................................................. 40

*Schaffer v. Horizon Pharma PLC*,
    2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ............................................ 18, 29, 30

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019) ................................................................ 39

*Schiro v. Cemex, S.A.B. de C.V.*,
    438 F. Supp. 3d 194 (S.D.N.Y. 2020) ................................................................ 17

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021) ................................................................................ 8

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) ................................................................... 8

*Shash v. Biogen, Inc.*,
    84 F.4th 1 (1st Cir. 2023) ................................................................................. 42

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019) .............................................................................. 27

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ............................................................................ 40

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................ 32

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013) ............................................................... 42

*Woolgar v. Kingstone Companies, Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020) ............................................................... 15

*Xerion Partners, I LLC v. Resurgence Asset Mgmt.*,
    474 F. Supp. 2d 505 (S.D.N.Y. 2007) ............................................................... 15

**Statutes and Rules**

42 C.F.R. § 422 ............................................................................................................................. 23

Fed. R. Evid. 201(b) ....................................................................................................................... 15

**GLOSSARY**

| Term | Description |
|------|-------------|
| AI | Artificial intelligence. |
| Class Period | November 2, 2022 through October 17, 2024, inclusive. |
| CMS | Centers for Medicare and Medicaid Services, the federal agency that contracts with private companies to provide Medicare Advantage insurance. |
| CVS or the Company | CVS Health Corporation, the second largest healthcare company in the world. |
| Defendant Cowhey | Thomas F. Cowhey, CVS's Chief Financial Officer since October 2023. |
| Defendant Guertin | Shawn M. Guertin, CVS's Chief Financial Officer from May 2021 until his resignation in October 2023. |
| Defendant Kane | Brian Kane, CVS's Executive Vice President and President of Aetna from September 1, 2023 until his sudden termination on August 7, 2024. |
| Defendant Lynch | Karen S. Lynch, CVS's President and Chief Executive Officer from February 1, 2021 until October 18, 2024. |
| Defendants | CVS Health Corporation, Karen S. Lynch, Shawn M. Guertin, Brian Kane, and Thomas F. Cowhey. |
| Exchange Act | Securities Exchange Act of 1934. |
| Health Care Benefits | Division of CVS Health Corporation that offered Medicare Advantage plans, as well as commercial insurance and other insurance plans. |
| MBR | Medical Benefits Ratio (alternatively known as Medical Loss Ratio). |
| Medicare | Medicare is the federal government program that provides healthcare coverage to more than 60 million people who are over 65, under 65 and receiving Social Security Disability Insurance for a certain amount of time, or under 65 and living with End-Stage Renal Disease. |
| Medicare Advantage | Medicare benefits received from a private insurance plan that contracts with the federal government. |
| PAA | Post Acute Analytics, a third-party vendor, under contract with CVS. |
| Plaintiffs | Louisiana Sheriffs' Pension & Relief Fund, Southeastern Pennsylvania Transportation Authority (SEPTA), and City |

| Term | Description |
|---|---|
| | of Miami Fire Fighters' and Police Officers' Retirement Trust. |
| Post-Acute Care | Treatments in nursing facilities, inpatient facilities, and long-term acute care hospitals. |
| Prior Authorization | An insurer's requirement to pre-approve whether items and services are medically necessary for the beneficiary and meet Medicare coverage rules before the patient receives the requested healthcare. |
| PSI | U.S. Senate Permanent Subcommittee on Investigations. |
| SEC | U.S. Securities and Exchange Commission. |
| Senate Report | PSI's October 17, 2024 report entitled "Refusal of Recovery: How Medicare Advantage Insurers Have Denied Patients Access to Post-Acute Care." |
| Traditional Medicare | Medicare benefits received from federal government based on fee-for-service. |

## I.   PRELIMINARY STATEMENT[1]

Defendants misled CVS shareholders by concealing the Company's reliance on risky and unsustainable practices to fraudulently inflate its financial performance during the Class Period of November 2, 2022 to October 17, 2024.  While Defendants publicly attributed CVS's success to favorable macroeconomic trends and sound business practices, they secretly implemented an AI-driven scheme to deny legitimate medical claims on the basis of fixed length of stay targets instead of medical necessity, in violation of regulatory requirements.  Defendants designed this scheme, which jeopardized the health of CVS's patients, to suppress the Company's key "medical benefits ratio" ("MBR") and inflate its profits at a time when post-pandemic patient utilization was rising and threatening CVS's margins.

Throughout the Class Period, Defendants repeatedly assured investors that CVS's improved MBR and operating income were the result of smaller COVID-19 impacts and strong underlying performance.  These statements were material to investors and analysts, who closely tracked MBR as a key indicator of CVS's profitability.  Indeed, the pandemic saw dramatically lower utilization rates, which was a boon for CVS as it collected premiums but shelled out relatively little in benefits.  This drove down MBR.  But in early 2021, CVS's fortunes reversed as COVID subsided and utilization and MBR rose.

To maintain the pandemic-level MBR lauded by investors, in April 2021, CVS's leadership enlisted a third-party vendor, Post-Acute Analytics ("PAA"), to deploy an AI algorithm—called "Anna"—to drive widespread denials of expensive post-acute care claims.  Internal documents and former employee accounts confirm that these algorithms were programmed to target shorter

---

[1] Capitalized terms have the meanings set forth in the Amended Complaint (the "AC") (ECF No. 43).  Citations to "¶__" are to the AC.  Unless otherwise stated, all emphasis is added and internal citations omitted.  Citations to "Br. __" are to Defendants' motion to dismiss memorandum (ECF No. 54).

lengths of stay, regardless of individual patient needs.  Moreover, clinical staff lacked the resources to meaningfully review AI recommendations, resulting in a process that rubber-stamped denials and prioritized cost savings over medical necessity.

Defendants' scheme violated longstanding Medicare regulations, which require that prior authorization decisions be based on individual medical necessity, not cost-driven algorithms. Despite this, Defendants assured investors of CVS's compliance with Medicare rules and its "responsible" use of AI, even as regulatory scrutiny intensified.  In April 2023, the Centers for Medicare and Medicaid Services ("CMS") issued clarifying regulations prohibiting the use of algorithms that fail to account for individual patient circumstances.  Congressional oversight also increased, culminating in a 17-month Senate investigation exposing the magnitude and scope of CVS's prior authorization denials and the improper use of AI to curtail medically necessary care.

As pressure mounted, CVS secretly suspended its illicit AI program in late 2023, but it continued to mislead investors by issuing financial guidance based on outdated, pandemic-era utilization data.  The deception began to unravel in May 2024, when CVS disclosed a sharp increase in MBR and a 59.9% decline in adjusted operating income for its Health Care Benefits ("HCB") segment, primarily due to increased Medicare utilization.  The market reacted swiftly, with CVS's stock dropping nearly 17%.  The scheme was further revealed in October 2024, when the U.S. Senate Permanent Subcommittee on Investigations ("PSI") released its investigative report detailing CVS's abuse of prior authorization and AI-driven denials.  The following day, CVS's CEO stepped down, and the stock declined further.

Defendants' conduct constitutes actionable securities fraud.  By selectively disclosing only benign drivers of financial performance and omitting the true, improper sources of CVS's profitability, Defendants misled investors about the Company's business practices, regulatory

compliance, and future prospects.  The AC is supported by extensive evidence, including internal documents, former employee testimony, and the findings of a comprehensive Senate investigation. These allegations are more than sufficient to state claims for falsity, scienter, and loss causation under the federal securities laws.

Defendants' motion to dismiss relies on improper factual disputes, ignores the well-pleaded allegations, and fails to undermine the core theory of liability.  The law is clear: once a company chooses to speak on a topic, it must tell the whole truth, not half-truths that create a materially misleading impression.  Here, Defendants' omissions and misrepresentations about the source of CVS's financial success, its compliance with Medicare regulations, and the basis for its financial guidance were material to investors and actionable under the securities laws.  The motion to dismiss should be denied.

## II.    STATEMENT OF FACTS

### A.    CVS's Business and Regulatory Background

In late 2018, CVS acquired Aetna, a move CVS described as a "transformative moment for our company and our industry."  ¶36.  This acquisition led to the creation of CVS's Health Care Benefits division, which offered Medicare Advantage plans, among other things.  ¶37.

Medicare Advantage generated profits by receiving fixed reimbursements from CMS for each patient, regardless of the services provided.  ¶41.  CVS's profits depended on the difference between those fixed premiums and the actual costs of providing care.  *Id.*  Premiums were set annually through a bidding process, making CVS's profitability highly sensitive to key metrics such as MBR and "utilization" rates.  ¶55.  MBR measures the cost of insurance benefits (or claims) divided by the premiums earned and quantifies how much CVS pays out in claims for every dollar in premiums the Company earns.  ¶56.  The lower the MBR, the more CVS profited. *Id.*  CVS's MBR was closely tied to "utilization," the rate at which its patients used its services.

¶58. According to Defendants, Medicare was CVS's "largest growth driver," accounting for more than 50% of CVS's revenue by mid-Class Period. ¶197.

Long before the start of the Class Period, Medicare regulations required Medicare Advantage plans to cover all services covered by Traditional Medicare. ¶43. While *additional* benefits could be offered, denial of coverage for "basic benefits" was prohibited. ¶44. Insurers determined whether a requested service was medically necessary through a "prior authorization" process. ¶68. CMS regulations mandated that insurers could only deny prior authorization if the requested service was not covered by the patient's plan. *Id.* Prior authorization denials, made before services were rendered, forced patients to either pay out-of-pocket, appeal, or forgo treatment altogether. *Id.*

### B. CVS Denies Treatments to Reclaim COVID Successes

During the COVID-19 pandemic, CVS's financial performance improved as patients deferred treatments, allowing CVS to collect premiums without paying for coverage. ¶141. In 2020, CVS reported an MBR of 80.9%, retaining over $19 of every $100 in premiums as profit. *Id.* According to Defendants, Medicare was CVS's "largest growth driver," accounting for more than 50% of CVS's revenue by mid-Class Period. ¶197. But as the pandemic eased, and utilization increased, CVS's MBR soared to 88.3% by February 2021. ¶83.

