**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IVY NIXON, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CVS HEALTH CORPORATION, KAREN S. LYNCH, SHAWN M. GUERTIN, BRIAN A. KANE, and THOMAS F. COWHEY, <br><br> Defendants. | Case No. 1:24-cv-05303-MMG <br><br> CLASS ACTION <br><br> **REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT** <br><br> ORAL ARGUMENT REQUESTED |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ..............................................................................................................................2

I.     PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS. ...................................................................................................2

     A.     Plaintiffs fail to allege any material violation of law that caused any statements to be false or misleading. ......................................................2

          1.     Plaintiffs fail to allege any Medicare violations. ...........................2

          2.     Plaintiffs provide no explanation for how legal use of prior authorizations could make any statements misleading. ................7

          3.     Plaintiffs fail to allege materiality.................................................8

     B.     The statements regarding Medicare compliance and use of AI are inactionable......................................................................................10

          1.     The statements were not false or misleading. ...............................10

          2.     The statements are inactionable puffery and opinions....................10

     C.     The statements regarding sources of success for the Health Care Benefits segment are inactionable.............................................................12

          1.     The statements were not false or misleading. ...............................12

          2.     The statements are inactionable opinions and puffery....................13

     D.     The statements regarding HCB guidance are inactionable. .................13

          1.     The statements were not false or misleading. ...............................13

          2.     The statements are inactionable forward-looking statements and opinions........................................................................................14

II.     PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER. .............15

     A.     Plaintiffs fail to allege motive..............................................................15

     B.     Plaintiffs fail to allege conscious misbehavior or recklessness. ............15

     C.     The more compelling inference is that there was no fraud....................17

     D.     Plaintiffs fail to allege corporate scienter. ...........................................18

III.     PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION..............................................18

IV.    PLAINTIFFS' SCHEME LIABILITY CLAIMS FAIL. ...............................................18

CONCLUSION ................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson* v. *Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)..................................................................................................18

*City of Warwick Mun. Emps. Pension Fund* v. *Rackspace Hosting, Inc.*,
2019 WL 452051 (S.D.N.Y. 2019)........................................................................................14

*Cornwell* v. *Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010)...................................................................................16

*Dobina* v. *Weatherford Int'l Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012)...................................................................................15

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009).............................................................................................8, 15

*Gamm* v. *Sanderson Farms*,
944 F.3d 455 (2d Cir. 2019)....................................................................................................2

*Ganino* v. *Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000)....................................................................................................8

*Gray* v. *Wesco Aircraft Holdings, Inc.*,
454 F. Supp. 3d 366 (S.D.N.Y. 2020)..................................................................................14

*Handal* v. *Tenet Fintech Grp. Inc.*,
2023 WL 6214109 (E.D.N.Y. 2023)...............................................................................3 n.2

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010)..............................................................................6 n.4

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)........................................................................6, 10 n.6

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017).....................................................................................13

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. 2018) ................................................................................16-17

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004) ............................................................................11-12

*In re Estée Lauder Co., Inc. Sec. Litig.*,
  2025 WL 965686 (S.D.N.Y. 2025)......................................................................7, 12, 12 n.7

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
  20 F.4th 131 (2d Cir. 2021) ........................................................................................7

*In re Hain Celestial Grp. Inc. Sec. Litig.*,
  2022 WL 18859055 (E.D.N.Y. 2022)...........................................................................13

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
  251 F. Supp. 3d 596 (S.D.N.Y. 2017)...........................................................................13

*In re Lions Gate Ent. Corp. Sec. Litig.*,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016) .............................................................................11

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  213 F. Supp. 3d 530 (S.D.N.Y. 2016)........................................................................6 n.4

*In re Lone Pine Res., Inc.*,
  2014 WL 1259653 (S.D.N.Y. 2014)...............................................................................8

*In re Teva Sec. Litig.*,
  671 F. Supp. 3d 147 (D. Conn. 2023)...........................................................................18

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
  195 F. Supp. 3d 528 (S.D.N.Y. 2016).......................................................................12 n.7

*Jackson* v. *Abernathy*,
  960 F.3d 94 (2d Cir. 2020)..........................................................................................18

*Karimi* v. *Deutsche Bank Aktiengesellschaft*,
  607 F. Supp. 3d 381 (S.D.N.Y. 2022).......................................................................11, 16

*Katyle* v. *Penn Nat'l Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) ......................................................................................18

*L-7 Designs, Inc.* v. *Old Navy, LLC*,
  647 F.3d 419 (2d Cir. 2011)...........................................................................................6

*Lozada* v. *TaskUs, Inc.*,
  710 F. Supp. 3d 283 (S.D.N.Y. 2024)...........................................................................14

*Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*,
  2021 WL 1199035 (S.D.N.Y. 2021)................................................................................9

*Meyer* v. *Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)..........................................................................................10

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth
    Cnty. Ret. Ass'n* v. *MDC Partners, Inc.*,
    2016 WL 5794774 (S.D.N.Y. 2016)................................................................14

*Novak* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................................13, 15

*Oregon Public Emps. Ret. Fund* v. *Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ................................................................18

*Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank*,
    11 F.4th 90 (2d Cir. 2021) ................................................................2

