USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/27/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOUISIANA SHERIFFS' PENSION AND RELIEF FUND, et al.,

Plaintiffs,

-against-

CVS HEALTH CORPORATION, KAREN S. LYNCH, SHAWN M. GUERTIN, BRIAN A. KANE, and THOMAS F. COWHEY,

Defendants.

24-CV-05303 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

This is an action under the Private Securities Litigation Reform Act ("PSLRA"). Plaintiffs are a putative class of purchasers of CVS common stock from November 2, 2022, to October 17, 2024. Defendants are CVS Health Corporation ("CVS"), CVS' former CEO Karen S. Lynch, CVS' former CFO Shawn M. Guertin, its current CFO Thomas F. Cowhey, and former Executive Vice President and President of Aetna Brian A. Kane. Plaintiffs bring claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Before the Court is Defendants' motion to dismiss for failure to state a claim. For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND[1]

### A. Regulatory Background

Medicare is a federal program that insures people over age sixty-five. The Center for Medicare and Medicaid Services ("CMS") administers Medicare benefits and contracts with private companies to provide certain Medicare benefits via a program called Medicare Advantage. Dkt. No. 43 ("Compl.") ¶ 43. These companies receive a fixed payment per Medicare Advantage enrollee under a "capitated payment model," regardless of the companies' actual costs to provide services. *Id.* ¶¶ 41, 43. The profitability of a capitated payment model depends in large part on the extent to which an enrollee seeks out and receives medical services, called "utilization"; and the cost of those services. A key metric to assess profits is the medical benefits ratio, or "MBR," which is the cost of insurance benefits paid out divided by the premiums paid for enrollees. *Id.* ¶ 56..[2] A lower MBR correlates with higher profits for the Medicare Advantage provider.

To participate in Medicare Advantage, an insurer must provide the same basic benefits an enrollee would receive under traditional Medicare. *Id.* ¶ 43. A portion of these benefits are for qualifying "post-acute" care, which are medical services that Medicare recipients receive following hospital admission "to safely transition back a more independent lifestyle." *Id.* ¶¶ 7, 48. Consistent with CMS regulations, an insurer may require a patient or provider to obtain "prior authorization" before providing certain acute-care benefits. *Id.* ¶ 68.

[1] The following facts are taken from the complaint or documents relied on therein and assumed true solely for purposes of resolving this motion. The Court refers to the parties' memoranda of law as follows: Dkt. No. 54 ("Mot."); Dkt. No. 57 ("Opp."); and Dkt. No. 58 ("Reply").

[2] "MBR" is also known as medical loss ratio, or "MLR."

**B. CVS and the Health Care Benefits Segment**

CVS "offers a broad range of healthcare services, including primary healthcare, health insurance, prescription drug coverage, and pharmacy services." *Id.* ¶ 36. In late 2018, CVS acquired Aetna, the nation's third-largest health insurance provider. *Id.* Following the acquisition, CVS created a new division called Health Care Benefits ("HCB") that offered Medicare Advantage plans. *Id.* ¶ 37. HCB proved highly lucrative, comprising 33% of CVS' operating income on average. *Id.* Much of this derived from Medicare Advantage. *Id.* ¶ 39. During a February 9, 2022 earnings call, Defendant Lynch noted, "Medicare is our largest growth driver," while, during an August 2, 2023 earnings call, Defendant Guertin highlighted that Medicare Advantage comprised more than half of CVS' premium revenue. *Id.* ¶ 40.

**C. CVS' Strong Performance and the May 1, 2024 Form 8-K**

CVS enjoyed strong revenue and financial performance from roughly 2019 to 2023 with an average low MBR. During a variety of earnings calls and through several SEC filings, Defendants attributed this success to the COVID-19 pandemic depressing utilization, which depressed MBR, and strong underlying performance of the company. For example, on a February 8, 2023 earnings call regarding CVS' Q4 2022 earnings, Defendant Guertin informed analysts that the company had an MBR of 86%, which represented an improvement of 100 basis points year-over-year, and adjusted operating income that had grown 68%. *Id.* ¶ 189. "Both of these measures were driven," he stated, "by the net favorable impact of COVID-19 compared to the prior year and strong underlying performance." *Id.*

This sunny outlook changed on May 1, 2024, however, when CVS issued a Form 8-K revealing financial performance dramatically below market expectations. *Id.* ¶ 149. CVS' MBR peaked at 90.4% in the first quarter of 2024, an increase of 580 basis points from the same period the prior year. *Id.* HCB's adjusted operating income decreased 59.9%, and CVS issued revised

guidance reducing its projected cash flow from operations by $1.5 billion. *Id.* ¶¶ 149–50. CVS disclosed that the shortfalls largely derived from a decline in HCB's revenue. *Id.* ¶ 150. CVS' stock price quickly dropped 16.8%, erasing $14 billion in shareholder value. *Id.* ¶ 154.