To restore CVS's profitability, Defendants systematically expanded CVS's secret pursuit of AI algorithms to reject prior authorization requests at a massive scale and maximize the profitability of its Medicare Advantage business. ¶¶83-86, 135-147. This was first revealed at the end of the Class Period in the extensive PSI report based, partly, on over 280,000 internal, confidential documents from CVS and others.

According to CVS's internal analyses, it had mined years of patient data and learned that its Medicare Advantage profits related directly to prior authorization requirements. ¶74. CVS

concluded that "Post-acute care is addressable for automation," systematically expanded its "facility level predictive model" to 26 facilities serving Medicare Advantage patients, and approved the use of algorithms in 16 states at or around the start of the Class Period. ¶100.

The Senate Report revealed that CVS hired PAA in April 2021 to carry out CVS's secret denials. ¶86. Multiple former PAA employees corroborate this, explaining that CVS programmed an algorithm to issue a "target" stay of 10 to 14 days or fewer (regardless of the patient's medical needs), that the algorithm's "secret sauce was trying to reduce costs for Aetna," and that "[t]he whole purpose was to reduce cost for a capitated regulated model." ¶¶90-91. These witnesses reported that these cost-driven recommendations were rubber-stamped by CVS's understaffed clinical staff, who were incentivized to approve denials. ¶¶94-96.

By October 2022, shortly before the Class Period, CVS internally recognized that its "automation concurrent review" had led to astonishing "medical cost savings" of $2.5 billion from 225,000 denials. ¶111. PSI concluded that "Medicare Advantage beneficiaries represented the largest share of these denials: if the $2.5 billion were proportionally distributed, *denials of these Medicare Advantage claims would represent $1.1 billion in savings*." *Id.*

### C.    Regulators and Congress Scrutinize CVS's Compliance with Medicare

In response to growing concerns about prior authorization practices, CMS issued *clarifying* regulations that took effect on June 5, 2023. ¶121. CMS confirmed that approvals granted through prior authorization must remain valid as long as medically necessary and that determinations must be based on individual circumstances "*as opposed to using an algorithm or software that doesn't account for an individual's circumstances*." ¶122.

Congressional oversight also intensified. On May 17, 2023, PSI launched an investigation into barriers facing seniors in Medicare Advantage. ¶125. The subcommittee collected hundreds

of thousands of pages of documents from CVS and competitors, and held a non-public briefing with CVS senior leadership on September 14, 2023. ¶130. CMS also warned that CVS would be audited for compliance with the clarifying regulations. ¶131. In response, CVS quietly terminated its relationship with PAA. ¶134.

### D.    Defendants Use Stale Pandemic-Era Data as Basis of Public Statements

After discontinuing the use of AI to suppress MBR, CVS continued to mislead investors by issuing guidance based on stale data. Detailed accounts from former CVS employees, FE-4 and FE-5, establish that it was "no secret" that as late as 2023, CVS's guidance was "based on 2020 numbers," and CVS relied on "stale utilization data and stale medical cost trends," which were unusually low due to pandemic-related deferrals of care. ¶¶137-140. FE-4, a Senior Medical Economics Analyst at Aetna from 2021 through February 2024, confirmed that CVS's use of "data from 2 to 3 years earlier" resulted in "huge shifts in Medicare costs and utilization and care being pushed back." ¶141. FE-5 stated that "the forecasting was overseen by the CFO" and FE-5 saw firsthand "an executive presentation with graphs" that was "from the CFO's group" and "showed they used 2020 numbers for their 2023 guidance." ¶165. FE-5 confirmed that CVS's practice of using stale data for its guidance did not stop until 2024 when "CVS started shifting from pre-pandemic data and started incorporating current data into their models." ¶166.

### E.    Defendants' False and Misleading Statements

Despite the intensifying scrutiny from regulators, Congress, and industry observers, Defendants: (1) falsely touted CVS's sources of success while concealing its risky, unsustainable, and irresponsible use of AI; (2) falsely claimed that CVS was in compliance with Medicare rules and regulations, and was responsibly using AI; and (3) issued positive financial guidance that they falsely said took into account all known utilization trends.

### F.      The Truth Begins to Emerge

The truth began to surface through a series of disclosures in mid- and late-2024.  On May 1, 2024, CVS disclosed in a Form 8-K and press release that the HCB segment's MBR had reached 90.4% in the first quarter of 2024, a Class Period high and an increase of 580 basis points from the prior year.  ¶149.  CVS attributed a 59.9% decrease in adjusted operating income in the segment to ***increased Medicare utilization***, forcing a substantial downward revision of 2024 guidance. ¶150.  Defendant Cowhey revealed that medical costs in the HCB segment, primarily attributable to Medicare Advantage, exceeded expectations by approximately $900 million.  ¶151.  Analysts described the results as "among the most disappointing we have ever seen come from a company of the size and breadth of CVS."  ¶152.  In response, CVS's stock fell approximately 16.8%.  ¶154. On August 7, 2024, Defendant Kane was terminated "based on the current performance outlook for the Health Care Benefits segment."  ¶155.

On October 17, 2024, the PSI published its Senate Report, revealing CVS's use of AI algorithms to deny claims and cut costs.  ¶156.  The Senate Report made clear that the "magnitude and scope of prior authorization requests and denials for particular types of care has been undisclosed before now."  *Id.*  The report specifically criticized the use of AI to set patient length of stay as a "wrong" and "disturbing practice," achieved through informal pressure on employees. In response, CVS's stock declined over 5% on October 18, 2024.  ¶160.  That same day, CVS announced that Defendant Karen Lynch had "stepped down from her position in agreement with the company's Board of Directors." ¶159.

## III.   LEGAL STANDARD

To survive a motion to dismiss, a complaint need only "contain sufficient factual matter…to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The "PSLRA does not demand 'that plaintiffs plead with particularity every single

fact upon which their beliefs concerning false or misleading statements are based,' … [n]or does Rule 9(b) 'require the pleading of detailed evidentiary matter in securities litigation.'" *Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*, 2024 WL 4354809, at *10 (S.D.N.Y. Sept. 30, 2024).

## IV.    PLAINTIFFS ALLEGE ACTIONABLE MISSTATEMENTS

A plaintiff need only plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth" in a "complete and accurate" manner. *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250-51 (2d Cir. 2014). "[T]he law is well settled that so-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021).

### A.    Defendants' Misstatements About CVS's Prior Authorization Practices Are False and Misleading

CVS secretly programmed algorithms with internal criteria that denied medically required care to cut costs for its Medicare Advantage business, the Company's "largest growth driver." ¶¶204-10. Instead of disclosing this strategy, Defendants falsely attributed Medicare Advantage's success to benign macroeconomic sources, ¶¶50, 55, 60, 188-89, and falsely touted the Company's "responsible" AI technology, ¶¶205-08.

#### 1.    Defendants' Misstatements About CVS's Sources of Revenue

During the Class Period, Defendants attributed the success of CVS's HCB segment and Medicare Advantage business to industry-wide macroeconomic trends and CVS's legitimate business practices.  ¶¶212, 214, 216-19.  For example, on November 2, 2022, Defendant Lynch said CVS's improved MBR was "***driven by a lower impact from COVID and medical cost trends that remained favorable***."  ¶212.  Similarly, on February 8, 2023, Defendant Guertin said CVS's

improved MBR and adjusted operating income "*were driven by the net favorable impact of COVID-19 compared to the prior year and strong underlying performance*."  ¶¶60, 189, 214, 216, 218.

These statements concealed that CVS had secretly deployed algorithms to artificially deflate MBR and utilization rates through the mass denials of costly prior authorization requests. ¶¶81-93. Specifically, these algorithms issued a coverage "target" of 14 days or fewer based on cost, as confirmed by FE-1.  ¶90.  FE-2 confirmed that the algorithm's "*secret sauce was trying to reduce costs for Aetna*" and, per FE-1, "[t]he shorter or lower the stay, the better for Aetna." ¶¶90-91. These coverage "targets" were rubber-stamped by overburdened clinical staff—per FE-1, and CVS "needed *double* the work force" to adequately evaluate the algorithm's recommendations, but refused to hire the additional staff.  ¶¶94-96.

Defendants' statements were thus false and misleading because "the securities laws don't tolerate" a company "tout[ing] the reasons for its success while leaving out the parts of the truth it found inconvenient."  *In re The Estée Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *3-4 (S.D.N.Y. Mar. 31, 2025) (touting high sales while omitting reliance on unsustainable "gray" marketplace is actionable); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 536-37 (S.D.N.Y. 2016) (statement that fund's performance was "a key driver of our high levels of sales and net flows" was misleading half-truth where certain returns were based on hypothetical back testing rather than actual asset management).

Defendants summarily claim that their half-truths were not false or misleading because Plaintiffs purportedly "do not challenge the accuracy of the financial metrics in the statements." Br. 24.  But Plaintiffs do.  For example, the AC alleges that Defendants' half-truths were materially misleading because Defendants concealed how favorable changes to operating income, MBR and

9

other core metrics "were in large part due to the Company's risky and unsustainable practices." ¶¶213, 215, 220; *compare with In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) (Br. 24) ("no allegation that Sanofi failed to accurately report any of its financial figures").