*Plymouth Cnty. Ret. Ass'n* v. *Array Techs., Inc.*,
    2023 WL 3569068 (S.D.N.Y. 2023)................................................................4, 14

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004)................................................................15

*Singh* v. *Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)................................................................10, 11

*Shemian* v. *Research In Motion Ltd.*,
    570 F. App'x 32 (2d Cir. 2014) ................................................................19

**Statutes and Rules**

17 C.F.R. § 240.10b-5................................................................ 18-19

42 C.F.R. § 422.101(c)(1)(i) ................................................................3

42 C.F.R. § 422.566(d) ................................................................3

88 FR 22120................................................................5

90 FR 28749................................................................8

15 U.S.C. § 78u-5(i)(1) ................................................................14

Fed. R. Civ. P. 9................................................................18

**Other Authorities**

CVS Code of Conduct, https://www.cvshealth.com/content/dam/enterprise/cvs-
    enterprise/pdfs/cvs-health-code-of-conduct.pdf (March 2025) (last visited
    Aug. 25, 2025) ................................................................10 n.6

*Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/roll%20up
    (last visited Aug. 25, 2025)................................................................6

Press Release, CMS, CMS Launches New Model to Target Wasteful,
    Inappropriate Services in Original Medicare (June 27, 2025),
    https://www.cms.gov/newsroom/press-releases/cms-launches-new-model-
    target-wasteful-inappropriate-services-original-medicare (last visited Aug. 25,
    2025) ....................................................................................................................8, 8 n.5

## PRELIMINARY STATEMENT

Plaintiffs' Opposition only reinforces that they have fallen far short of the PSLRA's heightened pleading requirements. The Complaint is based on the theory that CVS engaged in an "illegal" "scheme" to use AI to increase denials of prior authorization requests for post-acute care. The problem for Plaintiffs is that, while their Complaint and Opposition contain an avalanche of conclusory assertions of wrongdoing, they fail to allege the ***particularized facts*** that the Second Circuit requires to support such a claim. When the conclusory assertions are put aside, their anonymous sources—concededly without medical expertise to evaluate medical necessity or Medicare coverage—fail to particularly allege any violations of Medicare regulations. And after relying heavily on the PSI Report to suggest wrongdoing, Plaintiffs are unable to identify a single statement in that Report finding CVS engaged in any misconduct—because there was no such finding.

Faced with this failure, Plaintiffs now say in their Opposition that it does not matter. They claim that the challenged statements were misleading even if the alleged conduct was entirely permissible. The problem with this pivot is that Plaintiffs fail to provide any other coherent explanation for what made the alleged use of AI supposedly "improper," "risky," or "unsustainable," or how this could make any statements materially misleading, when they fail to particularly allege any Medicare violations.

Plaintiffs likewise fail to refute Defendants' showing that they have not sufficiently alleged materiality, scienter, or loss causation, and have no response to the implausibility of their theory that Defendants would develop purposely flawed guidance that failed to account for disclosed utilization and cost increases.

-1-

## ARGUMENT

### I.   PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS.

#### A.   Plaintiffs fail to allege any material violation of law that caused any statements to be false or misleading.

##### 1.   Plaintiffs fail to allege any Medicare violations.

The Complaint's theory of liability is that the challenged statements were false and misleading because CVS allegedly engaged in an "illegal" scheme to use AI to deny prior authorization requests for post-acute care.  ¶¶3-4.  As Defendants explained, the Second Circuit requires that when a complaint alleging securities fraud is based on "nondisclosure of an illegal act," then "the facts of those underlying illegal acts must also be *pleaded with particularity*." *Gamm* v. *Sanderson Farms*, 944 F.3d 455, 458, 463 (2d Cir. 2019) (emphasis added); *Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank*, 11 F.4th 90, 98-99 (2d Cir. 2021); Br. 10-11.[1]

Plaintiffs' Opposition underscores their failure to meet this standard.  Plaintiffs do not dispute that there are numerous compliant reasons that a prior authorization request may be denied, *see* Br. 12-13, but claim this presents a "factual dispute[]."  Opp. 18.  What it presents is a *pleading failure*—it is Plaintiffs' obligation to particularly plead that the alleged "'illegal'" denials violated the law, including by alleging they were not for permissible reasons, which Plaintiffs fail to do. Br. 13.

Plaintiffs further claim that the compliant reasons are inapposite because "medical necessity should dictate denial[s]" and Defendants do not "identify any exemptions to such requirement."  Opp. 18.  But Plaintiffs do not explain what "medical necessity" means in this

---

[1] "Br." refers to Defendants' Opening Brief; "Opp." refers to Plaintiffs' Opposition; "Section" and "Reply" refer to this Reply.

context.  There is no question that Medicare Advantage does ***not*** cover all requests for post-acute care, which is only covered when patients meet detailed coverage criteria.  Br. 12-13.  Under Medicare regulations, the "medical necessity" of care is subject to the limitations of these criteria. 42 C.F.R. § 422.101(c)(1)(i) (insurers "must make medical necessity determinations based on … [c]overage and benefit criteria"); DX40 (CMS Manual), Ch. 4 §§ 10.2, 10.16.  For example, even if a patient's physician believed that post-acute care was beneficial or even necessary, if the coverage criteria under the Medicare Advantage plan were not met, including basic criteria (*e.g.*, days covered) and more complex medical criteria (*e.g.*, need for daily care), the care would not be covered by the plan.  Br. 12-13.[2]