**D. CMS Regulations**

In early 2023, the Government subjected Medicare Advantage providers to increasing scrutiny. CMS began investigating compliance with certain of its regulations concerning Medicare Advantage providers. *Id.* ¶ 121. It then issued regulations clarifying and affirming that Medicare Advantage providers needed to provide the same basic benefits as Medicare. *Id.* ¶ 122. These regulations took effect on January 1, 2024. *Id.* ¶ 121.

**E. The Senate Report**

Also in early 2023, the United States Senate's Permanent Subcommittee on Investigations ("PSI") launched an investigation into "barriers facing seniors enrolled in Medicare Advantage in accessing care." *Id.* ¶ 125. PSI issued numerous document requests to the nation's largest Medicare Advantage providers, including CVS. *Id.*

The PSI investigation culminated in an October 17, 2024 report titled: "Refusal of Recovery: How Medicare Advantage Insurers Have Denied Patients Access to Psot-Acute Care" (the "Report"). *Id.* ¶¶ 65, 156; *see also* Dkt. No. 55-19 ("Senate Report"). The Report concluded that CVS recognized it could generate massive cost savings by subjecting post-acute care requests to prior authorization, providing CVS an avenue to deny coverage for some post-acute care. *Id.* ¶ 156. Per the Report, between 2019 and 2022, "the number of post-acute care service requests CVS subjected to prior authorization increased by 57.5 percent." Senate Report at 29. Internal documents that PSI obtained from CVS estimated that CVS' denials of prior authorization requests on Medicare Advantage claims generated $1.1 billion in medical cost savings for CVS. *Id.* at 32–33.

The Report also concluded that CVS deployed artificial intelligence ("AI") as part of this cost saving strategy. *Id.* at 37–39. The majority of AI's contribution to cost saving was by reducing administrative costs. For example, while AI tools could not deny prior authorization requests on their own, they could review and auto-approve claims, eliminating the need for human reviewers to examine all prior authorization requests. *Id.* at 34–35. The increased use of AI also let CVS reduce its clinical review staff because automation reduced the pool of requests that needed human review, *i.e.*, those that might be denied. Additionally, AI could ingest data from previous years and recommend procedures that should be subjected to prior authorization based on (i) the cost of the service; and (ii) the likelihood the service was being overutilized or likely to be deniable. *Id.* at 35–37.

The Report also concluded that—while AI primarily reduced administrative costs—CVS had been developing initiatives aimed at using AI to cut medical costs "by reducing what [CVS] spent on services received by beneficiaries." *Id.* at 38. The Report highlighted that CVS partnered with an entity called Post-Acute Analytics or "PAA," "which promised [r]eal time patient monitoring with AI technology and EMR integration optimizing skilled nursing facility utilization, which had Medical Cost Savings as its primary Value Driver." *Id.* By November 2021, CVS projected that this initiative would generate $77.3 million in medical cost savings for CVS over a three-year period. *Id.* at 39.

The Report did not find CVS engaged in any illegal conduct. But it recommended swift action to curb what the PSI deemed "wrongful" actions. *Id.* at 49–50. Public reaction to the Report was negative. Compl. ¶¶ 157–58. Defendant Lynch stepped down as CEO the day PSI published the Report. *Id.* ¶ 159. And CVS' stock price dropped 5% the following day. *Id.* ¶ 160.

### F. Plaintiffs' Theory of the Case

Plaintiffs' overall theory, as articulated in the Complaint, is that CVS illicitly used AI to deny medically necessary claims to maximize its profits, and hid their prior authorization and AI practices from the investing public by attributing CVS' success to external macroeconomic factors such as the COVID-19 pandemic reducing utilization. CVS then quietly sunsetted its AI programs in late 2023 before CMS' new regulations took effect, but it continued to outwardly portray strong financial performance and relied on stale data from 2020 in drafting and publishing its prospective financial guidance for 2024. The scheme unraveled, Plaintiffs allege, with CVS' disastrous 2024 earnings, when CVS could no longer generate cost savings via its improper AI and prior authorization practices.

To support their securities fraud claims, Plaintiffs distill the above narrative into three categories of alleged misstatements or omissions.