Next, Defendants erroneously claim that CVS's use of secret algorithms is not "sufficiently connected" to any of Defendants' misstatements. Br. 25. Defendants' misstatements concern improvements in CVS's MBR, medical cost trends, adjusted operating income, and health care cost estimates. ¶¶212-14. The AC explains how CVS's secret mass denials of costly prior authorization claims directly benefited these exact metrics. ¶107. This is sufficient. *Virtus Inv. Partners*, 195 F. Supp. 3d at 537 ("Virtus Partners cites proper drivers of 'sales and net flows' but omits the misleading performance history. Such a statement is a half-truth sufficient to state a claim."); *Estée Lauder*, 2025 WL 965686, at *2-3 (attributing sales success to a positive, COVID-related impact—easing of travel restrictions—while omitting reliance on prohibited resellers).[2]

None of Defendants' cases involve such connections. *Compare In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) ("Plaintiff does not allege that a material portion of ESI's revenue came from some other undisclosed source."); *Sanofi*, 155 F. Supp. 3d at 404 ("[n]one of the statements cited by plaintiffs in the CAC offered any explanation as to why the products were selling more"); *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 289 (E.D.N.Y. 2023) ("The closest Defendants come to mentioning specific revenue sources is their reference to 'major mobile broadband projects.'"); *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *18

---

[2] Defendants' claim that "generalized statements regarding factors impacting HCB performance are not sufficiently connected to the alleged wrongdoing in one subsection of HCB's business" (Br. 25) fails for similar reasons—and particularly given Defendants Lynch's admission that "Medicare is our largest growth driver" leading up to the Class Period. ¶5.

(S.D.N.Y. Mar. 30, 2021) ("challenged statements attribut[ed] the overall financial performance of Frutarom to factors like organic growth and acquisition").

Finally, Defendants argue these misstatements "do not suggest the alleged [misconduct] was not occurring," and thus cannot be misleading. Br. 25. That is not the standard. By repeatedly emphasizing the benign drivers of results while refusing to disclose that mass algorithmic denials propped up these results, Defendants misled investors through "deceptive" half-truths. *Estée Lauder*, 2025 WL 965686, at *3-4; *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) ("if [a Defendant] puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success").

### 2. Defendants' Misstatements About CVS's Compliance with Medicare Regulations

Throughout the Class Period, Defendants touted CVS's compliance with Medicare regulations and the Company's "responsible" use of AI. ¶¶200-10. For example, CVS's Forms 10-K for 2023 and 2024 represented that CVS "has internal control policies and procedures and conducts training and compliance programs for its employees to help ***prevent, detect and correct prohibited practices***" and assured investors that it "***has invested significant resources to comply with Medicare standards***." ¶¶201-02. During CVS's Investor Day 2023, CEO Lynch represented to investors "***we're using AI to increase the efficiency of our operations***" and that "***we are committed to responsible AI. We are ensuring that we're doing what's right for our customers, our colleagues, and our patients***." ¶205. CVS's December 19, 2023 ESG report stated that "***[o]ur Medicare businesses have comprehensive fraud, waste and abuse programs designed to comply with laws and regulations***." ¶209. [3]

---

[3] This report is publicly available through AlphaSense. Subsequent updates, containing the same statement cited in the AC, have been posted on CVS's website.

These assurances were false and misleading because, as noted above, Defendants deployed AI to deny claims based on cost instead of medical necessity. *See* Sec. II.B. CVS's *en masse* denials violated both CMS's 2023 regulation prohibiting AI "that doesn't account for an individual's circumstances," and CMS's longstanding requirement that CVS provide the same "basic benefits" available in Traditional Medicare. ¶¶44, 49, 87, 122, 124, 185-186. As the Senate Report concluded, using AI to fix patients' length of stay was a "wrong" and "disturbing practice[]…accomplished through informal pressure campaigns on employees." DX19, at 52.

Specific compliance assurances like Defendants' are actionable—even if "technically true"—where the misstatements inaccurately "gave comfort to investors that reasonably effective steps were being taken to comply with applicable . . . regulations." *JinkoSolar*, 761 F.3d at 250 & n.3 (defendants put compliance "in play," thereby giving rise to "a duty to tell the whole truth"); *see also City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*, 2013 WL 1100819, at *3-4 (W.D. La. Mar. 15, 2013) (touting "compliance with applicable laws" and "quality and comprehensiveness of [defendant's] compliance department" false and misleading because defendant knew they violated laws by providing unneeded medical care). The inference of falsity is particularly heightened here, where Defendants' misstatements were the very subject of PSI's investigation. ¶¶125-131; *see In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727-31 (S.D.N.Y. 2015) ("Plaintiff's allegations adequately allege that a reasonable investor would likely find a conflict between such a *carte blanche* conclusion in light of the existence of the [civil investigative demand] and the significant challenge it posed to BioScrip.").

### B.    Defendants' Misstatements About CVS's Financial Guidance Are False and Misleading

During the Class Period, Defendants assured investors that CVS's financial guidance for its HCB segment accurately reflected known utilization and medical cost trends. For example,

during a November 1, 2023 earnings call, Defendant Cowhey represented that "***out of an abundance of caution [we] are maintaining a provision for further utilization pressure in 2024***" and "***the remaining pressure we did not incorporate was reflected in the 2024 guide.***" ¶222.  On the same earnings call, Defendant Kane also assured investors that "***everything is fully baked in***" to this guidance.  ¶225.  Similarly, in a February 7, 2024 earnings call, Defendant Kane said that "***we've fully reflected the 2023 baseline in our 2024 numbers.***"  ¶228.  He further stated that "***[t]here's nothing that we've seen in our January data that gives us pause relative to the guidance that we've given today***" and that "***we are prudently assuming that the elevated medical cost trends we observed in the fourth quarter will carry forward in 2024***."  *Id.*

These statements were outright false.  In truth, CVS's guidance ***did not*** account for the Company's secret deployment of algorithms to deny costly claims and artificially depress utilization rates and medical cost trends.  ¶¶135-147.  Nor did CVS account for the impact of phasing out these algorithms in the face of CMS's clarifying regulations.  As CVS was forced to wind down its AI denials, "there was a lot more utilization" and "utilization [was] spiking through the roof."  ¶142.  Yet, according to FE-4, "the rising costs and increased utilization were not reflected in [CVS's] current forecast" in 2023.  ¶143.  And FE-5 saw firsthand an executive presentation from the CFO's group that "showed they used 2020 numbers for their 2023 guidance." ¶146; *see Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (crediting FE allegations that corroborated one another).  Defendants' counterfactual that utilization surged in 2024 (Br. 7) is both improper and nonsensical.  The COVID federal public health emergency had long ended, COVID vaccines were well into their third year of being administered, and utilization had already been "spiking" for years, as confirmed by the FEs and as evidenced by CVS's MBR ballooning to 88.3% in early 2021.  ¶¶83, 139, 142.

Defendants contest that neither FE-4 and FE-5 had a "personal role" in developing guidance and were "mid-to-lower-level employees." Br. 27. But courts routinely credit FE statements from "lower-level" employees and have made clear that an FE need not be at officer level. *See Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 323 (S.D.N.Y. 2024) (crediting FE despite argument that FE was a "low-level employee[] who had no insight into what the Officer Defendants were focused on"); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *10 (S.D.N.Y. May 24, 2018) (crediting confidential sources who "lacked direct contact with the Individual Defendants" but "detailed the types of relevant information made available to senior executives").

Defendants next argue that FE-4 and FE-5 were not positioned to know how guidance was developed. Br. 26-27. This misses a crucial point: these FEs were in a position to know utilization trends—a key component of CVS's guidance, per Defendants' own statements. ¶¶222, 225, 228. FE-4, a Senior Medical Economics Analyst in CVS's Aetna division from April 2021 through February 2024, assessed potential savings programs that CVS could implement to control rising utilization or increasing costs. ¶137. FE-5, the Lead Director of Project Program Management at Aetna's division from October 2021 through October 2023, oversaw business readiness, change, and product management in utilization management. ¶138. *See In re Avon Sec. Litig.*, 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) (crediting a FE who was "in position to possess information about hiring and sales practices … during the Class Period, and was aware of the extent to which the individual Defendants were involved in those same practices" and confirming the CW need not have "direct contact with individual defendants").

Defendants' cases are inapposite. In *ODS Cap. LLC v. JA Solar Holdings Co. Ltd.*, none of the witnesses "were in a position to be relayed plans to relist by corporate management or have

access to concrete plans to relist." 2020 WL 7028639, at *9 (S.D.N.Y. Nov. 30, 2020).  In *NECA-IBEW Health & Welfare Fund v. Pitney Bowes*, the witnesses did not play any meaningful role in financial forecasting or reporting, 2013 WL 1188050, at *35 (D. Conn. Mar. 23, 2013), whereas FE-4 was responsible for assessing ways to control rising utilization and increasing costs, and FE-5 was involved in utilization management and his reporting chain led up to the Clinical Services Executive Director, who was heavily involved in forecasting.  ¶¶137-138, 228. *Woolgar v. Kingstone Companies, Inc.* is also inapposite, because here the FEs had "specific experience" with utilization.  477 F. Supp. 3d 193, 219 (S.D.N.Y. 2020).

Finally, the cases Defendants cite to discredit FE-5's allegations concerning the presentation "from the CFO's group" lack the facts alleged here.  *See Xerion Partners, I LLC v. Resurgence Asset Mgmt.*, 474 F. Supp. 2d 505, 517 (S.D.N.Y. 2007) (no report specified); *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) (no allegation about who created the document).

### C.    Defendants' Other Challenges to the Misstatements Fail

#### 1.    Defendants' Counterfactual Narrative Is Improper

Defendants seek to introduce over three dozen exhibits—including 19 that are not cited in the AC—to manufacture their preferred counternarrative.[4]  But "a court must accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 579 (S.D.N.Y. 2020).  The Court should

---

[4] Defendants' conclusory footnote (Br. 4 n.1.) does not provide the "necessary information" to conclude that the documents are "not subject to reasonable dispute." Fed. R. Evid. 201(b).  Further, the Court cannot consider the filings "for the truth of the matters asserted" in those documents. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

disregard the numerous exhibits Defendants have submitted in support of their improper factual arguments.

### 2.    Plaintiffs Allege Concealed, Exploitive Conduct

Defendants argue that "Plaintiffs [supposedly] fail to allege any Medicare violations." Br. 10-13.  This misstates both the law and the well-pled allegations of the AC.