Plaintiffs fail to allege particularized facts showing that ***even one single prior authorization denial*** was noncompliant.  The Opposition asserts that "Anna was programmed to keep lengths of stay to 10 to 14 days or fewer, regardless of a patient's medical needs," but the Complaint does not allege Anna could decide requests.  Opp. 19-20.  The Complaint alleges that Anna produced a "'target'" that was only a "recommendation[]."  ¶¶9, 90, 92, 94.  As alleged, prior authorization requests were subject to clinical review by nurses and medical directors for Medicare compliance, and ***only medical directors (not Anna) were permitted to deny claims***, ¶¶94-95, 183—which is fully consistent with Medicare requirements that any medical necessity denials be made by clinicians.  42 C.F.R. § 422.566(d) (requiring clinical review of any "adverse medical necessity … decision[s]").  Plaintiffs allege nothing about the practices of these medical

---

[2] Plaintiffs' argument that the Court should disregard Defendants' exhibits is meritless.  Opp. 15 n.4.  Plaintiffs acknowledge that 20 were relied on in the Complaint; the remainder include earnings call transcripts, news articles, regulatory guidance, and SEC filings, of which courts regularly take judicial notice.  Br. 4 n.1; *Handal* v. *Tenet Fintech Grp. Inc.*, 2023 WL 6214109, at *6 n.10 (E.D.N.Y. 2023) (regulatory guidance).  The Stein Declaration (ECF No. 55) provides the information necessary to take judicial notice, and Plaintiffs do not dispute the authenticity or accuracy of any specific documents.

directors, or that any medical director ever denied care in violation of Medicare regulations. Moreover, FE-1's allegations about Anna's alleged "target" are not corroborated by the Report or any independently pled facts and should not be credited. *Plymouth Cnty. Ret. Ass'n* v. *Array Techs., Inc.*, 2023 WL 3569068, at *15 (S.D.N.Y. 2023) (discounting source not "'corroborated by independent adequately pled facts'").

Plaintiffs conclusorily assert that Anna's recommendations "functioned as a final decision, because CVS's strained medical staff lacked the resources to be anything more than a rubber stamp." Opp. 20. There are zero particularized facts supporting this assertion. The Complaint alleges only that nurses were directed "'to forward'" at least 50% of claims to medical directors, "who were permitted to deny the claims." ¶95. The Complaint conclusorily alleges that "'they didn't have enough nurses at Aetna to handle the work,'" ¶96—but Plaintiffs do not allege nurses could deny claims, and Plaintiffs allege nothing about medical director staffing or review. Plaintiffs do not dispute that the FEs lacked medical expertise and therefore could not assess medical necessity or Medicare coverage. There is therefore no particularized factual basis— *none*—for Plaintiffs' allegation that CVS ever denied "medically necessary" care or violated Medicare regulations.

Plaintiffs also acknowledge CMS guidance permitted use of AI algorithms, but claim CVS was noncompliant because "insurers must 'base [coverage] decision[s] on the individual patient's circumstances.'" Opp. 18. But Plaintiffs allege coverage decisions were made by nurses and medical directors, not Anna. Plaintiffs do not allege that this clinical review did not consider individual factors, and FE-1 alleges Anna *did* consider individual patient data. ¶89.

As for the Report, Plaintiffs misleadingly claim that it "detail[ed] CVS's abuse of prior authorization," Opp. 2, but the Opposition cannot identify a single statement in the Report

concluding (or even suggesting) that CVS violated any Medicare regulations—because there is none.  As noted, the PSI inquiry concluded with policy recommendations; the PSI was not empowered to make regulatory findings or enforce Medicare regulations.  Br. 7-8.  Plaintiffs claim the Report found that "'using artificial intelligence to fix [MA] beneficiaries' lengths of stay' is a 'most disturbing practice[]' and a 'wrong.'"  Opp. 19.  But this statement was referring to "[m]edia reporting," not any finding regarding CVS.  DX19, 52.  Elsewhere, the Report indicates that this refers to reports about *UnitedHealth*.  DX19, 13 ("media reports indicated that naviHealth, a company owned by UnitedHealth[] … was using [AI] to fix lengths of stay"), 25 n.94.  The Report contains no finding whatsoever that CVS used AI to "fix" length of stay.

To the contrary, the Report cites evidence that AI could only *approve* requests, and that denials must come from physician reviewers.  DX19, 13 n.41, 37 n.161.  Plaintiffs claim this was based on a "self-serving letter CVS sent to [the PSI]."  Opp. 18.  But the Report cites no evidence identified during the PSI inquiry (allegedly including review of voluminous CVS documents, ¶176) that CVS ever used AI to deny requests or fix length of stay.