#### 1. <u>Statements About Compliance with Medicare Regulations and Commitments to Responsible AI Usage</u>

First, Plaintiffs cite statements in CVS' SEC filings or from the individual Defendants that CVS complied with Medicare regulations or was "committed to responsible AI."[3] *Id.* ¶ 52. Plaintiffs argue these statements were false or misleading because, they allege, CVS improperly used AI to deny prior authorization claims *en masse* with an eye towards cutting costs instead of providing necessary medical care. *See id.* ¶ 82.

[3] For example, CVS' Forms 10-K stated: "The Company has internal control policies and procedures and conducts training and compliance programs for its employees to help prevent, detect and correct prohibited practices." Compl. ¶ 201. Elsewhere, the Forms 10-K stated: "The Company has invested significant resources to comply with Medicare standards." *Id.* ¶ 202. Lynch made statements on December 5, 2023, that Aetna is "committed to responsible AI." *Id.* ¶ 205. And a 2023 Investor Day Presentation slideshow included a slide about "responsible AI." *Id.* ¶ 207.

As evidence that CVS used AI improperly to deny post-acute care claims, Plaintiffs cite a former employee who worked at PAA ("FE-1") and stated that CVS' AI tool "was driven by a 'target' length of stay of 10 to 14 days or fewer—regardless of the medical needs of the patient." *Id.* ¶ 90. Another former employee of PAA ("FE-2") stated that the "secret sauce was trying to reduce costs," and "the goal was to . . . achieve the lowest cost possible to providing services." *Id.* ¶ 91. Plaintiffs also allege that CVS forced medical staff to "rubber stamp" AI recommendations regarding post-acute care claims. *Id.* ¶ 94. They cite another former employee ("FE-3") who explained that CVS leadership wanted utilization management nurses who reviewed claims to "forward at least 50% of their cases to medical directors," who were permitted to deny claims. *Id.* ¶ 95. FE-1 also stated that CVS employed an insufficient number of nurses to properly review AI-generated recommendations. *Id.* ¶ 96. Last, Plaintiffs cite that while CVS denied 13% of all prior authorization requests in 2022, 91% of patient appeals overturned CVS' initial denial. *Id.* ¶ 113. In Plaintiffs' view, these alleged facts render the statements about responsible AI usage and compliance with all Medicare regulations materially false or misleading.

### 2. **<u>Statements that CVS Fully Accounted for Trends in Its Financial Guidance for 2024</u>**

The second category of purportedly false or misleading statements are those about whether CVS' financial guidance for 2024 appropriately incorporated relevant information known to CVS. Defendants Cowhey and Kane at various points in late 2023 and early 2024 publicly expressed their belief that CVS' financial guidance for 2024 accurately captured known utilization trends.[4] *Id.* ¶¶ 222–31. Plaintiffs argue these statements were misleading for two

[4] For example, Defendant Cowhey in a November 1, 2023 earnings call stated the following regarding CVS' 2024 guidance: "out of an abundance of caution [we] are maintaining a provision for further utilization pressure in 2024" and "[w]e further indicated that we had a captured a portion of the

reasons—because the 2024 guidance did not account for or properly disclose CVS' use of AI-driven tools that had artificially inflated CVS' performance but were being phased out in 2023 and early 2024, and because the 2024 guidance was based on "stale data" from 2020 that was not applicable to 2024 and did not account for the COVID-19 pandemic's artificial depression of utilization in 2020. *See id.* ¶¶ 164, 221.

Plaintiffs rely on two former employees for evidence that the 2024 guidance relied on stale data. FE-4 was a Senior Medical Economics analyst in CVS' Aetna division. *Id.* ¶ 137. FE-4 alleged "it was no secret that the modelling at CVS was problematic" and "the Company leadership was aware of these issues." *Id.* ¶ 145. He also opined that the misleading forecasts must have been discussed with CVS' CEO and CFO "based on his experience with CVS executives." *Id.* FE-4 also sought to "escalate these utilization issues, including to CVS's executives," and in fact raised them to the Senior Manager of Medical Economics who then escalated the issues to the Director of Medical Economics. *Id.* ¶ 147.