### a.    Plaintiffs Need Not Allege Illegality

Defendants claim that none of the "source of success" and "legal compliance" misstatements were false or misleading because Plaintiffs failed to allege any "illicit" or "illegal" practices.  Br. 21-22, 24. But the law does not require that the "conduct underlying a purportedly misleading statement or omission amount to a fraudulent scheme or practice." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137 (2d Cir. 2021); *Estée Lauder*, 2025 WL 965686, at *3 ("[O]mitted sources of revenue don't need to be 'fraudulent or otherwise illegal' for a statement to be misleading").  Illegality is a factual determination, and courts routinely sustain statements based on uncharged wrongdoing. *See, e.g.*, *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 594 (S.D.N.Y. 2010) ("[W]hether the representation that the financial statements complied with GAAP was actually an 'untrue' statement—are not issues for resolution at this stage.").  At this stage, Plaintiffs must merely plead a course of conduct that was undisclosed to investors and rendered Defendants' statements false and misleading.  They have done so. *See* Sec. II, IV.A-B.

Defendants' cases, where plaintiffs either failed to sufficiently allege the underlying conduct or the conduct was material *only* by virtue of the regulations, are inapposite. *See Gray v. Alpha & Omega Semiconductor Ltd.*, 2021 WL 4429499, at *9 (S.D.N.Y. Sept. 27, 2021) (undisclosed export violations were not independently improper or risky, only in relation to export control regulations); *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) ("***virtually no explanation*** as to how that collusive conduct occurred, and whether and how it affected trade");

*Mucha v. Winterkorn*, 2022 WL 774877, at *3 (2d Cir. Mar. 15, 2022) (alleged antitrust violations required analysis of how the conduct "affect[ed] interstate commerce" and "what was agreed to" among the participants); *Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 199 (S.D.N.Y. 2020) (bribes alleged in conclusory fashion); *In re Yukos Oil Co. Secs. Litig.*, 2006 WL 3026024, at *14 (S.D.N.Y. Oct. 25, 2006) (Russian enforcement action based on a novel interpretation of Russian tax law); *Menaldi v. Och-Ziff Cap. Mgmt.*, 164 F. Supp. 3d 568, 578-79, 582 (S.D.N.Y. 2016) (undisclosed conduct only material if in violation of FCPA); *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (no explanation of "any form of customer or market allocation" or other basis for violation of competition laws); *In re DraftKings, Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023) (plaintiffs "essentially entirely relie[d]" on short seller report to satisfy its pleading obligations); *In re China Mobile Games & Ent. Grp. Ltd. Sec. Litig.*, 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016) (plaintiffs primarily relied on market reports that were published months after alleged misstatements).

### b.    CVS's Abusive Prior Authorization Practices Violated Established Regulations

Nevertheless, Plaintiffs amply allege CVS's violation of Medicare regulations. Specifically, Medicare Advantage must cover all the same services as Traditional Medicare and regulations prohibit "using an algorithm or software that doesn't account for an individual's circumstances." ¶¶44, 124.   The particularized facts, from the Senate Report and percipient witnesses, raise a plausible inference that CVS violated Medicare regulations by using AI to systematically deny valid medical claims and prioritize cost over medical necessity.  ¶¶65-66, 87-93.

Defendants' counterfactual attempt to justify the legality of CVS's indiscriminate denials fails.  ***First,*** Defendants argue that AI targets were permitted to "assist" in predicting a patient's

length of stay.  Br. 12, 15. But this argument relies on an extraneous CMS FAQ that specifically says insurers must "base the decision on the *individual patient's circumstances*, so an *algorithm that determines coverage based on a larger data set instead of the individual patient's medical history*, the physician's recommendations, or clinical notes *would not be compliant* with" Medicare regulations.  DX1 (CMS FAQ), 2.  CVS's algorithm conducted its analysis "regardless of the medical needs of the patient," and was thus non-compliant.  ¶90.

  *Second,* Defendants raise factual disputes by claiming there may be "compliant reasons for prior authorization denials."  Br. 13.  However, they do not challenge the regulatory requirement that medical necessity should dictate denial determinations or identify any exemptions to such requirement.  Thus, Defendants' cases where exemptions to the law existed are inapposite. *See, e.g.*, *Alpha & Omega Semiconductor*, 2021 WL 4429499, at *9 (mere fact of continued exports did not necessarily mean export law was violated, where exemptions and other nuances existed); *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *8 (S.D.N.Y. Jan. 18, 2018) (allegations concerning off-label prescriptions were insufficient, because plaintiff did not allege that drugs were marketed as such, and because there is "propriety and potential public value" in "unapproved or off-label drug use").

  *Third,* Defendants contend that "CVS reported that AI 'may only approve requests' and that final denials 'must come from physician reviewers.'"  Br. 14.  But this factual argument relies on an extraneous, self-serving letter CVS sent to the Senate PSI Committee.  DX19, at 13 n.41.  Regardless, as reported by FE-1, CVS directed PAA to generate "target" length of stay durations of 14 days or fewer, even where doctors prescribed days or weeks longer.  ¶9.  Because CVS's AI recommended denials based on improper criteria that were rubber-stamped, CVS's scheme violated regulations.  The Senate Report also found that post-acute care requests subjected to prior

authorization shot up 57.5%, far outpacing CVS's 42% enrollment growth and its overall volume of prior authorization requests.  ¶¶72, 171.  Defendants' attack on the methodology and data underlying this finding (Br. 14 n.7) is premature.  *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017) (a motion to dismiss "is not the proper stage to determine" the "methodology" underlying or "the accuracy" of plaintiffs' allegations).

Defendants further contend that the "Report does not conclude that CVS violated Medicare regulations."  Br. 14.  This ignores the Report's findings that (i) "using artificial intelligence to fix [MA] beneficiaries' lengths of stay" is a "most disturbing practice[]" and a "wrong" that may not be detected via normal regulatory oversight, DX19, at 52; and (ii) "CVS knew prior authorization denials generated huge savings, and subjected more and more post-acute care requests to the process," and "the magnitude and scope of prior authorization requests and denials for particular types of care" was "undisclosed."  ¶¶19, 66.

**Fourth,** Defendants attack the FE allegations, implying that they are "sourced secondhand" and "insufficiently particular."  Br. 15-17.  But the FEs' accounts are described with "sufficient particularity to support the probability that a person in the position occupied by [the FE] would possess the information alleged," and corroborate each other.  *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000).  *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 370-71 (S.D.N.Y. 2012); ¶¶90-92 (FE-1 and FE-2 corroborating that PAA and CVS focused on length of stay as a key metric and that CVS was driven by cost concerns); ¶96 (FE-1 and FE-3 confirming staffing shortages); ¶¶139-140 (FE-4 and FE-5 reporting on CVS's use of stale utilization data). Defendants protest that FE-1 does not explain how this target "worked in practice" or "impacted any final decisions."  Br. 15.  This improperly rewrites the AC, in which FE-1 says Anna was programmed to keep lengths of stay to 10 to 14 days or fewer, regardless of

19

a patient's medical needs.  This recommendation functioned as a final decision, because CVS's strained medical staff lacked the resources to be anything more than a rubber stamp, and CVS incentivized denials rather than evaluations of medical needs.  ¶¶87, 90, 94-96, 182.  Contrary to Defendants' claim, the AC makes particularized allegations regarding the time period: FE-1, who worked with facilities using PAA's algorithm, specifies that Anna was programmed to target length of stay, and the AC—citing the Senate Report—alleges that Anna was enlisted in April 2021 through late 2023.  ¶¶86, 89, 134.

Defendants' attempt to minimize FE-2's accounts as "vague" and only from "the first month of the Class Period" also falls flat.  Br. 16.  But FE-2, a Vice President of Product Support at PAA whose primary responsibility was PAA's strategic direction, had detailed knowledge regarding CVS's implementation of algorithms through PAA.  ¶¶91-92.  Courts routinely uphold similarly particularized allegations from FEs who departed early in—or even before—the Class Period when they, like FE-2, have a strong basis for their knowledge.  *See, e.g.*, *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 411 (S.D.N.Y. 2020) ("[T]here is no bright-line rule prohibiting courts from considering allegations that predate the Class Period,' and "courts in this Circuit frequently consider such allegations in denying motions to dismiss[.]").  FE-2's insights carry significant weight because "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." *Blanford*, 794 F.3d at 307.  Defendants' contrary authority is misplaced.  *In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *14 (S.D.N.Y. Mar. 31, 2015) (confidential witness could not speak to whether contractual terms had "changed in any material way" two years after her departure).

20

Defendants further claim that none of the FEs can provide credible allegations that medical necessity was not considered, since none are a physician or nurse. Br. 16. But the case Defendants rely on concerned allegations that required a medical diagnosis. *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008). The allegations here do not concern a specific patient's diagnosis, but whether CVS's algorithm was *programmed to reduce costs*. FE-1 and FE-2 are directly positioned to speak to that issue: they had ***direct exposure*** to CVS's decision to program the algorithm based on length of stay and knew that CVS was regularly informed of Anna's outputs (including a monthly review between PAA and CVS), and the "secret sauce was trying to reduce costs." ¶¶89-92.

Defendants wrongly claim that the AC does not allege that insufficient staffing "caused denials," and that there is "no logical basis to infer that less staffing would even result in more rather than fewer denials." Br. 17. But the AC alleges that insufficient staffing levels made it "impossible" to review AI-generated recommendations. ¶96. FE-1 further reported that CVS would need to double its work force to meaningfully evaluate AI output, and that CVS "didn't have enough nurses at Aetna to handle the work." ¶¶96, 204. FE-3 corroborated this, reporting that nurses were overwhelmed—evidenced through Power BI, a data warehouse that included detailed numbers to track caseloads and nurse productivity. ¶¶95-96. This is further corroborated by the Senate Report, which found that CVS reduced its review staff in 2019 to just 220 individuals to review thousands of daily requests. ¶96.[5]

Defendants also attack the AC's allegation that CVS acted quickly to wind down its engagement with PAA. Br. 18. Tellingly, Defendants do not deny that PAA was quietly

---

[5] Defendants' assertion that FE-1's statements are unmoored in time is, again, misplaced: FE-1 discussed the effect of Anna, which was implemented in April 2021 through late 2023.

terminated or that CVS phased out its use of improper algorithms—rather, they deny that the termination had to do with the new CMS regulations.  Br. 18.  But all that is required at this stage is for the AC to—drawing all reasonable inferences in Plaintiffs' favor—"state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678; *Perrigo*, 435 F. Supp. 3d at 579.  Here, the AC alleges that CVS deployed PAA to reduce costs beginning in 2021 (¶¶85, 99, 101) and only terminated PAA's contract amid the Senate PSI investigation in 2023 (¶134).