The Report's statements that CVS knew prior authorization denials resulted in savings and subjected more post-acute care requests to the process do not establish any misconduct.  Opp. 19.  As CMS recognizes, there is nothing wrong with using prior authorization properly to manage costs, which Medicare Advantage plans are "designed" to accomplish.  88 FR 22120, 22185 (prior authorization "help[s] to contain costs").  There is also no requirement that all services have the same level of prior authorization.  DX19, 19.[3]

---

[3] That requests for certain care are subject to more prior authorization does not support any inference of misconduct.  There may be perfectly compliant reasons for such differences (including higher cost of certain services or complex coverage criteria).

Moreover, Plaintiffs fail to address the PSI's finding that CVS's "denial rate for post-acute care remained *relatively stable*" during 2019-2022, DX19, 5, 19 (emphasis added)—which *directly contradicts* Plaintiffs' theory that CVS launched a scheme in 2021 to increase denials, as well as their "expert" analysis. ¶¶83-84, 103-05. Plaintiffs' allegations contradicted by the Report should not be credited.[4] *L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (allegations not accepted when contradicted by "documentary evidence" incorporated by reference); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 633 (S.D.N.Y. 2017) (allegations not accepted when "contradicted by the document upon which the amended complaint relies"). Plaintiffs thus provide no particularized basis to infer that CVS engaged in any scheme to improperly use AI to increase post-acute care denials.

Finally, Defendants *do* deny that "CVS phased out its use of improper algorithms" in response to CMS's clarifying regulation. Opp. 21-22. Plaintiffs fail to allege there were any "improper algorithms" that violated existing or clarifying CMS regulations. Plaintiffs provide no particularized facts that PAA's termination was related to CMS regulations or caused increased utilization. Plaintiffs' sole support is FE-5's statement that "'the more they rolled up automation, it set off bells'" and it "'had an impact on utilization.'" ¶¶143, 164. It is unclear what FE-5 means, the time period, "impact" referenced, or that the comment relates to PAA or post-acute care. Some sources define "rolled up" to mean "to increase," not decrease. *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/roll%20up (visited Aug. 25, 2025).

---

[4] Plaintiffs' cases cited in support of considering their expert "analysis" were not subject to PSLRA requirements, *In re London Silver Fixing, Ltd., Antitrust Litigation*, 213 F. Supp. 3d 530, 563 (S.D.N.Y. 2016), or provided additional details concerning qualifications and methodology, *In re Ambac Financial Group, Inc. Securities Litigation*, 693 F. Supp. 2d 241, 253 (S.D.N.Y. 2010).

**2.    Plaintiffs provide no explanation for how legal use of prior authorizations could make any statements misleading.**

Having failed to allege "illegal" practices, the Opposition pivots to an argument that the statements were misleading even without any violations, without providing any explanation for why this is so. The use of prior authorizations is a well-publicized, legitimate, widely-applied practice. DX23, 1-2 (reporting 99% of Medicare Advantage enrollees must obtain prior authorizations, with nearly 50 million determinations in 2023). Plaintiffs provide no basis for why the Company needed to disclose additional details regarding compliant denials in one Medicare Advantage service (post-acute care) to prevent misleading investors.

Plaintiffs' cases provide no support. In *Hain*, the plaintiffs alleged that defendants "attribut[ed] Hain's growing sales levels to strong consumer demand" when Hain achieved its sales by "'channel stuffing', whereby valuable and unsustainable sales incentives" were used to make customers "buy more product than needed." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 132-33 (2d Cir. 2021). Here, Plaintiffs conclusorily allege that use of AI was "unsustainable," "improper or risky," and "artificially deflat[ed]" MBR, Opp.1, 9-10, 16, but do not explain how those terms apply if the conduct was permissible. Unlike channel stuffing—which unsustainably inflates current sales at the expense of future sales even if the practice is not illegal— there is no reason that the alleged use of AI was "unsustainable," "improper," or "artificial" if the conduct did not violate Medicare regulations.

Likewise, in *Estée Lauder*, the company discussed increased sales without disclosing results were driven by "gray" market sales in China that were "if not illegal," then "of questionable legality." *In re Estée Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *3-4 (S.D.N.Y. 2025). These "gray" markets were subject to "prior crackdowns" by Chinese regulators and were therefore "vulnerable to government enforcement" and "'unsustainable.'" *Id*. at *4. Here,

Plaintiffs fail to allege that CVS engaged in any conduct of "questionable legality" and provide no other theory for why denials were allegedly risky or unsustainable.  That the PSI or CMS drew attention to the potential improper use of AI does not mean that *any* use of AI—even where permissible and compliant—was risky or unsustainable; Plaintiffs do not dispute that use of AI was and remains permissible under Medicare regulations.  Indeed, CMS recently announced it intends to use AI in prior authorization decision-making in Traditional Medicare.  CMS Release, CMS Launches New Model to Target Wasteful, Inappropriate Services in Original Medicare (6/27/25);[5] 90 FR 28749-50.

### 3. Plaintiffs fail to allege materiality.

Plaintiffs claim Defendants "improperly frame materiality in purely quantitative terms," citing *Ganino* v. *Citizens Utilities Co.*, 228 F.3d 154, 162-63 (2d Cir. 2000).  Opp. 23-24.  The Second Circuit has explained that "*Ganino* … did not exclude analysis based on, or even emphasis of, quantitative considerations." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009).  And courts have consistently found "an impact of less than 5% … is presumptively immaterial." *In re Lone Pine Res., Inc.*, 2014 WL 1259653, at *4 (S.D.N.Y. 2014); *JP Morgan*, 553 F.3d at 204; Br. 20.