Next, FE-5 served as the Lead Director of Project Program Management at CVS' Aetna division. *Id.* ¶ 138. FE-5 reported to the Chief Medical Officer, who in turn reported to the Executive Director who was "heavily involved" in forecasting and "connected to the C-suite." *Id.* FE-5 alleged that CVS was issuing guidance in 2023 based on 2020 numbers that did not "account for known utilization drivers." *Id.* ¶ 139. FE-5 stated that the "forecasting was

---

outpatient trend pressure in our bids in 2024, and that the remaining pressure we did not incorporate was reflected in the 2024 guide." Compl. ¶ 222. In that same call, Kane stated with regard to the 2024 guidance: "everything is fully baked in, including the utilization breakage that [Cowhey] discussed, the guide, I believe, fully reflects what's in our pricing, as well as utilization break." *Id.* ¶ 225. During a February 7, 2024 earnings call, Kane stated: "[W]e've fully reflected the 2023 baseline in our 2024 numbers. We put a normalized, very reasonable trend on top of that baseline, and today, we put additional dollars on top of that through the increase in the MBR." *Id.* ¶ 228. Kane continued, "[t]here's nothing that we've seen in our January data that gives us pause relative to the guidance that we've given today." *Id.*

overseen by the CFO" and that "the C-Suite and CFO directed" CVS' public guidance. *Id.* ¶ 146. FE-5 also stated that he saw firsthand an "executive presentations with graphs" provided by the Executive Director of Clinical Services that was "from the CFO's group" and "showed they used 2020 numbers for their 2023 guidance." *Id.* FE-5 also reported up the supervisory chain that CVS' numbers failed to properly account for the effects on utilization of reduced reliance on automation and AI tools. *Id.* ¶ 143.

### 3. <u>Statements About the Source of CVS' Success</u>

The third category of allegedly false and misleading statements related to explanations offered for CVS' financial success. Certain CVS offering materials and statements by Lynch and Guertin cited the COVID-19 pandemic depressing utilization rates and "strong underlying performance" as the primary drivers of CVS' success..[5] *Id.* ¶ 212. Plaintiffs allege these statements were misleading because they did not disclose that a major driver of CVS' performance was its increasing dependence on prior authorization and the use of AI to reduce administrative and medical costs. *Id.* ¶¶ 211–20.

### G. Procedural History

On December 5, 2024, various pension funds were appointed Lead Plaintiffs in the putative class action. Dkt. No. 33. Following this appointment, an Amended Complaint was filed. Dkt. No. 43. Count One alleges all Defendants violated Section 10(b) of the Exchange

[5] For example, during a November 2, 2022 earnings call, Lynch stated that CVS' MBR improved by 230 basis points, "driven by a lower impact from COVID and medical cost trends that remained favorable." Compl. ¶ 212. CVS' November 2, 2022 Form 10-Q stated the improvement was "reflective of the net favorable impact of COVID-19 compared to the prior year and strong underlying performance." *Id.* The Form 10-Q expressed that adjusted operating income increased $624 million "primarily driven by strong underlying performance, the net favorable impact of COVID-19 compared to the prior year and membership growth." *Id.* ¶ 214. Similarly, the February 8, 2023 Form 10-K for 2022 stated: "Adjusted operating income increased $972 million . . . . The increase in adjusted operating income was primarily driven by the net favorable impact of COVID-19 compared to the prior year, strong underlying performance and membership growth." *Id.* ¶ 216.

Act and Rule 10b-5 promulgated thereunder. Compl. ¶¶ 246–54. Count Two alleges the Individual Defendants violated Section 20(a) of the Exchange Act. *Id.* ¶¶ 255–56. Defendants responded by moving to dismiss for failure to state a claim. Dkt. No. 53.

## DISCUSSION

"To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 351–52 (2d Cir. 2022)..[6] Plaintiffs have not pled actionable statements regarding CVS' compliance with Medicare regulations and "responsible" use of AI, or regarding the use of stale data for forward-looking guidance. Plaintiffs have pled actionable misstatements, however, regarding financial forecasts "fully baking in" utilization trends and what factors were the "primary drivers" of CVS' success. Accordingly, Defendants' motion to dismiss is granted in part and denied in part.

## I. LEGAL STANDARD ON A MOTION TO DISMISS

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. The Court must assume all well-pled facts to

[6] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party."). However, the Court need not accept conclusory assertions. *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021).

On a Rule 12(b)(6) motion, a court "may review only a narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). That universe includes "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).

## II. DEFENDANTS' STATEMENTS ABOUT COMPLYING WITH CMS REGULATIONS AND USING AI RESPONSIBLY ARE NOT ACTIONABLE MISSTATEMENTS

Plaintiffs' first theory of fraud is that Defendants misrepresented CVS' compliance with Medicare regulations and falsely stated CVS was using AI responsibly. Plaintiffs contend these statements were false and misleading because CVS in fact used AI to deny claims based on cost instead of medical necessity, which violated CMS' 2023 regulation prohibiting AI that "doesn't account for an individual's circumstances," and CMS' "longstanding requirement that CVS provide the same 'basic benefits' available in Traditional Medicare." Opp. at 12.