*Fifth,* Defendants prematurely attack the AC's expert analysis of CMS enrollment statistics and other data concerning prior authorization denials.  Br. 17-18.  That analysis revealed that CVS's prior authorization requests spiked 60% from 2021 to 2023, while prior authorization denials rose 50% over that same period.  ¶¶103-104.  Defendants' attempt to have the Court "evaluate whether or not [plaintiff's] experts' [analyses] are adequate would require the Court to delve into complex factual disputes that cannot be resolved on a motion to dismiss." *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 272 (S.D.N.Y. 2010).

Further, Defendants disparage this analysis as "opinions couched as factual allegations," Br. 18, but their sole in-circuit case is inapposite; the AC does not ask the Court to consider an "opinion," but rather to consider factual assertions.  *Compare In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007), *with In re London Silver Fixing, Ltd. Antitrust Litig.*, 213 F. Supp. 3d 530, 563 (S.D.N.Y. 2016) ("The Court is not, however[,] relying on Plaintiffs' *opinions* (expert or otherwise) but rather on Plaintiffs' factual assertions regarding pricing and other economic data, which courts generally accept at the pleading stage.").[6]

---

[6] *City of Royal Oak Ret. Sys. v. Juniper Networks*, 2013 WL 2156358, at *7 (N.D. Cal. May 17, 2013) relies on out-of-circuit case law and concerned an expert affidavit, attached as an exhibit to the complaint.

*Sixth*, Defendants attempt to sidestep liability for Plaintiffs' misstatements prior to January 2024 by suggesting that certain provisions of 42 C.F.R. § 422.101(c) were not applicable until then. Br. 22. But this ignores that those provisions were effective by June 5, 2023. ¶121. And critically, the provisions requiring Medicare Advantage providers to offer the same "basic benefits" as Traditional Medicare (42 C.F.R. § 422.101(a)) were promulgated in 2019, several years before the start of the Class Period. Defendants' broad algorithmic denials violated these longstanding requirements.

### 3.    Defendants' Misstatements Were Material to Investors

Materiality is a "fact-specific" inquiry that "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). "On a motion to dismiss, a complaint may not be properly dismissed unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015). Defendants' two attacks—"quantitative" materiality and puffery—both fail.

### a.    Defendants' Quantitative Argument Fails

The Second Circuit has "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation," instead holding that both quantitative and qualitative factors must be assessed in context in order to determine materiality of financial misstatements. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162-63 (2d Cir. 2000).

Contrary to this established law, Defendants improperly frame materiality in purely quantitative terms, arguing that Plaintiffs do not plead a material financial impact from Defendants' fraud. Br. 20. But the assessment of materiality is not limited to tallying up the percentages of company profits directly impacted by the fraud. *See, e.g.*, *Ganino*, 228 F.3d at 166

(reversing district court's decision that fees totaling 1.7% of company's revenue were immaterial as matter of law, and finding this misrepresentation could be material depending on the facts). Here, Defendants' misstatements concerned conduct that violated Medicare, undermined CVS's relationship with its regulators, and put CVS's patients at risk. The statements were thus highly material to investors.

In any event, the AC goes into great detail—far more than necessary at this stage—on the quantitative impact of this scheme. ¶¶102-114. For example, in 2021, CVS projected that the cost-focused algorithms would save the Company more than $77 million over the next three years. Additionally, the PSI concluded that in 2021, the "denials of these Medicare Advantage claims would represent $1.1 billion in savings." The AC alleged that this rate of denials compared to the growth of Medicare Advantage membership would save CVS $1.2 billion in 2022 and nearly $1.3 billion in 2023. These massive savings were plainly material for the HCB segment, whose operating expenses were approximately $14.6 billion in 2022 and $16.2 billion in 2023. *See* DX6 (2023 Form 10-K), at 84. Therefore, the savings would represent 8.1% in 2022 and 8.02% in 2023.[7] Defendants dismiss these facts for not specifying how many of these billions "related to post-acute care," Br. 21, but this merely raises factual questions that cannot be resolved on a motion to dismiss. Even so, Defendants' premature arguments require the Court to look the other way in the face of PSI's detailed and undisputed findings: post-acute prior authorization requests surged from 2019-2022, outpacing overall requests, and by 2022, CVS denied more post-acute requests *than all other types of service requests combined*. ¶¶72, 171.

---

[7] This is far greater than the "less than 5%" and "0.3%" cited by Defendants in *In re Lone Pine Res., Inc.*, 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014) and *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003). And Defendants' use of CVS and HCB revenues as the denominator, Br. 20, violates the Second Circuit's admonition that "the items in issue should be compared to like items"—*i.e.*, reduced medical costs should be compared to HCB's operating expenses. *Ganino*, 228 F.3d at 165.

Defendants' cases lack the AC's specificity.  *See In re Ply Gem Holdings Sec. Litig.*, 135 F. Supp. 3d 145, 151 (S.D.N.Y. 2015) (the plaintiffs alleged only that the program led to a reduction "in the margin on the quarter by…a little over a full 100 basis points"); *Garber v. Legg Mason*, 537 F. Supp. 2d 597, 613, 615 (S.D.N.Y. 2008) (plaintiffs did not make any specific allegations that could provide the magnitude of the increase in expenses or initial projections); *Francesca's Holdings*, 2015 WL 1600464, at *14 (finding a "complete lack of any indication as to what terms the company received from its vendors or how, if at all, those terms changed"); *Inchen Huang v. Higgins*, 2019 WL 1245136, at *9 (N.D. Cal. Mar. 18, 2019) (failure to "identify a single prescription" generated by off-label marketing).

### b.    Defendants' Misstatements Are Not Puffery

Defendants challenge two categories of false and misleading statements as puffery: (1) statements regarding CVS's source of financial success, and (2) the Medicare compliance and use of AI statements.  Neither can be considered immaterial puffery as a matter of law.

***First***, the source of success statements are not puffery because statements "about a company's business practices may invoke reasonable reliance by investors, particularly if the statements relate to aspects of a company's brand or reputation that are touted as sources of its success." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 611 (S.D.N.Y. 2017); *see also In re Hain Celestial Grp. Inc. Sec. Litig.*, 2022 WL 18859055, at *17-18 (E.D.N.Y. Nov. 4, 2022), *report and rec. adopted*, 2023 WL 6360345 (E.D.N.Y. Sept. 29, 2023) (statements attributing successful financials to "strong demand" and "momentum" for products, among other things, "specify the sources of the Company's already-achieved success," and "[c]ourts generally find similar statements are not puffery").

Defendants offer no explanation for why the statements referencing "strong underlying performance," favorable "trends," "development," or "impact" are too generalized to be material.

Br. 26.  On the contrary, Defendants' statements concerned issues about the true source behind the success of CVS's HCB segment, which contributed over 33% of the Company's operating income on average during the Class Period.  ¶37.  In this context, Defendants' statement attributing the source of HCB segment's success to "strong underlying performance" is material, and not mere puffery.  *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (statements otherwise constituting puffery "become material to investors" if "made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors."); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) ("a reasonable investor could rely on [statements] as reflective of the true state of affairs at the Company").

Defendants' cases are inapposite.  The statements in *Pollio v. MF Global* did not attribute success to particular factors but rather stated generally that "the franchise is performing well." 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009).  Likewise, the statements in *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.* were merely that software had been successfully implemented, which lacked specifics on which investors would rely.  300 F. Supp. 3d 551, 559, 570 (S.D.N.Y. 2018).

**Second**, CVS's compliance statements were not puffery because investors were particularly attuned to Defendants' assurances of legal compliance given that the success of CVS's Medicare Advantage business—which is federally funded—depended on its compliance with CMS regulations.  *See Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 393 (S.D.N.Y. 2022) (defendants' statement that it has "developed effective procedures…in order to facilitate comprehensive compliance" was not an inactionable puffery);  *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) ("it defies logic to suggest that, for example, an investor would not reasonably rely on a statement, contained in what Defendants concede was a list of [a company's] business principles, that recognized [the company's] dedication to

26

complying with the letter and spirit of the laws and that [the company's] success depended on such adherence.").

Defendants argue that the compliance statements are nonactionable because they are too generalized to be material and that "several of the statements expressly warn of potential compliance failures." Br. 22. But treating noncompliance as a mere hypothetical when in fact CVS **knew** it was in violation of Medicare regulations cannot shield Defendants from liability. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Defendants cite *Singh v. Cigna Corp.* to argue that the "general statements about reputation, integrity, and compliance with ethical norms are inactionable" because "they are too general to cause a reasonable investor to rely upon them." 918 F.3d 57, 60, 63-64 (2d Cir. 2019); Br. 22. But in *Singh*, unlike here, Defendants cautioned that Cigna's Medicare business was "subject to ... numerous and complex regulations and requirements that are frequently modified and subject to administrative discretion." The Court noted that framing statements with acknowledgments of the complexity and numerosity of applicable regulations suggested "caution (rather than confidence) regarding the extent of Cigna's compliance." *Singh*, 918 F.3d at 64.

Rather than providing "simple and generic assertions" about "policies and procedures" and allocating "significant resources," *id.*, CVS assured investors that its fraud, waste and abuse programs included "compliance operational oversight, risk assessment, data analysis, investigations, training and processes to manage identified issues through corrective actions." ¶209. Thus, CVS "described its compliance mechanisms in confident detail," precisely what the *Singh* court found distinguished other cases in which representations about compliance *were actionable*.