Plaintiffs' references to savings of "$1.2 billion in 2022 and nearly $1.3 billion in 2023," Opp. 24, refer to alleged savings from *all* denials for inpatient admissions (including all hospital stays).  Plaintiffs do not dispute that they fail to allege what portion of any alleged savings related to alleged illegal post-acute care denials (if any), but claim this "merely raises factual questions." *Id*.  This, again, is a pleading failure, not a factual dispute.  Based on Plaintiffs' allegations, it is entirely speculative what (if any) portion of the alleged savings related to alleged illegal conduct.

---

[5] https://www.cms.gov/newsroom/press-releases/cms-launches-new-model-target-wasteful-inappropriate-services-original-medicare (visited Aug. 25, 2025).

Plaintiffs also claim operating expenses are the appropriate metric to gauge materiality. *Id.* The more logical cost measure is HCB's health care costs, since this measured expenses from medical claims (operating expenses only included "selling, general and administrative expenses and depreciation and amortization"). DX25, 79. Using this metric, the entire alleged $1.2 billion and $1.3 billion savings amounts to only 1.68% and 1.52% of HCB's 2022 and 2023 health care costs, respectively. *Id.*

Moreover, the only savings allegedly related to AI is the alleged projection that "cost-focused algorithms would save the Company more than $77 million" over three years. Opp. 24. Plaintiffs do not dispute that they fail to allege what portion was from alleged illegal denials (if any). Even considering the entire amount, this was only *0.16%* of HCB's operating expenses over 2022-24, and *0.03%* of HCB's health care costs. DX25, 79.

Despite its vanishing alleged financial impact, Plaintiffs claim the concealed use of AI was material because the "misstatements concerned conduct that violated Medicare, undermined CVS's relationship with its regulators, and put CVS's patients at risk." Opp. 24. As noted, Plaintiffs fail to plead any violations, that CMS ever found such violations, or that patients were "at risk." Plaintiffs do not cite any case holding that any alleged regulatory violation, no matter how insignificant, in a company with numerous business lines and well over $300 billion in revenues, DX25, 72, must be disclosed for the company's statements about compliance and performance to not be materially misleading. *See, e.g.*, *Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *22 (S.D.N.Y. 2021) (alleged "kickback scheme" immaterial where it impacted "at most between 1.6% and 2.7% of [company's] bottom line … below the 5% threshold to be presumptively immaterial").

### B. The statements regarding Medicare compliance and use of AI are inactionable.

#### 1. The statements were not false or misleading.

Plaintiffs claim that statements regarding compliance and use of AI were false and misleading because CVS violated Medicare regulations. Opp. 11-12. As noted, Plaintiffs fail to particularly allege any violations, much less material violations. Plaintiffs also suggest that the statements were misleading because the Report characterized using AI to fix length of stay as a "wrong," but Plaintiffs have not particularly alleged that CVS used AI to fix length of stay, and the Report contains no such evidence. Opp. 12. Plaintiffs' cases involved circumstances where plaintiffs sufficiently pled violations. *See, e.g.*, *Meyer* v. *Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (company "fail[ed] to disclose then-ongoing and serious pollution violations").

#### 2. The statements are inactionable puffery and opinions.

Contrary to Plaintiffs' assertion, the Second Circuit's decision in *Singh* is directly on point because CVS's statements also "acknowledg[ed] [] the complexity and numerosity of applicable regulations." Opp. 27; *see* DX6, 51 ("The laws and regulations governing … Medicare Advantage … are complex"); Br. 22. The statements are also indistinguishable from the "generic assertions" in *Singh*, versus detailed descriptions of compliance measures that might support a claim. *Compare* ¶209 (referencing "programs designed to comply with laws" including unspecified "risk assessment[s]"), with *Singh* v. *Cigna Corp.*, 918 F.3d 57, 63-64 (2d Cir. 2019) (referencing "'pollution abatement equipment'" and "'environmental teams'" at each facility "'to monitor waste treatment'" "'on duty 24 hours'").[6]

---

[6] Plaintiffs claim the statements in ¶209 were in an ESG Report, Opp. 11 n.3, but we cannot locate this language in that report. The statements appear to be from CVS's Code of Conduct. CVS Code of Conduct, https://www.cvshealth.com/content/dam/enterprise/cvs-enterprise/pdfs/cvs-health-code-of-conduct.pdf (March 2025) (visited Aug. 25, 2025). It is "well

Plaintiffs claim that investors were "particularly attuned" to compliance-related statements because the Medicare Advantage business "depended on its compliance with CMS regulations." Opp. 26. But if a conclusory asserted concern about Medicare compliance was sufficient, then any compliance-related statements about any heavily-regulated business would be material, contravening *Singh*'s analysis. That case held that general statements about Medicare compliance were inactionable even when that business was the "largest source of revenue" and CMS identified violations. *Singh*, 918 F.3d at 60-61. And Plaintiffs provide no support for the argument that high-level, non-specific statements about "responsible" use of AI were not puffery due to the PSI inquiry, which focused on post-acute care and did not find any wrongdoing. Plaintiffs' authorities involved more specific statements and/or were pre-*Singh*. *See, e.g.*, *Karimi* v. *Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 386 (S.D.N.Y. 2022) (statements about specific AML compliance measures "systematically undermined by the Bank's executives").