As to the statements about CVS' compliance with regulations, "[w]hen a securities fraud claim is premised on the defendant's predicate violations of law or accounting standards, the facts of that underlying violation must be pled with particularity." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021). This particularity requirement necessitates that a plaintiff state "what law or standard the defendant violated and

how the alleged violation occurred." *Id.* Fatal to this theory, Plaintiffs have not shown that Defendants' use of AI was illegal or contrary to applicable Medicare regulations.

The relevant regulations permit a Medicare Advantage insurer to subject claims, including claims for post-acute care, to prior authorization requirements. The regulations also provide insurers with multiple legal bases on which to reject prior authorization requests. Although Plaintiffs contend CVS subjected too many claims to a prior authorization requirement and denied many prior authorization requests, those allegations do not suggest illegality and certainly do not so with the required particularity.

Instead, Plaintiffs raise a variety of piecemeal arguments that CVS' use of AI was contrary to Medicare regulations. Those arguments cannot withstand scrutiny. Plaintiffs contend CVS' AI algorithm had a fourteen-day target for a patient's proposed length of stay in post-acute care, even though many patients required longer periods of care. Compl. ¶ 90. But they do not explain why having a "target stay" in the initial automated review of prior authorizations is unreasonable or illegal, nor substantiate that this target average precluded patients from receiving medically necessary care. Plaintiffs also argue that CVS forced its medical review staff to "rubber-stamp" AI-recommended denials. *Id.* ¶ 94. As evidence, Plaintiffs highlight that leadership wanted claim reviewers to forward 50% of their cases to medical directors, who were permitted to deny prior authorization requests, and allege CVS reduced the number of human reviewers even as the volume of prior authorization requests increased. *Id.* ¶¶ 95–96. But Plaintiffs nowhere allege that the medical directors then proceeded to deny all these requests, nor that medical directors could not grant requests or were pressured to deny requests for medically necessary care. Furthermore, the Report, relied on by Plaintiffs, highlighted that CVS was able to reduce its clinical review staff because AI could quickly review

and auto-approve prior authorization claims, reducing administrative demands on human reviewers. Senate Report at 34–35. Next, Plaintiffs invoke the Report as evidence of CVS' illegal conduct. Compl. ¶¶ 72–80, 156–60. Their reliance on the Report for this allegation is misplaced: it did not find that CVS engaged in any illegal conduct. Last, Plaintiffs point out that 91% of appeals from CVS' prior authorization denials were successful. *Id.* ¶ 113. But this data does not indicate illegal conduct and is at least equally consistent with the notion that patients only appealed when they had strong cases for the medical necessity of their request for post-acute care.

Plaintiffs also broadly argue that statements by Individual Defendants touting CVS's commitment to "responsible" AI were materially misleading. *Id.* ¶¶ 200–10. But the statements Plaintiffs identify are not actionable. Lynch made statements on December 5, 2023, that Aetna is "committed to responsible AI." *Id.* ¶ 205. An Investor Day Presentation slideshow included a slide about "responsible AI." *Id.* ¶ 207. Plaintiffs nowhere identify a commonly or widely-accepted meaning of "responsible" in the context of AI automation tools, or any other metric for "responsible" that could render these statements objectively false or misleading. Rather, such statements are inactionable opinion or puffery because they convey "no meaningful, objective data that an investor would rely upon." *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018); *see also Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019).

## III. PLAINTIFFS HAVE NOT ALLEGED SCIENTER REGARDING THE USE OF STALE DATA TO SUPPORT STATEMENTS THAT THE 2024 GUIDANCE ACCOUNTED FOR UTILIZATION TRENDS

Plaintiffs next allege that Defendants assured investors that CVS' 2024 financial guidance for its HCB segment accurately reflected known utilization and medical cost trends when, in reality, that financial guidance relied on stale data from 2020, which concealed that

utilization had been spiking since its artificially depressed level at the peak of the pandemic in 2020. Compl. ¶¶ 221–31. Defendants levy several arguments in response, including that Plaintiffs have not shown scienter. The Court agrees.

The PSLRA requires a plaintiff to plead scienter, meaning a defendant's "intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). A plaintiff must "allege facts supporting a strong inference with respect to each defendant." *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016). In assessing whether a plaintiff has done so, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324. The complaint survives "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

A plaintiff may satisfy the required scienter pleading standard in one of two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). "Motive and opportunity" requires allegations that a defendant "benefitted in some concrete and personal way from the purported fraud." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Generalized motives "possessed by virtually all corporate insiders," such as "the desire to . . . sustain the appearance of corporate profitability," are insufficient. *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). It is met "when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *ECA*, 553 F.3d at 198. Plaintiffs do not allege motive or direct personal benefit. So the

analysis in this case turns on whether Plaintiffs have alleged strong circumstantial evidence of conscious misbehavior or recklessness.