Defendants' remaining cases are also misplaced.  *See Telefonaktiebolaget LM Ericsson*, 675 F. Supp. 3d at 291 ("Defendants went so far as to warn investors perfect compliance might not be possible."); *Ong v. Chipotle Mexican Grill*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (Defendants' statements were "aspirational," including a professed "commit[ment]" to food safety).  CVS did not profess to "aspire" to regulatory compliance; CVS claimed that it ***had*** policies in place, ***had*** invested significant resources in compliance, and ***had*** comprehensive fraud, waste, and abuse programs, which it then specified, while treating the failure to comply with CMS regulations as a mere hypothetical when in fact CVS knew it was in violation of Medicare regulations.

CVS's statements about its commitment to responsible AI are also material, particularly in the context of the public, investor, regulatory, and congressional scrutiny on the very issues the statements discuss.  *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017) (statements about "integrity" were not puffery because they were "made in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery, during a time of concern, and … therefore a reasonable investor could rely on them").[8]

#### 4.    None of the Misstatements Are Inactionable Opinions

Defendants challenge multiple statements as inactionable "opinions." But even a so-called "opinion" statement is actionable if: (i) it does not "fairly align[] with the information in the issuer's possession at the time"; (ii) it "contain[s] embedded statements of untrue facts"; or (iii) "the speaker subjectively believes he lacks a reasonable basis." *Omnicare*, *Inc. v. Laborers Dist.*

---

[8] Defendants' authorities pertain to the business' focus rather than legal compliance.  *See ITT Educ. Servs. Inc.*, 859 F. Supp. 2d at 580 (statements concerning ancillary aspects of business that was not under any scrutiny); *Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings*, 2024 WL 5089970, at *11 (S.D.N.Y. Dec. 12, 2024) (vague assurances that the company's business is "efficient"); *Kemp v. Univ. Am. Fin. Corp.*, 2007 WL 86942, at *6 (S.D.N.Y. Jan. 10, 2007) (same).

*Council Const. Industry Pension Fund*, 575 U.S. 175, 176, 189 (2015).  Each of the challenged misstatements—many of which are not opinions at all—are actionable under *Omnicare*.

**First**, Defendants claim the "source of success" statements "are opinions because they 'turn[] on the exercise of subjective judgment' to identify factors driving results." Br. 25. But Defendants' primary authority, *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, recognized that "opinions lead double lives," and explained that "a reasonable investor expects that opinion statements 'rest on some meaningful ... inquiry,' 'fairly align[ ] with the information in the issuer's possession at the time,' and do not 'reflect baseless, off-the-cuff judgments." 122 F.4th 28, 41 (2d Cir. 2023) (quoting *Omnicare*, 575 U.S. at 188-90). Defendants' authorities do not stand for the proposition that identifying the "factors driving results" are *per se* subjective judgments outside the scope of liability for securities fraud.[9]

In any case, even if opinions, Defendants "were aware of undisclosed facts that seriously undermined the accuracy of their professed opinions or beliefs," and their misstatements are thus actionable.  *Lapin*, 506 F. Supp. 2d at 240 (rejecting argument that statements touting importance of company's independent research were inactionable opinions); *Estée Lauder*, 2025 WL 965686, at *8 (finding that defendant's "assertion about the causes of [company's] earlier sales decline" is an actionable opinion because "[p]laintiffs allege that [defendant's] statement misleadingly omits one of the decline's other causes").

**Second**, Defendants wrongly assume—without any argument—that their compliance statements are opinions.  That is not the case, as the statements "express[] certainty about" CVS's compliance program and are thus statements of fact. *Omnicare*, 575 U.S. at 183; *see, e.g.*, ¶202

---

[9] *Schaffer v. Horizon Pharma PLC* is also inapt.  There, defendants' statements about success were qualified with "we believe," and plaintiffs failed to allege that the improper conduct contributed to the company's success.  2018 WL 481883, at *10.

("The Company has invested significant resources to comply with Medicare standards").  But even if opinions, Defendants' misstatements coincided with the PSI's investigation *into the very same issues.*  Given Defendants' knowledge of that investigation**,** the misstatements are actionable, even to the extent they are opinions.  *See, e.g.*, *Lapin*, 506 F. Supp. 2d at 240 (statement that "integrity 'was at the heart' of [company's] business" actionable where company "puts the topic of the cause of its financial success at issue"); *BioScrip*, 95 F. Supp. 3d at 728-29 (sustaining legal compliance opinions—including that company was "in substantial compliance" with relevant laws and regulations—given regulator's issuance of civil investigative demand).[10]

*Third*, Defendants' scattershot claims that their guidance misstatements are "inactionable opinions" all fail.  Br. 31-32.  Defendants argue that these misstatements "include language identifying them as [opinions]" and "reflect management's assessments and forecasts of utilization trends and future performance, which are opinions."  Br. 31.  But Plaintiffs do not challenge the guidance, but rather the embedded false statements of present facts, which are actionable under the second prong of *Omnicare* and Second Circuit law.  *See, e.g.*, ¶225 ("***everything is fully baked in, including the utilization breakage that Tom discussed***); ¶228 ("**[*t*]*here's nothing that we've seen in our January data that gives us pause relative to the guidance that we've given today*"").  *See also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) ("A statement structured, 'I believe that x is so because y has occurred,' contains the factual and falsifiable statement, 'y has occurred.'") (citing *Omnicare*, 575 U.S. at 185).

---

[10] Neither of Defendants' authorities involved legal compliance statements that were contemporaneous with an investigation concerning precisely the same subject as those statements.  *Horizon*, 2018 WL 481883, at *10 (plaintiffs alleged only "an inconclusive investigation with an undefined scope."); *D.E. & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719 (E.D. Mich. 2003) (no contemporaneous investigation).

In all events, these statements are actionable under *Omnicare*'s third prong because the "basis for forming that opinion is not disclosed and is similarly in conflict with facts a reasonable investor would draw from the opinion." *BioScrip*, 95 F. Supp. 3d at 731. *See, e.g.*, ¶¶138-139, 146 (FE-5: "in 2023, CVS was issuing guidance based on 2020 numbers," including based on an FE's firsthand review of a presentation "from the CFO's group" that "showed they used 2020 numbers for their 2023 guidance"); ¶140 (FE-4: rather than use current data, CVS "used data from 2 to 3 years earlier" so there were "huge shifts in Medicare costs and utilization and care being pushed back").

Defendants' cases (Br. 30) miss the mark. *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 407 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018) ("plaintiffs make no allegation that any of the supporting facts contained in these [opinion] statements by ProNAi were untrue"); *Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, 2024 WL 2890968, at *3 (2d Cir. June 10, 2024) ("Glaringly absent from the Amended Complaint are any particularized facts suggesting that the Parallel Projections were even created by or shared with the Company, its Board, or the Transaction Committee prior to the date of the Final Proxy."); *Martin v. Quartermain*, 732 F. App'x 37, 40–41 (2d Cir. 2018) ("all the relevant allegations in the complaint suggest that . . . [defendant] believed that [consultant's] estimates would prove accurate") (non-precedential summary order).

### 5.    None of the Misstatements Qualify for the PSLRA Safe Harbor

Defendants contend that the guidance statements are forward-looking and thus protected by the PSLRA's "safe harbor." Br. 29. Again, the AC does not challenge the guidance itself. Rather, the AC challenges embedded misstatements of present fact, *i.e.*, that all data was "fully baked in" to the guidance when it was not. These statements were false when made because CVS

used stale 2020 data and had not baked in the winding down of its AI programs. This separates this case from Defendants' citations. *See Prime Mover Cap. Partners v. Elixir Gaming Techs. Inc.*, 548 F. App'x 16, 18 (2d Cir. 2013) (forward-looking statements were "expectation[s] or projection[s]"); *In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *1 (2d Cir. Oct. 25, 2022) (misstatement was the "earnings forecast," not statements about what was baked into the model).

## V.    PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER

In assessing scienter, "courts must ... accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007). The question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). The inference of scienter "need not be irrefutable … or even the most plausible of competing inferences" and need only be "cogent and at least as compelling as any opposing inference." *Id.* at 323-24. In other words, "the tie ... goes to the plaintiff." *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016).

The collective allegations—taken as true—support a strong inference that Defendants knew or were reckless in not knowing that in 2021, in order to undercut rising utilization and MBR at the end of the pandemic, CVS enlisted PAA to deploy an AI-driven prior authorization scheme to artificially suppress utilization rates and inflate the key metric of MBR, and that Defendants relied on outdated data for financial guidance.

A. **Defendants Knew or Were Reckless in Not Knowing That CVS Denied Prior Authorization Claims to Cut Costs**

The AC adequately alleges that defendants "knew facts or had access to information" reflecting CVS's systematic, intentional expansion of prior authorization denials and the use of AI to drive such denials. *Novak*, 216 F.3d at 308.

***Internal Documents.*** Documents uncovered by the Senate Report reveal that CVS systematically designed and, in 2021, implemented a strategy to deny prior authorization requests in order to inflate the key MBR metric, ultimately saving CVS hundreds of millions in "medical costs." ¶86. Per these internal documents, CVS concluded that "[p]ost-acute care is addressable for automation" and systematically expanded its "facility level predictive model" to 26 facilities serving Medicare Advantage patients and approved the use of algorithms in 16 states. *See, e.g.*, ¶¶ 169-172. CVS's systematic monitoring and expansion of prior authorization denials via algorithm just as its MBR was increasing from higher utilization raises a powerful inference of Defendants' scienter. *See Ambac Fin. Grp. Inc.*, 693 F. Supp. 2d at 284 (scienter inferred from information contained in key internal documents that contradicted public statements).

Defendants repeat their counterfactual that Plaintiffs do not allege illegality or materiality. Br. 36-37. As discussed above, illegality is not a prerequisite to liability for half-truths under the securities laws, and CVS's secret deployment of algorithms were material. *See* Sec. IV.C.2-3.