Finally, Plaintiffs fail to refute that the statements are inactionable opinions. None guaranteed "certain" compliance, and Plaintiffs do not claim any factual statements (*e.g.*, that CVS "invested significant resources" in compliance) were false. Plaintiffs also fail to explain how the PSI inquiry rendered any statements actionable when it did not find CVS violated any regulations, and Plaintiffs fail to allege such violations. It is well-settled that "a government investigation, without more, does not trigger a generalized duty to disclose," *In re Lions Gate Entertainment Corp. Securities Litigation*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016), and "the federal securities laws do not require a company to accuse itself of wrongdoing" or "'characterize its behavior in a pejorative manner,'" *In re Citigroup, Inc. Securities Litigation*, 330 F. Supp. 2d 367, 377

---

established" that such codes are "'inherently aspirational.'" *Banco Bradesco*, 277 F. Supp. 3d at 658.

(S.D.N.Y. 2004)—which applies equally to refute the allegations for each category of challenged statements. The PSI inquiry was also public knowledge, and did not begin until after many challenged statements. ¶¶125-27 (inquiry announced May 2023).

### C.  The statements regarding sources of success for the Health Care Benefits segment are inactionable.

#### 1.  The statements were not false or misleading.

Plaintiffs fail to explain how statements about HCB's performance were misleading, when Plaintiffs fail to particularly allege any Medicare violations, that the alleged undisclosed practices were otherwise "unsustainable," "risky," or "artificially" deflated MBR, or that the practices had any material impact, including on metrics referenced in the statements. Section I.A.[7]

Plaintiffs also fail to show a sufficient connection between the statements and alleged omissions. The statements in *Estée Lauder* related to the specific business and geographic area where the alleged misconduct occurred. 2025 WL 965686, at *3. The challenged statements concerned the entire HCB segment—which also included commercial insurance and Medicaid— and never referenced post-acute care (one of numerous services within Medicare Advantage). Plaintiffs' cases show that such generalized statements are inactionable. *Id.* at *4 (reference to "'growth from Asia/Pacific'" "'far too generic to be actionable'" because "[m]erely reporting sales and noting growth in one part of the globe isn't enough to put the alleged gray-market reliance 'in play'"); *see also* Br. 25.

---

[7] As noted, *Estée Lauder* is distinguishable because it involved "grey" market sales of "questionable legality," and *In re Virtus Investment Partners, Inc. Securities Litigation* is not comparable because it involved statements about a fund's sales that allegedly referred to other false statements. 195 F. Supp. 3d 528, 536-37 (S.D.N.Y. 2016).

**2.     The statements are inactionable opinions and puffery.**

Plaintiffs claim that, even if opinions, Defendants were aware of "'facts that seriously undermined the[ir] accuracy.'" Opp. 29. But Plaintiffs do not particularly allege any misconduct or other basis that could undermine the statements' accuracy, or that Defendants were aware of any misconduct. Br. 25-26; Sections I.A, II.B.

The statements are also puffery. Unlike Plaintiffs' cases, the statements did not relate to "business practices" that were "touted as sources of [] success," *In re Investment Technology Group, Inc. Securities Litigation*, 251 F. Supp. 3d 596, 611 (S.D.N.Y. 2017), were not "designed to distinguish [CVS] from competitors," *In re Hain Celestial Group Inc. Securities Litigation*, 2022 WL 18859055, at *18 (E.D.N.Y. 2022), and were not repeated "over and over and over," *In re BHP Billiton Ltd. Securities Litigation*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017).

**D.     The statements regarding HCB guidance are inactionable.**

**1.     The statements were not false or misleading.**

Plaintiffs argue that statements regarding HCB guidance were "outright false" because guidance did not account for "secret deployment" of AI to "artificially depress" utilization. Opp. 13. As noted, Plaintiffs fail to particularly allege any "artificial[] depress[ion]," that AI had any material impact on utilization or results, or that utilization increased due to CVS allegedly stopping use of the algorithms. Section I.A.

The problem with the FE statements is that they were not alleged to be in a position to know particularized facts about how guidance was developed or what it was based on. Br. 26-28; *Novak* v. *Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). It is no answer that the FEs allegedly were aware of increasing utilization—Plaintiffs do not claim that CVS failed to disclose increased utilization (which it repeatedly disclosed, Br. 5-7), but that CVS's guidance inexplicably ignored those increases.