Pleading conscious misbehavior or recklessness requires allegations of actual intent to defraud or "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015). It further requires allegations of "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309.

Assuming for present purposes that Plaintiffs have adequately pled that the 2024 guidance relied on stale data from 2020, Plaintiffs fail to plead with particularity that either Lynch or Cowhey knew the guidance relied on stale data. Neither FE-4 nor FE-5 had personal interactions with either defendant. *See In re Am. Express Co. Sec. Litig.*, No. 02-CV-05533 (WHP), 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) ("Plaintiffs have also failed to allege any facts showing that the confidential sources . . . had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period."), *aff'd sub nom. Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir. 2010). FE-4's statements that "it was no secret that the modelling at CVS was problematic" and that "Company leadership was aware of these issues," is too vague to support scienter. *See In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (disregarding allegation of a confidential witness that he personally attended meetings where representatives of defendants

were in attendance and discussed relevant reports as "so vague as to be meaningless" because it lacked details about when the meetings occurred, the positions of the representatives, and how extensively the reports were discussed), *aff'd sub nom. W. Virginia Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 F. App'x 717 (2d Cir. 2009). Similarly, FE-4's allegation that "CVS's outdated and misleading forecasts were 'without a doubt' discussed with CVS's CEO and CFO based on his experience with CVS executives" is speculative and conclusory, and ignores that even if the forecasts were discussed with the CEO and CFO, that does not indicate that either executive knew that those forecasts were based on stale data. *See id*. Furthermore, although FE-5 alleges he saw firsthand "an executive presentation with graphs" from "the CFO's group" showing "they used 2020 numbers for their 2023 guidance," there are no corroborating details such as the precise report, who created it, whether it was a draft or final version, or whether or when the CFO actually saw the presentation or the relevant graphs. *See id.*; *see also Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 517 (S.D.N.Y. 2007) ("[P]laintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officer reviewed them."), *aff'd sub nom. Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71 (2d Cir. 2008). Furthermore, Cowhey did not become the CFO of CVS until October 2023, and previously served as the CFO of Aetna's Institution Business portfolio. Compl. ¶ 32. Although FE-5 alleges the graph came from "the CFO's group," there is no allegation or even clear circumstantial indication that Cowhey was CVS' CFO at the time. As Plaintiffs have not adequately alleged Lynch or Cowhey had actual knowledge or recklessly disregarded that the data was stale, they have not shown scienter on this theory.

## IV. DEFENDANTS' OMISSIONS ABOUT ITS USE OF AI TOOLS ARE ACTIONABLE HALF-TRUTHS

Plaintiffs assert that Defendants misrepresented the effect of CVS' use of AI tools in two ways. First, the statements that the 2024 guidance "fully baked in" all known utilization trends failed to disclose that CVS' use of AI tools to deny prior authorization claims had artificially inflated performance and that CVS was phasing out those tools. *See, e.g.*, Compl. ¶¶ 221–30. Second, the statements that CVS' past financial performance and improved MBR was a result of the COVID pandemic depressing Medicare patients' use of medical services and strong underlying performance concealed that CVS had secretly deployed AI tools to artificially deflate utilization rates through denials of prior authorization requests. *See, e.g.*, *id.* ¶¶ 211–16 (citing November 2, 2022 statement by Defendant Lynch that CVS' "medical benefit ratio of 83.5% improved by 230 basis points versus the prior year driven by a lower impact from COVID and medical cost trends that remained favorable," and CVS' 2022 and 2023 SEC filings highlighting increases in operating income and explaining that the increase "was primarily driven by the net favorable impact of COVID-19 compared to the prior year, strong underlying performance and membership growth"). These are actionable statements because, assuming the truth of the Complaint's allegations, Defendants omitted material information—namely, their prior authorization and AI practices as significant or primary drivers of cost savings, and the predictable effect that ending or curtailing those practices would have on CVS' utilization rates, MBR, and overall financial performance. These disclosure failures rendered the statements that were made materially misleading.

Rule 10b-5 "requires disclosure of information necessary to ensure that statements already made are clear and complete. . . . [T]he Rule requires identifying affirmative assertions (*i.e.*, 'statements made') before determining if other facts are needed to make those statements

'not misleading.'" *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024). "An omission of information not affirmatively required to be disclosed is . . . actionable only when the disclosure of such information is necessary to make the statements made, in the light of the circumstances under which they were made, not misleading." *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 150 (S.D.N.Y. 2023).