***FE Accounts.*** Percipient witnesses attested that, just as utilization began to spike, CVS sought to reverse the trend by programming the Anna algorithms to prioritize cost savings over patient care. FE-1 explained how CVS programmed an algorithm to issue a "target" stay of 10 to 14 days or fewer, regardless of medical needs, because "[t]he lower the days, the more money Aetna [CVS] made." ¶180. The fact that Defendants knew or had access to information regarding

33

Anna's recommendations, including through a "monthly review between PAA and CVS," per FE-2, ¶181, bolsters the strong inference of Defendants' scienter.

Defendants say the monthly review is not sufficiently alleged. Br. 38. But Plaintiffs allege the frequency of these meetings and that they discussed "key metrics" such as "length of stay." ¶181. In addition, Plaintiffs plead specific information about each witnesses' title, tenure, and specific responsibilities. ¶¶89, 91, 95, 137-38. Defendants also attack FE-2 as "only employed by PAA for, at most, the first month of the Class Period." Br. 38. However, FE-2 describes practices that were alleged to continue throughout the Class Period, were corroborated by another witness, and that implicated hundreds of millions in savings for CVS. Courts find that such allegations readily support scienter. *See, e.g.*, *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) ("Though some of the [confidential witness] allegations concern reports made before the Class Period, the problems identified—concerning millions of dollars of [risk]—persuade the Court that, when drawing all possible inferences in favor of the Lead Plaintiffs, this knowledge remained pertinent to the Defendants' public statements during the Class Period.").

***Regulatory Scrutiny.*** PSI conducted a 17-month investigation into CVS's abuse of prior authorization practices and use of AI algorithms—the same issues concealed by Defendants' misstatements. PSI compelled CVS to produce thousands of pages of documents, respond to numerous inquiries, and present its senior leadership for a non-public briefing. It is not a plausible inference—let alone a more compelling inference—that Defendants were unaware of CVS's improper use of AI as it was purportedly cooperating with PSI's rigorous investigation. *See, e.g.*, *Karimi*, 607 F. Supp. 3d at 398 (allegations that executives had "been aware of these regulatory proceedings by virtue of their position as executives and as members of the management board

[raised] inferences that are sufficiently plausible at this stage"); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (investigation supportive of scienter).

Defendants argue that "the Report was not released until the end of the Class Period … and the PSI did not conclude that CVS engaged in illegal conduct." Br. 37. Putting aside that illegality is irrelevant, Defendants' argument ignores that PSI's 17-month investigation was contemporaneous with Defendants' misstatements and concerned the same subject matter. *BioScrip*, 95 F. Supp. 3d at 733 (finding scienter where "Plaintiffs have plausibly alleged that BioScrip subjectively knew about the [civil investigative demand], which identified conduct potentially implicating BioScrip in the Government's investigation, yet nonetheless stated publicly that they were in legal compliance").

Defendants' cases lack the allegations of contemporaneous knowledge present here. *Lipow v. Net1 UEPS Techs. Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015) ("the only circumstantial evidence alleged by Plaintiff that can form an independent basis to establish scienter is 'the information revealed through the AllPay Litigation,'" which plaintiff referenced in a single sentence in the complaint); *Alpha & Omega Semiconductor*, 2021 WL 4429499, at *12 ("there is no allegation that Defendants knew of the existence of the investigation at the time of the most recent challenged statement").

***Financial Impact.*** The AC alleges that CVS's abusive prior authorization practices saved the Company a massive amount of money, including $1.1 billion in 2021. The magnitude of these savings supports scienter. *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015) ("The Second Circuit Court of Appeals has held that the size of the purported fraud may also contribute to an inference of scienter.") (citing *In re Scholastic*

*Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001)).  Defendants' response regarding materiality is contradicted by the allegations, which must be accepted as true at this stage.  *See* Sec. IV.C.3.

**_Forced Denials of Claims_**.  Under Defendants, CVS forced reviewers to churn out as many prior authorization denials as possible, making it impossible to meaningfully evaluate the algorithm's results.  ¶182.  CVS also monitored denial rates, cut staffing, and chastised medical staff who failed to meet CVS's "target" denial rate.  *Id.*; *see In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1065 (C.D. Cal. 2008) ("Company-wide culture that encouraged unchecked deviations from underwriting standards" supported scienter).  Defendants argue that the FEs did not discuss these practices with the Individual Defendants.  But the law does not require such contact.  *See Chicago Bridge*, 2018 WL 2382600, at *10 ("[t]hat some of the CW's lacked direct contact with the Individual Defendants does not undermine their evidence"); *see also Glaser v. The9*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011) (courts will also credit FEs when they are described sufficiently to demonstrate they possessed the requisite knowledge).  Defendants also rehash their illegality argument, but as noted that is not a requirement.  *See* Sec. IV.C.2.a.

**_Importance of Regulatory Compliance_**.  CVS's compliance with regulations were critical to the success of the Company's Medicare Advantage business, particularly since its profitability hinged on CVS's compliance with CMS's capitated payment regime.  The inference of scienter is bolstered here where Defendants "undoubtedly appreciated" the importance of regulatory compliance and therefore knew or were reckless in not knowing that CVS's prior authorization practices threatened this compliance.  *See In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 481 (S.D.N.Y. 2008) (scienter pled where "defendants undoubtedly appreciated that theater system revenue was of singular importance to the financial well-being and market perception of the Company"); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 621 (S.D.W. Va. 2012)

36

(scienter where company misled market about its disregard for regulatory compliance, an "important component for investors to consider").

    ***Defendants' Public Assurances***. Defendants regularly answered analyst questions about the core metrics in its HCB segment, their drivers, and their impact on CVS's guidance. ¶¶165, 170, 172, 207, 219.  Given that Defendants repeatedly spoke on the same topics as the alleged fraud, and these were key issues of public focus, "this Court can reasonably conclude either that Defendants [had] access to information regarding [the subject of the Misstatements], or … were recklessly indifferent to the truth or falsity of their [] statements and never bothered to investigate [them]." *Avon*, 2019 WL 6115349, at *20; *see also Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 850 (S.D.N.Y. 2019) ("[T]o speak so knowledgeably regarding [the basis of the alleged fraud], [defendant] must have educated himself … presumably by reviewing data given to him … [and] performing his own due diligence."). Contrary to Defendants' arguments (Br. 39), these specific representations, not Defendants' positions at the Company, supports scienter.

    ***Executive Departures***. Defendant Lynch resigned as CEO on October 18, 2024, one day after the close of the Class Period and immediately after the issuance of the Senate Report.  ¶19. Defendant Kane, who ran Aetna, was suddenly terminated on August 7, 2024, as PSI's investigation neared completion.  ¶155.  CVS stated that it ousted Kane "based on the current performance and outlook for the Health Care Benefits segment," which required "leadership changes effective immediately."  *Id.*  Suspiciously timed departures of defendants support an inference of scienter.  *See In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) (timing of terminations and resignations, in relation to magnitude of corrections can be

strong inference of scienter); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) (resignations on day facts related to fraud were revealed supported inference of scienter).

The resignations in Defendants' cases dealt with different issues. *Glaser*, 772 F. Supp. 2d at 598 (plaintiffs have not come close to connecting those resignations to the fraud alleged in this case"); *Lighthouse Fin. v. Royal Bank of Scot.*, 902 F. Supp. 2d 329, 343 (S.D.N.Y. 2012) (court recognized that culmination of contemporaneous investigation near executive resignation concerned different subject matter than alleged fraud).

***Core Growth Segment***.  Defendants' misstatements went to the heart of CVS's most important business segment and "largest growth driver," representing "more than 50% of its premium revenue." ¶197.  *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37-38 (S.D.N.Y. 2019) (scienter inference "buttressed" by core operations allegations where segment generated 35% of revenues and was "primary profit engine," moving "the needle in Plaintiffs' favor").

### B.    Defendants Knew or Were Reckless in Not Knowing That Guidance Was Based on Stale Data

Multiple former employees responsible for how CVS considered utilization and utilization trends—key components of its guidance—reported that it was "no secret" internally that CVS knowingly used stale data to generate its November 2023 financial guidance, which pushed back "huge shifts" in utilization rates and medical cost trends.  FE-5 explained that forecasting was ***overseen by the CFO*** and that an "executive presentation" "from the CFO's group" showed that "2020 numbers were used for 2023 guidance," ***which "the C-Suite and CFO directed."*** FE-4 likewise reported that the outdated data was "without a doubt" discussed with CVS's CEO and CFO and even reported attending leadership townhalls with the Company's leadership specifically to discuss the rising utilization trends.  ¶165.  These firsthand accounts raise a strong inference of

Defendants' scienter regarding the stale inputs.  *See, e.g., In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *17 (S.D.N.Y. Mar. 28, 2018) (strong inference of scienter based on FE who "attended company-wide meetings involving [defendant's] CEO and CFO" and reported that pricing decisions "occurred frequently and involved all of [defendant's] top executives," and "the CEO and CFO ... reviewed any price adjustments and had the last word on pricing decisions.").[11]

CVS's management even admitted in May 2024 that it was "enhancing its bid process … *compared to a less defined process and oversight in recent years.*"  ¶167.  Management's admission of deficiencies in CVS's financial and regulatory oversight heightens the inference of scienter—there is no requirement that they specifically use the word "guidance," as Defendants claim (Br. 36).

Defendants argue that these witnesses did not "ha[ve] any interaction with any Individual Defendants" and "have no personal knowledge concerning their mental state."  Br. 34.  But as noted above, the law does not require such contacts.  *See* Sec. V.A.

### C.    Defendants' Motive Supports Scienter

Although not required, Defendants were also highly motivated to conceal the truth of their improper use of AI during the Class Period to successfully launch massive debt offerings.  In February 2023 and June 2023 (the month CMS's clarifying regulations took effect), CVS issued $11 billion of debt to fund strategic acquisitions.  ¶196.  Had investors known that CVS's improper, risky, and unsustainable use of AI was responsible for its apparent financial success, the debt offerings would not have succeeded.  Such allegations readily supply an inference of motive.  *See*

---

[11] In light of these detailed allegations, Defendants' argument that the allegations are "too non-specific" and their attempt to draw parallels to inapposite cases (Br. 35) fall flat.  *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) ("Plaintiffs fail entirely to allege the basis for CW-1's purported knowledge").

*Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000) ("The artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter."). Defendants' own cases support this conclusion. *See In re PXRE Grp. Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 533 n.24 (S.D.N.Y. 2009) (citing *Rothman*, 220 F.3d at 93).

### D. Plaintiffs Allege CVS's Scienter

To plead corporate scienter, a plaintiff must allege "facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Estée Lauder*, 2025 WL 965686, at *9. Contrary to Defendants' arguments, it is "possible to raise the required inference [of scienter] with regard to a corporate defendant without doing so with regard to a specific individual defendant." *In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 214–15 (D. Conn. 2023) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). Here, Plaintiffs have alleged widespread knowledge of a years-long scheme concerning one of CVS's most critical business units. Together, these allegations are more than sufficient to establish CVS's scienter. *Teva*, 671 F. Supp. 3d at 215 (finding corporate scienter for a "massive multi-year, multi-pronged company-wide scheme to push opioids for off-label use" that was alleged to have been "pushed by Teva's management").

### E. Defendants' Nonfraudulent Inference Is Less Compelling Than Plaintiffs' Scienter Theory

Defendants' assertion, based on competing facts, that the "more compelling inference is that there was no fraud" (Br. 40-42) ignores the particularized, corroborated evidence set forth above. Indeed, Defendants' narrative is undermined by the sequence of events. As soon as utilization spiked in 2021 as the pandemic eased and MBR ballooned, Defendants deployed an AI

algorithm to artificially inflate the key metric of MBR. ¶¶83, 86. Then, when algorithms came under regulatory fire, CVS abruptly terminated its AI program. ¶¶134, 176. To maintain the illusion of lower utilization, CVS issued financial guidance based on outdated, pandemic-era data, even as internal reports and FEs confirmed that utilization was rising for years. ¶¶145-146. These facts plainly demonstrate Defendants' knowing or reckless conduct.

## VI.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION

The Supreme Court has explained that pleading rules for loss causation "are not meant to impose a great burden on a plaintiff," who need only provide a "short and plain statement" that provides "some indication of the loss and causal connection" to the statements. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 337 (2005). Plaintiffs "need not establish that the disclosure of the truth underlying the alleged fraud was the sole cause of their losses nor must they conclusively rule out the role of potentially intervening events in the causal chain, as those are issues of proof reserved for the merits stage of the case." *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 266 (S.D.N.Y. 2021). Moreover, loss causation is subject to less stringent Rule 8 requirements. *Id.* at 266 n.7.

The AC readily meets this minimal burden. First, on May 1, 2024, CVS disclosed an earnings shortfall "primarily due to a decline in the [HCB] segment's operating results, reflecting utilization pressure in the Company's Medicare business." ¶235. This began to reveal the utilization pressures that CVS's use of stale data and misstatements had concealed from investors. As the risky and unsustainable AI scheme collapsed and CVS could no longer hide behind increasingly outdated data from 2020, it finally had to reveal the truth about higher utilization numbers. And while Defendants argue that this disclosure did not specifically reveal information concerning improper AI practices or stale data, there is no requirement that "a corrective disclosure

be a mirror image tantamount to a confession of fraud." *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 477 (S.D.N.Y. 2013).

Defendants' authorities are readily distinguishable. *Compare Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (plaintiffs conceded alleged fraud was not revealed until well after corrective disclosures); *Janbay v. Canadian Solar*, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) (one partial corrective disclosure "did not correspond with a drop in [company's] stock price" and another pertained to a different time period than when the alleged fraud occurred).

Second, the October 2024 Senate Report further revealed the full scope of CVS's improper scheme of mass AI-generated denials of claims. The following day, CVS's stock declined over 5% as media and market participants expressed outrage at the revelations. ¶¶158, 160.

Defendants' argument about the timing of the drop is wrong and premature. *Omega Healthcare Invs.*, 563 F. Supp. 3d at 266. Defendants' argument is based entirely on a short news article that describes only a subset of the lengthy, 54-page Report's conclusions—not the report itself. The argument also ignores that the market continued to process the information into the following day, as evidenced by the industry reactions published on October 18, 2024. ¶¶157-158. Even if there was a delayed market response—which Defendants have not established—any "limited temporal gap . . . does not render [Plaintiffs'] theory of loss causation per se implausible." *In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008); *see also Shash v. Biogen, Inc.*, 84 F.4th 1, 21 (1st Cir. 2023) (collecting "precedent from [four] other circuits, which we find persuasive, address[ing] delayed market reactions in the loss causation context" to find loss causation).

Defendants' attempt to blame other events for the drop is a premature factual question, and ignores the allegations that those other disclosures are directly related to the AI scheme disclosed

by the Senate Report.  For example, Lynch's departure connects to her knowing involvement in the scheme, and the disavowal of the guidance was the result of CVS's prior artificially depressed utilization and stale data.  Defendants' reliance on *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489 (S.D.N.Y. 2016), where unrelated issues were disclosed, is misplaced.

These corrective disclosures are also adequately pleaded as a materialization of an undisclosed risk.  *Omega Healthcare Invs.*, 563 F. Supp. 3d at 266-71 (finding that plaintiff adequately pled loss causation through both corrective disclosures and materialization of concealed risk).  Only Defendants knew that there was a foreseeable risk that regulatory scrutiny on AI-driven denials would negatively impact utilization.  Those risks materialized over the course of CVS's May 2024 and October 2024 corrective disclosures, injuring investors.  *See In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *13 (S.D.N.Y. Apr. 1, 2015) ("[t]he risk that caused the loss … was within the 'zone of risk *concealed* by the misrepresentations'") (emphasis in original).[12]

## VII.    PLAINTIFFS' CONTROL PERSON CLAIMS

Defendants argue that Plaintiffs' control person claims fail because the AC does not plead a primary Section 10(b) violation.  Thus, if the Court finds a primary violation, it must find a violation of Section 20(a).

## VIII.    PLAINTIFFS' SCHEME LIABILITY CLAIMS

Defendants' assertion that scheme liability fails because Plaintiffs allege only misstatements (Br. 43-44) is incorrect.  Plaintiffs have pled a deceptive course of conduct distinct

---

[12] Defendants' cases do not apply. *Francesca's Holdings*, 2015 WL 1600464, at *20 (company "repeatedly disclosed" the allegedly concealed risk and explicitly labelled it as "one of its primary risks"); *Huang*, 2019 WL 1245136, at *17 (failure to plead specific facts related to scale of off-label marketing or off-label prescriptions).  Defendants' repetition of the counterfactual argument that Plaintiffs did not allege any material or illegal practices (Br.42-43) fares no better and fails for the same reasons as in Sections IV.C.

from mere misstatements (*supra* Sections II, IV-V), which constitutes a scheme under Rule 10b-5(a) and (c). *E.g.*, *Oklahoma Firefighters Pension & Ret. Sys. v. Musk*, 2025 WL 951231, at *13 (S.D.N.Y. Mar. 28, 2025) (scheme found where "separate, additional acts" of deception alleged in addition to misstatements).

## IX.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss. Alternatively, Plaintiffs respectfully request leave to amend.

DATED: July 11, 2025                                      Respectfully Submitted,

/s/ Salvatore J. Graziano                                 /s/ Joseph A. Fonti
Salvatore J. Graziano                                     Joseph A. Fonti
Katie M. Sinderson                                        Erin H. Woods
Jonathan G. D'Errico                                      George N. Bauer
**BERNSTEIN LITOWITZ BERGER**                             William E. Freeland
 **& GROSSMANN LLP**                                      **BLEICHMAR FONTI & AULD LLP**
1251 Avenue of the Americas                               300 Park Avenue, Suite 1301
New York, NY 10020                                        New York, New York 10022
Phone: (212) 554-1400                                     Telephone: (212) 789-1341
Fax: (212) 554-1444                                       Facsimile: (212) 205-3960
salvatore@blbglaw.com                                     jfonti@bfalaw.com
katiem@blbglaw.com                                        ewoods@bfalaw.com
jonathan.derrico@blbglaw.com                              gbauer@bfalaw.com
                                                          wfreeland@bfalaw.com

*Lead Counsel for the Class and for Lead*
*Plaintiffs Louisiana Sheriffs' Pension & Relief*         -and-
*Fund, Southeastern Pennsylvania*
*Transportation Authority (SEPTA), and City of*           Evan A. Kubota
*Miami Fire Fighters' and Police Officers'*               75 Virginia Road
*Retirement Trust*                                        White Plains, New York 10603
                                                          Telephone: (914) 265-2991
                                                          Facsimile: (212) 205-3960
                                                          ekubota@bfalaw.com

                                                          *Lead Counsel for the Class and for Lead*
                                                          *Plaintiffs Louisiana Sheriffs' Pension & Relief*
                                                          *Fund, Southeastern Pennsylvania*
                                                          *Transportation Authority (SEPTA), and City of*

*Miami Fire Fighters' and Police Officers' Retirement Trust*

Robert D. Klausner
Stuart A. Kaufman
**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Louisiana Sheriffs' Pension & Relief Fund and City of Miami Firefighters' & Police Officers' Retirement Trust*

John A. Kehoe
**KEHOE LAW FIRM, P.C.**
2001 Market Street
Suite 2500
Philadelphia, Pennsylvania 19103
Telephone: (215) 992-6676
jkehoe@kehoelawfirm.com

*Additional Counsel for Southeastern Pennsylvania Transportation Authority*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on July 11, 2025, a copy of the foregoing was filed electronically with the Clerk of Court via CM/ECF. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the court's CM/ECF system.

                                          /s/ *Joseph A. Fonti*
                                             Joseph A. Fonti

## WORD COUNT CERTIFICATION

I, Joseph A. Fonti, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c). According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by the rule, there are 13,486 words in the document.


 /s/ *Joseph A. Fonti*   
Joseph A. Fonti