FE-5's assertion that they saw a presentation "'from the CFO's group'" that "'showed they used 2020 numbers for their 2023 guidance,'" ¶146—without identifying author, date, purpose, draft status, or whether other numbers were also used—falls far short of PSLRA requirements. Br. 27-28; *Array*, 2023 WL 3569068, at *15 (allegations CWs "instructed to use 'old and stale' inputs" in forecasts insufficiently particular); *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n* v. *MDC Partners, Inc.*, 2016 WL 5794774, at *16, *21 (S.D.N.Y. 2016) (discounting source that received documents about alleged improper expenses, but "lack[ed] personal knowledge" of expense approval process). None of Plaintiffs' cases involve sources that lacked knowledge of particularized facts supporting the allegations. *See, e.g.*, *Lozada* v. *TaskUs, Inc.*, 710 F. Supp. 3d 283, 323 (S.D.N.Y. 2024) (source personally prepared information provided to defendants).

Moreover, Plaintiffs have no response to the implausibility of their theory that Defendants would repeatedly disclose increasing utilization and cost trends, yet purposefully issue flawed guidance failing to consider those increases.

### 2. The statements are inactionable forward-looking statements and opinions.

Plaintiffs do not contest that guidance was forward-looking, but claim the challenged statements that "all data was 'fully baked in'" were not. Opp. 31-32. That is incorrect. These statements explained the "assumptions underlying or relating to" the guidance, and are thus protected. 15 U.S.C. § 78u-5(i)(1)(D); *City of Warwick Mun. Emps. Pension Fund* v. *Rackspace Hosting, Inc.*, 2019 WL 452051, at *3 (S.D.N.Y. 2019) (applying safe harbor to "assumptions underlying or relating to the full-year 2015 guidance"). Moreover, such "statements which merely endorse or state the speaker's belief in a certain future outlook" are forward-looking. *Gray* v. *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 387 (S.D.N.Y. 2020).

The statements are also inactionable opinions.  Plaintiffs fail to particularly allege that the guidance failed to incorporate recent trends or that Defendants did not believe their opinions.  Br. 31-32; Reply 17.  The statements that trends were "'fully baked in'" and "'nothing that we've seen … gives us pause'" are also subjective assessments, and thus opinions, that are inactionable.  ¶136.

## II.    PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER.

### A.    Plaintiffs fail to allege motive.

Plaintiffs claim that "'inflation of stock price in the acquisition context'" may support motive, Opp. 40, but inferring motive in that circumstance requires a "'unique connection between the fraud and the acquisition.'"  *Dobina* v. *Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 242 (S.D.N.Y. 2012) (quoting *JP Morgan*, 553 F.3d at 201).  Here, there was no stock acquisition, and Plaintiffs do not allege any "unique connection."  *Id*. at 243 (a "unique connection" "demands more than alleging simply that the Company acquired companies" with stock).  And Plaintiffs do not identify any "personal gain."  *Rombach* v. *Chang*, 355 F.3d 164, 177 (2d Cir. 2004).

### B.    Plaintiffs fail to allege conscious misbehavior or recklessness.

Plaintiffs' Opposition does nothing to cure the fundamental flaw with Plaintiffs' scienter allegations—failure to allege particularized facts showing Defendants "knew facts or had access to information" contradicting the challenged statements or "specifically identify[ing] the reports or statements containing this information."  *Novak*, 216 F.3d at 308-09, 311.

Plaintiffs fail to refute Defendants' showing that allegations concerning documents identified in the Report, financial impact, and "core growth" do not support scienter because they do not establish any regulatory violations, any material financial impact, that Defendants were aware of the alleged misconduct, or that post-acute care or Medicare Advantage was so significant

-15-

to invoke the core operations doctrine.[8]    Br. 36-40.    Plaintiffs' other responses are equally deficient.

***FE Accounts***.    Contrary to Plaintiffs' description, the Complaint does not contain any FE statement that CVS deployed Anna to reverse a "spike" in utilization.    Opp. 33.    Plaintiffs also do not explain how the alleged "monthly review" described by FE-2 supports scienter, when Plaintiffs do not allege any Individual Defendants ever attended or received reports from this review.    In *Cornwell* v. *Credit Suisse Group*, there were allegations that defendants "reviewed specific reports" and of reports during the class period.    689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010).    It is implausible that CVS high-level executives would receive information about an alleged PAA algorithm, which related to a single service in Medicare Advantage, and that did not have a material impact on HCB's performance, much less CVS as a whole.

***Regulatory Scrutiny***.    Other than asserting "illegality is irrelevant," Opp. 35, Plaintiffs fail to explain how the PSI inquiry supports scienter, when it did not conclude that CVS engaged in any violations, used AI to fix length of stay, or that AI denied any requests.    The inquiry also was not launched until May 17, 2023, after many challenged statements.    Plaintiffs' cases involved admissions and findings of wrongdoing.    *See, e.g.*, *Karimi*, 607 F. Supp. 3d at 389, 397-98 (plaintiffs alleged "settlements with regulators").

***Forced Denials***.    There are no particularized allegations (or FE statements) that CVS "forced" reviewers to "churn out [] denials" or had a "'target'" denial rate.    Opp. 36.    Plaintiffs also do not allege any facts showing any Individual Defendants were aware of the alleged misconduct.    *See, e.g.*, *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *3

---

[8] The Opposition misleadingly states Medicare was over "50% of CVS's revenue," Opp. 4; the Complaint alleges it was over 50% of HCB's premium revenue.    ¶197.

(S.D.N.Y. 2018) (witnesses reported defendants "could and did access" specific reports and "numbers [] were discussed" at meetings defendants attended) (cited Opp. 36).