As alleged, CVS' use of prior authorizations requirements and AI programs to automate claims reviews yielded a whopping $1.1 billion in cost savings—significant even in the context of a large company like CVS. Nevertheless, in numerous filings and public comments, Defendants identified specific factors as the primary drivers of its success. *See, e.g.*, Compl. ¶¶ 212–17. Once a company "puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400–01 (S.D.N.Y. 2005). Similarly, Defendants stated that their 2024 forecasts fully accounted for utilization and other relevant trends within the company, while failing to disclose that past performance had been significantly driven by the use of AI tools to review prior authorization requests, that those tools were being phased out, and that the 2024 forecasts did not account for the effects of that known change. At the motion to dismiss stage, Plaintiffs' allegations properly plead actionable half-truths, based on omissions of material information about CVS' past use of AI tools for prior authorization review, the financial impact of those tools, and the phasing out of their use.

Defendants levy several arguments challenging this conclusion. First, they argue Plaintiffs have failed to properly allege that CVS' use of AI was illegal. Mot. at 2–3. This argument fails as Plaintiffs need not allege illegality to succeed on this material omissions

theory. *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137 (2d Cir. 2021). Although the Complaint does repeatedly describe CVS' use of AI as "illicit" or "illegal," Plaintiffs' fraud theory is that, in both backward-looking and forward-looking statements, Defendants identified drivers of the company's performance that conspicuously failed to note the role AI algorithmic tools played in those outcomes. *See, e.g.*, Compl. ¶ 211 ("Because Defendants listed specific factors that led to the changes in the core metrics, they were obligated to tell the whole truth with respect to the cause of the changes."); *id.* ¶ 224 ("Defendant Cowhey omitted that the guidance [regarding forecasts including all relevant information] did not account for the impact of using illicit algorithms to artificially depress utilization by improperly denying prior authorizations and the impact of phasing them out."). It does not matter, and the Court has not considered in assessing the materiality of these alleged omissions to the statements actually made, whether the AI tools were legal. "The success of such a complaint in alleging a violation of clause (b) does not depend on whether the [challenged] practices themselves were fraudulent or otherwise illegal." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th at 137 (vacating lower court decision that dismissed action because defendants' omitted practice was not illegal).

Defendants also contend that Plaintiffs do not challenge the accuracy of Defendants' metrics. Mot. at 24. Whether Defendants are correct is of no moment. Plaintiffs' theory is not that Defendants misrepresented the *amount* of their success, but the *reasons* for that success, and the effect that eliminating one of those undisclosed reasons would have on future performance. *See In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016).

Next, Defendants argue that CVS' use of AI was not sufficiently connected to the statements to render them misleading. Mot. at 25. Defendants primarily rely on *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572 (S.D.NY. 2012). There, a

company attributed its success to high enrollment but did not disclose that its employees used "hyper-aggressive sales tactics" or had a "quota system." *Id.* at 579. The court in *ITT* reasoned "these statements are not misleading because they do not suggest that the undisclosed improper activity alleged by Plaintiff was not occurring." *Id.* The same simply is not true in this matter. Defendants' statements enumerated what a reasonable investor would assume were all the primary drivers of CVS' success, suggesting there were no other primary drivers. As alleged and corroborated by the Report, however, CVS reaped massive cost savings during the class period from its prior authorization practices and related use of AI. *See* Senate Report at 29–39. Similarly, the forward-looking statements that CVS' forecasts had accounted for all known utilization trends cannot be squared with what the Complaint alleges was the known significant effect on utilization of the use of AI tools and the knowledge that those tools were being phased out.

### 1. The Complaint Sufficiently Alleges Lynch, Cowhey, and Guertin's Scienter

The Complaint also adequately alleges strong circumstantial evidence of conscious misbehavior or recklessness by Lynch, Cowhey, and Guertin as to the relevant statements. *Stratte-McClure*, 776 F.3d at 106. Plaintiffs cite specific information available to Lynch, Guertin, and Cowhey (who was CFO of Aetna's division with financial responsibility for Medicare-related programs before becoming CFO of CVS in October 2023) showing the massive cost savings that prior authorization and AI were creating for CVS. *See, e.g.*, Compl. ¶¶ 168, 176 (describing the hundreds of thousands of internal confidential documents CVS produced to PSI during its investigation on AI usage and prior authorization). Lynch and Guertin made numerous public comments describing the profitability of the HCB segment. For example, Lynch publicly noted in a 2022 earnings call that Medicare was CVS' largest growth driver. *Id.*