*Regulatory Compliance*.  Plaintiffs fail to explain how this factor could support scienter absent any violations.  Even if Medicare compliance was important to the Medicare Advantage business, this does not support an inference that CVS's high-level executives would be aware of a specific prior authorization algorithm allegedly used for one service (post-acute care) that did not have any material financial impact.

*Analyst Questions*.  That Defendants answered analyst questions about overall HCB metrics does not support scienter.  Defendants did not speak about post-acute care or prior authorizations, and Plaintiffs fail to particularly allege any material impact on any metrics.

*Executive Departures*.  Plaintiffs argue that departures were "[s]uspiciously timed" in relation to the Report, Opp. 37-38, but the Report did not find any wrongdoing by CVS.  Mr. Kane's departure was also over two months before the Report.

*Stale Guidance*.  The allegations that it was "'no secret,'" that forecasting was "'overseen by the CFO,'" and references to a report "'from the CFO's group'" fall far short of PSLRA requirements. Br. 34-35; Reply 13-14.  Plaintiffs also inaccurately claim that FE-5 stated that "'the C-Suite and CFO directed'" that "'2020 numbers were used for 2023 guidance,'" Opp. 38; FE-5 only stated that they "'directed' CVS's guidance." ¶146.

## C.    The more compelling inference is that there was no fraud.

Plaintiffs' theory that CVS engaged in a secret illegal "scheme" to reduce utilization by using AI to increase post-acute care denials is an entirely implausible, unsupported explanation for CVS's performance that has been concocted to advance a lawsuit.  The only compelling explanation is that CVS's results were impacted by the economic and industry-wide factors

reported by CVS and other insurers, and that Defendants considered recent utilization increases in developing guidance, but simply underestimated the future impact.

        **D.      Plaintiffs fail to allege corporate scienter.**[9]

Plaintiffs have not particularly alleged any "scheme" or "widespread knowledge" of any scheme. Opp. 40. This is not the "'exceedingly rare'" instance where "'collective corporate scienter may be inferred.'" *In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 215 (D. Conn. 2023) (quoting *Jackson* v. *Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020)).

## III.    PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION.

While it remains undecided in the Second Circuit, other circuits have held that Rule 9 applies to loss causation. *Oregon Public Emps. Ret. Fund* v. *Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014); *Katyle* v. *Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011); *Abramson* v. *Newlink Genetics Corp.*, 965 F.3d 165, 179 n.65 (2d Cir. 2020) (declining to decide). Regardless, Plaintiffs' allegations fail under any standard.

As noted, Plaintiffs fail to allege that utilization pressures disclosed on May 1, 2024 were caused by discontinuance of a "scheme" or "regulatory scrutiny." Br. 18-19; Reply 6. Plaintiffs also fail to explain how the Report was a corrective disclosure when it did not conclude that CVS engaged in wrongdoing. The only cited "outrage" is two statements by healthcare and aging service provider groups; there are no "market participants." Opp. 42; ¶¶157-58.

## IV.    PLAINTIFFS' SCHEME LIABILITY CLAIMS FAIL.

Plaintiffs fail to explain how compliant prior authorization practices could be acts supporting scheme liability, or that the Individual Defendants engaged in such acts. 17 C.F.R.

---

[9] Plaintiffs' control-person claims fail for reasons noted. Br. 44.

§ 240.10b-5(a), (c).  Plaintiffs are impermissibly trying to repackage misstatements as "scheme liability."  Br. 43-44.

**CONCLUSION**

The Complaint should be dismissed with prejudice; amendment is futile and Plaintiffs fail to indicate "what [they] might add."  *Shemian* v. *Rsch. In Motion Ltd.*, 570 F. App'x 32, 37 (2d Cir. 2014).

Dated:  August 25, 2025                              Respectfully submitted,

                                         **WACHTELL, LIPTON, ROSEN & KATZ**

                                         */s/ William Savitt*
William Savitt
Lauren M. Kofke
Emma S. Stein
51 West 52nd Street
New York, New York  10019
Tel.:  (212) 403-1000
Fax:  (212) 403-2000
wdsavitt@wlrk.com
lmkofke@wlrk.com
esstein@wlrk.com

*Counsel for Defendants CVS Health Corporation, Karen S. Lynch, Shawn M. Guertin, Brian A. Kane, and Thomas F. Cowhey*

-19-

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule II(B)(2) of District Judge Margaret M. Garnett's Individual Rules & Practices and Local Civil Rule 7.1(c) of the United States District Court for the Southern District of New York, relying on the word count of the word-processing program used to prepare the foregoing Memorandum of Law, dated August 25, 2025, I hereby certify that the Memorandum of Law contains 5,397 words (excluding the caption, table of contents, table of authorities, signature blocks, and certifications), and thus does not exceed the Court's Order (ECF No. 51) granting Defendants' request for extensions of the word-count limitations (ECF No. 49).

/s/ *William Savitt*
William Savitt

-20-

## CERTIFICATE OF SERVICE

I hereby certify that, on August 25, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will give notice of such filing to all counsel of record.

/s/ *William Savitt*
William Savitt