¶ 40. Guertin also reported in 2022 that over 50% of CVS' premium revenue came from Medicare Advantage. *Id.* Guertin and Cowhey likewise made numerous forward-looking comments about the degree to which their forecasts specifically accounted for MBR, utilization, and regulatory trends. *Id.* ¶ 62. Guertin and Lynch signed the 2023 10-K, and Lynch and Cowhey signed the 2024 10-K. *Id.* ¶ 201. As alleged, and corroborated by the Report, prior authorization requirements and AI-driven automation were huge contributors to HCB's success, generating $1.1 billion in cost savings. *Id.* ¶ 174. Lynch, Guertin, and Cowhey's familiarity with HCB's operations and profitability provides a strong indication they knew how those profits were being generated. Additionally, Lynch made specific comments about her knowledge of the use of AI and prior authorization, stating in a May 4, 2021 earnings call: "We are also using AI and other technologies to simplify our prior authorization processes." Compl. ¶ 86; *see Speakes v. Taro Pharm. Indus., Ltd.*, No. 16-CV-08318 (ALC), 2018 WL 4572987, at *9 (S.D.N.Y. Sept. 24, 2018) (determining plaintiffs had properly alleged scienter regarding a price-fixing scheme, because, *inter alia*, defendants had spoken about pricing issues on earnings calls). Thousands of internal documents from CVS also showed upper management recognized the profits they could reap from implementing prior authorization. *See* Senate Report at 29–33. Conspicuously, while Lynch and Guertin made several comments describing the primary drivers of CVS' success, they omitted mention in those comments of one of the major initiatives for CVS' largest growth driver. The reasonable inference is that Defendants understandably would be hesitant to admit they were reaping massive cost savings by subjecting senior Americans with post-acute care needs to onerous prior authorization requirements and cutting costs through automation, and similarly would prefer not to highlight that ending those practices would reveal how much the company had profited from them. *See Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 215

(2d Cir. 2020) (determining complaint plausibly alleged scienter because there was a plausible inference defendants did not disclose weakness of entity central to its business and "[Defendant] had to know that revealing the full extent of [the entity's] performance problems would have been troubling news to its investors"); *see also In re Estee Lauder Co., Inc. Sec. Litig.*, No. 23-CV-10669 (AS), 2025 WL 965686, at *9 (S.D.N.Y. Mar. 31, 2025). Indeed, Lynch resigned as CEO almost immediately after the PSI published its Report revealing these practices, and CVS's stock soon dropped by over 5%. Compl. ¶¶ 159–60.

### 2. Lynch, Guertin, and Cowhey's Intent Can Be Imputed to the Corporation

To plead corporate scienter, a plaintiff must allege "facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015). "Courts in this district generally conclude that the scienter of 'management level' employees can be attributed to the corporation." *Speakes*, 2018 WL 4572987, at *9. Defendants only argue that Plaintiffs have not alleged corporate scienter because they have failed to show any individual defendant had the requisite scienter. Mot. at 42. This argument fails given Lynch, Guertin, and Cowhey had the requisite scienter, at least as to the AI-related omissions.

### 3. Plaintiffs Have Pled Loss Causation

Defendants next argue Plaintiffs have not shown loss causation. Plaintiffs claim "the relevant truth regarding Defendants' prior misrepresentations and omissions of material fact were disclosed to the market on May 1, 2024 [when CVS issued its Q1 2024 financials] and October 17, 2024 [when PSI published the Report]," causing CVS' stock price to fall. Compl. ¶

233. "To plead loss causation, plaintiffs must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). "Plaintiffs' burden is not a heavy one. The complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin.*, 797 F.3d at 187. "[I]f the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016). Plaintiffs in the Second Circuit may plead loss causation by alleging "either that (i) a corrective disclosure informed the market of the fraud, and the market reacted negatively; or (ii) the risk concealed from investors materialized and caused a foreseeable loss." *In re Francesca's Holdings Corp. Sec. Litig.*, No. 13-CV-06882 (RJS), 2015 WL 1600464, at *18 (S.D.N.Y. Mar. 31, 2015).

At the motion to dismiss stage, Plaintiffs have adequately alleged loss causation under a "risk concealed materialized" theory for the May 2024 financials, and under a corrective disclosure theory as it concerns the Report, which revealed that a substantial portion of CVS' past revenue stemmed from its prior authorization and AI practices. Both disclosures precipitated a significant drop in the value of CVS' stock price.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss, Dkt. No. 53, is GRANTED IN PART and DENIED IN PART.

Dated: August 27, 2026
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge